ORIGINAL



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

SEP 16 2014

RECEIVED

# UNITED STATES COURT OF APPEALS
# DISTRICT OF COLUMBIA CIRCUIT

333 Constitution Avenue, NW
Washington, DC 20001-2866
Phone: 202-216-7000    Facsimile: 202-219-8530

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    SEP 16 2014

CLERK

CNN America, Inc.,

            Petitioner,

      v.

National Labor Relations Board,

            Respondent.

Case Number: __14-1180__

## PETITION FOR REVIEW OF A DECISION AND ORDER
## OF THE NATIONAL LABOR RELATIONS BOARD

Notice is hereby given this the sixteenth day of September, 2014 that petitioner CNN

America, Inc., hereby petitions the United States Court of Appeals for the District of Columbia

Circuit for review of the decision and order that the respondent National Labor Relations Board

entered the fifteenth day of September, 2014 in cases 5–CA–31828 and 5–CA–33125 (formerly

2–CA–36129), and found at 361 NLRB No. 47.  A copy of the decision and order is attached to

this petition.  This petition is proper under 29 U.S.C. § 160(f) and Rule 15 of the Federal Rules

of Appellate Procedure.

Attorney for Petitioner, CNN America, Inc.:

/s/ Zachary D. Fasman
PROSKAUER ROSE LLP
Zachary D. Fasman, Esq.
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000
D.C. Circuit No.: 930446

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

SEP 16 2014

RECEIVED

USCA Case #14-1180      Document #1512585      Filed: 09/16/2014

UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

FILED

SEP 16 2014

CLERK

ORIGINAL

**14-1180**

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

CNN America, Inc. and Team Video Services, LLC *and* National Association of Broadcast Employees and Technicians, Communications Workers of America, Local 31, AFL–CIO

CNN America, Inc. and Team Video Services, LLC *and* National Association of Broadcast Employees and Technicians, Communications Workers of America, Local 11, AFL–CIO. Cases 05–CA–031828 and 05–CA–033125

September 15, 2014

DECISION AND ORDER

By Chairman Pearce and Members Miscimarra and Hirozawa

This case concerns CNN's unlawful replacement of a unionized subcontractor, TVS, with an in-house nonunion work force at its Washington, DC, and New York City bureaus. The judge found that CNN and TVS were joint employers, and that CNN violated the Act by (1) terminating the subcontracts with TVS out of antiunion animus and thereby causing the discharge of TVS employees; (2) failing to bargain with the Union about the decision to terminate the subcontracts and the effects of that decision; (3) making coercive statements; (4) implementing a hiring plan designed to limit the number of discharged TVS employees it hired to staff its in-house operations in order to avoid a successorship bargaining obligation; and (5) as a successor, failing to recognize and bargain with the Union and unilaterally changing employees' terms and conditions of employment.

We agree with the judge, essentially for the reasons he states, that CNN committed each of those violations.[1]

Because of the voluminous record and the length of the judge's decision, we summarize his findings and indicate where our analysis differs.[2]

I. BACKGROUND; JOINT-EMPLOYER STATUS

A. Facts

In 1980, Turner Communications created CNN as a 24-hour cable television news channel. Headquartered in Atlanta, Georgia, CNN is in the business of newsgathering, producing, and broadcasting. At the time of the hearing in this case, it maintained a network of bureaus and over 900 national and international affiliates.

CNN opened its Washington, DC news bureau in 1980. It opened its New York City (NYC) news bureau in 1985. From the start, CNN made the decision that the operation of the electronic equipment at those bureaus would be performed by outside contractors. Between 1980 and 2002, it awarded exclusive technical support service contracts, known as Electronic News Gathering Service Agreements (ENGAs), to a series of companies.

The first company to operate the equipment at the DC bureau was Mobile Video Services. In 1982, following an election, the Board certified National Association of Broadcast Employees and Technicians, Communications Workers of America, AFL–CIO, Local 31 as the collective-bargaining representative of Mobile Video's employees performing CNN work. In 1985, after the NYC bureau opened and following an election, the Board certified National Association of Broadcast Employees and Technicians, Communications Workers of America, AFL–CIO, Local 11 as the collective-bargaining representative of the NYC employees.[3] Each of the four subsequent contractors hired nearly all of its predecessor's employees and continued to recognize the Union. At all relevant times, DC and NYC were CNN's only bureaus where the technical staff was represented by a union.

In 1997, CNN DC Bureau Chief Bill Headline and Deputy Chief Peggy Soucy visited Asgard Entertainment Group, Inc. (Asgard), a DC-based television film production enterprise, and invited it to bid for the DC operations contract. Asgard won the bid and created Team Video Services (TVS) for the sole purpose of servicing the ENGA. In early 2001, again after a visit and at the invi-

---

[1] On November 19, 2008, Administrative Law Judge Arthur J. Amchan issued the attached decision. CNN filed exceptions, a supporting brief, an answering brief, and a reply brief. The General Counsel and the Union filed separate cross-exceptions, supporting briefs, and answering briefs. The General Counsel also filed a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the judge's decision and record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings, and conclusions consistent with our explanations below, and to adopt the recommended Order and notice as modified and set forth in full below.

The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d

Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[2] We affirm the judge's evidentiary rulings and deny all of CNN's due process contentions. In particular, we reject CNN's argument that it was disadvantaged by the judge permitting the General Counsel to amend the complaint at the close of his case, and we reject CNN's argument that CNN was harmed by the Regional Director's letters to employees advising them of the proceedings and their rights.

[3] CNN was not named in the election petition in either the DC or NYC bureau.

2          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

tation of CNN's top NYC management personnel, Asgard bid for and won the ENGA contract for the NYC operations. Asgard created Team Video Services of New York (TVS NYC; TVS and TVS NYC are hereafter jointly referred to as TVS) to service that ENGA. TVS hired about 95 percent of the technicians who worked for its predecessor in Washington. It hired about 90 percent of the technicians who had worked for its predecessor in New York.

The ENGA between CNN and TVS covering the DC bureau was effective from September 18, 1997, through October 31, 2001, and the parties renewed it twice thereafter, through December 5, 2003. The ENGA between CNN and TVS covering the NYC bureau was effective from March 2002 to January 16, 2004. In most respects, the DC and NYC ENGAs contained similar provisions.[4] In general, they required TVS to provide to CNN video and audio technicians, managers for the technicians, and other individuals required for newsgathering and production, in a manner specified in detail in the ENGAs. CNN in turn was required to advance or reimburse TVS its labor costs for technicians, including wages, benefits, workers' compensation and other insurance premiums, and payroll taxes, in addition to paying a monthly management fee and advancing or reimbursing vehicle expenses, all subject to detailed specifications and conditions.[5] The provisions of the ENGAs most relevant to the issues before us are summarized as follows:

- TVS would supply full-time technicians available for at least 40 hours per week, and make part-time technicians available for fewer hours, on a 24-hour per day, 7 days per week basis, as needed by CNN; the services provided would be a top priority and would be performed by the technicians prior to performing any work for any other client or customer or for TVS' parent or member entities, notwithstanding any other agreements, contracts or commitments to the contrary.
- CNN would have the right to require changes in TVS staffing levels and to negotiate with TVS to adjust the number of technicians and associated fees.
- TVS would, at all times, cooperate fully with CNN management in providing such services.

- TVS would provide CNN with detailed, itemized monthly statements of all payments and expenditures, and CNN had the right to audit TVS' books and records related to the ENGAs without cause or giving prior notice.
- If CNN paid TVS more money than TVS spent to supply services and CNN believed that the money was not used to maintain the quality of work as determined by CNN, TVS was required to remit to CNN 75 percent of the surplus.
- In addition to the contractual payroll amounts, CNN would deposit into TVS' account an additional 2 percent of payroll wages and taxes per month (the Merit Funds), which TVS could distribute as merit pay to the ENGA employees.
- Upon CNN's approval, CNN would reimburse TVS for all travel costs incurred by the technicians while performing work for CNN.
- CNN would reimburse TVS for overtime, part-time, and meal penalties accrued by the technicians while covering assignments, provided that CNN approved in advance TVS' resort to overtime or part-time use of technicians and approved the rates to be paid to any part-time technicians.[6]
- In the event that technicians' absence, vacation, sick leave or other leave caused TVS to be unable to cover the assignments requested by CNN with full-time technicians working at straight-time rates, TVS would coordinate with CNN to determine whether, and how many, additional technicians would be needed to accomplish assignment coverage.
- CNN would allow TVS to increase its payroll by 4 percent each year, and CNN had the right to review and approve all TVS' payroll transactions.
- CNN would supply all equipment used by TVS technicians to perform their work; such equipment would remain the sole and exclusive property of CNN and would be stored at CNN's facilities; CNN would provide insurance coverage of said equipment.
- TVS would ensure that the technicians received proper training on any new equipment supplied by CNN, and CNN would preapprove and reimburse TVS for the cost of all training.
- CNN would have the sole option to renew the agreements and could terminate the agreements "for any reason or no reason . . . upon giving four weeks' notice."

---

[4] The severance provisions of the two ENGAs were slightly different: the DC ENGA did not obligate TVS to pay severance to technicians who were hired by CNN; the NYC ENGA entitled all technicians to severance pay, regardless of whether they were subsequently hired by CNN.

[5] The details concerning the determination of the amounts to be paid for labor costs, vehicle costs, and management fees appear to have been set forth in appendices to the ENGAs. Those appendices, which were the subject of protracted subpoena litigation, were redacted by the Respondent either in their entirety or to exclude all details concerning payment components or amounts.

[6] With CNN's approval, all part-time technicians that TVS hired as substitutes were deemed "freelancers" and treated as independent contractors. CNN paid a $50-meal penalty to any employee who missed a scheduled mealbreak because of required work.

As detailed below, through the extensive requirements CNN placed on TVS through the ENGAs, its decisive role in TVS' collective-bargaining negotiations and its direct role in the assignment, direction, and supervision of the TVS employees, CNN exerted significant control over the essential terms and conditions of employment of the TVS employees.

### B. Analysis

The Board will find that two separate entities are joint employers of a single work force if the evidence shows that they "share or codetermine those matters governing the essential terms and conditions of employment." *TLI, Inc.,* 271 NLRB 798 (1984), citing *NLRB v. Browning-Ferris Industries of Pennsylvania,* 691 F.2d 1117, 1123–1124 (3d Cir. 1982). In *Laerco Transportation,* 269 NLRB 324, 325 (1984), the Board held that joint-employer status requires a showing that the employer meaningfully affects matters relating to the employment relationship "such as hiring, firing, discipline, supervision and direction." As stated in *Aldworth Co.,* 338 NLRB 137, 139 (2002), enfd. sub nom. *Dunkin' Donuts Mid-Atlantic Distribution Center, Inc. v. NLRB,* 363 F.3d 437 (D.C. Cir. 2004), the "relevant facts involved in this determination [of joint-employer status] extend to nearly every aspect of employees' terms and conditions of employment and must be given weight commensurate with their significance to employees' work life."[7]

We find that three of the *Laerco* factors—hiring, supervision and direction—as well as other factors on which the Board has relied to find a joint-employer relationship, support the judge's finding that CNN and TVS were joint employers. In addition, CNN was properly

___

[7] Accordingly, in addition to the above factors, the Board and courts have considered other factors in determining joint-employer status. See, e.g., *D&F Industries,* 339 NLRB 618, 640 (2003) (no evidence of influence over decisions regarding hiring, discipline, and supervision, but joint-employer status found based on employer's involvement in deciding number of job vacancies to be filled by contractor and the wages to pay them, amount of overtime to be worked, and directing contractor to lay off or terminate certain temporary employees). In *Clinton's Ditch Co-Op Co. v. NLRB,* 778 F.2d 132, 138–139 (2d Cir. 1985), the Second Circuit weighed the following factors in considering whether a joint-employer relationship existed: hiring, firing, discipline, pay, insurance and records, supervision, and involvement in the collective-bargaining process. See also *Aldworth Co.,* 338 NLRB at 139–141 (joint employer finding based on employer's involvement in decisions relating to employment tenure, discipline, assignment of work and equipment, recognition for incentive awards, and daily direction of leasing companies' employees).

The Board in *Airborne Express,* 338 NLB 597, 597 fn. 1 (2002), stated that the test for joint-employer status requires "direct and immediate" control by the putative joint employer over employment matters. The Board cited *TLI* for this proposition, but that case makes no mention that control over employment matters must be direct and immediate.

named as a joint employer here as it "played a direct and key role in [the] events alleged as unfair labor practices," which the judge found and which we adopt. *Aldworth Co.,* 338 NLRB at 140.

*Hiring and work hours:* The ENGA provisions gave CNN considerable authority over these matters and the evidence showed that CNN exercised that authority. Although TVS decided who to hire, CNN barred TVS from hiring any technicians who worked for CNN's competitors. TVS made that restriction known to the Union, when, in its initial discussions with the Union after obtaining the ENGAs, it told Union Counsel Stephen Sturm that it had no outside employment policy, but that it enforced CNN's policy, as set forth in the ENGAs or in CNN's handbook prohibiting TVS employees from working with CNN's competitors.[8]

The ENGAs also gave CNN substantial control over the number of technicians hired by granting CNN "the right to require changes in TVS staffing levels and to negotiate with TVS to adjust the number of technicians" retained. As TVS Chairman Brian Frydenlund explained, all changes made by TVS to the staffing levels at CNN during the term of the ENGAs were at the behest of CNN officials. TVS President Larry D'Anna testified that around the end of 2001, CNN conveyed the need for a reduction in the number of TVS technicians at the DC bureau and TVS complied. The ENGAs also required TVS to obtain CNN's approval to hire additional technicians to cover for those who were absent due to sick or vacation leave. On some occasions, CNN directed TVS to hire nonunit free-lancers for temporary assignments, resulting in a reduction of overtime opportunities for unit employees. When this issue led to a breakdown in negotiations for the 1997–2003 DC contract, CNN Bureau Chief Frank Sesno stepped in and authorized TVS to agree to the Union's proposal limiting such hiring.

CNN also controlled the number of regular, part-time, and overtime hours of unit employees. This control was rooted in the ENGAs' requirement that the full-time employees must work at least 40 hours a week; that part-time employees must be available "for fewer hours, on a 24-hour a day, 7 days a week basis, as needed by CNN;" and that CNN had to approve any overtime. TVS New York General Manager Rick Cohen testified that TVS adhered closely to those approval requirements. For example, CNN directed TVS to substantially reduce the overtime work performed by technician Luis Munoz; when he complained, his TVS supervisor replied that

___

[8] TVS distributed that CNN handbook to the technicians.

4             DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

"CNN was the client and could do whatever it wanted."[9] The Board has found joint-employer status in these circumstances where the employer controls the staffing levels of the subcontractor and the regular and overtime hours of the subcontractor's employees. See *D&F Industries*, supra, 339 NLRB at 640; *Quantum Resources Corp.*, 305 NLRB 759, 760–761 (1991).

*Assignment of work.*[10] CNN wielded substantial control over TVS' assignments of work to employees.[11] At both bureaus, CNN maintained an assignment desk that CNN and TVS assignment personnel shared. In daily discussions attended by both CNN and TVS management personnel, CNN decided the news stories to be covered and the TVS work force required for those stories. CNN assignment managers generated "daily rundowns" of news stories to be covered, and listing the location, date, time, duration, and number of TVS technicians and equipment needed for each assignment. CNN provided copies of the rundowns to the TVS assignment managers who filled in blank lines with the name of the TVS technician to perform the assignment.

TVS required technicians who worked in the field to telephone the TVS assignment desk to report the completion of one assignment and to obtain their next one. On occasion, TVS assignment managers reassigned technicians after CNN assignment managers complained that those technicians had been misassigned to an event. Often, when technicians called the TVS assignment desk, their calls rolled over to the CNN assignment desk; CNN personnel answered and gave them their new assignments.

At CNN's various satellite studios or field locations, where no TVS supervisors were present, CNN producers gave the TVS technicians their daily assignments, start times, directions, breaktimes, and authorized overtime without checking with TVS.[12] When CNN producers' directives differed from assignment information that the technicians received from calling the TVS Audex, the CNN producers' directives prevailed.[13]

CNN's control of assignments and re-assignments came to the fore in emergencies and for breaking news, when its managers often reassigned TVS technicians without checking with TVS. For example, in July 1998, when two Capitol Hill police officers were shot, a CNN producer directed TVS cameraman Gregory Robertson "to grab your camera and go photograph the event." In the initial moments of the 9/11 emergency, the CNN DC assignment desk manager instructed two TVS field technicians to go to New York but then quickly reassigned them to cover the Pentagon incident instead—all without consulting TVS. For the February 2003 Space Shuttle Columbia reentry disaster, CNN producers directly called TVS cameraman Munoz on his day off and ordered him to report to work to cover the story. Breaking news situations might arguably be viewed as exceptional, with the immediacy of getting the news on the air superseding adherence to the rundown or to obtaining TVS' approval before dispatching the technicians. But the TVS technicians sometimes remained on a job for days after the emergency news event without even contacting their TVS supervisors.

CNN's role in the assignment of the studio and control room technicians was less involved than with the field technicians, as TVS on-site managers performed most of this function. Yet, occasionally, the CNN directors of such shows as "Wolf Blitzer Reports" and "Late Edition" called sick TVS studio and control room employees at home and ordered them to report for work.

Against this abundant evidence of CNN's involvement in the assignment of work to TVS technicians, the dissent claims, "the important fact is that CNN managers did not

---

[9] In a May 21, 2002 memo to CNN, TVS noted the parties' agreement at a recent meeting to "alleviate the question" of the policy requiring CNN managers' daily approval of the technicians' overtime usage. Later, when TVS engineer Jeffrey Carlough, at the direction of CNN Engineering Manager Jesse Spilka, performed overtime work on a weekend project, TVS told Carlough it would not pay him for the overtime because it had not authorized him to do that work. But Spilka interceded and TVS paid Carlough.

[10] The Board finds joint employer status where the contractor plays a significant role in assigning work to the subcontractor's employees. *Aldworth Co.*, 338 NLRB at 140, 174.

[11] The dissent makes much of a provision of the ENGAs purporting to give TVS "sole and absolute discretion and responsibility for ... direction of the work force and other matters of personnel and labor relations." The record amply demonstrates as to this and the other relevant factors, however, that CNN actually exercised a great deal of control.

[12] In addition to its DC and NYC bureaus, CNN produced specialized news, plus business, sports, and entertainment programs through other Washington- or New York-based operations, including CNN en Espanol, CNN Financial Network (CNN*fn*), CNN Airport Network, CNN Headlines, and CNN Sports. CNN DC also operated satellite studios at the White House, the Pentagon, the State Department, Capitol Hill, and at The George Washington University (for the filming and broadcast of "Crossfire"). CNN NYC operated satellite studios or control rooms at the 6th Avenue Time-Life Building at Rockefeller Center; at 440 9th Avenue, where it housed Avid-editing suites for CNN*fn*; at the United Nations, NASDAQ, and the NYSE. TVS technicians were routinely assigned to those additional operations and satellite locations.

[13] CNN determined which four TVS technicians would cover former President Clinton's 1998 trip to Africa for almost 2 weeks without seeking the approval of TVS, and CNN Producer Willie Lora, who supervised TVS technician Munoz during his long-term assignment to CNN en Espanol, repeatedly rejected requests from TVS to release Munoz during downtimes so that he could perform TVS assignments.

assign TVS technicians to particular stories. That was left to TVS." We disagree. Given CNN's pervasive involvement in the assignment of work, the claim that CNN did not also assign particular stories to individual technicians does not defeat a joint-employer finding. And, in any event, the claim is belied by the facts. CNN routinely demanded that specific technicians or crews handle most story assignments. According to CNN NYC Deputy Bureau Chief Edith Chapin, several times a week, producers and reporters requested the assignment of specific TVS crews based on prior experience, particular knowledge, professional skills and techniques, or the nature of the assignment. Many of those requests were also based on managers' "comfort" levels working with specific technicians. For example, CNN Producer Craig Brothman "selected" DC cameraman and master controller Jimmy Suissa to cover President Clinton's 1997 and 1998 State of the Union addresses. CNN Producer Charlie Keyes "handpicked" Suissa to work on "Saturday Edition." TVS "accommodated those requests," except when the requested technicians were absent. NYC Shop Steward Brain Kiederling often complained to TVS General Manager Cohen that changes made to the daily assignment sheet to accommodate CNN managers' frequent requests for specific technicians were a "bone of contention" with the bargaining unit. Invariably, Cohen replied that CNN was allowed to make the changes because CNN was "the client." CNN also became involved in the assignment process through its directives to TVS to hire "outside-the-contract" part-time freelancers to cover overflow work.

*Direction and supervision:* As found by the judge, the level of CNN's direction and supervision varied depending on where the technicians worked. The largest category of TVS employees at both bureaus was the field technicians, who received all their direction and supervision from CNN personnel; TVS supervisors and managers did not accompany the TVS field crews.[14] TVS technicians on long-term assignment to CNN*fn*, CNN en Espanol, the White House, and the United Nations also

had no contact with TVS management for the duration of those assignments, and they worked completely under the direction and supervision of CNN personnel.

As described by the judge, the TVS studio and control room technicians were also under the constant direction and supervision of CNN producers and directors, and were required to act in accordance with the instructions received from those individuals. During live news program broadcasts, CNN producers gave directions on where to point a camera or when to show a video footage. TVS managers had no input in those live shows; they were not generally in the studio or control rooms, and when they were they did not direct the technicians' work. The testimony of TVS NYC Operations Manager Jon Silva illuminates this point. He was responsible for 10 to 15 studio employees who worked on the "American Morning" show, and testified that he "had no responsibility during the live broadcast of that show," that he "sat at his desk or in the control room," and that "if problems arose during the show . . . CNN's directors, producers yelled about problems on the show and would report any poorly or excellent performing employee to [him]."[15]

Similarly, as the judge found, CNN's direction of the engineering technicians was also common. In both DC and NYC, CNN's director of engineering and project managers regularly gave job instructions to TVS engineers. For example, in late 1999–2000, CNN DC Engineering Director Tu Vu instructed TVS engineers to assist an outside contractor with the installation of a new digital system at the DC bureau, and he supervised the engineers' work to upgrade the new system's wiring, microphones, and earpieces. Vu also directed TVS engineer Dennis Norman to install a new microwave receiver and camera tracks at the DC bureau, instructed him on how to do the work, inspected the work, expressed disapproval with some parts of the work, and ordered Norman to redo those parts. For live coverage of major news events around the Washington, DC area, such as State of the Union addresses, press conferences at the Pentagon or State Department, rallies on the National Mall, and memorial services at the National Cathedral, Vu routinely visited those locations and directed the TVS engineers in "pulling cables, wiring, and installing equipment," or regarding "engineering hook-up for Big Red," CNN's satellite truck in DC.

Notwithstanding this evidence, the dissent states that the TVS technicians were highly skilled and did not require detailed instructions as to how to perform their job.

---

[14] An illustrative example was TVS DC cameraman Sarah Pacheco's coverage of the October 2003 DC sniper trial in the Virginia Beach area. CNN Producer Laura Bernardi supervised every aspect of Pacheco's assignment: she made Pacheco's travel and accommodation arrangements and accompanied Pacheco on that trip; she told Pacheco when to report to the courtroom, where to station herself during coverage of the trial, what subjects to focus on, and when to take breaks; she even instructed Pacheco where to eat and reminded her about CNN's policy against its employees accepting free food from restaurants while on assignment. That policy was set out in a CNN "Turner Broadcast travel profile," a copy of which TVS provided to each technician. During that assignment, Pacheco's only interaction with TVS was calling the assignment desk to report her time.

[15] CNN sometimes intervened in the discipline of TVS employees and even dictated to TVS the punishment an employee should receive for a rules infraction.

6                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

However, as the Board explained in *Holyoke Visiting Nurses Assn.*, 310 NLRB 684, 685 (1993), enfd. 11 F.3d 302 (1st Cir. 1993), the fact that a subcontractor's employees were professionals and may not have required much instruction as to how to perform their work did not negate the fact that the supervisory instructions and direction that they received came from the putative joint employer.

We find no merit in CNN's argument, echoed in the dissent, that CNN's supervision and direction of TVS' employees was limited and routine, and was simply dictated by the demands of news coverage and the need to control the content of its broadcasts. As discussed above and more fully by the judge, the evidence shows that CNN's control over these matters was extensive and exercised with independent business and operational judgment. As for the latter argument, it is no defense to a joint-employer allegation to claim that the nature of its business is such that it requires the constant presence of its managerial officials to oversee operations. As the judge stated, the "[i]llogic[ ] . . . of [that] argument is that anytime an employer subcontracts the essential tasks of its business and then actively supervises and directs the employees of its subcontractor, it cannot be deemed to be a joint employer." To the contrary, logic would *dictate* a finding of joint-employer status in circumstances where a contractor deems its operations so essential that they cannot be entrusted to the supervisory oversight of its subcontractor's officials. The Board so held in finding a joint employer relationship in *G. Heileman Brewing Co.*, 290 NLRB 991, 999 (1988), stating that the "nature of the work involved, . . . which was closely related and essential to the [c]ompany's normal production operations, effectively precluded [the subcontractor] from playing any meaningful role in the day-to-day supervision and direction of work."

*Compensation:* According to TVS Chairman Frydenlund, TVS "identified and established the salary ranges" of TVS technicians, but CNN "informed" and "advised" TVS on "the market rate salaries" to pay the employees.[16] Moreover, as the sole source of funding for employee compensation, and through the ENGA labor cost provisions and its involvement in the collective-bargaining negotiations between TVS and the Union, CNN both possessed and exercised meaningful control over the wage rates of the TVS employees. The ENGAs

provided for TVS to award employees merit pay and specified that CNN would "allow" TVS to increase by up to 4 percent annually the regular pay of the TVS employees. CNN reserved the right under the ENGAs to audit TVS' payroll expenditures without cause or giving prior notice. During contract negotiations, TVS' two top executives and lead negotiators, Chairman Frydenlund and President D'Anna, repeatedly informed the Union of the ENGAs' constraints on employee compensation. TVS fashioned its wage proposals within the ENGAs' parameters, but on several occasions contract negotiations broke down over the Union's attempts to exceed them. On each occasion, TVS sought "permission" from CNN to agree to the Union's proposals or for "guidance" in formulating its negotiating strategies. After each consultation, TVS changed its bargaining position on the stalemated proposals and agreement on a contract was quickly reached.

For example, during negotiations for the 1997–1998 DC contract TVS President D'Anna informed the Union that TVS "had to speak to our people in Atlanta on the financial impact proposals." The negotiations stalled primarily because the parties were unable to bridge the gap between their respective wage increase proposals— TVS had offered the CNN-allowed 4-percent increase, and the Union had counterproposed a 4.5-percent increase. TVS Chairman Frydenlund called CNN Chief Operating Officer Steve Korn in Atlanta and immediately obtained permission to accept the Union's 4.5-percent counterproposal, thereby enabling the parties to reach a final agreement. TVS' negotiations of successor contracts followed a similar pattern of (a) stalled negotiations on wages and cost-related issues; (b) phone calls, or emails to CNN managers or lawyers for help/guidance/permission to accept or modify proposal; and (c) immediate movement by TVS towards agreement. The Board has found in similar circumstances that the degree of control over employee compensation that CNN possessed and exercised here supports a finding of a joint-employer relationship. *Continental Group, Inc.,* 353 NLRB 348, 356 (2008), affd. 357 NLRB No. 39 (2011) (joint-employer status found where the wages paid by the subcontractor were limited and substantially determined by the [subcontracting] agreement, which were controlling in negotiations with the union); *Aldworth*, supra, 338 NLRB at 173 (contractor's control of wages and benefits established in "cost-plus" agreement with subcontractor); *D&F Industries*, supra, 339 NLRB at 640 (contractor was source of funding for wages paid to subcontractor's employees, and overtime required the approval of contractor).

---

[16] Frydenlund also testified that CNN advised TVS to offer wage rates competitive with FOX News, which had recruited some of TVS' predecessor's "good engineers." The record also shows that CNN managers discussed with TVS its concerns about maintaining or increasing technicians' salaries to prevent them from leaving for competitor MSNBC.

CNN AMERICA, INC.                                                        7

While admitting that the ENGAs "undoubtedly had some indirect influence on the compensation that TVS was willing to give to its technicians," the dissent none-theless downplays CNN's involvement in TVS' wage decisions by asserting that, "*Presumably,* a company in TVS' shoes would want to avoid paying out to its em-ployees more than it could recoup from CNN." (Empha-sis added.) This line of argument completely ignores the admissions of TVS top officials, Chairman Frydenlund and President D'Anna, discussed above, that they could not and, indeed did not, make any wage decision without CNN's consultation and approval. None of the cases cited by the dissent include such admissions.[17]

*Additional factors:*  First, CNN not only solicited TVS to bid on the ENGAs, but it provided TVS managers with an entire floor of office space at each bureau, one floor below the offices of CNN managers. At the DC bureau, TVS' letterhead displayed the TVS logo above the CNN address: "The CNN Building - 820 1st Street NE, Washington, DC 20002." See *Harvey Aluminum, Inc.,* 147 NLRB 1287, 1289 (1964) (putative joint em-ployer owned buildings, tools, and materials used by subcontractor). Accord *NLRB v. Browning-Ferris Indus-tries,* supra, 691 F.2d 1117 (use of putative joint-employer's stationery for recordkeeping purposes); *Tex-as World Service Co. v. NLRB,* 928 F.2d 1426, 1433 (5th Cir. 1991) (stationery imprinted with putative joint em-ployer's address for business transactions). Second, CNN provided TVS' technicians, particularly the engi-neers, with email accounts on the CNN/Turner.com sys-tem. CNN also permitted TVS to establish and maintain TVSDC.TV and TVSNY.TV web-based email systems on the CNN/Turner network. In turn, TVS provided CNN's managers at both bureaus with TVS email ad-dresses, and the CNN managers could review and upload items to the TVS intranet system. Third, CNN supplied virtually all the equipment that the TVS employees used to perform their jobs; pursuant to the ENGAs, it ap-proved and paid for the employees' training to use the equipment. See *Aldworth,* 338 NLRB at 164 (contrac-tor's supplying employees of subcontractor their equip-ment is evidence of joint-employer relationship); *Painting Co.,* 330 NLRB 1000, 1007 (2000), enfd. 298 F.3d 492 (6th Cir. 2002) (same). Fourth, TVS employees per-formed work that was at the core of CNN's business and worked exclusively for CNN; the ENGAs specified that the TVS employees' work for CNN was their "top priori-ty and would be performed . . . prior to performing any work for any other client . . ., [and] notwithstanding any other agreements, contracts or commitments to the con-trary." See *Painting,* supra at 1007, and *G. Heileman Brewing Co. v. NLRB,* 879 F.2d at 1531 (subcontractor's maintenance electricians "worked exclusively at the [contractor's site] and did not work for [subcontractor] at other job sites, . . . facts [which] are indicative of [con-tractor's] control over the maintenance electricians"). Fifth, CNN held out the TVS technicians as its own em-ployees: it obtained security clearances and press passes for the field technicians, and required them to wear CNN ID badges and carry credentials that were identical to those of CNN reporters and producers. The technicians displayed the badges and credentials to gain access to secure locations like the White House, the Capitol, and the United Nations, and to major sporting events, festi-vals, music concerts, and press conferences to perform their jobs. CNN also on occasion identified TVS techni-cians as CNN employees.[18]  The Board has found that holding out evidence like this supports a finding of joint-employer status. *Whitewood Oriental Maintenance Co.,* 292 NLRB 1159, 1162 (1989), citing *Browning Ferris Industries,* 259 NLRB at 150, enfd. 691 F.2d 1117.[19]

In sum, we find from the foregoing facts that CNN ex-ercised significant control over the essential terms and conditions of TVS technicians and we agree with the judge that CNN is a joint employer with TVS of the technicians. CNN's liability as a joint employer is fur-ther supported by the direct role it played in committing the unfair labor practices against the TVS technicians.

---

[17] In *Hychem Constructors, Inc.,* 169 NLRB 274 (1968), cited in the dissent, the Board found that the putative joint employer's authority to approve the nominal employer's wage rates and overtime was insuffi-cient to establish a joint-employer relationship. It can fairly be said that the decision, although not overruled, is out of step with the last 30 years of the Board's joint-employer decisions. In any event, the case is dis-tinguishable. The argument for joint-employer status in *Hychem* was based on those two indicia alone, and the putative joint employer had no "control[] over hiring, job classification, hours, fringe benefits, supervisor, [or any] other matters directing affecting" the nominal employer's employees. Nor did the putative joint employer have "day-to-day control over the regular hours worked by the . . . employees except indirectly through its accounting procedures," and it had no "authority to determine the labor policies" of the nominal employer. As shown above, CNN's involvement in TVS' relationship with its employees was far more robust.

[18] CNN identified TVS White House crewmembers as CNN em-ployees, and reporters and producers introduced TVS field camera and audio operators to others as CNN staffers  An hour-long documentary entitled "CNN Tribute/America Remembers: The Events of September 11 and America's Response," which CNN produced and broadcast on the first and second anniversaries of 9/11, featured TVS field technician Brian Kiederling, whom CNN identified as "Brian Kiederling/CNN Videographer." The documentary was shown on the CNN/Turner network.

[19] The dissent "[p]resum[es]" that these additional factors "have lit-tle, if anything, to do with the TVS technicians' terms and conditions of employment." Again, this is incorrect. We have lumped these factors together in the interest of brevity, not because they lack relevance or importance.

8                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

The dissent asserts that CNN cannot be a joint employer with TVS because the Board's certifications of the Union, at the DC bureau in 1982 and at the NYC bureau in 1985, when employees were employed by predecessors of TVS, as well as the collective-bargaining agreements between the Union and the successive contractors, designated "the contractors as the 'employer,' not CNN." That assertion is incorrect. The Union's certification and the history of collective bargaining at the bureaus is important background information, but of little relevance to the joint-employer issue. Our task is to determine whether the evidence establishes that CNN shared or codetermined matters governing the essential terms and conditions of employment of TVS technicians, and therefore was a joint employer with TVS, not with any of the former contractors. And as the Board explained in *Goodyear Tire & Rubber Co.*, 312 NLRB 674, 676 (1993), the appropriate timeframe for determining "whether employers are to be considered joint . . . is that period surrounding the unfair labor practices." Therefore, whatever the relationship between CNN and prior contractors might have been, it cannot be considered relevant to the relationship between CNN and TVS as it existed during the period leading up to the violations at issue here.[20]

We categorically reject the dissent's related suggestion, that our decision in *Mobile Video Services*, 266 NLRB 1143 (1983), which involved discriminatory discharge findings against the initial technical services contractor (Mobile) at CNN's DC bureau, settled the question of "the contractor-CNN relationship." Neither the unfair labor practice charge nor the complaint in *Mobile* named CNN as party. Nor was it ever alleged during the course of the proceedings that CNN was a joint employer of the contractor's employees. Put simply, CNN's joint-employer status was not alleged, litigated, or decided in *Mobile*, and, therefore, that decision has no bearing on this case.

The dissent accurately describes the record in this case as voluminous, and the trial as lengthy. But we disagree with its contention that the findings made by the judge and adopted herein "necessarily over-simplif[y] an extremely complicated" case by relying on "highly selective" evidence to find joint-employer status and "disregard[ing] overwhelming evidence establishing that TVS acted independently as the employer." The judge adduces a multitude of evidence in support of his joint-employer finding, some of which we repeat here. Equal-

ly, if not more important, the dissent fails to offer even one example of a significant evidentiary omission.

Finally, we are cognizant of decisions such as *Goodyear Tire & Rubber Co.*, 312 NLRB at 678, cited in the dissent, that caution against relying on operational control provisions in cost-plus subcontracting agreements to support joint-employer status. But, as shown, CNN exercised its contractual authority to meaningfully affect the TVS employees' terms and conditions of employment. Consistent with its authority reserved in the ENGAs, CNN was involved in TVS' decisions relating to staffing levels, wages, hours, overtime, and training, among other things. Indeed, CNN was intimately involved in practically every important aspect of the employment relationship between TVS and its employees, and our finding that CNN was a joint employer of those employees is amply supported by precedent.[21] There is nothing close about that finding.

### II. TERMINATION OF THE ENGAS AND REPLACEMENT OF TVS' EMPLOYEES WITH A NEWLY HIRED CNN WORK FORCE

#### A. Facts

##### 1. CNN decides to terminate its contractual arrangements with TVS

In early 2003, unbeknownst to either TVS or the Union, top CNN executives met in Atlanta to discuss termi-

---

[20] Thus, it is irrelevant that the Board never found CNN to be a joint employer of any of TVS' other predecessor contractors. So far as we are aware, no party ever invoked the Board's processes on behalf of any such claim.

[21] See *NLRB v. Browning-Ferris Industries*, supra (joint-employer status found where contractor applied cost-plus contract language to "co-determine" with subcontractor matters including the hiring and firing of drivers, establishment of working hours, pay, approval of assignments, day-to-day supervision and direction of workers at certain sites, subcontractor's use of contractor's forms for recordkeeping purposes, provision of uniforms with contractor's logos for subcontractor's drivers to wear, and establishment of rules governing how those drivers worked); *Dunkin' Donuts Mid-Atlantic Distribution Center, Inc. v. NLRB*, 363 F.3d at 441 (joint-employer status found where cost-plus contract language on wage rates, benefits, overtime, and per diem payments for overnight work was actually applied in a manner giving general contractor a "significant" role in determining the subcontractor's employees' wages, incentive awards, benefits, and other matters such as hiring, assignment of work and equipment, day-to-day direction, and consulting with subcontractor about employees' discipline or speaking directly to employees about disciplinary matters); *Whitewood Oriental Maintenance Co.*, 292 NLRB at 1161–1162 (joint-employer status supported by cost-plus language that general contractor enforced to "meaningfully affect matters related to" the subcontractor's decisions on hiring, firing, and the amount of workers' compensation for fired employees). Accord *Ref-Chem Co. v. NLRB*, 418 F.2d 127, 129 (5th Cir. 1969) ("in practice, [joint employer] exercised its control" by retaining right to approve and control the number of employees hired; causing an employee to be fired; inspecting and approving work; and approving subcontractor's changes in employees' pay and overtime); *D&F Industries, Inc.*, 339 NLRB at 640 (joint employer determined the number of available temporary employee job vacancies to be filed by contractor, and decided when overtime was required and the number of employees necessary for such work).

nating the ENGAs and bringing the DC and NYC technical work in-house.[22]  Led by Executive Vice President of News Operations Cindy Patrick, they discussed the implementation of a new hiring system, called the Bureau Staffing Program, as an opportunity to "right-size" the DC and NYC operations.  Among other things, they discussed assigning field technicians as "1-man bands" with greater frequency than permitted under the Union's collective-bargaining agreements, and hiring sufficient numbers of full-time employees to avoid overtime and the use of freelancers.

A group of CNN managers, led by CNN Director of Newsgathering Matt Speiser, was charged with renaming every bargaining unit job category, merging some functions, and drafting position questionnaires (PQs) for the reclassified bargaining unit jobs based on the PQs used at CNN's Atlanta headquarters.  At an April 3, 2003 meeting, the group circulated the proposed name changes.  TVS camera and audio field technicians were reclassified as senior photojournalists, photojournalists, and photojournalist/lighting specialists (referred to here collectively as photojournalists).  TVS engineers—whose department CNN combined with its nonunit information technology (IT) department to form the new BIT/Engineering division—became associate support engineers, support engineers, senior support engineers, and field engineers.  And TVS studio, control room, and quality control technicians became studio operators, audio designers, floor directors, TD/directors, production assistants, lighting specialists, and production support specialists.

On May 20, 2003, the group circulated among its members a draft of the photojournalist PQs, which listed the same functions that the TVS field technicians performed, but also stated that 20 percent of the job would be editing/producing, i.e., cutting video in the field or in the bureau, and that candidates would be required to perform nonlinear editing in the field for most events and assignments.  In a cover email to other managers, Speiser wrote, "In the Photojournalist PQs we should emphasize the use of DV cameras (since this isn't within NABET jurisdiction now)."    In a followup email, Speiser acknowledged, "One very disturbing discovery: as we

use new narrowly defined jobs, we're finding that we have less flexibility in the use of manpower . . . .  Where [TVS] now uses people for a variety of jobs within one shift, we think we'll be more tightly constrained by these narrow PQs."[23]

2. CNN announces the termination of the ENGAs
and refuses to bargain with the Union

In mid-September 2003, CNN informed TVS that it was terminating the ENGAs at both bureaus.  It expressed appreciation for TVS' performance and services, but it explained that it wanted a new work force to allow it to take advantage of technological developments in the industry, particularly computer-related technology.

On September 29, 2003, CNN publicly announced its termination of the ENGAs.  In the press release, CNN praised TVS as "a fine company that had done an excel-

_____

[22] The CNN executives included Phil Kent, president of Turner Broadcasting Systems, Inc., CNN President and CEO Jim Walton, Executive Vice President of News Operations Cindy Patrick, Senior Vice President Marty Garrison, Vice President of Newsgathering Keith McAlister, and Executive Vice President of Finance and Administration Brad Ferrer, as well as bureau chiefs and chief financial administrators from DC and NYC.  Lisa Reeves and Lynne Wurzberg, in-house counsel for CNN and Turner, respectively, also attended these meetings.  This core group held numerous other planning meetings, and a subset of the group of managers drafted new position questionnaires for each of the new Bureau Staffing Program jobs.

[23] The dissent acknowledges that CNN kept its planning and decisionmaking a secret.  Nevertheless, it describes our account of CNN's replacement of TVS' union work force with an in-house, non-union work force as "language one would expect to see in a Robert Ludlum novel."  The obvious difference, which the dissent seeks to elide by citing a work of fiction, is that the events described herein actually occurred.  The record establishes CNN's conduct and its motivation clearly.  Moreover, for a student of labor law, there should be nothing surprising about the secrecy in which CNN cloaked its planning.  This is far from the first case in which an employer has engaged in discriminatory hiring in an effort to avoid a successor's obligation to bargain with a union.  To our knowledge, however, no such employer openly admitted its unlawful scheme as it was hatching the plot.

The dissent also states, "Concerns about secrecy would be especially appropriate where, as in CNN's case, a company depended on contractor personnel for operations that were continuing around the clock while CNN was deciding whether to change or discontinue this arrangement."  Whether true or not as a generalization, it is not an argument that CNN advanced in this case.

The dissent similarly takes issue with one of our 8(a)(1) findings, regarding CNN NYC Bureau Chief Karen Curry's statement to TVS employees that CNN had terminated the TVS contracts because, inter alia, TVS "came along with rules and regulations."  The dissent's initial response is worth highlighting:

First, in most if not all cases when an employer discontinues a subcontract and brings the work in-house, this type of change is motivated in part by a desire to have "more control" over the work, and I believe this precludes finding unlawful antiunion motivation based on such an expression.

Apparently, we are to reverse the judge because in "most cases," employers have good reasons to make such changes.  The dissent also asserts that Curry made no reference to unions or union rules.  That assertion is incorrect.  Curry told employees that "the Union had rules that CNN would find hard to follow when managing technical crews."

Finally, the dissent cites *Plumbers Local 447 (Malbaff Landscape Construction)*, 172 NLRB 128, 129 (1968), and *Computer Associates International*, 324 NLRB 285 (1997), for the proposition that, "as a contracting employer, CNN could lawfully cease doing business with TVS even if motivated by a desire to avoid TVS' union obligations."  In both decisions, that right was contingent on the absence of any interrelationship between the entities beyond that of contractor and subcontractor.

10                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

lent job running its business and meeting the needs of
CNN." That same day, CNN Atlanta-based Executive
Vice President of News Operations Patrick sent an email
to its own CNN employees at the DC and NYC bureaus
stating, "I want to be very clear when I say that we have
the highest regard for TVS and its staff and thank them
for their years of service to CNN." She added that the
Bureau Staffing Program hiring process "to fill nearly as
many new positions at CNN as currently held by [TVS]"
would begin immediately. She noted that there would be
a significant number of job openings at both bureaus, and
she encouraged CNN staff to apply.

The same day, CNN DC Bureau Chief Kathryn Kross
and her NYC counterpart, Bureau Chief Karen Curry,
emailed their respective CNN employees reiterating
praise for TVS as "a fine company that has done an ex-
cellent job meeting the needs of CNN," and adding that
TVS' management and employees "are professionals
through and through." Curry's email stated that CNN
was "about to make structural changes" to its work force
and intended to fill a total of about 240 positions in both
bureaus "with nonunion" workers "that reported directly
to CNN."

Later that day, Curry conducted a series of staff meet-
ings to discuss the change. At one of the meetings, Cur-
ry explained that CNN was terminating the ENGAs and
bringing the technical services jobs in-house so that it
"can work much easier with both the crews and the tech-
nical people; that in order to make it smoother, [CNN]
needed to get rid of [TVS, because TVS] came with rules
and regulations; [a]nd that by getting rid of [TVS], then
they can have more control of the technical people."
Curry explained that the Union had rules that CNN
would find hard to follow when managing the technical
crews.

NYC CNN Engineering Supervisor Jesse Spilka told
TVS Engineering Manager Edward DeLauter that CNN
would not be taking the Union to the Time Warner Cen-
ter, where CNN planned to relocate its NYC bureau.
Spilka added that CNN would only hire 50 percent of
bargaining unit employees, in order to get rid of the Un-
ion.

Also on September 29, CNN DC White House Execu-
tive Producer Danielle Whelton called bargaining unit
cameraman Tim Garraty into her office to discuss the
termination of the ENGA. Garraty asked Whelton where
the Union fit into CNN future plans. Whelton replied
that there would be no union when CNN took over the
DC technical work force.

Still that same day, TVS President D'Anna informed
Local 31 President Mark Peach that, after the first week
of December, TVS would no longer have employees

working at the DC bureau, and that the bargaining unit
employees could apply for CNN jobs. Peach telephoned
DC Bureau Chief Kross requesting a meeting to discuss
the status of the unit employees following the termina-
tion of the ENGA. Then, on October 3, Peach met with
Kross, who insisted that developing technology required
CNN to have a new work force. Peach asked Kross
about the number of Bureau Staffing Program positions
that would be available, and what weight CNN would
give to unit employees' tenure and commendations re-
ceived while working at CNN when it made its hiring
decisions. Kross replied that CNN would not count the
unit employees' time at CNN toward their employment
prospects in carrying out the Bureau Staffing Program or,
if hired, toward future benefits or programs, and that
CNN would not consider their commendations. Peach
asked about the Union's role at the DC bureau after De-
cember 5, 2003. Kross replied that "the Union would not
be a part of CNN after December 5, that there would be
no need for [the Union], because employees would be so
happy they would not need a union." After the meeting,
Peach informed the unit employees of Kross' answers.
By letter dated a week later, CNN invited bargaining unit
employees to apply for Bureau Staffing program jobs.

In late October, NYC Bureau Chief Curry refused Lo-
cal 11's request to discuss future employment prospects
for the NYC bargaining unit employees. Curry instruct-
ed the Union to direct all inquiries to CNN's attorneys in
Atlanta. By letter dated November 19, the presidents of
NABET and Communications Workers of America re-
quested a meeting with CNN President Jim Walton to
discuss such issues as the continued employment of all
NABET members, the continuation of the collective-
bargaining agreements, and recognition of the Union.
On December 3, Walton rejected the Union's request,
stating that there would be no benefit in meeting. On
December 8, and January 23, 2004, Local 31 and Local
11, respectively, repeated their requests for recognition
and bargaining. CNN denied both requests.[24]

Meanwhile, shortly before the end of the ENGA in
DC, TVS engineer Dennis Norman, who was the Union's
shop steward, told CNN Director of Engineering Tu Vu
that he (Norman) had not yet heard from CNN about
whether he had been hired and asked if Vu thought he
(Norman) would still have a job under the Bureau Staff-
ing Program. Vu said he did not have an answer, but
added that Norman "probably made too much money."
Norman testified that Vu's surmise confirmed the per-

---

[24] The Union's repeated requests for bargaining after learning of the
ENGAs' termination undermines the dissent's claim that "it is far from
clear that the Union would have entertained a bargaining demand from
CNN."

meating "rumors in the shop, that CNN was not going to hire the highest paid unit employees" like Norman, whose annual salary was "$83,000, and with overtime $110,000," and that CNN was "scared that the shop stewards would help the Union organize the employees."

About that same time, in New York, Operations Manager Lou Strauss told unit employee Jon Ford, whom he was interviewing for a Bureau Staffing Program job, that CNN intended to operate a union-free technical work force at the end of the ENGA. Ford mentioned the stresses that "a lot of my friends who had families and mortgages to pay" were experiencing because of uncertainty related to their job prospects with CNN. Strauss replied that "everything would be okay, there is nothing to worry about." Ford asked if it was "a safe assumption to say the [U]nion won't be back at CNN." Strauss replied, "Yes, that's a safe assumption to make."

### 3. CNN's hiring to staff the DC and NYC bureaus

In late August or early September 2003, Turner Recruitment Manager Loren Kile advised CNN to use a multistep "behavioral interviewing" process to hire over 200 skilled technicians for the Bureau Staffing Program.[25] Turner had experimented with behavioral interviewing before; CNN had not. Kile conducted several training sessions for about 30 CNN recruiters and hiring managers. The hiring process included a nationwide job advertising drive and submission of resumes online at the www.Turnerjobs.com website. Recruiters designated for each job category were to screen those applications for completeness and requisite qualifications, and schedule applicants who passed the screenings for face-to-face interviews with hiring managers. In turn, hiring managers for each job category, working in groups of at least two, were to interview the referred applicants using a comprehensive 10-page guide to rate their performance on a variety of criteria, including client service, initiative, interpersonal skills, teamwork, organizational skills, communicational skills, and motivational fit. Human resources' coordinators were to compile tabulated "summaries" of the hiring managers' scores for each applicant. The final steps included a debriefing/selection

session for each job category, during which hiring managers, relying on their interview notes and the summaries prepared by HR, were to discuss the strengths and weaknesses of each applicant, chart their discussions on large sheets of "butcher block" paper posted on the walls, and select the most qualified candidates. Recruiters were then to run background checks of the selected candidates before making job offers.

Simultaneously with its September 29, 2003 announcement of the cancellation of the TVS ENGAs, CNN announced the "kickoff" of recruitment as an opportunity "to hire a dream team that included people to push [CNN] into the future [by] conducting a broad and diverse search for candidates [with] experience in some of the skills that CNN hoped to do in the future." CNN advised its own employees and TVS technicians that anyone seeking a Bureau Staffing Program job would have to go through the entire behavioral interviewing/hiring process.

CNN used an elaborate Excel spreadsheet system to continuously track every applicant for every job category. It listed the applicants' names, years of experience, employment history, recruiters' screens and recommendations; date(s) and number(s) of interview(s); hiring manager(s) conducting interview(s); summaries of scores and comments; debriefing managers' ranking of each applicant; selected candidates' lists; recruiter's background check report; and job offers made/accepted/rejected. It separately identified the bargaining unit applicants by their TVS job status and union membership. We summarize how the process worked in several of the job categories.

*Photojournalists:* The advertised photojournalist jobs listed the following PQs: 3 to 5 years' experience; excellent technical ability as a photographer; the ability to operate audio in the field; and nonlinear editing (NLE) skills.[26] In addition to their resumes, photojournalist

---

[25] Development Dimensions International, a human resources company, developed the behavioral interviewing method. According to its "Interviewing for Hiring Success" handbook, which Kile distributed to the hiring managers, behavioral interviewing maintains the accuracy and fairness of the hiring process by "focusing interviews and selection procedure on job-related information, organizing accurate behavioral information that can be used to predict future behavior, assessing the motivational fit of candidates, systematically sharing the information about candidates in debriefs, and making legally credible hiring decisions."

[26] NLE allows users to electronically transfer videos to a computer's hard drive, where they can be edited and processed into a wide variety of formats. Different managers gave different weight to the importance of NLE as a component of the photojournalist jobs. Executive Vice President of Operations and architect of the Bureau Staffing Program Cindy Patrick stated that the NLE function was essential and meant the ability to "pitch a story, make suggestions for a stronger story, and decide what to use immediately and what to keep for historical use." By that definition, TVS cameramen were already performing editorial tasks. If, however, it meant the ability to edit using NLE technology to clean up footage before transmitting it from the field, the record shows that the photojournalists actually hired through the Bureau Staffing Program performed relatively little editing because the digital equipment that they used had software programs like File Transfer Protocol (FTP) and Final Cut Pro (FCP), with shoot-to-air capability.

Patrick's Atlanta-based counterpart, Vice President of Media Operations and Hiring Manager John Courtney, assigned reduced importance

12                       DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

applicants were required to submit a video or demo reel sample of their work.

Of the 64 applicants for photojournalist jobs in DC, 48 were TVS technicians, and of the 59 applicants for photojournalist jobs in NYC, 41 were TVS technicians. Every TVS technician passed the recruiter's screening and had two sets of "face-to-face" interviews by teams of two or more hiring managers. In DC, the photojournalist hiring managers included DC Bureau Director of Newsgathering Matthew Speiser and Deputy Bureau Chief Steve Redisch and three Atlanta-based managers. In NYC, the photojournalist hiring managers were Bureau Chief Karen Curry and Deputy Bureau Chief Edith Chapin and two Atlanta-based photojournalist managers. In both DC and NYC, neither of the local hiring managers had a camera/lighting/audio background or familiarity with the TVS technicians' work; although two of the Atlanta-based hiring managers had a photojournalist background, they had not previously worked in either bureau or with the TVS technicians.

Many non-TVS applicants for photojournalist positions failed the recruiters' screening and were not recommended for interviews, primarily because they did not submit a complete application or they lacked the requisite qualifications. Some of those failed applicants worked with hiring managers who disregarded the recruiters' recommendations and interviewed them anyway. For example, after recruiter Rick Denius recommended that non-TVS applicant Tony Butler should not be interviewed because he lacked field experience, Newsource Operations Manager R. J. Fletcher, with whom Butler had previously worked as a DC freelancer, "passed along" Butler's name to hiring managers and "vouched" for Butler's reliability. Some CNN employees who did not even apply for Bureau Staffing Program

jobs were interviewed after their managers or supervisors recommended them. In most of those instances, the same recommending manager officiated as the interviewer. In other instances, a single hiring manager interviewed those candidates over the phone. In other instances, hiring managers floated the names of non-TVS applicants after the photojournalist debriefing selection, which was well past the cutoff date for applicant consideration. Cindy Patrick recommended that those applicants be offered jobs without screening or interviewing, to the chagrin of some of the hiring managers.

Atlanta-based hiring manager Daniel Young was by far the most active advocate for hiring non-TVS photojournalist applicants. He sent a favorable assessment of Atlanta-based applicant Doug Schantz to the other hiring managers in DC. Young had been working closely with Schantz, who taught Young to use Final Cut Pro; Hiring Manager Courtney was Schantz' immediate supervisor. Courtney and Young rated Schantz 12th and 7th, respectively, among the photojournalist candidates. The other three hiring managers rated him 20th, 29th, and 19th, respectively. At the debriefing session, Schantz received a cumulative ranking as the 15th highest DC photojournalist applicant, and CNN hired him. Similarly, Young went to bat for Floyd Yarmuth, one of his subordinates. After recruiter Rick Denius rejected Yarmuth for an interview, and after Hiring Manager Speiser emailed Young and others expressing concerns about Yarmuth's lack of practical camera experience, Young sent the hiring managers an email in which he heaped praise on Yarmuth as a self-taught "go getter," whose "resume tape showed he's got talent, and no doubt, could be a good candidate, worthy of second interview given his shooting and FCP experience, he could grow immensely into this job." CNN hired Yarmuth. For his first year as a photojournalist in DC, Yarmuth had problems performing his field camera assignments.[27]

---

to NLE. He explained that although he saw the ability to edit as "an important hiring criterion for the photojournalist's job", "technically, first priority was given to FCP experience, second priority to NLE, third priority to general editing skills."

DC Bureau Chief and Photojournalist Hiring Manager Steve Redisch also contradicted Patrick's statement about the central importance of prior NLE experience in the hiring process, stating that it was not any more or less important than other kinds of experience. Redisch explained that NLE was "nice to have, nice to know, but in most circumstances, in the work that we did, in the work that we needed, it was not a priority." He further explained that NLE's "significance in DC was marginal," because much of the videos are transmitted over fiber lines "so the need for editing materials in the field is low," and that while NLE can help at times, "for the most part, since the bureau is wired, the need for field NLE is marginal." Redisch recognized that DC photojournalists working on assignments throughout the CNN network and even internationally might find knowledge of NLE helpful in those situations where raw materials could not be fed back to the bureau, and that NLE training offered at the beginning of CNN's takeover of the bureau helped in that respect.

[27] CNN hired former TVS cameraman Richard Morse as a senior photojournalist and assigned him to a White House crew. Morse left CNN in December 2005, because of pay. But during Morse's 1-year BSP stint, several new photojournalists who had previously worked for TVS asked him how to operate the equipment. Morse observed that Yarmuth and Ron Helm "had major problems with camera and lighting work," and he had to train and coach them.

Jerry Santos was another new photojournalist whose shooting inexperience caused problems. On November 15, 2004, Santos was assigned to the U.S. State Department to cover the live broadcast of Colin Powell's last briefing as Secretary of State. Instead of focusing the camera on Powell, Santos did a "cut-away" during the live news conference. This led CNN's assignment desk manager to ask Morse to intervene. By the time Morse got to Santos, the news event was over. CNN reporter Andrea Koppel complained that she had never seen anything like that before, and Emily Rust, CNN's pool coordinator at the assignment desk, informed Morse that she received "quite a few"

Young also lobbied for Doug Chance, another of his Atlanta-based supervisees, after recruiter Denius found Chance lacked the requisite camera experience. Young and another hiring manager interviewed Chance and hired him. Young also ignored recruiter Denius' decision that photojournalist applicant Jeremy Moorhead should not be interviewed because he lacked the requisite 3 years of experience. Young pushed for Moorhead's reconsideration. Speiser interviewed Moorhead in person; Young joined by telephone. Speiser gave Moorhead average scores of one 4 and three 3s under the photojournalist rating criteria; Young gave him top scores of two 5s and three 4s. At the debriefing session, Young ranked Moorhead the 15th most desirable candidate; other hiring managers ranked him 27th. Notes from the debriefing session listed "NLE" as one of Moorhead's strengths, but Moorhead's resume did not show that he had NLE experience. The spread sheets tracking the candidates during the interviewing process inexplicably gave Moorhead credit for 5 years of camera experience. CNN hired Moorhead as a photojournalist.

The hiring managers' handling of Carlos Christen, a CNN Atlanta-based editor who applied for a photojournalist job in both NYC and DC, is illustrative of some of the anomalies in the hiring process. CNN's tracking spread sheet reflects that Hiring Managers John Courtney and Young, and possibly Karen Curry and Edith Chapin, were scheduled to interview Christen in early November. But there is no evidence that those interviews ever occurred. Christen submitted a single video for both applications. Young's assessments of those videos that he reviewed for the DC photojournalist applicants contained the following note of Christen's video: "On the bubble, no hard news, live stuff, needs work." For the NYC video reviews, Young rated Christen as a "fairly good shooter, wanted to see more news, live shots." At the end of the debriefing selection process, hiring managers ranked Christen *57th of the 60* most desirable candidates for a photojournalist job in DC, and 28th among the most desirable candidate for NYC. Email exchanges show that hiring managers considered hiring Christen as a NYC "growth candidate" if Ray Britch—a selected photojournalist candidate from CNN's London bureau, whose discussions with CNN to cover his $11,000-plus relocation costs from London to NYC delayed his "answer on accepting or not"—did not accept an offer. In one of those emails, sent on January 7, 2004, just 10 days before CNN's installation of its own NYC technical work force, Young wrote, "[W]e can free up Carlos

[Christen] on occasion to help us out on assignments to strengthen his photography skills."

The same group of NYC hiring managers interviewed 17 TVS bargaining unit audio technicians who applied for photojournalist jobs. CNN hired only two of them, Desmond Garrison and Jamie Wiener (but after three non-TVS candidates declined job offer). Garrison was TVS' least senior bargaining unit audio technician at the NYC bureau.

*BIT Engineers:* This job category was located in Broadcast Information Technology (BIT), a department that CNN created for the Bureau Staffing Program by merging the work performed by the TVS engineers with the responsibilities of CNN's own information technology (IT) workers.[28] The BIT job openings were primarily engineer positions. The PQs for those jobs stressed that all successful applicants must be able to cross over and handle some IT troubleshooting, as well as the traditional engineering tasks of maintaining broadcast equipment. According to the testimony of CNN DC Director of Engineering Tu Vu, who assisted Atlanta-based HR Manager Jim Hebb in drafting those PQs, BIT engineers "had the same job responsibilities [as TVS engineers], and the only thing that had changed was adding BIT to the title." "All the positions simply got a title change."

In DC, all seven of TVS' engineers applied for BIT openings. Two different teams of hiring managers interviewed each of them. Only one of those four hiring managers, DC Director of Engineering Tu Vu, had worked closely with the TVS engineers and knew their skills. Two of the other three, Atlanta-based IT Director Rick Cole and CNN International Engineering Manager Matthew Holcombe, were also on the BIT hiring committee for NYC, and neither had any prior contact with the TVS engineers or any familiarity with the nature of the services they provided. Although Holcombe acknowledged that established "teamwork is important," he also testified that "it was of no concern to the interviewers that some bargaining unit engineers, who were applying for work in the Bureau Staffing Program, had [an] established group working relationship for 10–15 years."

CNN hired three of the TVS DC engineers. It did not hire Dennis Norman, Jeffrey Adkinson, Nicholas Kiraly, or William Evans, each of whom had exemplary employment histories under the ENGAs. Norman had worked for CNN ENGA subcontractors for over 19 years.[29] According to Vu, despite Norman's engineering

---

phone complaints from all the television news networks in the pool about Santos' shooting mistake.

[28] The BIT department was later renamed the Broadcast Engineering and Systems Technology (BEST).

[29] Norman's engineer colleagues referred to him as "an encyclopedia of knowledge when it came to the work at CNN," and the "go-to guy

14                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

experience and versatility, the hiring managers at the debriefing sessions considered Norman only for the single job, "support engineer," for which he applied. Vu added that Norman could have increased his chances of being hired by applying for multiple engineer jobs. But Vu later admitted that when the hiring managers made their selections they considered "some" applicants for jobs for which they had not applied. For instance, non-TVS candidate Andre Parker applied only for a project management job, but CNN hired him as a BIT support engineer.[30]

Adkinson, a bargaining unit employee for 7 years, was also an adept engineer who substituted as an EIC in Norman's absence. Vu testified that Adkinson also handled major news events when CNN had "pool" coverage responsibility, and that CNN selected Adkinson to drive Big Red to Atlanta to help with covering "The World Report" international conference. CNN did not hire Adkinson.

Kiraly had been a TVS engineer since 1998, and had 9 years of previous broadcast engineer experience. Vu conceded that Kiraly was "versatile, able to tackle most field or studio maintenance or production projects."[31] After CNN's September 29, 2003 announcement of the

ENGA's termination, Vu prepared and forwarded to recruiter Susanne Mackiewicz a list of TVS engineers for Bureau Staffing Program jobs. The list included Kiraly and Norman. CNN hired neither.

Evans had been a TVS engineer since 1998, and had prior broadcast engineering experience similar to Kiraly. Vu testified that he "never heard any complaints of problems" about Evans' work. Vu also acknowledged that, during the ENGA, "in instances when the complexity of production in the field required competent technical engineering skills," Evans was one of the frequently referred engineers. CNN did not hire Evans.

CNN changed the TVS microwave truck operators title to BIT field engineers. In DC, TVS cameraman Benny Farkas applied for the BIT field engineer job. CNN DC Hiring Manager Speiser rated Farkas very highly in his face-to-face interview. Atlanta's Operations Manager for Newsource R. J. Fletcher rated Farkas very low. Notes from the debriefing meeting showed that at some point during the discussion, the hiring managers considered Farkas to be a "strong possible" candidate, but he was then downgraded to "possible" for unexplained reasons. CNN did not hire Farkas.

In New York, all of TVS' engineers applied for BIT jobs. As in DC, teams of two hiring managers, including DC's Engineering Director Jeff Gershgorn and IT Director Michelle Lackey and Atlanta's Holcombe and Cole, interviewed the applicants. Gershgorn, like his DC hiring manager counterpart Vu, worked with TVS engineers daily and knew their skills. Lackey had had minimal interaction with the TVS engineers. On December 3 and 5, 2003, hiring managers met for the debriefing and selections. CNN did not offer positions to some of TVS' most qualified and senior engineers, but it offered positions to measurably less qualified nonbargaining unit applicants.

CNN did not produce the butcher-block sheets for the NYC BIT/engineers debriefing sessions, insisting that they were "lost." Those sheets documented the hiring managers' contemporaneous discussions concerning their selection of candidates. Without that information, the testimony of the participating hiring managers became very important. But those hiring managers offered conflicting accounts of what transpired at the debriefing sessions and the judge reasonably discredited them.

*Growth Candidates:* In most, if not all, job categories, CNN set aside an undetermined number of slots for "growth candidates." These applicants lacked either the minimum number of years, qualifications, or skills, but CNN designated them as having the potential to "grow." Cindy Patrick, accompanied by Atlanta-based CNN and Turner attorneys, inexplicably attended the debriefing

---

[30] for help with fixing problems with equipment." CNN DC Engineering Manager Vu, who supervised Norman, stated that Norman was the "versatile" "engineer-in-charge" (EIC)—the engineering department's equivalent of a shift supervisor—for many of the bureau's major news events, including the coverage of the post-9/11 memorial service broadcast from the National Cathedral, State of the Union addresses, U.S. Presidential inaugurations, and White House press conferences. Vu relied on Norman to upgrade the bureau's Chryon Infinity switchers, a computerized video writer that superimposed graphics/words on the lower third of the screen with the latest software, and to rewire "Big Red," the microwave truck used as "a remote studio on wheels" for breaking news and as a feeder truck for pool coverage. From February 2002 to December 2003, when CNN broadcast "Crossfire" live from the George Washington University campus, Norman operated Big Red as the on-site production studio and he had to "fix or swap out broken components on the truck a couple of dozen times."

[30] The case of TVS studio technician Barbara Morrisey also casts doubt on Vu's testimonial assertion that applying for more than one BSP job increased a TVS applicant's probability of being hired. Morrisey applied for 13 BSP jobs. Hiring managers interviewed her for one, a media coordinator position, and "the interviewers were not even interested in her qualifications for that position." CNN did not hire her.

[31] The record shows, and the judge found, numerous instances in which Vu gave contradictory accounts of Kiraly's engineering capabilities. In particular, Vu's interview rating sheet for Kiraly reflected several inconsistencies that support a finding of an intentional attempt to deny him employment. For example, Vu's handwritten notes gave Kiraly a "4" for "taking Initiative," but a "3" under the "initiative" criterion; Vu wrote that Kiraly was "not always a self-starter," then gave him credit "for taking initiative of studying for the MCSE network certification." For the "interpersonal skills" criterion, Vu's handwritten interview notes gave Kiraly a score of "5," while the HR summaries showed that Vu gave him a "4." Vu's handwritten score for the "client service" criterion was altered from a "5 or 4" to a "3."

CNN AMERICA, INC.                                                    15

session for every job category in both the DC and NYC bureaus, where the hiring managers altered some of the scores on the HR summaries in a manner that raised the rankings of non-TVS applicant growth candidates and lowered the rankings of TVS applicants.

Following the debriefing selection sessions, Patrick consistently reminded the photojournalist hiring managers of "the need to correct the lack of growth candidates on the lists, to achieve a reasonable balance, and once that was achieved we would start looking at 'equitable losses.'" On December 1, 2003, just 5 days before the implementation date of the DC Bureau Staffing Program, Patrick wrote, "We have not even begun to correct our growth candidate issue so the next photojournalist offer should go to Khalil Abdallah," a CNN Newsource editor with no camera experience. That same day, CNN Vice President of Media Operations and Hiring Manager John Courtney wrote to Patrick questioning her "growth candidate concerns." Courtney stated that DC photojournalist Manager and Lighting Specialist Ben Coyte "didn't feel it was appropriate to jump [Abdallah] over more qualified current unit [TVS] shooters." Patrick responded that Courtney should get Abdallah "screened and interviewed," adding, "get this done." (GC Exh. 555.)

The photojournalist hiring managers selected, ranked, and approved 39 candidates to be hired in DC. A few growth candidates were included. Although there were many "strong shooters with good journalistic initiative and potential in the top 39," it became clear that the list was "extremely short of growth candidates who would bring editing in particular to the table." In an email sent to Hiring Manager Speiser, Cindy Patrick emphasized the urgency of completing the hiring to meet the December 6, 2003 deadline for the DC bureau and about "getting a mix of growth candidates and not limiting hires only to candidates with network-level background."

The hiring managers agreed that should any growth candidates "fall off the list," the opening so created would have to be offered to another growth candidate regardless of how low that growth candidate was ranked, or whether the candidate was ranked at all (several were not ranked because they were interviewed or referred after the debriefing/selection ranking meetings). Accordingly, CNN reshuffled the list and eventually made offers to 10 candidates below the original 39-person cutoff: every one of them was a growth candidate, and none was a TVS employee.[32] On average, CNN offered the growth

candidates annual salaries of $15,000 less than the nongrowth candidate senior photojournalist, and decreased and or eliminated their cost-related benefits such as overtime.

Many CNN nonbargaining unit employees in DC and NYC applied for jobs pursuant to the Bureau Staffing Program. CNN hired them all. Conversely, about 55 of 120 TVS bargaining unit employees in NYC, and about 38 of 86 TVS bargaining unit employees in DC were not hired and lost their jobs. Although CNN managers who supervised TVS' most active union members at the DC bureau praised them as some of TVS' most skilled technicians, CNN did not hire any of them. The rejected employees included Union Executive Board Representative Sarah Pacheco and Shop Stewards Keith Crennan, Dennis Norman, Dave Jenkins, and Ralph Marcus.

### 4. Operations of the DC and NYC bureaus under CNN

At the end of work on Friday, December 5, 2003, TVS bargaining unit employees at the DC bureau turned in their CNN-supplied gear, equipment, and credentials to TVS. The next day, Saturday, December 6, when those who were hired for the Bureau Staffing Program reported to work, CNN returned to them the same credentials, gear, and equipment.

CNN continued its newsgathering, production, and broadcasting operations at the two bureaus uninterrupted. Most of the Bureau Staffing Program hires attended a 2-day weekend orientation. For about the first month, CNN Photojournalists Manager Dan Young conducted FCP and NLE training on Mac laptop computers, and the employees attended for a day or so as their assignment schedules permitted. CNN did not provide the photojournalists with Mac laptop computers for use in the field until 8 to10 months later.

According to former TVS DC cameraman Elizabeth Zasso, whom CNN hired as a photojournalist and assigned to operate the microwave truck, during the weekend orientation she and another former TVS technician, Richard Morse, were charged with taking "a bunch of new hires to show them the different locations from which CNN broadcasts." They also showed them the "live drops" used to send live coverage back to the studio, and how to hook up the microwave truck for transmitting pictures. After that weekend, Zasso testified, everything in her new job was the same as her TVS job. Zasso called the same automated system nightly to get

---

[32] The non-TVS growth candidates hired as photojournalists by CNN lacked the experience and qualifications of many TVS bargaining unit members who were not hired. For example, Ron Helm, Doug Schantz, Floyd Yarmuth, and Jeremy Moorhead were CNN Atlanta-based editors, not photographers, and they lacked both the minimum number of

years experience and the skills required for the photojournalist jobs and "had major problems with camera and lighting work" once hired; CNN also selected Bethany Chamberland Swain and Khali Abdallah, CNN Newsource editors who had little shooting experience.

16     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

her assignments, although she did receive some assignments through her cellphone. She reported to the same 11th floor assignment desk—which was staffed by the same former TVS slot schedulers—where she picked up rundowns, which were kept in the same place as before and contained the same types of information. She retrieved the same keys for the same truck and used the same equipment, stored in the same locker in the same room. She loaded the equipment as she always had and set out with the same crewmember, Reggie Selma, using the same designation, "Crew #6," and the same CNN press credentials. Zasso and Selma operated the same microwave truck in the same manner as when they were TVS bargaining unit employees. Zasso also testified that when they were in the field with reporters or producers, they received the same type of instructions and guidance as they had when they were TVS technicians. She noted that the only change in her job as a CNN photojournalist was that she "no longer had to sign in on a sheet" for the microwave truck, and that she "worked in that truck less frequently than before."

CNN's January 17, 2004 takeover of the technical services at the NYC bureau mirrored what happened in the DC bureau. Richard Shrine, a former TVS field camera technician hired by CNN as a photojournalist, echoed Zasso's account of the "sameness" of his photojournalist responsibilities and his work as a TVS field cameraman. Shrine recounted that on the last day of TVS' NYC contract, he surrendered his equipment and credentials to TVS; on the first day of the Bureau Staffing Program, he "seamlessly collected" the same gear and credentials that they had turned in the day before. Shrine noted that he, too, attended 1 day of NLE training around the time of orientation, which "did not make [him] proficient in FCP—rather, it took [him] over a year of self-training, practicing and tutoring" to use NLE for editing. Shrine stated that he retained the same crew partner as under TVS; they used the same gear as under TVS, and they did the "same job, go out and shoot stories." Shrine and his crew partner also had the same crew number and did the same assignments with the same producers and reporters, and used the same style of capturing pictures and sounds. He continued to receive the same assignment information as under TVS. As they had done before, Shrine and his crew partners contacted producers to fill in open space in their schedules. And they retained the same password to access CNN's computer system that they had during the ENGAs.

On Memorial Day, May 31, 2004, CNN officially relocated its NYC operations from 5 Penn Plaza to the Time Warner Center. Stacy Leitner, a former TVS studio technician whom CNN hired as a media coordinator,

testified that at both of those locations, she had performed the same tape feed operation and quality control (QC) tasks that she performed as a TVS employee. At Penn Plaza, between the implementation of the Bureau Staffing Program and the move to the Time Warner Center, CNN assigned her to train five or six new employees "to do QC, use a router and wave 4 monitor, and use VTs and RTS data server panels, the same new QC equipment [Leitner] used" during the last months of TVS' contract. According to Leitner, CNN transferred the "new" equipment from 5 Penn Plaza to the Time Warner Center. Leitner explained that apart from the "training aspect, [her] new job responsibilities at 5 Penn Plaza were unchanged from [her] previous job with TVS, and once the move to the Time Warner Center was done, there was more new equipment, [including] computers, monitors, routers, wave 4 monitors, and vectors."

CNN paid the former TVS employees it hired $3000 to $30,000 per year less than they earned under TVS. Except for the White House crews, CNN did not assign employees overtime work. For example, CNN paid former TVS engineer Ron Kuczynski, whom it hired as a BIT engineer, a salary comparable to his TVS-base salary, but he did not earn overtime under CNN. It hired former TVS studio technician Stacy Leitner as a media coordinator and paid her a salary that was $5000 less than she earned under TVS. It hired former TVS White House field technician David Bacheler as a senior photojournalist studio operator at a salary that, even with overtime and penalties, was $10,000 to $30,000 less than Bacheler earned under TVS. Gregory Robertson, a TVS field technician in DC—whom CNN hired as a photojournalist lighting specialist—explained that his "job as a TVS employee in 2003 and as a CNN employee in 2004, did not change, except for the different name on [his] paycheck and the reduced amount of [his] pay."

Other former TVS employees refused CNN's job offers because those jobs paid less than they had been earning under TVS. In addition to the changes in overtime and wages, CNN eliminated bargaining unit employees' contractual premiums, including meal penalties, paid lunch hours, holiday pay and double time pay after working 7 consecutive days. CNN also changed the unit employees' leave benefits by replacing TVS' policy of carried-over annual and sick leave with a use-it-or-lose-it-within-28-days sick and personal leave policy.

*B. Analysis*

1. The violations committed by CNN as
a joint employer

Having found that CNN and TVS are joint employers of the union-represented TVS technicians, we find that

CNN violated Section 8(a)(5) and (1) by canceling the ENGA with TVS to avoid its obligation under the collective-bargaining agreements, failing to bargain with the Unions over the termination of the ENGAs and the effects thereof, and by making unilateral changes in the terms and conditions of employment when it operated with a new work force.

In *D & S Leasing*, 299 NLRB 658 (1990), enfd. sub nom. *NLRB v. Central, Inc.*, 954 F.2d 366 (6th Cir. 1992), cert. denied 513 U.S. 983 (1994), a joint-employer contractor canceled its contract with its joint-employer subcontractor, whose employees were covered by a collective-bargaining agreement. The Board held that by discharging the unit employees and failing to rehire many of them when it took over the subcontracted work, the contractor violated Section 8(a)(3) and (1) because its actions were motivated by antiunion animus under *Wright Line*[33] as part of a plan to avoid its obligations under the subcontractor's collective-bargaining agreement that it incurred as the joint employer of the union-represented employees. Id. at 660. The Board further held that the contractor was obligated to recognize and bargain with the union and maintain the terms and conditions of employment contained in the collective-bargaining agreement until it either reached agreement with the union or bargained to impasse. The Board also held that the contractor violated Section 8(a)(5) and (1) by failing to bargain with the union over both its decision to terminate its subcontract and the effects of that decision. Id.[34]

As in *D & S Leasing*, supra, we find that CNN violated Section 8(a)(5) and (1) by refusing to bargain with the Union about the termination of the ENGAs and the effects thereof, by failing to recognize and bargain with the Union to agreement on a new collective-bargaining agreement or to impasse, and by making unilateral changes in the employees' wages and other terms of employment when it conducted its operations with a new work force. See also *Executive Cleaning Services*, 315 NLRB 227, 227 (1994), enfd. in relevant part sub nom. *AT&T v. NLRB*, 67 F.3d 446 (2d Cir.1995) (decision and

effects violation); *Whitewood Maintenance*, supra, 292 NLRB at 1168 (unilateral change violations).[35]

CNN argues that it did not violate Section 8(a)(5) and (1) by failing to engage in decisional and effects bargaining regarding the ENGAs' cancellations because (1) the Union waived its bargaining rights by failing to request such bargaining, and (2) the decision to cancel the ENGAs and hire its own work force to perform the work previously performed by the TVS technicians did not turn on labor costs, but instead constituted an entrepreneurial change relating to the "scope and direction of the enterprise" within the meaning of *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 677 (1981). We reject the first argument because CNN's decision to cancel the ENGAs was presented to the Union as a fait accompli. See *D & S Leasing*, 299 NLRB at 660 fn.10. We reject the second argument based on the judge's finding that the decision to terminate the ENGAs was to escape the obligations under TVS' collective-bargaining agreement, particularly its labor costs. Even assuming, as CNN and the dissent claim, that CNN's decision to terminate the ENGAs was to take advantage of new technological advances in the industry, the decision did not involve a change in the scope and direction of its business. Rather, it involved a change only in the job description of the employees who performed the same work for CNN, with the same equipment to produce the same product. As such, the decision was a mandatory subject of bargaining under *Fibreboard Paper Products Corp.* v. NLRB, 379 U.S. 203, 215 (1964). See also *Winchell Co.*, 315 NLRB 526, 526 fn.2, and 530–535 (1994) ("technological advance of the desktop computers changed the Respondent's operation by degree not kind" and layoff of prepress employees who performed the same printing work was subject to bargaining), enfd. 74 F.3d 1227 (3d Cir. 1995); *O.G.S. Technologies, Inc.*, 356 NLRB No. 92, slip op. at 3–5 (2011) (same).

Finally, the complaint alleged, and we find, that CNN's termination of the ENGAs and the termination of TVS technicians' employment also violated Section 8(a)(3) and (1). The General Counsel correctly argues that the judge made all the necessary factual findings, and conducted the proper 8(a)(3) legal analysis to establish that the decision to terminate the ENGAs and discharge the TVS technicians was part of an unlawfully motivated plan to avoid the Union and the obligations under the collective-bargaining agreement, but inexplicably, or perhaps inadvertently, failed to find the 8(a)(3)

---

[33] 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982).

[34] There is no legal or logical support for the dissent's argument that by honoring the joint-employer obligation to give notice and an opportunity to engage in effects bargaining, CNN would have violated the principle of promoting stable bargaining relationships, "would have contradicted the then-existing TVS-NABET collective-bargaining agreement," and would have "exhibited a total disregard for the elaborate body of law regarding successorship."

---

[35] Contrary to the judge, CNN was not "bound by TVS' contracts" with the Union. Rather, it was obligated to maintain the status quo as set forth in the contracts, until bargaining to agreement or impasse. See *D & S Leasing*, 299 NLRB at 660 fn.12.

18                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

violation. The evidence demonstrating CNN's union animus includes the pretextual reasons given for the ENGAs' terminations, the discriminatory application of the Bureau Staffing Program in hiring the new work force, discussed below, the repeated complaints by CNN officials about the costs of the rules and regulations imposed by the collective-bargaining agreement and statements that operations after the termination of the ENGAs would be "nonunion."

### 2. The violations committed by CNN as a successor

The test for determining successorship is: (1) whether a majority of the new employer's work force in an appropriate unit are former employees of the predecessor employer; and (2) whether the new employer conducts essentially the same business as the predecessor employer. *NLRB v. Burns Security Services,* 406 U.S. 272 (1972), and *Fall River Dyeing Corp. v. NLRB,* 482 U.S. 27 (1987). Continuity in the work force is established if the successor employed a majority of the successor's employees. Id. at 41. The Board gauges the union's majority status at the time when a "substantial and representative complement" of employees has been hired. *Grane Healthcare Co.,* 357 NLRB No. 123 (2011), enfd. 712 F.3d 145 (3d Cir. 2013), (citing *Fall River,* 482 U.S. at 40). With respect to continuity of the business enterprise, the Board considers "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Fall River Dyeing Corp. v. NLRB,* 482 U.S. at 43.

In assembling its work force, a successor "may not refuse to hire the predecessor's employees solely because they were represented by a union or to avoid having to recognize the union." *U.S. Marine Corp.,* 293 NLRB 669, 670 (1989), enfd. 944 F.2d 1305 (7th Cir. 1991), cert. denied 503 U.S. 936 (1992). To establish that a successor has engaged in discriminatory hiring in violation of 8(a)(3), the General Counsel must show that the employer failed to hire employees of its predecessor and was motivated by union animus. *Planned Building Services, Inc.,* 347 NLRB 670, 673 (2006). The burden then shifts to the employer to show that it would not have hired the predecessor's employees even in the absence of an unlawful motive.[36]

---

[36] An unlawful refusal to hire may be shown by a lack of a convincing rationale for the refusal to hire, inconsistent hiring practices, or overt acts, or conduct evidencing a discriminatory motive; and evidence

If an employer is found to have discriminated in hiring, the Board assumes that, but for the unlawful discrimination, the successor would have hired the predecessor employees in their unit positions. Id. at 672 (citing *Love's Barbeque Restaurant No. 62,* 245 NLRB 78, 82 (1979), enfd. in relevant part sub nom. *Kallmann v. NLRB,* 640 F.2d 1094 (9th Cir. 1981)). The Board also assumes that the union would have retained its majority status. *State Distributing Co.,* 282 NLRB 1048 (1987). Consequently, if the successor employer has refused to recognize and bargain with the union, it will be held to have violated Section 8(a)(5) and (1) of the Act and will be disqualified from setting initial terms and conditions of employment for the new work force. *Planned Bldg.,* 347 NLRB at 674 (citing *Love's Barbeque,* 245 NLRB at 82).

#### a. The 8(a)(3) discriminatory hiring

The evidence of animus in this case is overwhelming, as is the evidence that CNN's explanations for its conduct were pretextual. Substantial evidence of CNN's union animus is its termination of the ENGAs. The em-

---

supporting a reasonable inference that the new owner conducted its staffing in a manner precluding the predecessor's employees from being hired as a majority of the new owner's overall work force. *Planned Bldg.,* 347 NLRB at 673 (quoting *U.S. Marine,* 293 NLRB at 670).

The *U.S. Marine* case is particularly instructive here and rebuts our dissenting colleague's suggestion that an unlawful motive to avoid a successor bargaining obligation cannot be shown where a successor ultimately hires a majority of the predecessor's employees. The respondent successor in that case falsely projected that the number of employees that would comprise its full work force would be twice the size of the predecessor's bargaining unit. Based on this "false full-complement projection," the respondent rehired a majority of the predecessor's employees but stopped at the point that they would become a majority of its enlarged "fabricat[ed]" bargaining unit. The Board found (293 NLRB at 671) that the respondent's failure to rehire remaining employees of the predecessor "was a necessary and integral part of the Respondents' attempt to avoid an obligation to recognize and bargain with the Union" and violated Sec. 8(a)(3) and (1).

Here, as in *U.S. Marine,* CNN's hiring process was motivated by the intention to avoid its successor bargaining obligation. Although CNN did not falsely project a bargaining unit larger than the historical TVS bargaining unit, it erroneously contended, contrary to the judge's finding and substantial precedent, *Trident Seafoods, Inc. v. NLRB,* 101 F.3d 111, 118 (D.C. Cir. 1996), and *Banknote Corp. of America,* 315 NLRB 1041, 1043 (1994), enfd. 84 F.3d 637, 647 (2d Cir. 1996), that the only appropriate unit was a much larger one that consisted of the TVS employees and its own production employees. Based on this erroneous projection, CNN conducted its hiring process in the same discriminatory manner as in *U.S. Marine* to ensure that the number of TVS employees that it hired would not constitute a majority of the larger unit that it believed appropriate. In doing so, the number of TVS employees that it hired constituted a majority of the historical TVS bargaining unit that remained appropriate after CNN took over operations from TVS. However, by refusing to hire additional TVS employees to avoid a successor bargaining obligation, based on its erroneous position regarding the size of the appropriate unit, CNN violated Sec. 8(a)(3) and (1).

CNN AMERICA, INC.                                                                    19

ployees at the DC and NYC bureaus had lived through substantial technological changes, most notably going from videotape to digital media, and then from digital to HD, with ever increasing reliance throughout on sophisticated computer programs. As stated above, CNN never terminated or directed the termination of any TVS unit employee for failing to keep up with those changes or inability to perform the work. And when it terminated the TVS contracts, after secretly deciding to do so, CNN personnel went out of their way to praise the abilities of the two bargaining unit work forces. In the face of that evidence, CNN's claim that it brought the work in-house in order to keep up with technological change was, as the judge found, pretextually false. *Lucky Cab Co.*, 360 NLRB No. 43, slip op. at 4–5 (2014) (evidence of pretext may be used to show discriminatory motivation).

The numerous 8(a) (1) statements made by CNN officials also establish union animus. They complained repeatedly about the labor costs and "rules and regulations" imposed on CNN by virtue of the collective-bargaining agreements with the Union. And, as illustrated above, when the termination of the ENGAs was announced, they repeatedly told TVS employees that operations under CNN would be "nonunion."[37]

The evidence concerning CNN's staffing of the DC and NYC bureaus, however, provides the principal evidence of its unlawful discrimination against TVS employees in order to avoid a successorship bargaining obligation. As shown above, CNN, which plotted the ter-

mination of the ENGAs in secret, deliberately changed every bargaining unit job and position qualification with the expressed purpose of getting out from under the Union's jurisdiction. The change also had the effect, no doubt intended, of minimizing the significance of the bargaining unit employees' prior experience when they applied for the "new" jobs.

As the record also shows, once the actual hiring began, there were numerous instances of interviewing/debriefing/hiring disparities that adversely affected TVS applicants. In every job category, as detailed in the judge's decision, hiring managers ignored ostensibly governing protocols intended to ensure the objectivity of the behavioral interviewing process. At the beginning, they interviewed non-TVS applicants who were either rejected by their recruiters as unqualified after screening or who were never screened at all.[38] As discussed above, one such example was non-TVS photojournalist applicant Jeremy Moorhead who did not pass recruiter Rick Denius' screening because he lacked the requisite 3 years of experience. Atlanta-based photojournalist Manager Dan Young ignored Denius' report and set up an interview with Moorhead. Director of Newsgathering Matt Speiser interviewed Moorhead in person; Young, who had already pushed for Moorhead's reconsideration, participated by telephone. Young gave Moorhead two 5s and three 4s in the photojournalist rating criteria. Speiser gave Moorhead one 4 and three 3s. In the debriefing session, Young ranked Moorhead the 15th most desirable candidate; other hiring managers ranked him 27th. Notes from the debriefing session listed NLE as one of Moorhead's strengths, but nothing about NLE appeared on Moorhead's resume. The spread sheets tracking the candidates during the interviewing process inexplicably gave Moorhead credit for 5 years of experience. CNN hired Moorhead as a photojournalist. As also noted above, CNN interviewed and ultimately hired CNN employees who did not even apply for the positions in the DC and NYC bureaus.

There is little evidence that any of CNN's hiring managers consulted with CNN producers, editors and reporters who were familiar with the work of the TVS cameramen.[39] But when they did so, they ignored favorable assessments they received. Hiring managers, however, had no hesitation in soliciting favorable assessments of non-TVS applicants. For example, Atlanta-based Hiring

---

[37] The 8(a)(1) statements, discussed more fully below, consisted of:
- NYC Bureau Chief Karen Curry's statement to employees that CNN was terminating the ENGAs and bringing the technical services jobs in-house so that it "can work much easier with both the crews and the technical people; that in order to make it smoother, [CNN] needed to get rid of [TVS, because TVS] came with rules and regulations; that by getting rid of [TVS], then they can have more control of the technical people; and that CNN would not tolerate a union in its work force."
- NYC photojournalist Manager Jeff Kinney's statement to employees that their employment with TVS disqualified them from employment with CNN, telling TVS field cameraman James Peithman that CNN "could not hire [him] to do free-lance work because of his affiliation with the Union."
- NYC Operations Manager Lou Strauss' statement to employees that CNN intended to operate its NYC technical work force without a union at the end of the ENGA, and his additional confirmation that it was safe for employees to assume that the Union "won't be back at CNN."
- CNN DC White House Executive Producer Danielle Whelton's statement to TVS cameraman Tim Garraty that there would be no union at the DC bureau after CNN hired its own technical work force; when Garraty asked where the Union fit into CNN's future plans, Whelton replied that there would be "no Union" when CNN took over because there would "be no role for the Union."

[38] CNN hired an entire category of BIT senior engineers without subjecting them to the behavioral interviewing process. Those employees had formerly worked as CNN satellite truck operators.

[39] As DC and NYC employees of CNN who worked closely with the technical employees, in some cases for years, their assessments would have been worthy of consideration.

Manager Anne Woodward, who was the only person interviewing candidates for audio designer in DC, asked CNN Atlanta managers about the job performance of some candidates from Atlanta. Woodward made no such inquires about any of the TVS applicants that she interviewed. TVS DC unit engineers, who applied for BIT/engineer positions, fared no better at the hands of CNN DC Director of Engineering Tu Vu, who knew their work intimately and was the only DC manager on the BIT/engineering hiring committee. Vu acknowledged that he did not, at any time during the BSP, "try to steer the discussion by touting the strengths of TVS employees whose working history [he] knew."

Kellie Clarke, an independent human resources expert hired by CNN to coordinate the DC hiring, and who was later called by CNN as a witness, testified about other disparities and anomalies in the hiring. According to Clarke, after the interviews, she received and used the hiring managers' raw interview notes and scores for each candidate to generate spread sheet summaries of individual applicants' ratings, and the cumulative averages for all applicants in the specific job categories. Before the debriefing sessions for each job category, Clarke sent those summaries to CNN DC's top executives; to the hiring managers for the respective job category; to CNN Atlanta-based Cindy Patrick and Attorney Lisa Reeves; and to Turner Recruitment Manager Lauren Kile. After the debriefing sessions, the managers returned those summaries to Clarke with notes reflecting their discussions and selections. Clarke used the information on those returned spread sheets to update the master spread sheets. But she noticed that, "some of those returned spread sheets were altered; the averages were different and the ratings had been changed." Clarke said the changes baffled her and she "re-calculated the numbers to check for accuracy, and there was not a single error in [her] calculations." She reported the discrepancies to CNN HR Director Tim Taylor. There is no evidence that he did anything about them.

Once the hiring managers selected the candidates for job offers, Clarke was responsible for checking their references. Turner Recruitment Manager Kile instructed Clarke to check the references for non-TVS candidates first. Clarke "ran into a lot of problem with the professional references" listed on resumes of the non-TVS candidates: some of the businesses had closed; many of those candidates had given incorrect phone numbers for their references; and for those that gave correct phone numbers, "frequently the professional references were very negative." Clarke sought advice about how to handle the negative professional references, and Kile instructed her to ask the affected non-TVS candidates for

"personal references." Clarke testified that "this was the first time in [her] 17-year HR experience that [she] had been instructed to revert to personal references when there [were] negative professional references." She added that "some personal references called out of the blue to vouch for non-TVS applicants." As instructed, Clarke checked the TVS candidates' references last, and none received a negative reference. Clarke stated that following the completion of the DC recruiting, CNN asked her to help repeat the recruiting success in NYC, but she declined.[40]

Many CNN employees applied for the jobs in DC and NYC, and CNN hired every one of them. It allotted and paid relocation expenses for senior photojournalist candidates, ranging from $8000 for those from domestic bureaus, to $11,000 plus for those from its London bureau. It had difficulty getting U.S. work authorizations for some of its international candidates and ultimately hired an expert to handle the immigration and visa issues. Meanwhile, it did not hire about 55 of 120 TVS bargaining unit employees in NYC, and about 38 of 86 TVS bargaining unit employees in DC, all of whom were performing the very work that CNN was going to continue, some of them with many years of experience handling the bureaus' most important assignments.[41] Although CNN managers who supervised TVS' most active union members at the DC bureau praised them as some of TVS most skilled technicians, CNN did not hire any of them.

As also illustrated above, CNN's focus on "growth" candidates led to unusual hiring decisions. Growth candidates, many lacking in the skills necessary for their positions, were often hired over much higher-rated TVS employees. Like the judge, we regard CNN's emphasis on growth candidates as a poorly concealed effort to refuse to hire TVS employees.

In sum, the judge correctly reasoned that CNN's hiring managers' inconsistent application of their ostensibly objective guidelines of "behavioral interviewing" evinced discriminatory motivation. Based on this and the other evidence of CNN's discriminatory motive discussed above, we agree with the judge's finding that CNN's decision to terminate its arrangements with TVS and the Bureau Staffing Program were all part of a plan to replace a functioning union work force with a nonunion work force. We further agree with the judge that

---

[40] As noted above, CNN claims to have lost documents created during the debriefing sessions.

[41] It is unclear if the number of TVS candidates who were not hired included those who refused job offers (a few did). In addition, as noted above, whether every single TVS technician applied for a BSP job is also unclear. For example, of the four DC couriers, the record includes job application information for only two.

CNN AMERICA, INC.                                                21

CNN's reasons for failing to hire the TVS technicians were all pretextual, and that it has therefore failed to establish that it would not have hired the technicians absent its union animus. We therefore affirm his finding that CNN's refusal to retain TVS employees violated Section 8(a)(3).

### b. The 8(a)(5) and (1) violations

We agree with the judge that CNN was a successor employer. As recounted above, on the day following the termination of the ENGAs, CNN continued the same business operations with employees who performed the same work, at the same locations, and using the same equipment, as the TVS technicians. Accordingly, as continuity of the business enterprise and the work force was established, CNN was a successor and was obligated to recognize and bargain with the Union. Thus, by failing to do so and implementing unilateral changes in terms and conditions of employment, CNN violated Section 8(a)(5) and (1).

### III. SHIFT SUPERVISORS

CNN argues that, even assuming it had a successorship bargaining obligation, it had no obligation to bargain over those individuals denominated shift supervisors by TVS. The judge rejected that argument, finding the shift supervisors to be employees under the Act. We agree.

### A. Facts

The collective-bargaining agreements provided for TVS to designate skilled, experienced, and versatile hands-on bargaining unit studio and control room employees as "shift supervisors" in NYC, as "master controllers" in DC, and as engineer-in-charge (EIC) in both bureaus (collectively referred to here as "shift supervisors"). The collective-bargaining agreements also provided that shift supervisors and other unit employees assigned to "work in a high job category on a temporary basis" would receive contractually mandated hourly or weekly wage increases for the time spent on those assignments. In fact, all such designations were temporary; TVS routinely "rotated" those individuals back to their employee positions when their shift supervisory assignments ended.[42]

Shift supervisors at both bureaus handled identical responsibilities. They assisted the TVS managers with assignments and technical troubleshooting duties in the control rooms and studios. Shift supervisors begin their assignments by using the daily rundowns, prepared by

---

[42] For example, the record shows that shift supervisors Jimmy Suissa, Ralph Marcus, and Dennis Norman resumed their regular duties once the shows on which they were assigned as shift supervisors were over.

CNN and TVS managers. By the time the shift supervisors received those rundowns, TVS managers had already assigned the technicians to cover all the permanent or semipermanent tasks, such as those at CNN*fn*, CNN en Espanol, "Crossfire," and the White House. For the unassigned tasks, the shift supervisor followed an established pattern of assignments, based on employees' availability and the shift supervisors' knowledge of their coworkers' skills, to decide which employees would work on "day-to-day, short-term, trouble calls," e.g., who would operate the pedestal camera or who would operate the robotic camera.

One of the shift supervisors' main responsibilities was to notify a TVS manager when a technician called in sick. The TVS manager then arranged for a substitute to cover the absent worker. Occasionally, when the TVS manager had difficulty finding a substitute, the TVS manager would suggest that the shift supervisor handle the assignments on his own. Also occasionally, a shift supervisor told employees to stay late to finish a task, but only after the shift supervisor informed a TVS manager of the proposed overtime and after the TVS manager, in turn, obtained CNN's approval for the overtime.

Shift supervisors were also responsible for setting up the control room, handling technical troubleshooting such as "patching certain audio and video," and ensuring that all employees were in their appropriate positions. But the collective-bargaining agreement provided: "While shift supervisors are expected to report to TVS management regarding problems affecting the job performance of employees assigned to them, shift supervisors are not authorized to discipline or effectively recommend discipline of those persons. It is the job of TVS management to investigate and discipline." Unit employees assigned as weekend shift supervisors called TVS managers at home for guidance on handling nonroutine situations.

Engineer-in-charge (EIC), a designation used only in the DC bargaining unit, was the engineering department's equivalent of a shift supervisor. EICs were responsible for the technical aspects of live shoots or shows. For example, from February 2002 to December 2003, TVS engineer Dennis Norman was the EIC during the filming of "Crossfire" at the George Washington University campus. Norman ensured that "Big Red," the on-site microwave production truck, worked properly. The EIC designation was not used in NYC, but senior engineers in that bureau worked on high-profile shows in the control room and some were stationed at the 6th Avenue studio to handle on-site engineering problems.

22                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*B. Analysis*

Section 2(11) of the Act defines a "supervisor" as "an individual having authority, in the interest of the employer, to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not a merely routine or clerical nature, but requires the use of independent judgment." The party asserting supervisory status bears the burden of proof. *Oakwood Healthcare*, 348 NLRB 686, 694 (2006).

We affirm the judge's finding that CNN failed to prove TVS shift supervisors possessed any of the statutory supervisory indicia. As an initial matter, the "shift supervisor" designation in and of itself is neither a legal construct nor indicative of statutory supervisory status. Rather, as shown above, it derived from the collective-bargaining agreements between TVS and the Union, and it referred only to the designation of certain employees as shift supervisors on an as-needed basis. And, as in an April 2, 2002 memo, TVS often reminded the employees that the shift supervisors were bargaining unit employees and lacked any "genuine management prerogatives." See *Oakwood Healthcare, Inc.*, 348 NLRB at 690 ("[T]he Board has long held that job titles and descriptions prepared by employers are not controlling; rather the Board looks to the authority actually possessed and the work actually performed by the alleged supervisor."); *Heritage Hall, E.P.I. Corp.*, 333 NLRB 458, 458–459 (2001) (same); see also *Health Resources of Lakeview*, 332 NLRB 878, 878 (2002) (citing *St. Francis Medical Center-West*, 323 NLRB 1046 (1997) (temporary assumption of supervisory duties insufficient to establish supervisory status).

It is true that bargaining unit shift supervisors assisted TVS managers with "staffing," to the extent that they helped to fill in unassigned day-to-day or short-term tasks on the rundowns. But to do so, shift supervisors essentially followed an established pattern of assignments—who had done the specific assignment before—and relied on their knowledge of their coworkers' skills. We agree with the judge that in performing that task within those limits, the shift supervisors did not exercise independent judgment. See, e.g., *KGW-TV*, 329 NLRB 378, 381–382 (1999) (assignment editors' responsibility of matching particular stories with the right reporters and photographers not supervisory; no independent judgment required where assignments based on well-known employees' skills and the assignment process was a collaborative effort). The record also conclusively establishes

that shift supervisors had no authority to discipline or effectively recommend the discipline of other employees.

In sum, CNN failed to establish that the shift supervisors exercised any of the supervisory criteria of supervisory status. The judge therefore reasonably determined that the shift supervisors were bargaining unit employees.

IV. CNN'S "NO UNION" STATEMENTS

The judge found that certain statements by CNN managers violated Section 8(a)(1) of the Act. We affirm each of those findings.

*A. Legal Principles*

In *Advanced Stretchforming International, Inc.,*[43] the Board held that

> A statement to employees that there will be no union at the successor employer's facility blatantly coerces employees in the exercise of their Section 7 right to bargain collectively through a representative of their own choosing and constitutes a facially unlawful condition of employment. Nothing in *Burns* suggests that an employer may impose such an unlawful condition and still retain the unilateral right to determine other legitimate initial terms and conditions of employment. A statement that there will be no union serves the same end as a refusal to hire employees from the predecessor's unionized work force. It "block[s] the process by which the obligation and rights of such a successor are incurred." [Citations omitted.]

1. Karen Curry's statement

We affirm the judge's finding that CNN violated the Act when NYC Bureau Chief Karen Curry stated to employees that CNN had to "get rid of" TVS because it came with union "rules and regulations . . . ." That remark, made during a September 29, 2003 meeting to discuss CNN's announcement that same day of its termination of the ENGAs and implementation of the Bureau Staffing Plan, imparted the coercive message that CNN would not do business with the Union.

We reject CNN's claim that because TVS employee Barbara Morrisey-Marquez could not identify Curry as the speaker, the finding was based on speculation. The claim is meritless, as the judge's finding is supported by Curry's own admissions and the testimony of CNN Vice President of Technical Operations Jeffrey Polikoff. Cur-

---

[43] 323 NLRB 529, 530–531 (1997), enfd. in part on other grounds, remanded in part 208 F.3d 801 (9th Cir. 2000), amended and superseded on rehearing and enfd. in relevant part 233 F.3d 1176 (9th Cir. 2000), cert. denied 534 U.S. 948 (2001), remanded by the Board 336 NLRB 1153 (2001).

ry testified that she conducted and spoke at four meetings, one of which was the 4 p.m. meeting at issue. Polikoff testified that he attended the 4 p.m. meeting and that Curry was the only female who spoke. Morrisey-Marquez attended the 4 p.m. meeting at which, she testified, "a female" spoke about the changes, including getting rid of TVS and union rules. Based on those statements, in addition to Morrisey-Marquez' contemporaneous notes of what was said at the meeting, the judge had ample reason to credit Morrisey-Marquez' account and discredit Curry's denial.

## 2. Jeff Kinney's statement

We affirm the judge's finding that CNN violated the Act when NYC photojournalist Manager Jeff Kinney stated to TVS cameraman Jonathan Smith that his employment with TVS disqualified him from employment with CNN. As detailed in the judge's decision, Kinney and Smith had a series of conversations about Smith's continued employment before and after the termination of the TVS contracts. Smith asked Kinney several times about obtaining freelance work after CNN took over. At one point, Kinney told Smith that CNN was hiring cameramen who owned their own gear, which Smith said he had. Smith then asked if his union membership was a problem. Kinney replied, "That's good to know," and promised to check with the "higher ups." Approximately 3 weeks later, Smith called Kinney, who stated that because of Smith's "prior relationship with TVS and the Union, CNN would not be able to offer him freelance work."

CNN does not dispute that Kinney made the statement attributed to him. Instead, it challenges the judge's finding on the grounds that the statements could not be deemed unlawful coercion because Kinney had no role in planning the BSP, was a newly hired photojournalist manager, and therefore had no reason to know CNN's motivation. However, as CNN's own account establishes, Kinney made the statement months after his employment as the Bureau Staffing Plan's photojournalist manager began. Kinney was unquestionably an agent of CNN at the time of the statement, and, given Kinney's managerial status, the judge reasonably found that his statement was both unlawful and an admission of unlawful motivation. See *Reliant Energy*, 357 NLRB No. 172, slip op. at 1 fn. 6, 26 (2011) (agent's admissions admissible). CNN also argues that Kinney's statement was "irrelevant" because it was made in March or April 2004, "long after" the TVS contracts ended and CNN's work force was hired. That fact hardly diminishes the coercive nature of the statement.

## 3. Danielle Whelton's statement

We affirm the judge's finding that CNN violated the Act when White House Executive Producer Danielle Whelton told TVS cameraman Tim Garraty that there would be no union at the DC bureau after CNN hired its own technical work force. On September 29, 2003, immediately after CNN announced the termination of the ENGAs, Whelton called Garraty to her office to discuss the termination. In response to Garraty's question about where the Union fit into CNN's future plans, Whelton replied that there would be "no union" when CNN took over because there would "be no role for the Union."

CNN argues that because Whelton also told Garraty that CNN intended to hire all of TVS' staff, and Garraty knew of the principle of union recognition based on the "50% rule," he must have known that Whelton's no-union statement was a contradiction in terms. We regard that argument, too, as specious. "No union" means no union, regardless of what else Whelton said in the course of the conversation.

## 4. Lou Strauss' statement

We affirm the judge's finding that CNN violated the Act when NYC Operations Manager Lou Strauss told employees that CNN intended to operate its NYC technical work force without a union at the end of the TVS contract. During Strauss' interview of unit employee Jon Ford for a job with CNN, Ford mentioned the stresses that "a lot of my friends who had families and mortgages to pay" were experiencing because of uncertainty about obtaining employment with CNN. Strauss replied that "everything would be okay, there is nothing to worry about." Ford asked if it was "a safe assumption to say the [U]nion won't be back at CNN." Strauss replied, "Yes, that's a safe assumption to make."

CNN challenges the judge's finding by pointing out that Ford, not Strauss, raised the union issue, and Ford did so even after Strauss assured him that everything would be okay. These challenges are meritless. Strauss' statement was unlawful regardless of who first raised the issue and whatever Strauss may have said to put Ford's mind at rest.

CNN also contests the judge's decision to credit Ford over Strauss' denial. Among other reasons for crediting Ford, the judge observed that Strauss denied interviewing Ford despite having before him at the hearing a company exhibit that showed that he had. The judge noted that Strauss similarly denied interviewing another TVS employee, Neal Rivera, when documentation showed that he had.

24                           DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

### V. THE GENERAL COUNSEL'S EXCEPTIONS

The General Counsel urges the Board to find additional 8(a)(1) violations that the judge discussed but, the General Counsel asserts, inadvertently failed to include in his conclusions of law. The General Counsel supports that request by citing *South State Builders*, 339 NLRB 465, 465 fn. 1 (2003), and *Wake Electric Membership Corp.*, 338 NLRB 298, 299 (2003). Both cases provide that where the Board finds such omissions are inadvertent, it shall "modify the Conclusions of Law, Order, and notice to substitute [the omitted] descriptions." The General Counsel also urges the Board to modify the language the judge used in setting forth some of the 8(a)(1) findings.

We find it unnecessary to pass on all but one of these specific exceptions. It is understandable in this case that the General Counsel wants to "throw the book" at CNN. But the findings sought by the General Counsel would be cumulative and would not materially affect the remedy.

The one exception is the General Counsel's request that the Board find that CNN violated the Act when it informed its NYC employees that CNN "would not tolerate a union in its workforce." Although the judge's finding regarding CNN NYC Bureau Chief Curry's conduct on September 29, 2003, arguably subsumes that finding, we will add the quoted language to the conclusions of law and amend the Order and notice accordingly.

The General Counsel also contends that the judge incorrectly failed to include cease-and-desist language in the Order for all the specific 8(a)(1) violations. Again, we deem this unnecessary. We are satisfied that the order, which includes a provision enjoining CNN from "[i]n any other manner interfering with, restraining and coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act," adequately addresses the violations at issue.

Last, the General Counsel contends that the judge incorrectly failed to include language in the notice concerning the remedies for the 8(a)(1) violations. We grant that exception and, in our Order, correct this omission.

### AMENDED CONCLUSIONS OF LAW

1. Substitute the following for the judge's Conclusions of Law 2.

"2. As a joint employer, the Respondent violated Section 8(a)(5) and (1) by refusing and failing to comply with the collective-bargaining agreements between TVS and Local 31 and between TVS and Local 11 after the Respondent terminated the contracts with TVS at both its DC and NYC bureaus."

2. Insert the following as Conclusions of Law 3 and renumber subsequent paragraphs accordingly.

"3. The Respondent violated Section 8(a)(5), (3), and (1) by failing to give the Union notice and an opportunity to bargain over the decision to terminate its contracts with TVS at both its DC and NYC bureaus, by refusing the Union's requests for bargaining over the effects of that decision, and by discharging the TVS technicians because of their union affiliation and to avoid its obligation to bargain with the Union."

### AMENDED REMEDY

In addition to the remedies provided in the judge's decision, we shall order the Respondent to make unit employees whole for any loss of earnings and other benefits suffered as a result of its unilateral changes. This make-whole remedy applies to all unit employees who were employed by the Respondent at its DC and NYC bureaus and whose wages and benefits were affected by the Respondent's refusal to apply the terms of the collective-bargaining agreements between TVS and the Union after the Respondent terminated its contracts with TVS. The make-whole remedy shall be computed in accordance with *Ogle Protection Service*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), with interest as prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB No. 8 (2010).

In addition, we shall order the Respondent to compensate the bargaining unit employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards and to file a report with the Social Security Administration allocating the backpay awards to the appropriate calendar quarters for each bargaining unit employee.

### ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge as modified and set forth in full below and orders that the Respondent, CNN America, Inc., its officers, agents, including Turner Broadcasting Systems, its officers, agents, and their successors and assigns, shall

1. Cease and desist from

(a) Discharging bargaining unit employees of Team Video Services (TVS) its joint employer and predecessor employer at the Washington, DC (DC) and New York, New York (NYC) bureaus because of their union-represented status in TVS' operation; or because of their union activities and membership; or otherwise discriminating against these employees to avoid having to recognize and bargain with NABET Local 11 and NABET Local 31 (the Union).

(b) Refusing to comply with the collective-bargaining agreements between TVS and the Union at both the DC and the NYC bureaus.

(c) Refusing to recognize and bargain in good faith with the Union as the exclusive collective-bargaining representatives of its employees in the bargaining units recognized by TVS at both the DC and the NYC bureaus.

(d) Refusing the Union's requests for bargaining over the decision to terminate the contracts with TVS and implement the Bureau Staffing Project and the effects of that decision on the bargaining unit employees at both the DC and the NYC bureaus.

(e) Unilaterally limiting the number of TVS bargaining unit employees it hired, and changing the wages, hours, and other terms and conditions of employment of those it hired and the work that they previously performed or functionally equivalent work, without giving the Union notice and an opportunity to bargain.

(f) Contracting out bargaining unit work without providing the Union with notice and an opportunity to bargain over such work.

(g) Informing bargaining unit employees at both the DC and NYC bureaus that the Respondent intended to operate a nonunion workplace, and that the employees' employment in the TVS bargaining units or their union activity, affiliation, or membership disqualified them from employment with the Respondent.

(h) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Notify the Union in writing that it recognizes the Union as the exclusive representative of the employees in the bargaining units recognized by TVS and that it will bargain with the Union concerning the terms and conditions of employment for the bargaining unit employees and other employees performing work that was previously performed by the unit employees, or functionally equivalent work.

(b) Recognize, and on request, bargain with the Union as the exclusive representative of the unit employees concerning the terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

(c) At the request of the Union, rescind any change(s) in the terms and conditions of employment of its bargaining unit employees that were unilaterally implemented after December 6, 2003, at the DC bureau, and January 17, 2004, at the NYC bureau, and retroactively restore the preexisting terms and conditions of employment, including hours, wage rates, and benefit plans, until the Respondent negotiates in good faith with the Union to agreement or to impasse.

(d) Nothing in this order shall authorize or require the withdrawal or elimination of any wage increase or other improved benefits or terms and conditions of employment that the Respondent may have established at its DC or NYC bureau since the termination of its contracts with TVS.

(e) Within 14 days from the date of the Board's Order, offer employment to the former TVS employees listed below to their former positions or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

26                                DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

**DC Bureau**
(TVS unit employees
not hired by CNN)

Jeffrey Adkinson
Emmanuel Agomuoh
Charles Anderson
Rodney Atkinson
Tim Bintrim
James Cook
Keith Crennan
Timothy Durham
Bill Evans
Danny Farkas
Dennis Faulkner
Christopher Hamilton
David Jenkins
Martin Jimenez
Michael Kauffman
Nicholas Kiraly
Adilson Kiyasu
Donna Lacey
Larry Langley
Myron Leake
Mark Marchione
Ralph Marcus
Joseph Mosley
Luis Munoz
Jeffrey Noble
Dennis Norman
James Norris
Sarah Pacheco
John Quinnette
Tyrone Riggs
Oscar Romay
Fred Schall
Paul Skaife
James Stubbs
James Suddeth
James Suissa
John Urman
Joseph Wade
Aaron Webster
Darrin White
Patrick Howley[44]

**NYC Bureau**
(TVS-unit employees
not hired by CNN)

Marc Abramson
Melanie Baker
Marcus Bassett
Paul Bernius
Doriann Bertino
Richard Birch
Steve Burnett
Joseph Cantali
Jeffrey Carlough
Timothy Cassese
Christopher Collins
Duff Conner
Robert Cummings
Christopher Cunningham
Viktor David
Jennifer DeStefano
John Diaconu
Michael Diana
Jeffrey Edelman
Jay Eric
Vince Everett
Donald Fenster
Felix Formaintt
Todd Ferrand
Jon C. Ford
John Gallagher
Mitchell Gomila
Fernando Garcia
Daniel Hacker
Phil Hadrovic
Kristi Harper
Peter Hedeman
Juan Hortua
Daniel Rodriguez
Christian Roebling
Hamid (David) Rokshar
Daniel Scalley
Shari Schlager
William Seiden
Charles Serra
Michael Sollenberger

Jeffrey Jaramillo
Asprey Jones
Kenneth S. Kaplan
Brian Kiederling
Robert Knolle
Glen Kreigsman
Beth Lasch
Steven Lima
Connie Long
Perry MacLean
Tommy Maney
Sarael Martinez
Robert Matteo
Roy McClain
Kathleen McLaughlin
Edward McShea
Barbara Morrisey
Rod Nino
Ramon Olivo
Tracy Organ
James Peithman
Mark Peters
Todd Pivawer
Charles Rainone Jr.
John Rappa

Mickael Squier
Danielle St. John
Robert Sullivan
Mary Theodore
Richard Uhoda
Pedro Valentin
Brian Wood

(f) Compensate the affected employees for the adverse tax consequences, if any, of receiving a lump-sum backpay awards, and file a report with the Social Security Administration allocating the backpay awards to the appropriate calendar quarters for each employee.

(g) Provide to the employees named in the preceding paragraph 2(e) whatever training the Respondent has provided since its termination of the contracts with TVS, if such training is necessary to allow these employees to perform their former jobs or substantially equivalent positions.

(h) Within 14 days from the date of this Order, remove from its files any reference to the unlawful refusal to hire the employees named in the preceding paragraph 2(e), and within 3 days thereafter, notify them in writing that this has been done and that the refusal to hire them will not be used against them in any way.

(i) Make whole, in the manner set forth in the remedy section of the judge's decision, as modified in this decision, the employees named below, in addition to those named in paragraph 2(e) above, for any loss of earnings and other benefits suffered as a result of the Respondent's unlawful discharge of them and its failure to hire them, or unilateral changes in the terms and conditions of

---

[44] The judge found that Patrick Howley worked 282 hours in the NYC studio between pay periods 3 and 7 in 2003, but excluded him from the TVS-NYC bargaining unit because he did not perform any bargaining unit work after April 1, 2003. The General Counsel, citing *DIC Entertainment, L.P.*, 328 NLRB 660 (1999), which established that any freelance or daily hire employee who worked at least 15 days within the prior year should be included in the bargaining unit, contends that Howley should be included on the list of discriminatees because he

worked during the relevant 12-month period, irrespective of when during that period he performed the work. We agree.

CNN AMERICA, INC.                                                                27

their employment that existed prior to the Respondent's termination of its contracts with TVS.

(j) Make whole, in the manner set forth in the remedy section of the judge's decision, as modified in this decision, those employees that it hired in the Bureau Staffing Program and paid a lower wage rate that they previously earned under the collective-bargaining agreement.

### DC Bureau

Bill Alberter
David Bacheler
Reza Baktar
Mike Bannigan
Cameron Bartlett
Stephen Bartlett
Jay Berk
Dave Berman
John Bodnar
Burke Buckhorn
David Catrett
Bobby Clemons
Everett Cottom
Michael David
John Davis
Ronald Davis
Ken Distance
Martin Dougherty
Brenda Elkins
Thomas Everly
Cesar Flores
Michael Galindo
Tim Garraty
Maurice George
Augusto Gomez
Thomas Michael Greene
Eddie Gross
Conrad Hirzel
Paul Hollenback
David Hugel
Lesa Jansen
Lori Jennings
Warren Kinlaw
Dave Kopecky
Martin Kos
Douglas Koztoski
Ronald Kuczynski

Kevin McCall
Kevin McClam
Barbara Stieritz Mccloskey
Douglas Mckinley
Samuel Jay McMichael
Paul Miller
William Moore
James Moran
Peter Morris
Flick Morse
John (Nick) Mueller
Lorn Murphy
Ernest Nocciolo
John Otth
Robert Parker
Ines Perez-Thompson
William Pettus
James Riggs
Greg Robertson
David Scherer
Barry Schlegel
Reggie Selma
Raeshawn Smith
Tawana Smith-Brown
Carolyn Stone
Daniel Taylor
Arthur Thomas
Jerry Thompson[45]
Lisa Timchalk
William Tipper
John Tripp
Ken Touhey
Kim Uhl
Anthony Umrani
Joe Walker
Mark Walz
Kenneth White

Marianna Lafollette
Christopher Leonard
Tau Liu
Howard Lutt
Michael Maciejewski

Alvester Williams
John Williams
Brian Yaklyvich
Elizabeth Zosso

### NYC Bureau

John Allen
Andrew Gideon Arnold
Shimon Baum
Gordon D. Benedict
Shep Berkon
Frank Bivona
Robert Borland
Karl Braunwarth
Robert Brennan
Chris Brown
Gregory Bryne
Jeffrey Bums
Joe Capolarello
Douglas Carroll
Mark Casey
Timothy Cassese
Sergio Centa
James Clarke
Christopher Collins
John R. Conroy
  Stephen Coombs
Paul Cutting
Louis Delli-Paoli
Gary D'Orio
Michael Dottin
Stefan P. Dreyfuss
Ori M. Dubow
Bruce Dunkins
Larry Edgeworth
Nicholas J. Fayo
Bradley Fehl
John Ferry
Dennis Finnegan
Stewart Forman
John M. French
Arielle Garnza
Nicolae Ganea
Desmond Garrison
Christopher Geiger
Michael Gittelman
Michael J. Glazier
Ricardo Gomez
Glen R. Gorham
Larry Greenberg
William Greene

P. Jeffrey Latonero
Brenda Laux
Jason Lazar
Brahms Lee
Laurent LeGal
Stacy Leitner
Allan Leibman
Todd Lindenfeld
Kevin M. Lishawa
Felice Loccisano
Steven Machalek
Christopher Madden
Douglas Maines
Michael Manzo
Alexander Marshall
Gilbert Martinez
David McCarrie
Sean P. McGinn
Dan Meara
Jennifer T. Messina
Thomas Miuccio
John Montalbano
Donald Mulvaney
Joathan C. O'Beirne
Juan Ortiz
Dina V. Pace
Diane Parker
Phillip Pernice
Glenn W. Perreira
Timothy A. Persinko
James Pertz
Saylor Phair
Lauren Price
Andrew Rabel
John Reilly
Jonathan D. Reiss
Scott Riley
Frank Romano
Pietro A. Rotundo
Joseph Santos
Samuel Sawyer III
Frederick Schang
Edward Scholl
David B. Schumacher
Charles Serra

---

[45] The General Counsel excepted to the judge's omission of TVS-DC unit employee Jerry Thompson from App. A, the list of employees whose were affected by CNN's unilateral changes to the terms and conditions of employment. The original complaint listed Thompson as an affected employee, and the judge's omission appears to be inadvertent.

28                            DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| Jason Greenspan | Richard Shine |
| Jeffrey D. Greenstein | Jonathan Smith |
| Eric Grima | Michael Sollenberger |
| John J. Heneghan | William M. Sparks |
| Mark A. Herman | Michael Stein |
| Thomas P. Hollyday | Robert Strano |
| Larry Holmes | Roger Thomas |
| Mark Hubbard | Ronald L. Thompson |
| Walter Imparato | Shane Touhey |
| Anthony K. Ioannou | Mike Trier |
| Thomas Jurek | Ioannis Tsesmelis |
| William Kane | Lawrence Van Pattern |
| Nicholas P. Karas | Donald Walden |
| Gerard Kaufold | Christopher Ward |
| Sergei Khramtsov | David Weber |
| Paul T. Kim | Robert Wenk |
| Keith H. Koslov | Jamie Wiener |
| Edward Langan | Glenn W. Zachar |

(k) Compensate bargaining unit employees listed in 2(e) and (h) above for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file a report with the Social Security Administration allocating the backpay award to the appropriate calendar quarters.

(l) Restore any bargaining unit work, which has been contracted out since the termination of the contracts with TVS.

(m) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents for examination and copying, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(n) Remit to the Union with interest, any dues that the Respondent was required to withhold and transmit under the DC bureau's collective-bargaining agreement since December 6, 2003, and the NYC bureau's collective-bargaining agreement since January 17, 2004.

(o) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause show, provide at a reasonable place designated by the Board or its agents, all payroll records.

(p) Within 14 days after service by the Region, post at its DC and NYC bureaus copies of the attached notice marked "Appendix."[46]   Copies of the notice, on forms

provided by the Regional Directors for Regions 2 and 5, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted.   In addition to physically posting of paper notices, notices shall be distributed electronically, such as by email, posting on an internet or intranet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the bureaus involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice that has been signed by the Respondent's authorized representative to all current employees and former employees employed by the Respondent at its DC and NYC bureaus at any time after September 29, 2003.

(q) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.   September 15, 2014

_____

Mark Gaston Pearce,                    Chairman

_____

Kent Y. Hirozawa,                         Member

(SEAL)            NATIONAL LABOR RELATIONS BOARD

MEMBER MISCIMARRA, concurring in part and dissenting in part.

The National Labor Relations Act charges the Board with the "special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236 (1963) (citation omitted). In my view, the majority inadequately considers the "complexities" associated with the work setting here, which presents a triple threat of challenges for the Board.   We are dealing with cable television news journalism, an industry that involves near-continuous

---

[46] We shall substitute a new notice to conform with *Durham School Services,* 360 NLRB No. 85 (2014). If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall

read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

technological change. Cable News Network (CNN) has a business model—unprecedented when it was created—requiring around-the-clock instant coverage of unpredictable global events. Finally, like the economy in general, CNN's operations involve complex relationships with other entities, including the need to change those relationships with some frequency.

These considerations do not detract from the importance of ensuring that employers like CNN comply with federal labor laws, and I agree with some conclusions reached by my colleagues.[1] However, our areas of agreement are obscured by my colleagues' more sweep-

---

[1] I agree with several parts of my colleagues' decision in this case, although there is a vast record with conflicting evidence as to almost every issue. First, I agree that the record supports (though not uniformly) my colleagues' finding that some CNN representatives engaged in individual discriminatory hiring decisions in violation of Sec. 8(a)(3), although I believe CNN lawfully decided to discontinue the use of personnel employed by Team Video Services (TVS), and I disagree with my colleagues' finding that the General Counsel proved that CNN's entire Bureau Staffing Project was an unlawful plan designed, from its inception, to result in unlawful discrimination. Second, I agree that the record supports a finding that CNN, as a successor to TVS, was required to recognize and bargain with the former TVS unions (NABET Locals 11 and 31). Third, I agree that several CNN representatives violated Sec. 8(a)(1) by making unlawful statements—when discussing how CNN would address union issues as a prospective posttransition employer—about the posttransition status of the Union. Even as to these issues, however, the instant case presents very close questions that, in my view, are not amenable to such straightforward resolution as one might infer from the majority opinion.

Contrary to the majority, in addition to the issues addressed in the text, I would find that CNN's New York Bureau Chief, Karen Curry, did not violate Sec. 8(a)(1) when she told certain CNN employees on September 29, 2003, that CNN had terminated the subcontracts with TVS so that it would have more control over its technical work force. Curry reportedly stated that CNN terminated the TVS agreements because CNN wanted "more control of [its] technical people," and that TVS "came along [with] rules and regulations." As the judge found, the record is insufficient to establish that Curry explicitly mentioned "union rules" (as opposed to "rules"), restrictions in collective-bargaining agreements, or even the broader subject of unions. In the context of CNN's contractor relationship with TVS, I believe the sentiments expressed by Curry were lawful for several reasons. First, in most if not all cases when an employer discontinues a subcontract and brings the work in-house, this type of change is lawfully motivated in part by a desire to have "more control" over the work, and I believe this counsels against interpreting Curry's statement as an expression of unlawful antiunion motivation. Second, the statement that TVS was associated with "rules and regulations" was clearly correct, even if one only considers the detailed provisions in the Service Agreements between CNN and TVS, which gave TVS "sole and absolute discretion" to direct the TVS technicians. The record suggests that this noncoercive interpretation is just as plausible as my colleagues' assumption that Curry was referring to "union" rules and regulations. Third, as a contracting employer, CNN could lawfully cease doing business with TVS even if motivated by a desire to avoid TVS' union obligations. *Plumbers Local 447 (Malbaff Landscape Construction)*, 172 NLRB 128, 129 (1968); *Computer Associates International, Inc.*, 324 NLRB 285, 286 (1997). Thus, Curry's statement was lawful even accepting the majority's interpretation of it.

---

ing pronouncements of illegality that, in my view, cannot be squared with our precedents and the record. In particular, I believe my colleagues' broader findings misapply labor law principles governing four areas: joint-employer status, contractor relationships, changes driven by technological advances, and successorship (the law governing a purchaser's treatment of predecessor labor law obligations). I respectfully dissent from my colleagues' findings regarding joint-employer status; I dissent from their finding that CNN had a statutory duty to notify the Unions and bargain with them over CNN's decision to terminate the Team Video Services (TVS) contracting relationship and to insource its technical work; I disagree with the finding of unlawful motivation regarding CNN's decision to terminate the TVS relationship, the decision to insource technical work, and the overall design of CNN's staffing plan; and I dissent from my colleagues' order that CNN rescind the initial employment terms established by CNN at the time of the TVS-CNN transition.

### Factual Background

The relevant facts—summarized more fully in my colleagues' opinion—center on CNN's arrangements in New York and Washington, D.C., with a succession of outside contractors that, in turn, employed technical personnel. These contracting relationships began more than 20 years ago when CNN, in 1980, basically created the industry of around-the-clock cable television news journalism. Personnel supplied to CNN pursuant to these contracting arrangements included field and studio camera and audio technicians, engineering technicians, and other technical employees (technical employees). I do not need to restate the facts summarized by my colleagues, except their recitation does not adequately address several points.

First, as the Board itself acknowledged near the beginning of this 20-year history, each CNN contractor has been a distinct "employer," with its own union, separate from and without *any* participation by CNN in the bargaining relationship. In *Mobile Video Services*, 266 NLRB 1143, 1144 and fn. 2 (1983), the Board dealt with unfair labor practice charges against the then-current contractor responsible for providing technical employees to CNN in Washington, D.C. In *Mobile Video*, the contractor-CNN relationship—putting aside numbers of employees—was described in terms nearly identical to the instant case:

> Respondent is engaged at its facility in Washington, D.C., in the production of video tape and television programming, primarily news coverage, for its clients. Respondent's operations in Washington

30                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

commenced in November 1978. Cable News Net-
work commenced operations in Washington in April
1980 and went on the air June 1, 1980. *Since about
June 1980, 80 to 90 percent of Respondent's busi-
ness has been on a contract basis with Cable News
Network, herein called CNN.* Prior to April 1980,
Respondent had six employees in the classification
of *cameramen, tape operators, and editors.* General-
ly, one cameraman and one tape operator constitute
a camera crew; however, a crew may be enlarged
depending upon the complexity of the assign-
ment. . . .

*Respondent's CNN operation requires, in addition to
the camera crews who do the fieldwork, master con-
trollers.* These master controllers work at the master
control facility located in the CNN building. They are
responsible for the direction of the various shows, for
the technical product, the signal, recording tapes, play-
ing tapes to air, and taking in signals from the field,
such as from a microwave truck or a telephone facility.[2]

As my colleagues indicate, the Board in 1982 certified
NABET Local 31[3] as the representative of contractor tech-
nical employees in Washington, D.C. Similarly, in 1985,
the Board certified NABET Local 11 as the representative
of contractor technical employees in New York. In both
cases, the "employer" has always been the contractor, not
CNN. There is no evidence that CNN has ever had any
bargaining relationship or entered into any agreement with
either Union.

Second, there is an enormous record in this case. The
hearing involved 82 days of trial, more than 1300 exhib-
its, and more than 16,000 transcript pages. This means
the description of facts by the ALJ—and in the majori-
ty's opinion—necessarily oversimplifies an extremely
com-plicated series of events, decisions, and relation-
ships. In every case, there is a risk of relying on a few
facts that, viewed in isolation, support one proposition,
when the weight of the evidence goes elsewhere. How-
ever, I respectfully suggest that, in the instant case, this is
more than a risk: my colleagues' finding of joint-
employer status disregards overwhelming evidence es-
tablishing that TVS acted independently as the "employ-
er," even though, like countless other businesses, TVS
was heavily dependent on its commercial contract with a
principal client, CNN. The evidence my colleagues rely
on is highly selective. For example, to demonstrate that

CNN purportedly engaged in the type of day-to-day di-
rection associated with an employer rather than a client,
the majority cites two of the most extraordinary, impos-
sible-to-predict events in the past 30 years when CNN
gave direct instructions to TVS personnel: immediately
after the September 11 terrorist attacks on the World
Trade Center and the Pentagon, and the reentry explosion
of the Space Shuttle Columbia. Likewise, my colleagues
improperly discount the significance of CNN's decision
to bring in-house the technical work previously per-
formed by TVS and its predecessors, when the record
shows this was not only a major change driven in large
part by technological advances, this was an unpreceded-
ed departure from CNN's 20-year practice—spanning the
entire history of CNN's New York and Washington,
D.C. operations—of using contractor technical person-
nel.

Third, the record establishes that, when conducting
arm's-length negotiations over its commercial contract
with TVS, CNN endeavored to secure adequate protec-
tion in the CNN-TVS contract and to ensure that its tech-
nical staffing needs would be met.[4] Considering that
CNN operates an around-the-clock cable television news
operation devoted almost entirely to unplanned and un-
foreseeable events (i.e., "news"), it is no surprise that the
CNN-TVS Electronic News Gathering Services Agree-
ment (ENGA or Agreement) provided that TVS would
supply technicians "on a twenty-four (24) hour per day,
seven (7) day per week basis as needed by [CNN]." The
Agreement provided that CNN would furnish all tech-
nical equipment, consistent with its need to ensure com-
patibility with other CNN equipment, live coverage and
real-time editing. CNN's primary liability under the
Agreement consisted of personnel-related fees and ex-
penses (dealt with only in the aggregate), and the
Agreement limited CNN's maximum overall exposure to
"up to four percent (4%) per year," with an additional 2
percent that TVS could choose, in its sole discretion, to
provide as "Merit Funds" to TVS employees as TVS
deemed appropriate. As one would expect, CNN re-
tained the right to "freely contract with any other indi-
vidual or entity" and "to make such work assignments
. . . as it sees fit, whether to its own employees, to [TVS],

---

[2] 266 NLRB at 1144 (footnotes omitted; paragraph structure modi-
fied; emphasis added).
[3] NABET refers to the National Association of Broadcast Employees
and Technicians, Communications Workers of America, AFL–CIO.

[4] There is no allegation that CNN and TVS were commonly owned
or commonly controlled, or that one was a "disguised continuance" of
the other, which has resulted in Board and court findings that two enti-
ties are a "single employer" or alter egos. *Southport Petroleum Co. v.
NLRB,* 315 U.S. 100, 106 (1942). Indeed, the arm's-length nature of
the commercial relationship between CNN and TVS (and its predeces-
sor contractors) is reflected in the detailed nature of the Agreement
between CNN and TVS, in addition to the fact that CNN terminated the
contractor relationship relating to technical personnel at least four times
over a 20-year period.

CNN AMERICA, INC.                                              31

or to other entities." Also no surprise, CNN's needs were made "a top priority . . . [to] be performed by [TVS] technicians . . . prior to performing any other work for any other client or customer." The Agreement further provided that the TVS employees "*are not employees of [CNN], and shall not be so treated at any time by either [TVS or CNN]*" (emphasis added). Finally, the Agreement provided that TVS had "sole and absolute discretion and responsibility for *hiring, firing, wages, benefits, compensation, direction of the work force and other matters of personnel and labor relations*" regarding all technical personnel (emphasis added). The record clearly establishes that TVS—and not CNN—was solely responsible for these traditional indicia of "employer" status.

Fourth, after deciding to insource all technical personnel work, CNN devised an extensive process to facilitate recruiting and hiring technical personnel. Although my colleagues discount the process devised by CNN—called the Bureau Staffing Project—their own description reveals that CNN retained an outside consultant (Development Dimensions International), and CNN devoted significant resources to create, refine, and/or consolidate positions and job descriptions. Approximately 30 CNN recruiters and hiring managers received training related to the Project, CNN engaged in a nationwide job advertising campaign, and it ultimately filled more than 200 technical positions using highly structured behavioral interviews (focusing on specific technical qualifications in addition to factors such as client service, teamwork, and organizational skills, among others).

Finally, and most importantly, *the majority of technical employees hired by CNN pursuant to its Bureau Staffing Project consisted of former TVS personnel represented by the TVS Unions.* Of the 120 bargaining unit positions filled by CNN in New York, 65 were hired from the predecessor employer (54 percent). Similarly, of the 86 bargaining unit positions filled by CNN in Washington, D.C., CNN hired 48 from the predecessor employer (55 percent). The Board's well-established rules require a successor to recognize and bargain with a predecessor's union if the successor hires a "workforce majority" (i.e., if a majority of the posttransition work force in an appropriate unit consists of the predecessor's union-represented employees). If the Project was created to avoid a successorship obligation to bargain, it was an abject failure. CNN's hiring pursuant to the Project produced a work force majority *and* a successor bargaining obligation. Thus, even though the record suggests some individual hiring decisions reflected a bias against former TVS employees, it defies reason to suggest (as my colleagues find) that CNN's Bureau Staffing Project was

motivated by the intention to avoid a posttransition bargaining obligation, when the Project caused CNN to become a legal successor obligated to bargain with NABET Locals 11 and 31.[5]

Discussion

*A. Joint-Employer Status*

The Board will find that two separate entities are joint employers of a single work force if the General Counsel proves that they "share or codetermine those matters governing the essential terms and conditions of employment." *TLI, Inc.*, 271 NLRB 798 (1984) (citing *NLRB v. Browning-Ferris Industries of Pennsylvania*, 691 F.2d 1117, 1123–1124 (3d Cir. 1982)). As my colleagues explain, joint-employer status requires a showing that the employer "meaningfully affects matters relating to the employment relationship such as hiring, firing, discipline, supervision and direction." *Laerco Transportation*, 269 NLRB 324, 325 (1984). "The essential element in this analysis is whether the putative joint employer's control over employment matters is *direct and immediate*." *Airborne Express*, 338 NLRB 597, 597 fn. 1 (2002) (emphasis added) (citing *TLI, Inc.*, 271 NLRB 798. 798–799 (1984)), cited in Wilma B. Liebman, *Decline and Disenchantment: Reflections on the Aging of the National Labor Relations Board*, 28 Berkeley J. Emp. & Lab. L. 569, 581 fn. 86 (2007); see also *Summit Express, Inc.*, 350 NLRB 592, 592 fn. 3 (2007).[6] Of course, the burden of proving that two entities are joint employers rests with the General Counsel. *Hobbs & Oberg Mining Co.*, 297 NLRB 575, 586 (1990).

In applying this doctrine, our cases establish that a business that subcontracts labor services will not be deemed to be a joint employer merely because it exerts

---

[5] As noted below, CNN acknowledges that its hiring decisions pursuant to the Bureau Staffing Project resulted in a "workforce majority" both in New York and Washington, D.C., which strongly undermines any suggestion that the Project reflected an intention to avoid a bargaining obligation. However, CNN also argues that its posttransition work force included changes in the bargaining unit's composition, including the addition of new positions that, CNN argued, prevented CNN from inheriting a successor bargaining obligation. Like my colleagues, I find this argument to be without merit. Thus, I agree that when NABET Locals 11 and 31 demanded bargaining, CNN had a substantial and representative complement of employees in New York and Washington, D.C., respectively, a majority of which consisted of employees formerly represented by NABET Locals 11 and 31, the preexisting bargaining units remained generally unchanged, and CNN was therefore required as a successor to recognize and bargain with those Unions. *NLRB v. Burns Security Services*, 406 U.S. 272 (1972); *Fall River Dyeing Corp. v. NLRB*, 482 U.S. 27 (1987).

[6] In fn. 7 of the majority opinion, my colleagues cast some doubt on the Board's "direct and immediate" requirement, but they do not overrule *Airborne Express*, supra, or *Summit Express*, supra. These precedents remain good law.

32                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

sufficient control over subcontractor employees to ensure that it receives the contracted services:

> An employer receiving contracted labor services will of necessity exercise sufficient control over the operations of the contractor at its facility *so that it will be in a position to take action to prevent disruption of its own operations or to see that it is obtaining the services it contracted for.* It follows that the existence of such control, is not in and of itself, sufficient justification for finding that the customer-employer is a joint employer of its contractor's employees.

*Southern California Gas Co.*, 302 NLRB 456, 461 (1991) (emphasis added).

Our cases also attach importance to whether an agreement explicitly identifies the "supplier" employer as an independent contractor with language that expressly vests in it exclusive supervisory authority over its employees. The Board has referred to such language—like that contained in the CNN-TVS Services Agreement—as an "important factor in determining whether a joint-employer relationship exists." *Cabot Corp.*, 223 NLRB 1388, 1389 fn. 7 (1976) (citing *Mobil Oil Corp.*, 219 NLRB 511 (1975)), enfd. sub nom. *Chemical Workers Local 483,* 561 F.2d 253 (D.C. Cir. 1977); see also *Airborne Express*, 338 NLRB at 605.

My colleagues concede that CNN had no direct role in hiring, firing, disciplining, discharging, promoting, or evaluating employees and that CNN did not actively codetermine the TVS technicians' other terms and conditions of employment. Nevertheless, my colleagues find that CNN was a joint employer (together with TVS) based on areas where CNN ostensibly exercised indirect influence on TVS employees. In all of these areas, I believe the record is insufficient to prove that CNN was a joint employer of TVS technical employees.

1. *In General—The Nature of CNN's Business.* Contrary to the thrust of the majority opinion, it is not foreign in Board case law to have situations where an independent contractor's employees have a jobsite presence and substantial oversight and interaction between the client and contracting employer. The Board has long dealt with situations where multiple "employers"—while retaining their separate identities—have employees who interface with one another and provide services to third parties. This has been most prevalent in the construction industry, where general contractors oversee multiple subcontractors, each responsible for a particular specialty, on a single project. The general contractor exercises substantial oversight over the subcontractors *and* their employees to ensure that subcontractor employees do the work

needed at the correct time and place. Nonetheless, the Supreme Court long ago concluded that this type of complex interaction did not convert the general contractor into an "employer" of subcontractor employees. *NLRB v. Denver Building Trades Council*, 341 U.S. 675, 692 (1951) (*Denver Building Trades*). Nor is this treatment of contractor employees limited to the construction industry. See *Broadcast Employees NABET Local 250 (Taft Broadcasting, Inc.)*, 194 NLRB 162 (1971) (professional hockey team contracted with radio station to furnish labor services of a color commentator to work alongside, and under the "direction and control," of a team-employed play-by-play announcer during game broadcasts; the Board adopted judge's finding that color commentator was employed by the radio station, not the hockey team, and that the union representing radio station employees did not violate Sec. 8(b)(4) by picketing the hockey arena during broadcasts); *TLI, Inc.*, 271 NLRB at 799 (Board finds that driver leasing company was the sole "employer" of drivers used by separate company engaged in manufacture and distribution of corrugated boxes, where the user employer engaged in "limited and routine" day-to-day supervision and direction and "lack[ed] . . . hiring, firing, and disciplinary authority"; Board rejects judge's conclusion that the user employer "controlled the economics of the relationship and therefore determined the terms and conditions of employment").

In *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 (1964), an employer had union-represented employees performing maintenance work in one of its plants. At one point, the employer contracted out the maintenance work to an independent contractor. The employer "merely replaced existing employees with those of an independent contractor," which prompted the Supreme Court to find that the contracting employer had the obligation to give its union notice and the opportunity for bargaining over the subcontracting decision. Id. Even though the subcontractor's employees continued "to do the same work under similar conditions of employment" and the "maintenance work still had to be performed in the plant," id. at 213, Fibreboard ceased being the "employer." Indeed, the premise of *Fibreboard* and comparable decisions is that the outsourcing of work may "quite clearly imperil job security, or indeed terminate employment entirely" for employees of the contracting employer. Id. at 223 (Stewart, J., concurring). However, this type of economic dependence does not confer "employer" status on the client or customer.

As noted previously, in relation to technical personnel working for CNN, the Board and NABET Locals 11 and 31 have acknowledged that the *contractor* was the "em-

CNN AMERICA, INC.                                                                 33

ployer" responsible for bargaining over wages, hours, and terms and conditions of employment. Both Unions were certified by the Board as bargaining representatives for employees of the contractors who handled CNN's technical personnel needs in New York and Washington, D.C., shortly after CNN commenced its television news journalism operations in 1980. In each case the certification was based on an election in which the "employer" was the contractor, not CNN. There was no question then, nor is there now, that the contractors' near-exclusive responsibility was to employ qualified technical personnel who were assigned to CNN's news operations in New York or Washington, D.C. See, e.g., *Mobile Video Services*, quoted supra.

As a general matter, therefore, our cases support the proposition that "employer" status does not result from the type of relationship that existed between CNN and an independent contractor like TVS. The bona fide nature of such relationships has been recognized regarding the type of work at issue here and in other industries. See, e.g., *Mobile Video Services*, supra; *Denver Building Trades*, supra. The most important specific criteria relied upon by my colleagues in their joint-employer finding are discussed below.

2. *Hiring/Staffing Levels*. Contrary to the majority, I would find that CNN did not share or codetermine essential terms and conditions of employment through its alleged role in TVS' hiring process. The record shows that TVS made its own hiring decisions, without any input whatsoever from CNN. TVS officials alone reviewed resumes, selected qualified candidates for interviews, and decided whom TVS would hire into the technical classifications. CNN agents played no role in that process.

My colleagues nevertheless conclude that the hiring factor supports a joint-employer finding because CNN had some control over the overall number of individuals employed by TVS through its right to request changes in TVS' total staffing levels. However, our precedent indicates that the critical inquiry is whether a user employer actively participates in the supplier employer's actual hiring process, not whether the user merely influences overall staffing levels. See *Southern California Gas*, 302 NLRB at 459, 461 (dismissing joint-employer allegation where user employer negotiated changes in supplier's staffing levels); *Hychem Constructors, Inc.*, 169 NLRB 274, 275 (1968) (dismissing joint-employer allegation where the supplier employer "d[id] its own recruiting, interviewing, and hiring without any assistance from [the user]" even though the user had the right to approve the number of man hours required to complete construction operations); see also *AM Property Holding Corp.*, 350 NLRB 998, 1006 (2007) (Member Liebman, concurring

in part and dissenting in part) (recognizing that, under extant law, control over hiring can support a joint-employer finding where the user employer "was directly involved in actual hiring decisions with respect to individual employees").

The majority cites two decisions in support of its conclusion that a putative joint employer's control over its subcontractor's overall staffing levels supports a finding of joint-employer status: *D&F Industries*, 339 NLRB 618 (2003), and *Quantum Resources Corp.*, 305 NLRB 759 (1991). Each is distinguishable. In *D&F Industries*, the user employer (D&F) did not merely influence or control the total number of individuals employed by the supplier employer (Olsten). Rather, D&F demanded a reduction in Olsten's work force, and D&F itself actually selected the particular employees to be laid off. The judge, whose decision was adopted by the Board, gave "utmost significance" to those particular circumstances. Id. at 640. In contrast to that case, CNN did not here involve itself in selecting particular TVS technicians for hiring or retention.[7]

Likewise distinguishable is *Quantum Resources Corp.*, 305 NLRB at 759. In that case, a company (FP&L) did not merely make general decisions regarding overall staffing levels of its subcontractor (Quantum). Rather, FP&L actually "approve[d] the hiring of unit personnel," and the record there contained specific examples of the involvement of an FP&L site superintendent in decisions to "hire, promote, and fire" Quantum's personnel. Id. at 760–761. Only in that context did the Board find that the hiring factor was one, among many others, that tended to support a joint-employer finding. The record here lacks evidence of a similar role played by CNN.

I disagree with one other consideration relied upon by my colleagues. TVS had no policy against technicians having outside employment, nor did the ENGAs—which governed the CNN-TVS relationship—impose such a policy on TVS. Nonetheless, my colleagues argue that TVS distributed a CNN handbook that contained such a restriction for CNN employees. However, there is no indication in the record that TVS distributed the CNN handbook to TVS employees, much less that CNN directed TVS to take this action. Rather, there is some testimony (not cited by the parties) that TVS *sought to pattern its own employee handbook* on CNN's handbook; that TVS and the Unions reviewed the CNN handbook; that TVS and the Unions eliminated provisions that were

---

[7] *D&F Industries* is also distinguishable from this case on the ground that D&F established the wage rates for Olsten's employees and had suspended an Olsten employee. The Board relied in part on those facts to support its joint-employer finding, and no such circumstances are present here.

inapplicable and/or conflicted with the parties' collective-bargaining agreements; and that TVS then distributed *its own handbook* to its employees. More importantly, the General Counsel did not even argue that any alleged restriction on TVS' hiring authority supports a joint-employer finding. In any event, I believe the record does not support a finding that CNN had meaningful control over the TVS hiring process, especially given that TVS alone reviewed resumes, selected applicants for interviews, and made all of its own hiring determinations.

3. *Compensation*. Similarly, CNN did not have or exercise "direct and immediate" control over the wage rates of TVS employees. In fact, CNN played no role in establishing the wage rates of full-time TVS technicians or even for whole classifications of such workers. *TVS alone* set the compensation for those employees, after bargaining to agreement with the Unions. As stated above, it is undisputed that CNN was not a party to those negotiations.

Nevertheless, in finding that CNN had meaningful control over the TVS technicians' compensation, the majority relies on testimony by TVS Chairman Brian Frydenlund, who according to the majority stated that "CNN 'informed' and 'advised' TVS on 'the market rate salaries' to pay to the TVS employees." I do not believe a fair reading of the record supports this assertion. Frydenlund actually testified that, before TVS submitted its bid to become CNN's technical contractor, CNN merely encouraged TVS to prepare its bid with an eye on the going wage rates for technical employees in the marketplace.[8] CNN did not suggest any particular rates, and TVS remained free to prepare its bid and pay wages as it saw fit. In my view, CNN's suggestion that TVS consider the marketplace when formulating a bid does not constitute meaningful control over the TVS technicians' pay rates.

The majority also relies on the fact that CNN was the "sole source of funding for employee compensation" and points to a provision in the ENGAs authorizing TVS "to increase the actual Payroll by up to four percent (4%) per year over the life of this Agreement in order to account for actual increased Payroll costs." With that provision, CNN sought to cap the total amount of reimbursable labor expenses under its cost-plus contracts with TVS. Importantly, CNN did not *prohibit* TVS from increasing compensation rates for TVS employees such that TVS' total payroll would increase by greater than 4 percent per year. Nor did CNN *require* TVS to increase its total payroll by any minimum percentage. Certainly, CNN did

not dictate specific wage rates or fringe benefits for TVS employees. Rather, the ENGAs merely placed an upper limit on the total amount that CNN would reimburse TVS for the latter's overall payroll expenses.[9]

To be sure, the cited ENGA provision undoubtedly had some indirect influence on the compensation that TVS was willing to give to its technicians. Presumably, a company in TVS' shoes would want to avoid paying out to its employees more than it could recoup from CNN. But such indirect influence by CNN does not constitute "direct and immediate" control over employee compensation required to support a joint-employer finding. *Goodyear Tire & Rubber Co.*, 312 NLRB 674, 678 (1993). In *Goodyear Tire & Rubber*, the Board dismissed a joint-employer allegation where a subcontract between two companies "set[] forth the wage reimbursement schedules under which Goodyear paid TU [Transportation Unlimited, Inc.] for the cost of labor which TU provided." Id. at 677. The judge, whose decision was adopted by the Board, explained:

> Although it does appear that the contract sets forth the wage reimbursement, and one might argue, as the General Counsel does, that this constitutes "codetermination" of a wage, I do not believe that characterization is what the Board or the courts had in mind when using the phrase "share and codetermine" essential terms such as wages. A contractual agreement, between two companies, utilizing cost-plus concepts is not the type of arrangement which either *Browning-Ferris* or *TLI, Inc.* was discussing. If they were, all cost-plus agreements would become joint employer relationships. Neither the courts nor the Board has ever expressed such an intention.

Id. at 678.

Similarly, in *Hychem Contractors, Inc.*, 169 NLRB at 274, the Board dismissed a joint-employer allegation where a contract between a user employer and a supplier employer gave the user power of prior approval of wage rates and overtime assignments, required the employees

---

[8] Tr. at 15169–15170.

[9] Similarly, CNN did not have meaningful control over merit pay awarded by TVS to TVS employees. The ENGAs merely required CNN to "deposit to the Account an additional two percent (2%) of payroll wages and taxes per month ('the Merit Funds') not to exceed [redacted] annually, which [TVS] may distribute as merit pay to [TVS'] employees whose services are engaged pursuant to this Agreement, at [TVS'] sole discretion." As the ENGAs state, TVS had sole discretion to choose which TVS technicians would receive merit pay and the amounts given. Moreover, to the extent that TVS did not distribute the Merit Funds, CNN's subsequent deposit to the labor fee account was to be reduced in a corresponding amount. In short, the ENGAs merely established a maximum total amount that CNN would reimburse TVS for merit pay.

CNN AMERICA, INC.                                              35

to abide by the user's plant rules, and gave the user the power to remove the supplier's employees. The Board explained that those controls were "consistent with [the user employer's] right to police reimbursable expenses under its cost-plus contract" and did not warrant a joint-employer finding. Id. at 276. "The authority of [the user employer] to control its costs in this manner seems to us no different from the right of any commercial client to continue to accept, or to reject, a supplier of goods or services based on the consideration of price." Id. at 276 fn. 4. Given that *Goodyear Tire & Rubber* and *Hychem* establish that specification of wage rates in a cost-plus subcontract does not tend to support a joint-employer finding, the fact that CNN and TVS took the less drastic step of setting forth a maximum reimbursable rate for total payroll expenses does not warrant a finding that CNN controlled the unit employees' compensation.

*Continental Group, Inc.*, 353 NLRB 348, 356 (2008), affd. 357 NLRB No. 39 (2011), cited by the majority, is distinguishable from this case. In that case, the service agreement between the user employer (Sunset Harbour) and the supplier employer (Continental) specifically provided that "[a]ny terminations, new hires, or salary adjustments shall be approved by the Board of Directors [of Sunset Harbour]." Id. In light of that contractual language, the Board found that the two entities were joint employers because "Sunset Harbour would be involved in grievances involving terminations and *would have the final say regarding employee compensation* since it reimburses Continental for wages *and must approve all salary adjustments*." Id. (emphasis added). Here, in contrast, CNN did not have "final say" over the wages of TVS' full-time technicians, as TVS was not required to, and did not, obtain CNN's approval before establishing those wage rates.[10] Nor did TVS need CNN's approval before terminating or hiring individual employees.

The majority also relies on the fact that, on two occasions of collective bargaining, the Unions proposed to TVS an increase in total compensation of greater than 4-percent annually, and, after TVS consulted with CNN and learned that CNN was willing to reimburse the additional amounts, TVS returned to the bargaining table and accepted the Unions' proposals. Our precedent indicates that those facts do not support a joint-employer finding.

In *TLI, Inc.*, 271 NLRB at 799, a paper company (Crown) leased drivers from a supplier company (TLI). A Crown representative attended bargaining sessions between TLI and the union representing TLI's drivers. At the bargaining table, he outlined Crown's economic position, the need to substantially cut labor costs, and the maximum acceptable package that TLI could negotiate with the union while keeping Crown as its customer. He made clear that transportation-cost savings of $200,000 were necessary or the subcontract would be jeopardized. The Board found that such involvement in the negotiations did not mean that Crown controlled the economics of the relationship or codetermined employee compensation. The Board noted that the Crown representative had not made specific proposals and had left the particulars of the savings entirely to TLI and the union to work out. Id.; see also *Goodyear Tire & Rubber*, 312 NLRB at 688 (joint-employer status not supported by fact that employer responded to union's demand for higher wages by explaining that he would have to consult with the client to determine its "perimeter").

Here, as in *TLI*, CNN did not make specific proposals regarding employee compensation or otherwise involve itself in the negotiations between TVS and the Unions. CNN merely informed its subcontractor of the total amount it was willing to reimburse TVS for the contracted-for services. TVS and the Unions remained free to bargain whatever mix of wages and benefits they desired.[11]

4. *Hours.* Contrary to the majority, I would find that joint-employer status is not supported by the fact that the ENGAs contain the following provision addressing the hours of TVS technicians:

> Full-time technicians shall be available for at least forty (40) hours per week; part-time technicians shall be available for such hours less than forty (40) as agreed

---

[10] As noted by the majority, CNN had a contractual right to approve the wage rates of *part-time* technicians hired by TVS to cover a developing news story. Specifically, the ENGAs provide that CNN would reimburse TVS for the wages of part-time employees hired to cover assignments for CNN, "provided that CNN[] . . . approves the rates to be paid to any part-time technicians used." CNN's contractual right to approve wage rates for this limited group of employees, under its cost-plus arrangement, does not support a joint-employer finding. See *Hychem Constructors*, 169 NLRB at 274–276 (holding that user employer was not a joint employer where the user had a contractual right of prior approval of wage rates for supplier's employees). Additionally, the record fails to show that TVS ever actually consulted with CNN before setting part-time wage rates. In my view, the provision is properly viewed as an effort by CNN to contain costs under a commercial contract. Given the distinct possibility that developing news events would require TVS to quickly hire part-time technicians to work extended hours in various locales, CNN, as a purchaser of labor services, would naturally be sensitive to the possibility of opportunistically high wages.

[11] Contrary to the majority's assertion, neither Frydenlund nor TVS President Larry D'Anna admitted at the hearing "that they could not and, indeed did not, make any wage decision without CNN's consultation and approval." To the contrary, Frydenlund testified that "we [TVS] identified and established our salary ranges" based on TVS' knowledge of the marketplace. Tr. at 15170.

36                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

between CNNA and the Independent Contractor from time to time.

That provision does not establish that CNN controlled the working hours of TVS technicians. It merely indicates that CNN required TVS to furnish a cadre of skilled technicians available to perform services for it on a full-time basis and that, when necessary, TVS would furnish part-time technicians to cover developing news stories. The record shows that TVS, not CNN, performed the scheduling function, and that TVS supervisors were solely responsible for granting time off for vacations and sick leave.

The majority also cites the fact that the ENGAs required TVS to obtain CNN's approval before making overtime assignments. Our precedent indicates that such a contractual requirement is a cost-containment measure that does not support a joint-employer finding. *Hychem*, 169 NLRB at 274. In *Hychem*, a subcontract required the supplier employer to obtain the user employer's prior written consent before performing overtime work. The Board rejected the General Counsel's argument that such provision supported a joint-employer finding, reasoning that the right of prior approval was consistent with the user's right to police reimbursable expenses. Id. at 276. I would adhere to *Hychem*.

As the majority concedes, TVS technicians received their assignments through TVS personnel who staffed an assignment desk. It is true that CNN managers daily determined the news stories to be covered and created "rundown" sheets identifying the location, date, time, duration, and number of technicians required for each assignment. However, the important fact is that CNN managers did not assign TVS technicians to particular stories. That was left to TVS. With the rundown sheet in hand, TVS officials alone selected which particular TVS technicians would work a given assignment. Unlike my colleagues, I cannot find that CNN effectively assigned TVS employees merely by identifying the work to be performed by its subcontractor. Cf. *G. Wes Ltd. Co.*, 309 NLRB 225, 226 (1992) (dismissing joint-employer allegation where user informed supplier's employees "what areas were to be worked and with whom the employees were to work").

There is some evidence that, "several times a week," CNN managers requested the presence of specific TVS crews for particular assignments based on their prior experience, knowledge, or skills, and TVS ordinarily accommodated such requests. Yet, the record establishes that such requests by CNN were relatively rare, at most consisting of several requests per week in the context of a 200-employee bargaining unit where each employee generally had many assignments. Moreover, CNN had

no authority to require that TVS furnish the requested technicians. Rather, the ENGAs gave TVS "sole and absolute discretion and responsibility for . . . direction of the work force and other matters of personnel and labor relations." I do not believe this record reasonably supports my colleagues' finding that CNN had meaningful control over the TVS technicians' assignments merely because it occasionally requested the services of certain TVS personnel.

My colleagues identify a few instances in which CNN officials directly assigned TVS technicians to particular stories under exceptional circumstances. Specifically, they cite the fact that CNN made emergency assignments to TVS technicians shortly after the attack on the World Trade Center on September 11, 2001, and during the catastrophe involving the Space Shuttle Columbia's reentry in 2003. It bears emphasis, here as well, that the vast majority of assignments were made by TVS personnel. Moreover, as noted previously, the 9/11 attacks on the World Trade Center and the Columbia disaster are among the most extraordinary news events that occurred in the past 30 years. I do not believe it is reasonable to support a finding of joint-employer status on a few direct assignments made under such extraordinary circumstances, when the record otherwise shows, overwhelmingly, that TVS formulated the schedules worked by its employees.

5. *Supervision and Direction.* Unlike my colleagues, I am not persuaded that the General Counsel proved that the supervision and direction provided by CNN producers to TVS technicians support a finding that CNN and TVS constitute a joint employer. TVS technicians worked out in the field as well as inside CNN studios, operating audio and video equipment to capture images and sounds that CNN used in producing the news. In the field, TVS technicians for the most part worked free of any direct TVS supervision. They performed their functions independently, and CNN news personnel worked alongside them. The CNN news personnel informed the TVS technicians about the content they should record. In the studios, in comparison, TVS supervisors were present to guide and direct the TVS technicians. Nevertheless, in the studios, CNN producers routinely gave instructions to studio technicians regarding where to point a camera or when to show video footage. At the hearing, TVS field and studio technicians testified generally that they were under the "constant direction and supervision" of CNN producers. My colleagues rely on that general testimony, coupled with the absence of TVS supervisors in the field, to conclude that CNN producers actively supervised the TVS technicians and thereby "directly and immediately"

CNN AMERICA, INC.                    37

affected their terms and conditions of employment. I disagree.

"The Board has held that evidence of supervision that is 'limited and routine' in nature does not support a joint employer finding." *AM Property Holding Corp.*, 350 NLRB 998. 1001 (2007) (citing *G. Wes Ltd.*, 309 NLRB at 226). Supervision is found "limited and routine" where the supervisor's instructions consist primarily of telling employees what work to perform, or where and when to perform the work, but not how to perform it. Id. To be sure, the record shows that CNN producers gave detailed instructions to TVS technicians regarding what work to perform and where and when to perform it. CNN producers and news personnel directed TVS technicians when and where they were going to capture video and audio for a news story and the kinds of shots they desired. However, the record lacks the necessary proof that CNN personnel instructed them *how to* perform their jobs, i.e., how to operate and maintain the audio and video equipment. Because it is undisputed that the TVS employees were highly skilled technicians, I am unable to infer from general testimony about "constant supervision" that CNN producers gave anything beyond limited and routine guidance insufficient to support a finding of joint-employer status.

In *G. Wes Ltd. Co.*, 309 NLRB at 225, an asbestos removal company (Environmental Technology) leased skilled asbestos abatement workers from a company (G. Wes) that furnished labor services pursuant to a subcontract. The "Environmental Technology supervisors supervised G. Wes employees onsite on a day-to-day basis." Id. at 226. There were no G. Wes supervisors present. The abatement workers were told "what areas were to be worked and with whom the employees were to work and the work was then left to the employees to perform." Id. The Board dismissed the complaint's joint-employer allegation, emphasizing that the workers were "trained and certified" in asbestos abatement and that there was no specific evidence that Environmental Technology's supervisors told G. Wes employees *how to* perform their work. Here, there is a similar absence of proof. Further, the Board explained that "the absence of G. Wes supervision onsite and the oversight of the project by Environmental Technology supervisors does not warrant a finding that Environmental Technology was a joint employer of the workers furnished by G. Wes to perform the asbestos removal." Id.; see also *Cabot Corp.*, 223 NLRB at 1389 (dismissing joint-employer allegation where user required supplier's employees to perform work in accordance with its drawings and specifications and monitored those employees' performance to ensure that final product was satisfactory).

Even assuming arguendo that CNN producers instructed TVS technicians *how to* perform their duties, I would find that fact would not tend to support a joint-employer finding under the particular circumstances of this case. CNN is in the business of providing news coverage 24 hours per day, 7 days per week. At arm's length, CNN contracted with TVS to provide technicians to operate audio and video equipment. CNN producers and on-air talent worked together with TVS technicians in real time to gather news footage. CNN was the client, and TVS was the service provider. Any directions that CNN gave to TVS technicians were simply client demands given in real time to obtain the final product desired by the client.

6. *Additional Factors.* I further disagree with the majority's reliance on several "additional factors," or secondary indicia, to support its joint-employer finding. Specifically, the majority notes that TVS employees operated equipment owned by CNN, performed CNN's "core" work of gathering news, worked exclusively for CNN, and wore CNN badges and carried CNN press credentials. Presumably, the majority identifies these factors as "additional" because they have little, if anything, to do with the TVS technicians' terms and conditions of employment. See *Airborne Express*, 338 NLRB 597, 597 (2002). In that case, Airborne, a package delivery service, leased drivers from a supplier employer to deliver its packages. Airborne owned the terminals that the drivers used and all the onsite equipment at those terminals. The drivers performed Airborne's core function of delivering packages to Airborne's customers. Id. at 604. They wore uniforms bearing Airborne insignia, and their vehicles were marked with Airborne logos. Id. In rejecting the General Counsel's contention that Airborne and the subcontractor constituted a joint employer, the judge, whose decision was adopted by the Board, did not find that such additional factors tended to support a joint-employer finding. Rather, the judge limited his inquiry to the factors identified in *Laerco*, supra, including the user's authority to hire, fire, discipline, supervise and direct the supplier's work force.[12]

In sum, the record fails to show that CNN had any direct and immediate control over the TVS employees' terms and conditions of employment, and therefore I

---

[12] In *Aldworth Co.*, 338 NLRB 137, 139–141 (2002), enfd. sub nom. *Dunkin Donuts Mid-Atlantic Distribution Center. Inc. v. NLRB*, 363 F.3d 437, 440 (D.C. Cir. 2004), cited by the majority, the Board gave weight not to the fact that the user employer owned the trucks driven by the employees of the supplier employer, but to the fact that the user employer assigned drivers to particular pieces of equipment. In the present case, the General Counsel does not point to evidence that CNN assigned TVS technicians to work on particular pieces of CNN's equipment.

38                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

would dismiss the complaint's joint-employer allega-tion.[13]

### B. The Finding that CNN had to Bargain Over CNN's Decisions to Terminate the CNN-TVS Arrangements and to Insource Technical Personnel Work

My colleagues also find that CNN was required under Section 8(a)(5) to give advance notice and engage in bargaining with NABET Locals 11 and 31 over CNN's decisions (i) to terminate its relationship with TVS, and (ii) to bring in-house all technical employee work related to CNN's news operations in Washington, D.C., and New York (the "termination/insourcing decisions").

Three considerations establish, in my view, that CNN did not have an obligation under Section 8(a)(5) to give the Unions advance notice and the opportunity for bargaining before CNN could lawfully make the termina-tion/insourcing decisions.

1. *Everyone Recognized TVS (and Its Predecessor Contractors) as the "Employer."* The record establishes a 20-year history during which everyone regarded TVS or its predecessor contractor(s)—and not CNN—as the only "employer" responsible for collective bargaining and other employment matters pertaining to technical personnel. Over that 20-year period, the contractor was the "employer" whose representatives participated in collective bargaining. Every resulting collective-bar-gaining agreement was entered into by the Unions and the contractor, and not CNN. Moreover, as my col-leagues concede, CNN terminated the existing contractor relationship, and commenced a new contracting relation-ship, *on four separate occasions.* However, the record does not reflect *any* instance when CNN itself engaged in bargaining with any contractor unions regarding these decisions.

My colleagues do not anywhere explain why or how CNN suddenly became a "joint employer" in 2003 or 2004, nor do they make any effort to reconcile such a finding with the preceding 20-year history when the Un-ions, the contractors, and CNN regarded TVS and every predecessor contractor as the "employer" of technical personnel under the Act. Additionally, the status of TVS

as the "employer" was recognized by the Board in the two union elections and Board certifications pertaining to CNN's technical personnel in Washington, D.C., and New York, and in at least one unfair labor practice pro-ceeding. *Mobile Video Services,* 266 NLRB 1143 (1983). The record does not indicate any change in 2003 or 2004—nor do my colleagues identify any develop-ment at that time—giving rise to the onset of joint-employer status contrary to the preceding 20 years.[14]

"Employer" status does not arise as the result of spon-taneous combustion. Nothing is more fundamental when interpreting and applying the Act than correctly identify-ing the parties. Many cases are devoted to establishing what parties and representatives may appropriately par-ticipate in bargaining.[15] And one of the Board's primary responsibilities under the Act is to foster labor relations stability. *Colgate-Palmolive-Peet Co. v. NLRB,* 338 U.S. at 362–363 ("To achieve stability of labor relations was the primary objective of Congress in enacting the Na-tional Labor Relations Act."); *NLRB v. Appleton Elec. Co.,* 296 F.2d at 206 (A "basic policy of the Act [is] to achieve stability of labor relations."). The Supreme Court has stressed the need to provide "certainty before-hand" to employers so they can "reach decisions without fear of later evaluations labeling . . . conduct an unfair labor practice." *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 678–679 (1981). In cases involv-ing contract rebidding or termination (i.e., where a pre-decessor's union-represented employees apply for em-ployment with the successor), the successor cannot law-fully extend recognition unless and until it has hired a "substantial and representative complement" of employ-

---

[13] I would dismiss the complaint's joint-employer allegation even if the record supported a finding that CNN had meaningful control over the assignment and supervision of TVS technicians. I am unaware of any Board precedent that justified a joint-employer finding based on those two *Laerco* factors alone, where, as here, the user entity failed to exercise meaningful control over hiring, discipline, discharge, wages, and/or benefits of the supplier employer's work force. Thus, even if one accepted the majority's position regarding assignment and supervi-sion, the balance of *Laerco* factors tips decidedly against a finding that CNN and TVS jointly employed TVS' technicians.

[14] My colleagues refute an argument I am not asserting when stating they "categorically reject" my "suggestion" that *Mobile Video Services* "settled the question of 'the contractor-CNN relationship.'" I freely concede that the Board has not previously considered allegations that CNN was a "joint employer" of the technical employees referred by TVS and its predecessor contractors. However, given that the Unions and TVS (and its predecessor contractors) had stable bargaining rela-tionships spanning 20 years, the fact that nobody even *alleged* CNN was a "joint employer" adds to the considerations undermining a find-ing that CNN, in 2003 and 2004, suddenly became obligated to satisfy "employer" obligations vis-à-vis TVS employees. The identity of the "employer" responsible for collective bargaining and the "employer" party to collective-bargaining agreements is usually no secret. And much of our case law emphasizes the importance of recognizing and preserving stability in bargaining relationships. *Colgate-Palmolive-Peet Co. v. NLRB,* 338 U.S. 355, 362–363 (1949); *NLRB v. Appleton Elec-tric Co.,* 296 F.2d 202, 206 (7th Cir. 1961) (quoted in the text infra). It is reasonable to take into account what the majority disregards here: a lengthy history when nobody—not even the Board—treated CNN as an "employer" of TVS employees. Nor does the record suggest any changed circumstances that suddenly warranted such a finding in 2003–2004.

[15] See, e.g., *Recana Solutions,* 349 NLRB 1163 (2007); *Oakwood Care Center,* 343 NLRB 659 (2004).

ees and has received a demand for recognition from the predecessor union(s). *Fall River Dyeing Corp. v. NLRB*, 482 U.S. at 47–48.[16]

It would do violence to *all* of the above-policy considerations to suggest that CNN was required to give advance notice to the Unions and to bargain with them before CNN could lawfully make its termination/insourcing decisions. Any bargaining between CNN and the Unions would have departed from the applicable collective-bargaining agreements (which identified TVS as the employer) and from a 20-year bargaining history in which the *only* employer party in negotiations was TVS (or its contractor-predecessors), not CNN. It is far from clear that the Unions would have entertained a bargaining demand by CNN, a party with which they had never negotiated as to the TVS employees, over CNN's decision to terminate its relationship with TVS. It is also important to focus on timing: because my colleagues find CNN was required to notify the Unions and bargain *over* CNN's "decision" to terminate the TVS contract and to hire its own technical personnel, this means CNN's statutory duty, according to my colleagues, was to give the Unions notice and the opportunity for bargaining (i) before CNN formulated its own final decision, and (ii) before CNN *gave notice to TVS*.[17] Nothing in such a sce-

nario would promote stable bargaining relationships. Rather, CNN's actions—taken as an "employer" of the TVS technical personnel—would have directly contradicted the then-existing TVS-NABET collective-bargaining agreements (which identified TVS, not CNN, as the employer). CNN's actions would have violated the CNN-TVS Agreements, which stated (as noted above) that TVS employees "are *not* employees of [CNN], and *shall not be so treated at any time*" (emphasis added). Finally, CNN's actions would have exhibited a total disregard for the elaborate body of law regarding "successorship" and related business changes that has been the subject of nearly a dozen Supreme Court cases and innumerable Board decisions.[18] This body of law, as noted above, includes a prohibition against any successor's recognition of a predecessor union before the actual hiring of a "substantial and representative complement," and where recognition and bargaining are lawful at that time only if a majority of the successor's workforce consists of predecessor employees (among other requirements).[19]

2. *CNN's History of Terminating and Changing Its Contractor Relationships Without Bargaining.* CNN made *four* separate decisions after commencing operations in 1980 to terminate CNN's relationship with the contractor that employed and supplied technical personnel in Washington, D.C., and New York. The record provides no evidence that CNN, on *any* of these occasions, gave advance notice to the contractor unions or bargained with them regarding these decisions. In view of this history, the Board cannot reasonably find that CNN's similar treatment of the TVS termination decision in 2003–2004 violated Section 8(a)(5). Even if CNN could be considered an "employer" having 8(a)(5) obligations pertaining to TVS employees, CNN's termination of the TVS relationship—and the substitution of a different employer—could not reasonably be considered a "change" as to which decision bargaining was required. These actions were similar "in kind and degree" to decisions made multiple times over the preceding 20-year period. *Westinghouse Electric Corp. (Mansfield Plant)*, 150 NLRB 1574, 1577 (1965); *NLRB v. Katz*, 369 U.S.

---

[16] In *Dana Corp.*, 356 NLRB No. 49 (2010), enfd. sub nom. *Montague v. NLRB*, 698 F.3d 307 (6th Cir. 2012), a divided Board held that in some circumstances an employer and a union that has not yet demonstrated it has the support of a majority of the employer's employees may lawfully enter into a "pre-recognition" agreement if the agreement does nothing more than outline a "framework for future collective bargaining" and where the employer "disclaimed any recognition of the union as exclusive bargaining representative" unless and until the union demonstrates majority support. Id., slip op. at 6, 8. The instant case does not involve any of these issues, and my colleagues find that CNN was required to give the Unions notice and the opportunity for full-fledged bargaining before CNN made the decision to terminate its TVS relationship and to hire its own technical personnel. I do not here express any view regarding *Dana Corp.* or its potential application in other cases.

[17] It is well established that, when bargaining is required over a particular decision, the employer violates Sec. 8(a)(5) if it makes a final decision rather than giving the union notice and the opportunity for bargaining at a time when the employer's potential plans remain tentative. Otherwise, the employer's final decision—formulated without bargaining—is deemed an unlawful fait accompli. See *National Family Opinion, Inc.*, 246 NLRB 521 (1979) (employer violated Sec. 8(a)(5) even though union was informed of decision to subcontract printing operations almost 4 weeks before the subcontract took effect; employer was found to have presented the union with a "fait accompli" since "the [u]nion was told of a completed decision rather than a decision to be finalized"); *Houston Shopping News Co.*, 223 NLRB 1133, 1134 (1976), (Board finds employer violated Sec. 8(a)(5) by failing to give the union notice and the opportunity for bargaining before employer offered to lease its hot type printing operation, even though lease offer was rejected and, therefore, never implemented), enf. denied 554 F.2d 739 (5th Cir. 1977).

[18] See, e.g., *Fall River Dyeing Corp. v. NLRB*, 482 U.S. 27 (1987); *First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981); *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249 (1974); *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973); *NLRB v. Burns Security Services*, 406 U.S. 272 (1972); *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 (1964); *Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263 (1965); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964); *NLRB v. Deena Artware, Inc.*, 361 U.S. 398 (1960); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945); *Southport Petroleum Co. v. NLRB*, 315 U.S. 100 (1942).

[19] *Fall River Dyeing*, 482 U.S. at 47–48; *Burns*, 406 U.S. at 281.

40           DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

736, 748 (1962); *Equitable Gas Co. v. NLRB*, 637 F.2d 980, 988 (3d Cir. 1981).

3. *The Nature of CNN's Termination/Insourcing Decisions Makes Them Nonmandatory Subjects of Bargaining.* In *First National Maintenance*, 452 U.S. at 676, the Supreme Court stated that, in adopting the NLRA, Congress "had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed." A long line of Board and court cases establish that fundamental management decisions relating to the structure and scope of the business are nonmandatory subjects of bargaining *even though* they may directly affect employees and determine whether they remain employed.[20] CNN's decision to hire its own technical personnel in Washington, D.C., and New York involved a structural change driven in large part by technological advances that blurred the lines between news journalists and producers (historically employed by CNN) and technical personnel (historically employed by TVS or its predecessor contractors). Although CNN's operations did not immediately change at the time the TVS-CNN transition became effective (on December 5, 2003, in Washington, D.C., and on January 17, 2004, in New York), the record contains compelling evidence that CNN's in-sourcing of technical work occurred in conjunction with dramatic advances in the use of nonlinear digital video and audio files, digital processing, and digital equipment (instead of videotape and related-legacy technologies that had been prevalent for much of the preceding 20 years).

Additionally, the advent of nonlinear digital processing has caused and will continue to drive immense changes in television news journalism. CNN's hiring process was driven by such changes, including the increased use of "1-man bands" (where news journalists do their own digital video and audio recording) and the consolidation of technical and nontechnical positions. Putting aside my colleagues' finding that CNN was a joint employer prior to the TVS-CNN transition (which I believe is incorrect), my colleagues do not afford these considerations adequate weight. In my view, CNN's termina-

tion/insourcing decisions involved considerations that made them nonmandatory subjects of bargaining under Section 8(a)(5). As Justice Stewart stated in his well-known concurring opinion in *Fibreboard*:

> *An enterprise may decide to invest in labor-saving machinery. Another may resolve to liquidate its assets and go out of business. Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control.* Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. If, as I think clear, the purpose of § 8(d) is to describe a limited area subject to the duty of collective bargaining, *those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area.*[21]

### C. The Unlawful Motivation Findings Regarding the TVS Arrangement's Termination, the Insourcing of Technical Work, and CNN's Bureau Staffing Project

I also disagree with my colleagues' finding that CNN's termination/insourcing decisions (the decisions to terminate the TVS relationship and to bring the technical work in-house) and the design of CNN's posttransition hiring arrangements (the Bureau Staffing Project) were unlawfully motivated. As noted above, there is some evidence—although it is not uniform—that particular CNN hiring decisions may have reflected a bias against TVS-represented employees.[22] However, I do not believe the

---

[20] See, e.g., *First National Maintenance*, 452 U.S. at 666; *Fibreboard*, 379 U.S. at 203 ; *Dubuque Packing Co.*, 287 NLRB 499 (1987), remanded sub nom. *Food & Commercial Workers Local 150-A v. NLRB*, 880 F.2d 1422 (D.C. Cir. 1989); *AG Communication Systems Corp.*, 350 NLRB 168 (2007), petition for review denied sub nom. *Electrical Workers Local 21 v. NLRB*, 563 F.3d 418 (9th Cir. 2009); *Dorsey Trailers, Inc. v. NLRB*, 134 F.3d 125 (3d Cir. 1998); *Arrow Automotive Industries v. NLRB*, 853 F.2d 223 (4th Cir. 1988), denying enf. 284 NLRB 487 (1987); *NLRB v. Wehr Constructors, Inc.*, 159 F.3d 946 (6th Cir. 1998); *NLRB v. Adams Dairy, Inc.*, 350 F.2d 108 (8th Cir. 1965), cert. denied 382 U.S. 1011 (1966).

[21] 379 U.S. at 223 (Stewart, J., concurring).

[22] For example, an email authored by CNN Director of Newsgathering Matt Speiser described photojournalist position qualifications and stated, "[W]e should emphasize the use of DV cameras (since this isn't within NABET jurisdiction now)." The record also indicates there were a significant number of after-the-fact rating changes for TVS applicants and some decisions that cannot be easily explained. The judge found that a disproportionately high number of TVS applicants were denied employment compared to CNN candidates (virtually all of whom were hired, although they were much fewer in number). However, CNN introduced statistical evidence regarding TVS applicants who were selected for interviews and received job offers in comparison to all applicants and all persons interviewed, which suggested TVS applicants were selected in numbers consistent with their representation in the applicant pool or were even statistically favored. Given the complexity and scope of CNN's hiring decisions in connection with the transition, I believe the majority cannot reasonably conclude, based on particular examples of irregularities or antiunion motivation, that the entire hiring process was designed to circumvent union obligations. As noted in the text, such a conclusion is belied by the fact that CNN did in

CNN AMERICA, INC.                                                  41

record provides reasonable support for my colleagues' broad conclusion that CNN's termination/insourcing decisions and the overall Bureau Staffing Project were motivated by a desire to avoid union obligations in violation of Section 8(a)(3).

First, my colleagues' finding of antiunion motivation is based in part on circular reasoning. My colleagues find that CNN has liability "as a joint employer" based in part on "the direct role it played in committing the unfair labor practices against the TVS technicians." However, most of the unfair labor practices that my colleagues attribute to CNN—for example, "canceling the [Agreement] with TVS to avoid its obligation under the collective-bargaining agreements" and "failing to bargain with the Unions"—are contingent on finding that CNN was a joint employer.

Second, my colleagues and the judge give inadequate weight to the magnitude of the technological advances described above—especially the impact of non—linear digital audio and video recording and related equipment—as it affects CNN operations and, more generally, the cable television news journalism industry. The nature and extent of these changes, in the context of real-time, around-the-clock news coverage, far exceed the impact of "desktop computers" on "printing work," which my colleagues describe as involving a change "by degree not kind" (quoting *Winchell Co.,* 315 NLRB 526 fn. 2 (1994)). Indeed, while my colleagues label CNN's explanations as "pretextual," they acknowledge that "employees at the DC and NYC bureaus had *lived through substantial technological changes,* most notably *going from videotape to digital media,* and then *from digital to HD,* with *ever increasing reliance throughout on sophisticated computer programs*" (emphasis added). My colleagues treat these technological advances as static events without recognizing the profound impact these changes had on the nature of the work being performed, diminishing CNN's need to have separate "technical personnel" performing this work. In my view, it undermines the areas where the Board's intervention is appropriate (for example, I agree that CNN should recognize and bargain with the Unions as TVS's legal successor) if we give short shrift to profound technological changes that also obviously require substantial and nearly continuous capital investment. These factors render unreasonable the analysis of my colleagues, who, like the judge, essentially denounce all CNN decisions as reflecting a preoccupation with labor costs and antiunion sentiment. A fair reading of the record establishes, to the contrary,

that CNN's basic termination and insourcing decisions resulted from substantial technological and economic factors affecting the entire industry.

Third, my colleagues describe CNN's decisionmaking process using terms that suggest covert, nefarious activity indicative of unlawful motivation, when the reality was that CNN merely had internal meetings to evaluate whether it made sense to consider taking these actions. My colleagues acknowledge that "CNN's staffing of the DC and NYC bureaus" constituted the "principal evidence of [CNN's] unlawful discrimination against TVS employees." But their broader finding of unlawful motivation (regarding CNN's decisionmaking in general) uses language one would expect to see in a Robert Ludlum novel.[23] Thus, my colleagues state:

> CNN . . . *plotted the termination of the [TVS Services Agreements] in secret,* [and] deliberately *changed every bargaining unit job and position qualification* with the expressed purpose of getting out from under the Union's jurisdiction. The change also had the effect, no doubt intended, of *minimizing the significance of the bargaining unit employees' prior experience when they applied for the "new" jobs.*

Along similar lines, the majority states:

> In early 2003, *unbeknownst to either TVS or the Union,* prominent CNN executives *met in Atlanta* to discuss terminating the ENGAs and bringing the DC and NYC technical work in-house. Led by Executive Vice President of News Operations Cindy Patrick, they discussed the implementation of a *new hiring system, called the Bureau Staffing Program,* as an opportunity to "*rightsize" the DC and NYC operations.* Among other things, *they discussed assigning field technicians as "1-man bands"* with greater frequency than permitted under the Union's collective-bargaining agreements, and *hiring sufficient numbers of full-time employees to avoid overtime and the use of freelancers.*

It is plainly unreasonable to draw an inference of unlawful motivation from the fact that CNN executives had "secret" meetings about potentially terminating the TVS relationship "unbeknownst to either TVS or the Union." It would have been sheer folly to publicize to TVS and its Unions these

_____

fact hire work force majorities—in Washington, D.C., and New York—giving rise to successorship bargaining obligations in both locations.

_____

[23] Robert Ludlum wrote more than 2 dozen popular spy and thriller novels, many of which have been made into movies. His well-known books include *The Bourne Identity,* which "tells the story of Jason Bourne, a man with remarkable survival abilities who suffers from retrograde amnesia, and who must seek to discover his true identity. In the process, he must also reason out why several shadowy groups, a professional assassin, and the CIA want him dead." See http://en.wikipedia.org/wiki/The_Bourne_Identity_(novel).

42                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

potential changes *before* CNN executives met regarding whether such changes were feasible or financially beneficial. Even when an employer has its own unionized workforce, the Board has rejected the notion that potential business changes must be publicized as soon as they are under "active consideration," and the Board has held that commercial negotiations "may be complex, conditioned on other factors, and delicate, and as a result the seller may desire, or the purchaser may insist on, strict secrecy to ensure against economic injury to the business, such as the loss of customers until the sales agreement is executed." *Willamette Tug & Barge Co.,* 300 NLRB 282 (1990). Concerns about secrecy would be especially appropriate when, as in CNN's case, a company depended on contractor personnel for operations that were continuing around the clock while CNN was deciding whether to change or discontinue this arrangement. It is unreasonable to draw any negative inference from the manner in which these internal discussions occurred. Moreover, as noted previously, my colleagues' finding of unlawful motivation is undermined by CNN's *actual hiring of a work force majority* consisting of former TVS employees in both Washington, D.C., and New York, requiring CNN to recognize and bargain with the Unions in both locations.

As to the other considerations my colleagues mention—the desire to have greater use of "1-man bands," to have more flexibility than was permitted under the TVS arrangement, to reduce overtime and the need for freelancers, to "right-size" their operations, and to change job descriptions—these are completely lawful options for CNN to discuss, particularly in an internal meeting among executives who were deciding *whether* to hire technical personnel instead of relying on TVS. The Act does not support an inference of unlawful motivation merely because "prominent" executives have "met" to "discuss" these types of changes.

There is also overwhelming evidence that technological improvements substantially diminished the need for separate technical staff (at present and especially in the future), which warranted CNN's significant investment in the creation of new job descriptions, and the same technological improvements would tend to diminish the significance of "bargaining unit employees' prior experience." Again, I do not dissent from my colleagues' finding that particular hiring decisions were unlawful. But my colleagues improperly base their broader finding of unlawful motivation on evidence that, in my view, does not reasonably support their conclusion, and they disregard undisputed facts (especially the impact of technological advances on the work at issue here) that strongly undermine such a finding.

Finally, CNN—under longstanding Board law—had the right as a contractor to terminate its subcontract with TVS and to hire its own technical personnel *even if these decisions were motivated by antiunion considerations.* Under long-settled precedent, "an employer does not violate Section 8(a)(3) by ceasing to do business with another employer *because of the union or non-union activity of the latter's employees.*" Thus, in *Plumbers Local 447 (Malbaff Landscape Construction),* 172 NLRB 128, 129 (1968), the Board held that "an employer does not discriminate against employees within the meaning of Section 8(a)(3) *by ceasing to do business with another employer because of the union or nonunion activity of the latter's employees*" (emphasis added). To the same effect, the Board stated in *Computer Associates International, Inc.,* 324 NLRB 285, 286 (1997), that "finding a violation of Section 8(a)(3) on the basis of an employer's decision to substitute one independent contractor for another because of the union or nonunion status of the latter's employees is inconsistent with both the language of Section 8(a)(3) . . . and with legislative policies underlying Section 8(b) of the Act aimed at *protecting the autonomy of employers in their selection of independent contractors with whom to do business*" (emphasis added).

### D. The Order Requiring CNN's Rescission of Changes Made at the Time of the TVS-CNN Transition

I concur with my colleagues' finding that CNN was a legal successor to TVS, following the TVS-CNN transition, obligated to recognize and bargain with the Unions. This successorship finding is based on the fact that after the transition, the majority of CNN employees in the historical TVS bargaining unit consisted of union-represented former TVS employees, and CNN's posttransition operations reflected substantial continuity between the enterprises. *NLRB v. Burns Security Services,* 406 U.S. at 280–281 & fn. 4; *Fall River Dyeing Corp. v. NLRB,* 482 U.S. at 43.[24]

It has long been established, however, that a successor employer, though obligated to recognize and bargain with a predecessor's union, has the right to set its own

---

[24] Like the majority, as noted above, I do not believe the historic units were rendered inappropriate when CNN combined its unit technicians and nonunit IT workers into a single department called the BIT Department. In this regard, I note that the judge credited witnesses who testified that the respective duties of the technicians and IT workers were essentially unchanged by the creation of the BIT Department, and the record also establishes that the broader operational changes planned by CNN—though likely to occur in the future—did not take place (nor were they imminent) when CNN had a substantial and representative complement of technical personnel after the TVS-CNN transition.

CNN AMERICA, INC.                                                    43

different "initial terms" of employment, and it has no legal obligation to adopt the predecessor's collective-bargaining agreements. *Burns*, 406 U.S. at 287–288, 294–295. In *Fall River Dyeing*, 482 U.S. at 40, the Supreme Court stated that *Burns* "was careful to safeguard the rightful prerogative of owners independently to rearrange their businesses" (internal quotations omitted). The Court in *Fall River Dyeing* continued:

> We observed in *Burns* that, although the successor has an obligation to bargain with the union, it "is *ordinarily free to set initial terms on which it will hire the employees of a predecessor*," . . . and it is *not bound by the substantive provisions of the predecessor's collective bargaining agreement.* . . .

*Fall River Dyeing*, 482 U.S. at 40 (quoting *Burns*, 406 U.S. at 294) (emphasis added).[25]

The Supreme Court holdings in *Burns* and *Fall River Dyeing*—that successor employers are free to unilaterally set different initial terms of employment and are *not* bound by the predecessor's labor contract—overturned the Board's contrary finding in *Burns* that initially imposed the predecessor's contract on the successor employer.[26] The Supreme Court in *Burns* stated:

> [T]his case is not like a § 8(a)(5) violation where an employer unilaterally changes a condition of employment without consulting a bargaining representative. It is difficult to understand how *Burns* could be said to have *changed* unilaterally any pre-existing term or condition of employment without bargaining when it had no previous relationship whatsoever to the bargaining unit and, prior to July 1 [when Burns commenced its operations], no outstanding terms and conditions of employment from which a change could be inferred.

The terms on which Burns hired employees for service after July 1 may have differed from the terms extended by Wackenhut and required by the collective-bargaining contract, but it does not follow that Burns changed its terms and conditions of employment when it specified the initial basis on which employees were hired on July 1.

406 U.S. at 294 (emphasis in original). The Supreme Court in *Burns* indicated that substantial policy reasons warranted the Court's rejection of the Board's imposition of predecessor contract terms on the successor. The Court stated:

> We . . . agree with the Court of Appeals that holding either the union or the new employer bound to the substantive terms of an old collective-bargaining contract may result in *serious inequities*. A potential employer may be willing to take over a moribund business *only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision.* Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract *may make these changes impossible and may discourage and inhibit the transfer of capital.* On the other hand, a union may have made concessions to a small or failing employer *that it would be unwilling to make to a large or economically successful firm.* The congressional policy manifest in the Act is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities. *Strife is bound to occur if the concessions that must be honored do not correspond to the relative economic strength of the parties.*

406 U.S. at 287–288 (emphasis added).

In the instant case, I believe the Board's order requiring CNN to rescind all changes it made at the time of the TVS-CNN transition implicates all the policy considerations and concerns expressed by the Supreme Court in *Burns* and *Fall River Dyeing*. I believe the Board cannot reasonably find that CNN—prior to the TVS-CNN transition—was an "employer" of the represented YVS employees.[27] Accordingly, I believe my colleagues cannot impose the predecessor contract terms on CNN with any greater validity than when the Board did this in *Burns*. Not only was CNN privileged to set its own initial employment terms, but my colleagues' findings of unlawful motivation are in part improperly based, as noted above, on CNN's desire to make these permissible changes.

---

[25] In *Burns*, the Supreme Court recognized a limited exception (to the successor's right to unilaterally set different initial terms of employment) where "it is *perfectly clear* that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms." 406 U.S. at 294–295. The Board interprets this exception as requiring a successor to refrain from changing initial terms of employment where it extends employment offers without indicating that it will set different initial employment terms. *Spruce Up Corp.*, 209 NLRB 194, 195 (1974), enfd. 529 F.2d 516 (4th Cir. 1975). The General Counsel does not contend that the "perfectly clear" exception applies in the present case.

[26] The Board decision in *Burns* (ultimately overturned in this respect by the Supreme Court) stated: "The obligation to bargain imposed on a successor employer includes the negative injunction to refrain from unilaterally changing wages and other benefits established by a prior collective-bargaining agreement even though that agreement has expired." *William J. Burns International Detective Agency, Inc.*, 182 NLRB 348 (1970), enf. denied in relevant part 441 F.2d 911 (2d Cir. 1971), affd. 406 U.S. 272 (1972).

[27] See part A above.

44                DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

In part, my colleagues justify imposing the predecessor contract terms on CNN based on *Love's Barbeque Restaurant No. 62*, 245 NLRB 78, 82 (1979), enfd. in relevant part sub nom. *Kallmann v. NLRB*, 640 F.2d 1094 (9th Cir. 1981), where the Board held that a *Burns* successor forfeits its right to set different initial terms if it engages in antiunion discrimination in connection with hiring decisions to avoid a successorship finding. I dissent from this aspect of my colleagues' decision for two reasons.

First, I believe *Love's Barbeque* inappropriately deviates from the Supreme Court holdings in *Burns* and *Fall River Dyeing* that legal successors—though required to recognize and bargain with the predecessor's union—do not inherit the predecessor's contractual obligations. If the successor engages in discriminatory hiring decisions that defeat successor status, the appropriate remedy is to order reinstatement[28] and make-whole relief for the individuals adversely affected by such discrimination and, to the extent otherwise warranted by relevant facts, to require the successor to recognize and bargain with the predecessor's union. Apart from these remedies, I believe the Board remains constrained by *Burns* and *Fall River Dyeing*, in addition to Section 8(d) of the Act, from imposing substantive contract terms on the successor. See also *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970). Thus, I agree with the reasoning of former Member Hurtgen in *Pacific Custom Materials*, 327 NLRB 75, 75–76 (1998) (Member Hurtgen, dissenting), who stated:

> The 8(a)(3) violations yield their own compensatory remedy of reinstatement and backpay. It is excessive and punitive to use those 8(a)(3) violations to take away the legitimate defense to an 8(a)(5) allegation concerning the setting of initial terms.
>
> . . . . In addition, even if the Board's position is a permissible one, it would seem that the position set forth herein is a more prudent one, more balanced concerning a successor employer's obligations, and is more consistent with the Supreme Court's language.

Second, I believe the *Love's Barbeque* holding is inapplicable because the employer there was found to have discriminatorily refused to hire any predecessor employees, thereby avoiding a successor obligation to bargain that would have existed "but for Respondent['s] unlawful

conduct." 245 NLRB at 79, 82. In the instant case, by comparison, a majority of CNN's posttransition work force consisted of former TVS union-represented employees, which renders CNN a legal successor obligated to recognize and bargain with the Union (regardless of any particular hiring decisions where individuals were denied employment based on antiunion discrimination).[29]

## Conclusion

Throughout our history, the Board has dealt with the reality of complex relationships and substantial interaction between employers, contractors, and successor employers. Fifty years ago in *Fibreboard*—where contractor employees were retained to "do the same work" (inplant maintenance) under "similar conditions of employment" (379 U.S. at 213)—the Supreme Court observed that "the terms 'contracting out' and 'subcontracting' have no precise meaning," they "are used to describe a variety of business arrangements altogether different from that involved in this case," and the Court was careful to note that its decision did "not encompass other forms of 'contracting out' or 'subcontracting' which arise daily in our complex economy" (id. at 215 & fn. 8). Forty years ago in *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249 (1974)—where a successor employer used its own work force to operate a motel and restaurant previously owned by a franchisee—the Supreme Court stated that the term "'successor' is simply not meaningful in the abstract," the Court observed that "no single definition of 'successor' . . . is applicable in every legal context," and the Court held that these cases require "analysis of the interests of the *new employer* and the employees and of the policies of the labor laws in light of the *facts of each case* and the *particular legal obligation which is at issue*." Id. at 262–263 fn. 9 (emphasis added).

Here, my colleagues make a joint-employer finding—rejecting CNN's status as a "new employer"—that in my view is contrary to relevant case law and the "facts of [this] case." Id. In large part based on this erroneous joint-employer finding, my colleagues—when evaluating CNN's obligations under Section 8(a)(5) and (3)—also

---

[28] "Reinstatement" typically refers to the rehiring of former employees. In successorship cases, a reinstatement remedy may more accurately be called "instatement" because the individuals never previously worked for the successor. Because it is so commonly used and understood, I use "reinstatement" to describe Board-ordered hiring in both contexts.

[29] Even in cases where, pursuant to *Love's Barbecue*, a successor forfeits its right to unilaterally set different initial terms, the Board permits the successor, at compliance, "to present evidence establishing that it would not have agreed to the monetary provisions of the predecessor employer's collective-bargaining agreement, and further establishing either the date on which it would have bargained to agreement and the terms of the agreement that would have been negotiated, or the date on which it would have bargained to good-faith impasse and implemented its own monetary proposals." *Planned Building Services*, 347 NLRB 670, 676 (2006). If the successor "carries its burden of proof on these points, the measure of [its] make-whole obligation may be adjusted accordingly." Id.

inadequately address the "particular legal obligation which is at issue." Id. Unlike my colleagues, I believe CNN did not have an 8(a)(5) duty to notify the Unions and bargain over its decisions to terminate the Team Video Services (TVS) contracting relationship and to insource its technical work; I believe the record fails to prove CNN violated Section 8(a)(3) based on its decisions to terminate the TVS relationship and to insource technical work and on the overall design of CNN's staffing plan; and I dissent from my colleagues' order that CNN rescind the initial employment terms established by CNN at the time of the TVS-CNN transition.

Accordingly, as to the above issues, I respectfully dissent.

Dated, Washington, D.C.  September 15, 2014

_____

Philip A. Miscimarra,                    Member

NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT discharge you or refuse to hire you because of your prior employment with Team Video Services (TVS) or your union activities and membership, or otherwise discriminate against you to avoid having to recognize and bargain with NABET Local 11 and NABET Local 31 (the Union).

WE WILL NOT refuse to comply with the collective-bargaining agreements between TVS and the Union at both the DC and the NYC bureaus, or change your terms and conditions of employment without first notifying the Union and giving it an opportunity to bargain.

WE WILL NOT refuse to recognize and bargain in good faith with the Union as your exclusive collective-bargaining representative by refusing its requests for bargaining over our decision to terminate the contracts with TVS and implement the Bureau Staffing Project and the effects of that decision on you.

WE WILL NOT unilaterally limit the number of former TVS bargaining unit employees that we hire, or change your wages, hours, and other terms and conditions of employment, or the work that you previously performed, or any functionally equivalent work, without first bargaining with the Union.

WE WILL NOT withdraw or eliminate any wage increase or other improved benefits or terms and conditions of employment established at the DC and NYC bureaus since the termination of the TVS contracts.

WE WILL NOT contract out your work without giving the Union notice and an opportunity to bargain over these changes.

WE WILL NOT inform you that we intend to operate a nonunion workplace, or that your employment in the TVS bargaining units or your union activity, affiliation, or membership disqualifies you from employment with CNN.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Federal labor law.

WE WILL notify the Union in writing that we recognize it as your exclusive representative and that we will bargain with it concerning the terms and conditions of your employment.

WE WILL recognize and, on request, bargain with the Union as your exclusive representative concerning the terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

WE WILL rescind any change(s) in your terms and conditions of employment that we unilaterally implemented after December 6, 2003, at the DC bureau, and January 17, 2004, at the NYC bureau, and retroactively restore the preexisting terms and conditions of employment, including hours, wage rates, and benefit plans, until the Respondent negotiates in good faith with the Union to agreement or to impasse.

WE WILL, before implementing any changes in wages, hours, or other terms and conditions of your employment, notify, and on request, bargain with the Union as your exclusive collective-bargaining representative.

WE WILL make whole those TVS unit employees that we unlawfully discharged for losses caused by our failure to apply the terms and conditions of employment that

46                   DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

existed immediately prior to our takeover of the TVS operations at the DC and NYC bureaus.

WE WILL make whole those employees that we hired in the Bureau Staffing Program and paid a lower wage rate that they previously earned under the collective-bargaining agreement.

WE WILL, within 14 days from the date of the Board's Order, offer employment to the following named former employees of TVS in their former positions or, if those jobs no longer exist, in substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed, discharging if necessary any employees hired in their places:

**DC Bureau**
(TVS unit employees not hired by CNN)

Jeffrey Adkinson
Emmanuel Agomuoh
Charles Anderson
Rodney Atkinson
Tim Bintrim
James Cook
Keith Crennan
Timothy Durham
Bill Evans
Danny Farkas
Dennis Faulkner
Christopher Hamilton
David Jenkins
Martin Jimenez
Michael Kauffman
Nicholas Kiraly
Adilson Kiyasu
Donna Lacey
Larry Langley
Myron Leake
Mark Marchione
Ralph Marcus
Joseph Mosley
Luis Munoz
Jeffrey Noble
Dennis Norman
James Norris
Sarah Pacheco
John Quinnette
Tyrone Riggs
Oscar Romay
Fred Schall
Paul Skaife
James Stubbs
James Suddeth

**NYC Bureau**
(TVS-unit employees not hired by CNN)

Marc Abramson
Melanie Baker
Marcus Bassett
Paul Bernius
Doriann Bertino
Richard Birch
Steve Burnett
Joseph Cantali
Jeffrey Carlough
Timothy Cassese
Christopher Collins
Duff Conner
Robert Cummings
Christopher Cunningham
Viktor David
Jennifer DeStefano
John Diaconu
Michael Diana
Jeffrey Edelman
Jay Eric
Vince Everett
Donald Fenster
Felix Formaintt
Todd Ferrand
Jon C. Ford
John Gallagher
Mitchell Gomila
Fernando Garcia
Daniel Hacker
Phil Hadrovic
Kristi Harper
Peter Hedeman
Juan Hortua
Daniel Rodriguez
Christian Roebling

James Suissa
John Urman
Joseph Wade
Aaron Webster
Darrin White
Patrick Howley
Jeffrey Jaramillo
Asprey Jones
Kenneth S. Kaplan
Brian Kiederling
Robert Knolle
Glen Kreigsman
Beth Lasch
Steven Lima
Connie Long
Perry MacLean
Tommy Maney
Sarael Martinez
Robert Matteo
Roy McClain
Kathleen McLaughlin
Edward McShea
Barbara Morrisey
Rod Nino
Ramon Olivo
Tracy Organ
James Peithman
Mark Peters
Todd Pivawer
Charles Rainone Jr.
John Rappa

Hamid (David) Rokshar
Daniel Scalley
Shari Schlager
William Seiden
Charles Serra
Michael Sollenberger
Mickael Squier
Danielle St. John
Robert Sullivan
Mary Theodore
Richard Uhoda
Pedro Valentin
Brian Wood

WE WILL provide to the above-named employees whatever training we have provided since the termination of our contracts with TVS, if such training is necessary to allow them to perform their former jobs or substantially equivalent positions.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to our unlawful discharge of or refusal to hire the above-named employees, and WE WILL, within 3 days thereafter, notify them in writing that this has been done and that our unlawful discharge of or refusal to hire them will not be used against them in any way.

WE WILL make whole the following individuals, in addition to those listed above, for any loss of earnings and other benefits suffered as a result of our discharge of or failure to hire them or our unilateral changes in their preexisting terms and conditions of their employment:

**DC Bureau**

Bill Alberter                     Kevin McCall
David Bacheler                    Kevin McClam

CNN AMERICA, INC.                                                                47

Reza Baktar
Mike Bannigan
Cameron Bartlett
Stephen Bartlett
Jay Berk
Dave Berman
John Bodnar
Burke Buckhorn
David Catrett
Bobby Clemons
Everett Cottom
Michael David
John Davis
Ronald Davis
Ken Distance
Martin Dougherty
Brenda Elkins
Thomas Everly
Cesar Flores
Michael Galindo
Tim Garraty
Maurice George
Augusto Gomez
Thomas Michael Greene
Eddie Gross
Conrad Hirzel
Paul Hollenback
David Hugel
Lesa Jansen
Lori Jennings
Warren Kinlaw
Dave Kopecky
Martin Kos
Douglas Koztoski
Ronald Kuczynski
Marianna Lafollette
Christopher Leonard
Tau Liu
Howard Lutt
Michael Maciejewski

**NYC Bureau**

John Allen
Andrew Gideon Arnold
Shimon Baum
Gordon D. Benedict
Shep Berkon
Frank Bivona
Robert Borland
Karl Braunwarth
Robert Brennan
Chris Brown

Barbara Stieritz Mccloskey
Douglas Mckinley
Samuel Jay McMichael
Paul Miller
William Moore
James Moran
Peter Morris
Flick Morse
John (Nick) Mueller
Lorn Murphy
Ernest Nocciolo
John Otth
Robert Parker
Ines Perez-Thompson
William Pettus
James Riggs
Greg Robertson
David Scherer
Barry Schlegel
Reggie Selma
Raeshawn Smith
Tawana Smith-Brown
Carolyn Stone
Daniel Taylor
Arthur Thomas
Jerry Thompson
Lisa Timchalk
William Tipper
John Tripp
Ken Touhey
Kim Uhl
Anthony Umrani
Joe Walker
Mark Walz
Kenneth White
Alvester Williams
John Williams
Brian Yaklyvich
Elizabeth Zosso

P. Jeffrey Latonero
Brenda Laux
Jason Lazar
Brahms Lee
Laurent LeGal
Stacy Leitner
Allan Leibman
Todd Lindenfeld
Kevin M. Lishawa
Felice Loccisano

Gregory Bryne
Jeffrey Bums
Joe Capolarello
Douglas Carroll
Mark Casey
Timothy Cassese
Sergio Centa
James Clarke
Christopher Collins
John R. Conroy
Stephen Coombs
Paul Cutting
Louis Delli-Paoli
Gary D'Orio
Michael Dottin
Stefan P. Dreyfuss
Ori M. Dubow
Bruce Dunkins
Larry Edgeworth
Nicholas J. Fayo
Bradley Fehl
John Ferry
Dennis Finnegan
Stewart Forman
John M. French
Arielle Garnza
Nicolae Ganea
Desmond Garrison
Christopher Geiger
Michael Gittelman
Michael J. Glazier
Ricardo Gomez
Glen R. Gorham
Larry Greenberg
William Greene
Jason Greenspan
Jeffrey D. Greenstein
Eric Grima
John J. Heneghan
Mark A. Herman
Thomas P. Hollyday
Larry Holmes
Mark Hubbard
Walter Imparato
Anthony K. Ioannou
Thomas Jurek
William Kane
Nicholas P. Karas
Gerard Kaufold
Sergei Khramtsov
Paul T. Kim
Keith H. Koslov

Steven Machalek
Christopher Madden
Douglas Maines
Michael Manzo
Alexander Marshall
Gilbert Martinez
David McCarrie
Sean P. McGinn
Dan Meara
Jennifer T. Messina
Thomas Miuccio
John Montalbano
Donald Mulvaney
Joathan C. O'Beirne
Juan Ortiz
Dina V. Pace
Diane Parker
Phillip Pernice
Glenn W. Perreira
Timothy A. Persinko
James Pertz
Saylor Phair
Lauren Price
Andrew Rabel
John Reilly
Jonathan D. Reiss
Scott Riley
Frank Romano
Pietro A. Rotundo
Joseph Santos
Samuel Sawyer III
Frederick Schang
Edward Scholl
David B. Schumacher
Charles Serra
Richard Shine
Jonathan Smith
Michael Sollenberger
William M. Sparks
Michael Stein
Robert Strano
Roger Thomas
Ronald L. Thompson
Shane Touhey
Mike Trier
Ioannis Tsesmelis
Lawrence Van Pattern
Donald Walden
Christopher Ward
David Weber
Robert Wenk
Jamie Wiener

48                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Edward Langan          Glenn W. Zachar

WE WILL compensate bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file a report with the Social Security Administration allocating the backpay award to the appropriate calendar quarters.

WE WILL restore any bargaining unit work that has been contracted out since our termination of the contracts with TVS.

WE WILL remit to the Union, with interest, any dues that we were required to withhold and transmit under the DC bureau's collective-bargaining agreement since December 6, 2003, and the NYC bureau's collective-bargaining agreement since January 17, 2004.

CNN AMERICA, INC.

The Board's decision can be found at www.nlrb.gov/case/05-CA-031828 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1099 14th Street, N.W., Washington, D.C. 20570, or by calling (202) 273-1940.



*David Biggar, Dorothy Foley, Thomas P. McCarthy, Carol A. Baumerich, Daniel Collopy, Daniel Heltzer, Gregory Beatty, Susannah Ringel, Allen Rose,* and *Lindsay Parker, Esqs.,* for the General Counsel.
*Zachary Fasman, Kenneth N. Willner, Maureen O'Neill, Todd C. Duffield,* and *Sandi F. Dubin, Esqs. (Paul, Hastings, Janofsky and Walker, LLP),* of Washington, D.C.; *Lisa Reeves, Esq.,* for Respondent CNN America, Inc.
*Peter Chatilovicz, Michael Viccora, Eric Janson,* and *Daniel Sikka, Esqs. (Seyfarth Shaw, LLP),* of Washington, D.C., for Respondent Team Video Services, LLC.
*Brian Powers* and *Keith Bolek, LLP (O'Donoghue and O'Donoghue, LLP),* of Washington, D.C., for Charging Party Local 31.
*Robert Marinovic* and *Lowell Peterson, Esq. (Myers, Suozzi, English and Klein),* of New York, New York; *Stephen H. Sturm, Esq. (Sturm & Perl),* of New York, New York, for Charging Party Local 11. *Matt Harris,* for Charging Parties Local 31 and Local 11.

## DECISION

ARTHUR J. AMCHAN, Administrative Law Judge. This case was tried in Washington, D.C., and New York, New York, on 82 dates between November 7, 2007, and July 21, 2008. There are over 16,000 pages of transcript and over 1300 exhibits, many of them voluminous.

### Jurisdiction

At all times material to this case, Respondent[1] CNN America, Inc. (CNN) a division of Turner Broadcasting Systems, Inc., had its headquarters in Atlanta, Georgia, and had bureaus in other countries and States including New York and the District of Columbia. At all material times, CNN has been engaged in the gathering, producing, and broadcasting of national and International news. In 2003 and 2004, CNN performed services valued in excess of $100,000 outside of the State of Georgia. CNN has been, at all material times, an employer engaged in commerce within the meaning of the Act.

Team Video Services, LLC, during all material times had a place of business in Washington, D.C. Team Video Services of New York, had a place of business in New York, New York. Both Companies (Team or TVS), provided services valued in excess of $50,000 to enterprises located outside Washington and New York, respectively. Team was at all material times an employer engaged in commerce within the meaning of the Act.

The Charging Parties, National Association of Broadcast employees 7 Techinicians, communications Workers of America Locals 31 and 11, AFL–CIO (NABET Locals 31 and 11) are labor organizations within the meaning of the Act.

### STATEMENT OF THE CASE

#### Major Issues

1. Prior to December 6, 2003, in Washington, D.C., and January 17, 2004, in New York, Team Video employed camera operators, sound technicians, studio technicians, and broadcast engineers who performed much of the technical work at CNN's Washington and New York bureaus. Team also employed couriers at CNN's Washington, D.C. bureau. The General Counsel alleges that CNN was a joint employer with Team Video of these employees.

2. Effective on the dates set forth above, CNN terminated its contracts with Team Video and directly hired employees to perform the camera, studio, and engineering work at its Washington and New York bureaus. CNN named the process by which it directly hired technical employees the Bureau Staffing Project (BSP). Turner Properties hired two of the couriers who had previously worked for Team at the Washington, D.C. bureau. The General Counsel alleges that CNN was also a successor employer to Team Video at the Washington and New York bureaus.

3. Team employees at CNN's Washington and New York bureaus were represented by the Charging Parties, Local 31 of the National Association of Broadcast Employees & Technicians (NABET) in Washington and NABET Local 11 in New York. The General Counsel alleges that CNN discriminated

---

[1] When I use the term Respondent, I mean CNN, unless otherwise specified.

against Team bargaining unit members in its direct hiring of technicians.

4. The General Counsel further alleges that CNN violated the Act in refusing to recognize and bargain with NABET Locals 31 and 11 as the collective-bargaining representatives of those of CNN's technical employees who the General Counsel alleges were performing work previously performed by bargaining unit employees in CNN's Washington and New York bureaus. To this end, the General Counsel alleges that a majority of the CNN employees in the historic bargaining units were formerly members of the Team bargaining units. Moreover, the General Counsel alleges that but for CNN's discrimination against Team unit members, a majority of the members of any appropriate CNN units would have been former Team unit members.

5. CNN and Team Video contend that they were not joint employers. CNN contends that it did not discriminate against NABET bargaining unit members when directly hiring its technical employees. CNN also contends that it is not a successor employer. Among CNN's contentions is that the NABET bargaining units are not appropriate CNN bargaining units. CNN contends that any appropriate CNN bargaining unit must be a wall-to-wall unit of production employees, including employees who were directly employed by CNN prior to the termination of the Team contracts. This includes employees such as information technology specialists, electronic graphics operators, and editor/producers.

6. CNN also argues that even if a majority of employees in an appropriate unit are former Team Video bargaining unit members, it is not a successor employer to Team. CNN contends that its technical employees are not performing the same jobs that Team employees performed at CNN's Washington and New York bureaus. For example, CNN contends that its photojournalists are not performing the same job as were Team Video cameramen.

### Procedural Background

The National Association of Broadcast Employees and Technicians (NABET) Local 11 filed the original charge in Case 5–CA–33125 (formerly designated as Case 2–CA–36129) regarding CNN's New York, New York Bureau on March 5, 2004. NABET Local 31 filed the original charge in Case 5–CA–31828 on March 22, 2004, regarding CNN's Washington, D.C. Bureau.

On June 30, 2006, Region 5 dismissed the charge regarding the D.C. bureau insofar as it alleged that CNN and TVS terminated their contract to discourage membership in Local 31. The General Counsel's Office of Appeals sustained Local 31's appeal of the dismissal on February 23, 2007 (CNN Exh. 723). On April 4, 2007, the General Counsel filed the initial complaint in this matter. An amended consolidated complaint was issued on November 6, 2007.

On the entire record,[2] including my observation of the demeanor of the witnesses, and after considering the briefs and

exhibits, I use the abbreviation B# and omit zeros that are at the front of the Bates numbers.

To my knowledge, the issue of whether CNN has fully complied with the General Counsel's subpoena has yet to be resolved, see 352 NLRB 675 (2008).

Additionally, I note that CNN has refused to allow this judge or any ALJ to examine the documents listed on its privilege log to determine whether they are in fact privileged, despite a Board Order that it do so, Id. at fn. 4, Tr. 7673–789. I ordered an *in camera* inspection of 26 pp. of CNN's privilege log, encompassing documents authored between January 1, 2003, and the end of February 2004. I did not order an in-camera review of documents between CNN and the Paul Hastings law firm, but required a review of documents claiming attorney-client privilege for numerous emails between CNN's in-house counsel, Lisa Reeves, and other CNN employees.

In this regard, CNN states at p. 37 of its reply brief that "there is no evidence of a single Team candidate whose candidacy was quashed by [Cynthia] Patrick or Reeves." Without a review of the documents listed on the privilege log, there is no way of telling whether such evidence exists. Moreover, there is a strong suggestion of such "quashing" by Patrick with regard to Jimmy Suissa and an initial attempt to "quash" the hiring of Barbara McCloskey.

The Eastern District of Louisiana in *In re Vioxx Products Liability Litigation* noted that in-house counsel often plays a dual role in the corporate context: "It is often difficult to apply the attorney-client privilege in the corporate context to communications between in-house corporate counsel and those who personify the corporate entity because modern corporate counsel have become involved in all facets of the enterprises for which they work. As a consequence, in-house legal counsel participates in and renders decisions about business, technical, scientific, public relations, and advertising issues, as well as purely legal issues." In re *Vioxx Products Liability Litigation,* 501 F.Supp.2d 789, 797 (E.D.La.2007).

"Only if the attorney is 'acting as a lawyer' giving advice with respect to the legal implications of a proposed course of conduct may the privilege be properly invoked. In addition, if a communication is made primarily for the purpose of soliciting legal advice, an incidental request for business advice does not vitiate the attorney-client privilege." *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136, 147 (D.Del.1977).

There are numerous errors in the transcript. However, few of them appear to be material. I correct one of these errors at following critical point, Tr. 10874, L. 16. What appears to be a continuation of my instruction to the witness, Barbara Morrisey-Marquez, is in fact her testimony.

> JUDGE AMCHAN: If she knows.
>
> I would want you to distinguish between the two people who, as I understand it, were running the meeting and statements in the audience. [The rest of this line and continuing to the end of L. 23 is Morrisey's testimony, not a continuation of my instructions to her.]
>
> A. I can tell you that during the meeting mainly the woman was speaking and I remember somebody else standing up basically adding in their two cents here and there.
>
> But there was only one main speaker. There was two head people speaking. Not speaking, standing up. And addressing the conference room, basically.
>
> Q. Do you know either of their names?
>
> A. No, I don't know.

Tr. 10129, L. 16: the word "phone," should be "stand."

Tr. 13167, L. 15: "February" should be "December."

GC Exh. 40, the contract (ENGA) between CNN and Team Video in Washington, is received into evidence if I inadvertently failed to receive it into the record during the hearing.

---

[2] Each page of every document produced by CNN in response to the General Counsel's subpoena has a unique number in the lower-right corner of each page. These are called "Bates numbers," e.g., CNNA-011650 or CNNA-PROD00064228. When I cite to Bates numbers in

50                         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

reply briefs filed by the General Counsel, Respondents, and the
Charging Parties, I make the following

<div align="center">FINDINGS OF FACT</div>

<div align="center">General Background/Overview</div>

<div align="center">The Joint Employer Issue</div>

Respondent CNN America, Inc. (a/k/a CNNA, the Cable
News Network) is a division of Turner Broadcasting Systems,
Inc. CNN's headquarters is in Atlanta, Georgia, and it has
bureaus in other cities and countries. CNN went on the air
from Washington, D.C., in June 1980, *Mobile Video Services,*
266 NLRB 1143, 1144 and fn. 2 (1983). Since that time until
December 6, 2003, CNN contracted with a number of compa-
nies successively, including Mobile Video, Newslink, Profes-
sional Video Services, Potomac Television Services, and Team
Video Services, to provide technical services, such as camera,
audio, engineering, and studio and control room work at its
Washington, D.C. bureau. It also contracted out its technical
services at its New York, New York bureau from as early as
1985 until January 17, 2004.

The last contractor, October/November 1997–December 5,
2003, at the Washington bureau was Respondent Team Video
Services, LLC. The last contractor at the New York bureau,
March 1, 2002, to January 16, 2004, was Team Video Services
of New York. These sister companies were part of the Asgard
Entertainment Group (TVS and/or Team).[3] As set forth herein,
I find that CNN meaningfully affected matters relating to the
employment relationship of Team employees to such a degree
that it was a joint employer of Team's employees. I draw this
conclusion primarily on the basis of the extent of CNN's super-
vision and direction of the Team Video work force.

<div align="center">The Successor Employer Issue</div>

The Board certified NABET Local 31 as the exclusive bar-
gaining representative of Mobile Video's employees at CNN's
D.C. Bureau in January 1982, *Mobile Video Services,* 266
NLRB 1143, 1144 and fn. 2 (1983) (GC Exh. 2).[4] In 2003,
Contractor Team Video employed field, studio, engineering
technicians, and couriers. The contractors' employees in New
York were represented by NABET Local 11 beginning in 1985.
That bargaining unit consisted of field camera, field audio,
engineering, and studio technical employees. There is no evi-
dence in this record indicating that CNN contracted out the
technical work at any of its other bureaus. Technical employ-
ees at CNN headquarters in Atlanta and at other bureaus were
not unionized.

Throughout the 1980s, 1990s and, in New York in 2002,
each successive contractor retained the vast majority of the
employees of its predecessor, and recognized and bargained
with Locals 11 and 31. Thus, the General Counsel alleges, and

---

[3] GC Exh. 326, is received into evidence with its handwritten nota-
tions, pursuant to Local 31's motion to reopen the record and CNN's
October 23, 2003 letter consenting to its admission.

[3] At both bureaus, Team's immediate predecessor was Potomac Tel-
evision Services, Corporation (Potomac).

[4] Local 31's certification describes the bargaining unit as "all full-
time and regular part time employees . . . including camera operators,
tape operators, editors, couriers, engineers and master controllers . . . ."

I find, that CNN's failure to hire many of Team employees and
its refusal to recognize NABET was unprecedented and thus
suggestive of discriminatory motive.

For example, when Team Video replaced Potomac Televi-
sion as the contractor at the D.C. Bureau in 1997, it hired 85
out of the 89 Potomac bargaining unit members. It then recog-
nized and bargained with Local 31. Most recently in March
2002, Team retained over 90 percent of Potomac's bargaining
unit members when it became the contractor in New York.[5]
Thereafter, Team recognized and bargained with Local 11.
There is no evidence that any contractor replaced employees
who were performing their jobs satisfactorily.

Recognition has been embodied in successive collective-
bargaining agreements. The most recent of these agreements
for the New York bureau between Team Video and Local 11
was signed in April 2003. It was effective from about Decem-
ber 2000 (retroactively) through February 28, 2006. The most
recent of the agreements for the Washington, D.C. bureau be-
tween Team and Local 31 was effective from February 1, 2002,
through January 31, 2006.

On September 29, 2003, CNN publicly announced that it was
terminating its contracts with Team in both bureaus. CNN then
implemented the "Bureau Staffing Project (BSP)" to recruit,
interview and hire its own employees to provide the technical
services it had previously contracted out.

The Bureau Staffing Project was an elaborate process with
many steps. As discussed in great detail herein, the Bureau
Staffing Project was a sham process. During the BSP, CNN
engaged in widespread and blatant discrimination against Team
Video bargaining unit members. CNN did so with the objective
of depriving employees of NABET representation. As dis-
cussed herein, there is direct evidence of CNN's discriminatory
motive, as well as overwhelming circumstantial evidence of
discrimination. I set forth herein in great detail the disparate
treatment of many Team applicants when compared to non
Team unit members.

CNN invited applicants to apply online to the Turner jobs
website. CNN or Turner recruiters then screened applicants in
a telephone interview. Those who passed this initial screen,
including virtually all full-time Team bargaining unit members,
were then scheduled for face-to-face or telephone interviews
with one or more CNN "hiring managers." These hiring man-
agers included CNN management personnel from CNN's At-
lanta headquarters, as well as from the CNN Washington and
New York bureaus.

Each hiring manager was supposed to fill out a 10-page in-
terview guide; however, it is unclear as to whether every hiring
manager did so for each applicant. The 10th page of this guide
contained a rating sheet on which the interviewer was supposed
to rate each interviewee in a half dozen categories, such as
creativity, initiative, decision making, ethics and integrity, and
teamwork. The hiring managers rated interviewees on a scale

---

[5] As of February 20, 2002, Team intended to hire 87 out of 95 Poto-
mac bargaining unit members. In at least one instance, Team declined
to hire a Potomac bargaining unit member because of concerns about
his skill and attitude. These concerns were communicated to Team by
Potomac managers, CNN Exh. 229.

CNN AMERICA, INC.     51

of one (the worst) to five (the best). At least in some cases, CNN compiled composites of these interview ratings. As discussed herein, it is unclear what use, if any, CNN made of these interview ratings in the hiring process. The absence of evidence that that the applicant interviews played any role in CNN's hiring decisions is one of several factors which leads me to conclude that the Bureau Staffing Project was a sham process.

Some or all applicants for photojournalist positions were asked to submit a "demo tape" or reel to CNN's chief photographer in Atlanta, Dan Young. As set forth herein, it is unclear what role, if any, the review of these tapes by Young and/or other CNN management personnel played in the hiring process.

After the interviews, the hiring managers, and other CNN management personnel met to conduct a debriefing or selection meeting. At each of these meetings, applicants were evaluated on "butcher blocks," which are large sheets of manila paper. At these meetings, the hiring managers purportedly determined which applicants should be hired. The record, however, establishes that at least some, if not all, final hiring decisions were made by higher-level CNN officials who were not "hiring managers."

CNN witnesses testified that applicants, at least in some job categories, were first classified in such terms as a "very strong possible" candidate, a "strong possible" candidate, a "possible" candidate, a "possible minus" candidate, etc. It is unclear who performed this categorization and when it was done.

After this categorization, CNN managers ranked some or all of the candidates in order of desirability. For example, 55 applicants for the photojournalist position in Washington were ranked in order by each hiring manager. Then a composite list averaging these rankings was composed. CNN purportedly made its hiring decisions on the basis of the rankings at the debriefing/selection meetings. However, in some cases CNN changed the order of these rankings after the debriefing sessions. The reasons for these changes are unexplained in many cases. Sometime after the debriefing meetings, CNN checked the references of applicants it intended to hire and extended offers of employment.

CNN personnel periodically prepared spreadsheets, such as General Counsel's Exhibits 268–270 and CNN Exhibit 541, to keep track of the progress of the BSP. CNN made unexplained changes to the order of applicants to whom jobs would be offered and added individuals to the spreadsheets who were not considered at the debriefing meetings and in some cases were interviewed after the debriefing meetings.

Most importantly, CNN hired individuals for positions subject to the Bureau Staffing Project who were interviewed after the debriefing meetings at which applicants who supposedly selected for hire. Some of these individuals were offered positions prior to the end of the Team contracts and some were offered their positions soon afterwards. This is another major factor in my conclusion that the Bureau Staffing Project was a sham.

During the Bureau Staffing Project, virtually all the full-time Team Video employees applied for positions with CNN. CNN hired approximately 70 of the 120 former Team Video bargaining unit employees in New York and roughly 48 of the 86 bar-

gaining unit members who worked for TVS at CNN's Washington, D.C. Bureau.

CNN did not terminate the TVS contract because it was dissatisfied with the quality of the work performed by bargaining unit employees. The reason advanced by CNN for replacing many of its technical employees is that it was necessary for it to have a new workforce in order to take advantage of technological developments in the industry, particularly those related to computer technology (e.g., GC Exh. 101, pp. 5 & 8–9; Tr. 803–804, 8346).

With regard to the New York Bureau, CNN relies also on the fact that it was moving from a largely tape-based (or analog) facility to a new more computer-based (or digital) facility at the Time Warner Center.[6] This move occurred in 2004, several months after the termination of the Team Video contract.[7]

As set forth herein, I find the reasons given by CNN for its termination of its contracts with Team Video and its implementation of the Bureau Staffing Project to be pretextual. A major motive in these decisions was CNN's desire to operate its Washington and New York bureaus without a union.

CNN could easily have trained the employees who worked for Team in the new technologies, and in fact CNN did provide extensive training to all the employees hired during the Bureau Staffing Project, regardless of whether or not they had previously worked for Team Video. There is no evidence that any Team employees, either those who were hired and those who were not hired, could not have adapted to the technological changes that CNN was undertaking.

Indeed, CNN hired a number of Team employees who it discriminatorily refused to hire during the Bureau Staffing Project, afterwards. There is no evidence that any of these employees was unable to cope with the technological changes at CNN. However, some of the nonTeam members hired during the BSP were terminated for poor performance and others quit their jobs soon after they were hired.

Team ceased operations at CNN's Washington bureau at the close of business Friday, December 5, 2003. The technicians hired through the Bureau Staffing Project reported to work on Saturday, December 6, 2003. Team ceased operations at the New York bureau on January 16, 2004. Employees hired through the Bureau Staffing Project in New York reported to work on Saturday, January 17, 2004.

CNN broadcasted on the days after the termination of the Team contracts without any interruption of service to its viewers. Former Team employees hired by CNN performed essentially the same tasks for CNN that they had performed for Team. The employees hired to replace Team employees who

---

[6] The value of a digital signal, as opposed to an analogue signal, is that it does not deteriorate as it is transmitted or replicated.

CNN Engineering Director Tu Vu testified that the Washington bureau was transformed from an analog to a digital facility in 1999 or 2000, Tr. 1735.

[7] CNN fn, CNN's financial network, began broadcasting from the Time Warner Center on April 12, 2004. The last shows moved from 5 Penn Plaza to the Time Warner Center in May 2004, Tr. 12273–1274. Thus, for 2–3 months the employees hired during the Bureau Staffing Project worked at the same location as had the TVS employees, operating the same equipment to broadcast CNN's programming.

52                   DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

were discriminated against also performed essentially the same tasks that were previously performed by Team bargaining unit employees. Since, but for CNN's discriminatory conduct, Team unit members would have constituted a majority of any CNN bargaining unit, I find that CNN was a successor employer to Team Video.

Locals 11 and 31 requested on several occasions that CNN recognize and bargain with them as a successor employer to Team Video.[8] CNN refused to do so. It informed the Unions, through counsel, that it did not agree that a majority of CNN's current employees in any appropriate bargaining unit were previously represented by NABET at the D.C. and New York bureaus while Team Video was CNN's contractor. (GC Exhs. 26, 28.) Counsel also asserted that CNN employees were not performing the same or similar work as TVS employees.

CNN contends that any appropriate CNN bargaining unit must include employees at the two bureaus who were directly employed by CNN prior to the termination of the Team contracts, rather than Team Video. These are individuals such as computer specialists, lines coordinators (who performed administrative rather than technical tasks for CNN), electronic graphics operators, and editors. Due to CNN's discrimination against Team Video bargaining unit members, CNN is a successor employer to Team either in the historic bargaining units or any expanded bargaining units.

As a result of CNN's refusal to recognize the Unions and its failure to hire many members of its bargaining units, Locals 11 and 31 filed the instant charges.

Specific Allegations in the Complaint

The essence of this case is paragraph 22(b) of the complaint. This paragraph alleges that all the allegedly illegal acts in this case "are part of an overall plan . . . to undermine the union activity of the Unit employees in Respondent CNN's D.C. and NY bureaus. This overall plan included, but was not limited to, the termination of the ENGA [the contracts between CNN and Team Video] . . . transfer of bargaining unit work to CNN, and the discharge of bargaining unit employees in each Unit, and Respondent's creation and implementation of recruitment and hiring procedures to discriminatorily limit the hiring of a majority of TVS bargaining unit employee applicants in each Unit."

The General Counsel also alleges that:

a number of supervisors and agents of CNN made statements to employees that restrained, interfered with and coerced employees in violation of Section 7 of the Act;[9]

---

[8] Formal demands for recognition and bargaining were made by Local 31 on December 8, 2003, and by Local 11 on January 23, 2004. However, NABET requested to meet with CNN on several occasions prior to the end of the Team contracts, and as discussed more fully later, I deem these requests to constitute requests to bargain. CNN, except for the brief meeting between D.C. Bureau Chief Kross and Local 31 President Peach, declined these requests. At this meeting, I find that Peach effectively requested bargaining and Kross in effect told Peach that CNN intended to operate without NABET.

[9] I find that every individual named in pars. 4(a) and (b) of the complaint was at all relevant times an "agent" of CNN within the meaning of Sec. 2(13) of the Act. First of all, CNN did not specifically deny that any of these individuals was an agent and therefore these allegations

CNN sufficiently affected matters relating to the employment of TVS employees prior to December 2003, that CNN and TVS were joint employers of bargaining unit employees. Therefore, the General Counsel contends CNN could not legally terminate the collective bargaining agreements on December 5, 2003 in Washington and on January 16, 2004 in New York. Further, the General Counsel contends that both CNN and TVS are responsible for remedying the unfair labor practices committed by CNN because TVS was on notice that these violations were occurring, acquiesced in the violations and did not exercise means available to it to resist them;

Any changes CNN has made to terms and conditions of employment of unit employees violate Section 8(a)(5) of the Act;

CNN's bureau staffing project was established and implemented in such a manner so as to limit or delay the hiring of TVS unit applicants in order to avoid a successorship obligation to recognize and bargain with the Unions. It also discriminated against particular named employees because of their union membership and activities.

CNN packed its bargaining units in order to avoid a successorship obligation. The essence of this allegation is CNN's claim that employees who worked directly for CNN in 2003 and who were not members of the TVS bargaining units must be included in any appropriate CNN

---

are admitted, 29 CFR § 102.20. Secondly, the record establishes that these individuals were agents of CNN with respect to all material issues in this case. This is clearly the case with regard to Karen Curry, Jeff Kinney, Lew Strauss, Kathryn Kross, Danielle Welton, and Tu Vu who are specifically mentioned in the General Counsel's briefs, but also all other hiring managers and CNN employees who directed Team technicians in their work.

Board law regarding the principles of agency is set forth and summarized in its decision in *Pan-Oston Co.,* 336 NLRB 305 (2001). The Board applies common law principles in determining whether an employee is acting with apparent authority on behalf of the employer when that employee makes a particular statement or takes a particular action. Apparent authority results from a manifestation by the principal to a third party that creates a reasonable belief that the principal has authorized the alleged agent to perform the acts in question. Either the principal must intend to cause a third person to believe the agent is authorized to act for him, or the principal should realize that its conduct is likely to create such a belief.

The Board also stated in *Pan-Oston,* supra, that the test for determining whether an employee is an agent of the employer is whether, under all the circumstances, employees would reasonably believe that the employee in question was reflecting company policy and/or acting for management. The Board considers the position and duties of the employee in addition to the context in which the behavior occurred. It also stated that an employee may be an agent of the employer for one purpose but not another.

It is clear that whenever one of these individuals named in complaint pars. 4(a) and (b) communicated to a Team or CNN employee on any matter relevant to this case that the employee understood that this individual was speaking on behalf of CNN. I fail to understand how it is relevant to this case whether these individuals were also "supervisors" within the meaning of Sec. 2(11), although I deem this to be admitted by CNN's insufficient answer to the complaint as well.

CNN AMERICA, INC.                                                                53

unit. These employees include information technology employees, line coordinators, electronic graphics employees in New York and editors.

Had CNN not purposely limited the hiring of TVS unit applicants and discriminated against them in its hiring process, the General Counsel alleges that former TVS unit employees would have comprised a majority of CNN unit employees, either in the historic D.C. and New York units, and/or in the expanded CNN units.

### Joint Employer

The practical consequences of finding the CNN and Team to be joint employers are two fold. First as a joint employer, CNN would be bound by the terms of Team Video's collective-bargaining agreements with Locals 31 and 11. The second consequence of a finding of joint employer is that Team Video would be jointly and severally liable for remedying CNN's unfair labor practices if the record permits two inferences: first, that Team Video knew or should have known that CNN acted against employees for unlawful reasons and secondly, that Team acquiesced in the unlawful conduct by failing to protest such conduct or to exercise any contractual right it might have to resist it, *Capitol EMI Music*, 311 NLRB 997, 1000 (1993).

For the reasons set forth below, I find that CNN and Team Video were joint employers of Team's employees at CNN's Washington and New York bureaus. Thus, I find that CNN was bound by the terms of Team Video's collective-bargaining agreements with NABET. However, for reasons set forth at page 143 herein, I find that Team should not be held liable for CNN's unfair labor practices.

In *TLI, Inc*, 271 NLRB 798 (1984), the Board set forth what has been its standard for determining joint-employer status for the past 25 years. Where two separate entities share or codetermine those matters governing the essential terms and conditions of employment, they are to be considered joint employers for purposes of the Act. Further, to establish such status there must be a showing that the employer meaningfully affects matters relating to the employment relationship such as hiring, firing, discipline, supervision, and direction. See *Airborne Express*, 338 NLRB 597 fn. 1 (2002).

In practice, Board decisions do not provide a bright line for determining when a joint employer relationship exists. Each case is pretty much sui generis and requires consideration of numerous factors.[10]

Many of the factors that have led the Board to find a joint-employer relationship exist in this case and I find that such a relationship existed between Team and CNN. As noted by the Board in *Painting Co.*, 330 NLRB 1000, 1007 (2000), the rela-

tionship between a typical contractor/subcontractor is one in which the subcontractor undertakes to perform a particular task, as opposed to the situation herein in which CNN treated the arrangement as one in which Team provided employees for CNN's use.[11] Moreover, typically, a subcontractor provides at least some of the equipment and materials needed to do their job. Virtually all the equipment used by Team employees to perform their jobs belonged to CNN.

This is not a case like *Service Employees Local 254 (Women's & Infants Hospital)*, 324 NLRB 743, 748–749 ((1997), cited at page 80 of CNN's brief and at page 41 of Team's brief. The Board found in that case found that the Massachusetts Bay Community College and a company performing janitorial services at the college were not joint employers. These services were ancillary to the core business of the college, i.e., teaching students.

This case is more like *Holyoke Visiting Nurses Assn.*, 310 NLRB 684 (1993), enfd. 11 F.3d 302 (1st Cir. 1993), where the Board found joint-employer status. Team's employees were performing work that involved the core of CNN's business. Indeed, this is a stronger joint-employer case than *Holyoke Visiting Nurses* in that Team employees were exclusively performing services that involved the core of CNN's business and performed services for no other employer. In Washington and New York, CNN did not employ full-time rank-and-file camera operators, broadcast engineers, and the types of studio operators who worked for Team.[12]

In the instant case, there is no question that Team Video performed most or all of the traditional human resource functions with regard to the TVS technical employees at the bureaus. Team paid its employees, provided health insurance, workers compensation insurance, etc. However, what it paid them and what it could agree to pay them under a collective-bargaining agreement was effectively circumscribed by its contracts with CNN (the ENGAs), e.g. (Tr. 11042). For example, in its contract with TVS in Washington, CNN authorized TVS to increase Team's payroll by up to 4 percent per year. While Team could have paid its employees more, it may not have been reimbursed for any increases above 4 percent.

---

[10] CNN's reliance on *Goodyear Rubber & Tire Co.*, 312 NLRB 674, 688 (1993), and *Southern California Gas Co.*, 302 NLRB 456, 461 (1992), is somewhat misplaced. Unlike those cases, the record herein shows that NABET had previously taken the position that CNN and Team were joint employers. Jimmy Suissa, then assistant to the Local 31 president, in fact contended that CNN and TVS were joint employers during contract negotiations in 2002, Tr. 4953. As noted in CNN's brief at p. 30, then Local 31 President James Harvey requested CNN's presence at the bargaining table to discuss merit pay in August 1999, GC Exh. 41.

[11] Asgard Entertainment Corporation created Team Video and Team Video of New York for the sole and express purpose of servicing CNN's Washington and New York bureaus. Although other companies within the Asgard umbrella continue to operate, Team and TVS of New York ceased their active operations with the termination of the CNN contracts, and were dissolved shortly thereafter, TVS Br. at 2, fn. 2. Team Video and Team Video of New York did not have businesses that were separate from running the CNN Washington and New York bureaus. That Team had no business purpose apart from providing services to CNN may or may not be relevant to a joint-employer analysis, see, *B.A.F., Inc.*, 302 NLRB 188, 193 (1991); *Lite Flight, Inc.*, 270 NLRB 815, 816 (1984). In any event, I find CNN and Team to be joint employers without considering this factor. I find a joint-employer relationship solely on the basis on CNN's direction and control of the terms and conditions of Team employees' employment.

[12] CNN occasionally sent employees from Atlanta, and possibly other bureaus, to Washington or New York to do camera work and other work which was usually performed by Team bargaining unit employees.

54                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

This contract further stated that CNN would not fund more than a 4-percent increase unless it agreed to do so, e.g. (GC Exh. 40, p. 15). CNN was effectively the only source from which TVS could draw upon to compensate its employees at the D.C. and New York bureaus. Such factors have been relied upon by the Board in concluding that two employer were joint employers, *Continental Group, Inc.,* 353 NLRB 348, 355–356 (2008); *D & F Industries,* 339 NLRB 618, 640 (2003); *Windemuller Electric,* 306 NLRB 664 (1992).

Furthermore, in negotiating compensation of its employees with NABET in New York, TVS sought input from CNN on issues such as cost-of-living increases and health insurance (GC Exh. 593). As discussed below, overtime compensation of Team employees was within the total control of CNN. Moreover, Team sought approval from CNN before accepting Local 11's wage proposals at the end of collective bargaining in New York in March–April, 2002 (Tr. 10607–1008, 10635–1036).[13]

Team hired and fired employees. Team gave the technical employees at the Washington and New York bureaus their specific assignments. However, the assignments Team field employees would undertake on any given day were determined by CNN. Particularly for field assignments, CNN determined where Team employees worked and when they worked. Team then decided which of its employees went out on which specific assignments that CNN required Team employees to cover (see CNN Br. at 105). Even then, on some occasions, CNN decided which field crews would cover which events during the course of the workday.

In Washington, beginning in June or July 2003, CNN provided the following information to Team through a software program named Newsource: the slug (name) of the assignment, the time of the assignment, the location of the assignment, and the names of the on-air CNN "talent" who would be covering the assignment (Tr. 3771). Team filled in the names of the particular Team employee assigned to do camera, audio, and/or lighting work. It is not clear who made the determination as to how many Team employees were assigned to shoot.[14]

Moreover, it was CNN, not Team that effectively determined many of the essential terms and conditions of employment of TVS employees. Most importantly, CNN supervisors and agents supervised and directed the work of Team employees to a very great extent. CNN suggests at page 8 of its reply brief that it was not a joint employer of Team employees because its direction and control of Team employees was necessitated by news coverage and news content. I am not aware of any precedent which deems these factors to be exceptions for the proposition that direct supervision and control by an employer over a subcontractor's employees makes it a joint employer. A logical extension of such an argument is that anytime an employer subcontracts the essential tasks of its business and then actively supervises and directs the employees of its subcontractor, it cannot be deemed to be a joint employer.

The amount of contact and direction TVS employees received from CNN personnel varied. In the studios and control rooms, TVS employees were under the constant control and supervision of CNN producers and directors and had to act in accordance with the instructions received from these individuals, e.g. (Tr. 10473–10481, 10859–10866). Other than the specific position at which they worked, CNN provided most of the direction and supervision to Team Video studio employees as to how they performed their jobs, albeit often relayed through the Team employee working as technical director. The direction Team employees received from other Team employees was often the mere transmission of instructions that came from the CNN producer, director, or other agent.

This was also true for the Team Video camera and audio technicians in the field. Generally, whatever direction or supervision they received during the workday, other than where to go for their next assignment, came from CNN personnel.[15] Team field technicians were free to leave their assignments only when given such permission by CNN personnel. CNN suggests that CNN rank-and-file employees, particularly the engineer-in-charge, Dennis Norman, supervised Team employees at George Washington University where CNN filmed the *Crossfire* show. It is clear, however, that CNN directors and producers were in charge of TVS employees on that site and that Norman transmitted instructions from CNN or filled in the particulars for the general direction and supervision of CNN personnel, e.g. (Tr. 3125).

CNN and TVS cite a number of Board decisions to the effect that limited and routine supervision is insufficient to make one employer the joint employer of another. Those cases are distinguishable from the instant situation. CNN's supervision of Team employees was constant and in many cases, exclusive, as to how TVS employees performed their jobs.

In addition, Rick Cohen, TVS' general manager in New York, testified that TVS management could not assign its field

---

[13] CNN discusses the testimony of Local 11 President Ed McEwan cited above at p. 89 fn. 67 of its initial brief. CNN argues it should not be credited because the testimony is hearsay. However, CNN did not object to this testimony and I find it credible for the following reasons. First, McEwan's testimony is not hearsay for the proposition that he heard D'Anna make such a statement. Secondly, D'Anna was called as a witness by Team Video 3 weeks after McEwan testified and did not contradict him either in examination by Team, Tr. 11040–11044 or by CNN, Tr. 11055–11061. If D'Anna said he would run NABET's proposal by CNN, I infer that he did so.

CNN points out that NABET notes of a March 5, 2002 negotiating session include a statement by Team's counsel, Peter Chatilovicz, that "we don't need an agreement with CNN, or their permission, to sign a deal," CNN Exh. 335 p. 8. However, further negotiation sessions were held as late as April 16 and 17, 2002, CNN Exh. 336. Thus, NABET's notes do not conflict with McEwan's testimony that Team's position changed at the end of negotiations and that D'Anna made the statement to which he testified.

[14] TVS Exh. 8 indicates that at least in some circumstances CNN determined how many Team employees would be working on a given day.

[15] Only one TVS manager, Gabriel Romero in Washington, regularly visited Team employees working outside the bureau building. Romero was a TVS manager for approximately a year.

Several General Counsel witnesses testified that on some occasions the TVS assignment editor was merely repeating directions from the CNN assignment editor as to where a particular TVS field crew should report during the workday.

CNN AMERICA, INC.     55

employees overtime work without prior approval from CNN (Tr. 11279–11280):

Q. Who assigned overtime to your employees?

A. Who assigned overtime? Essentially, if there was something that was going to cost the client more money, say, a crew was out in the field, our assignment manager would ask would always be with their approval. We didn't do anything on our own. If a crew was out in the field and it looked like it was going to cost more money, it would be an issue of overtime, the producer would have to check in with the CNN end and get their approval.

Q. But who would actually instruct the technicians to work the hours?

A. Somebody at the CNN assignment desk for the field technicians. For instance, if it were a field overtime case would speak to our assignment manager and say hey, we need this person for X number of extra hours. Our assignment managers were not acting autonomously. They were not doing anything unless they were told to.

Q. Understood. But who would instruct the employee all right, you can work an additional four hours?

A. We would, our assignment manager.[16]

The contract between Team and CNN in Washington provided that Team would be reimbursed for overtime—provided that CNN approved Team's resort to overtime in advance (GC Exh. 40, p. 14). This has also been a factor in cases in which the Board has held respondents to be joint employers, *Quantum Resources Corp.*, 305 NLRB 759 (1991).

Certain cameramen, such as the four technicians assigned daily to CNNfn in Washington, and Thomas Miuccio and Luis Munoz, who were assigned to CNN Espanol in New York and D.C., had virtually no contact with Team Video management. These field technicians were under the control of CNN personnel throughout their entire workday (Tr. 13520–13540, 13631).[17] Even their specific assignments came from CNN personnel, rather than from the Team Video assignment editor.[18] TVS crews assigned to the White House and the United Nations also had little contact with Team management and received whatever direction they received from CNN personnel.

When Team camera operators traveled on assignment they were under the complete control of CNN personnel. Except for one visit by TVS Manager Gabriel Romero to Philadelphia, rarely, if ever, was a TVS manager with them. For example, Sarah Pacheco covered the trial of one of the D.C. snipers in

the Virginia Beach/Chesapeake area for several weeks in late 2003. While she was in the Virginia Beach area, Laura Bernardi, a CNN producer, told Pacheco when to report to work, where to station herself, and when she could leave her post. Pacheco's only contact with TVS while in the Virginia Beach area was to call in her start and finish times (Tr. 6536–6539).

The couriers in Washington also were under the complete control and direction of CNN. TVS technicians in New York worked weekends with supervision only by CNN (Tr. 10482).

In the engineering departments, most, but not all, supervision came from TVS personnel. However, what projects the TVS engineers worked on was often determined by CNN personnel, e.g. (Tr. 8636–8638). TVS' general manager in Washington, Brad Simons, testified that there were occasions when Tu Vu, CNN's director of engineering, came into the engineering shop and directed TVS engineers to perform a task (Tr. 15341). Simons testified that when that occurred he would remind Tu Vu that he had to go through TVS management if he wanted something done by bargaining unit employees. However, Vu also dealt directly with unit employees when neither Simons nor any other TVS manager was present on numerous occasions (Tr. 1872–1874, 2963–2944, 3206–3207).

In New York, CNN engineering project managers routinely gave direction to Team bargaining unit supervisors, Bob Cummings and Bill Greene, e.g. (Tr. 8045–8047). At pages 132–135 herein, I find that Cummings and Greene were bargaining unit employees, not statutory supervisors. CNN project managers, such as Jesse Spilka, at least on occasion also gave specific direction to other Team rank-and-file engineers, e.g. (GC Exh. 437).

In addition to CNN's direction and supervision of Team employees, CNN determined the number of full-time and daily hires to be employed by Team at its bureaus, e.g. (GC Exh. 40, pp. 1, 43), and provided all the money from which all Team employees were paid. CNN also in many circumstances held out TVS field employees as CNN employees. Thus, some of the credentials issued to Team employees identified them as working for CNN, rather than Team, e.g. (GC Exh. 131). These are also factors on which I rely on in finding CNN and Team to be joint employers, *D & F Industries*, 339 NLRB 618, 640 (2003); *Capitol EMI*, supra.

Finally, I would note that the remedy under the General Counsel's joint-employer theory and the remedy under the General Counsel's successorship theory, which is analyzed below, are practically the same. Given the fact that I find that the entire Bureau Staffing Project was discriminatorily motivated, it must be assumed that every TVS bargaining unit would have continued their employment at the bureaus but for CNN's discriminatory conduct. Therefore, CNN, as a successor employer, was not entitled to set initial terms of employment without bargaining with the Unions, *Love's Barbeque Restaurant No. 62*, 245 NLRB 78, 82 (1979); *Planned Building Services*, 347 NLRB 670 (2006); *U.S. Marine Corp.*, 293 NLRB 669, 672 (1989).

Since any changes in the terms of employment that existed under Team violate Section 8(a)(5), the remedy for CNN's unfair labor practices vis-à-vis CNN is the same under either a

---

[16] Also see GC Exhs. 421, 422. The statement at p. 34 of TVS' brief that TVS shift supervisors had the authority to approve overtime work is not supported by the exhibits cited, or by anything else in the record. CNN Exh. 103 makes it clear that it was the TVS manager who had the authority to approve overtime work, not the bargaining unit supervisor.

[17] CNNfn in Washington had one permanent crew, John Bodnar and Kim Uhl, assigned to it. There was also another rotating crew on which at least a half dozen TVS employees served at one time or another.

[18] These technicians were sometimes sent to the TVS assignment desk for general assignment work. However, on some occasions, CNN Espanol Manager Willie Lora told Luis Munoz that he denied a request from the TVS assignment desk for his services.

56                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

joint employer or successorship theory, *Smoke House Restaurant,* 347 NLRB 192, 204–205, 208–209 (2006). This is so because the terms from which CNN has departed in either case are those contained in the collective-bargaining agreements that were in place in late 2003 and early 2004.

### NABET did not Waive its Bargaining Rights Regarding CNN's Decision to Terminate the Team Contracts or the Bureau Staffing Project

CNN argues at pages 119–121 of its brief that NABET waived its bargaining rights concerning its decision to terminate its contracts with Team, and I assume everything else. First of all, as a joint employer, CNN was bound by TVS' contracts with NABET.[19] NABET was not obligated to demand recognition and request bargaining. CNN, as a joint employer, was not privileged to make any changes in the terms and conditions of unit members' employment without the consent of their collective-bargaining representatives.

Even assuming that NABET had an obligation to request bargaining, it did not waive its rights. With regard, to CNN's decision to terminate the contracts, the Union was presented with a fait accompli. On September 29, 2003, Cynthia Patrick announced to CNN employees at the New York and Washington bureaus that CNN was ending its relationship with Team Video, not that it was considering such action. She informed these CNN employees that there would be a significant number of job openings at the two bureaus and encouraged CNN employees to apply for the jobs then held by Team employees (GC Exh. 338).

Neither Local 31 nor Local 11 was informed of this decision until after it was made, and communicated to CNN staff. The record thus establishes that by the time NABET learned of CNN's decision to terminate the TVS contracts, it was a final decision about which CNN had no intent to bargain, *Pontiac Osteopathic Hospital,* 336 NLRB 1021, 1023–1024 (2001).

Local 31 was informed of this decision by Team President Larry D'Anna on September 29. He told Union President Peach that Team would no longer have employees at the CNN Washington bureau after the first week of December (Tr. 1210–1211). Peach set up a telephone call to CNN's Washington bureau chief, Kathryn Kross, almost immediately. Peach met with Kross on October 3. He asked Kross how many people CNN intended to hire, whether the recruiters would take into account commendations unit members had received, whether CNN would hold a meeting for NABET unit members to relieve their anxiety (Kross told Peach it would not do so), and then whether unit employees' tenure with contractors would be recognized (Tr. 1210–1224).

After asking these questions, Peach asked Kross about the role of the Union after December 5. She clearly indicated there wouldn't be one. I deem Peach's inquiries to constitute a de-

mand for bargaining over the terms of conditions of employment of employees CNN intended to hire, and Kross' response as a refusal to bargain with NABET.

Similarly, on October 7, 2003, Local 11 President McEwan wrote to the New York Bureau Chief Karen Curry asking to meet with her to discuss the future employment by CNN of NABET members. This constitutes a request to bargain under Board precedent, *Armour & Co.,* 280 NLRB 824, 828 (1986) ("want to discuss your position" is a request to bargain). Curry responded in late October by telling McEwan over the telephone that all inquiries should be directed to CNN's attorneys (Tr. 10609).[20]

On November 19, 2003, the presidents of NABET and the Communications of America wrote to Jim Walton, the president of CNN, asking for a meeting on such issues as the continued employment of all NABET members, the continuation of the collective-bargaining agreements and recognition of the Union (GC Exh. 23). This is also a bargaining request under Board law. On December 3, 2003, Walton responded by stating that he did not believe there was any benefit to a meeting (GC Exh. 24). Walton's response indicates any request by NABET to bargain with CNN at any time would have been an exercise in futility.

As noted previously, formal demands for recognition and bargaining were made by Local 31 on December 8, 2003, and by Local 11 on January 23, 2004.

### Successorship

### The Legal Framework

In *Planned Building Services,* 347 NLRB 670 (2006), the Board set forth the analytical framework to be applied in determining whether an alleged successor employer has unlawfully refused to hire its predecessor's employees to avoid a bargaining obligation and the appropriate make whole remedy. The General Counsel has the burden of proving that the employer failed to hire employees of its predecessor and was motivated by antiunion animus. He need not demonstrate that the employees had relevant experience or training for essentially the same jobs in the successor's workforce that they performed in the predecessor's work force.

Once the General Counsel has made its prima facie case, the burden of proof shifts to the employer to prove that it would not have hired the predecessor's employees even in the absence of its unlawful motive. The shift in the burden of proof is particularly important in this case. As set forth below, the General Counsel easily met its burden of establishing a prima facie case and in virtually all cases, CNN failed to introduce any evidence establishing that it would not have hired TVS unit members in the absence of antiunion animus.

First, however, I must determine whether CNN is a successor to Team Video. This is so because CNN claims that despite the fact that it hired more than 50 percent of the members of the Team Video bargaining units, these employees were not hired

---

[19] NABET had requested CNN's participation in bargaining on at least two occasions prior to September 2003. Assistant to the Local 31 President Jimmy Suissa told TVS negotiators that he wanted to negotiate with CNN during 2002 contract negotiations. As noted in CNN's Br. at 30, then Local 31 President James Harvey requested CNN's presence at the bargaining table to discuss merit pay in August 1999, GC Exh. 41.

[20] In contrast, the Union in *W. W. Granger, Inc. v. NLRB,* 860 F.2d 244 (7th Cir. 1988), which is relied upon by CNN, made no attempt to contact Granger.

CNN AMERICA, INC.                                                57

for jobs that were essentially the same as those they performed for Team.

An employer, which buys or otherwise takes control of the unionized business of another employer, succeeds to the collective-bargaining obligation of the seller if it is a successor employer. For it to be a successor employer, the similarities between the two operations must manifest a "substantial continuity between the enterprises" and a majority of its employees in an appropriate bargaining unit must be former bargaining unit employees of the predecessor. The bargaining obligation of a successor employer begins when it has hired a "substantial and representative complement" of its work force. *NLRB v. Burns Security Services,* 406 U.S. 272 (1972); *Fall River Dyeing Corp. v. NLRB,* 482 U.S. 27 (1987), affg. 775 F.2d 425 (1st Cir. 1985).

Justice Blackmun, in the majority opinion in *Fall River Dyeing* set forth the factors to be considered in determining whether there is a substantial continuity between the predecessor and the alleged successor:

In *Burns,* we approved the approach taken by the Board and accepted by courts with respect to determining whether a new company was indeed the successor to the old. 406 U.S. 280–281, and fn. 4. This approach, which is primarily factual in nature and is based upon the totality of the circumstances of a given situation, requires that the Board focus on whether the new company has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Golden State Bottling Co. v. NLRB,* 414 U.S. at 414 U.S. 184. Hence, the focus is on whether there is "substantial continuity" between the enterprises. Under this approach, the Board examines a number of factors: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. See *Burns,* 406 U.S. at 406 U.S. 280, fn. 4; *Aircraft Magnesium, Division of Grico Corp.,* 265 N.L.R.B. 1344, 1345 (1982), enfd. 730 F.2d 767 (CA 9 1984); *Premium Foods, Inc.,* 260 N.L.R.B. 708, 714 (1982), enfd. 709 F.2d 623 (CA 9 1983).

In conducting the analysis, the Board keeps in mind the question whether "those employees who have been retained will understandably view their job situations as essentially unaltered." See *Golden State Bottling Co.,* 414 U.S. at 414 U.S. 184; *NLRB v. Jeffries Lithograph Co.,* 752 F.2d 459, 464 (CA 9 1985). This emphasis on the employees' perspective furthers the Act's policy of industrial peace. If the employees find themselves in essentially the same jobs after the employer transition, and if their legitimate expectations in continued representation by their union are thwarted, their dissatisfaction may lead to labor unrest. See *Golden State Bottling Co.,* 414 U.S. at 414 U.S. 184.

The instant case is not the typical successorship case. CNN was not a "new company." It operated its broadcasting business seamlessly at the same locations in Washington and New York immediately after the end of the TVS contracts as when TVS was on its premises, with approximately the same number of employees performing its technical work.

TVS' employees were performing production work for CNN. TVS did not produce anything; it merely provided management services to CNN. TVS employees performed their jobs almost exclusively with CNN equipment. When the TVS contracts ended, those employees hired by CNN initially continued to perform their services with the same equipment. As discussed in more detail later, these employees performed essentially the same jobs for CNN that they did for Team Video. Thus, as far as the employees were concerned, they were engaged in the same enterprise on the first day after the Team contracts ended as they were on the previous day. On the other hand, CNN had concrete plans to upgrade its equipment, and in New York, to move to a brand-new facility within a couple of months of the changeover.

CNN essentially eliminated a layer of supervision. Instead of, in some cases, taking direction from Team Video supervisors, the employees took direction from the CNN managers who had previously, in some cases, given instructions through Team Video. However, the record also shows that while Team was at the CNN bureaus, its employees often took direction directly from CNN personnel.

Had CNN not discriminated against Team Video employees, as I find below, former Team unit members would have constituted a majority of the employees in any appropriate CNN unit. Furthermore, they would have viewed their job situations as essentially unaltered, despite the relatively insignificant modifications (to be discussed in more detail later) that CNN made in their job responsibilities. They would have expected that the Unions would have continued to represent them.

Thus, I find that CNN was a successor employer to Team Video as of December 6, 2003, in Washington, and January 17, 2004, in New York. As of these dates, CNN was operating normally with a representative complement of employees, assisted by CNN employees from Atlanta and other bureaus on temporary duty.[21] Assuming as CNN argues, that it was not operating normally until December 15, 2003, in Washington and January 26, 2004, in New York, CNN was a successor to Team Video as of those dates.[22]

---

[21] In some cases, for example with regard to the photojournalists in Washington, CNN needed help from its Atlanta employees in part because it allowed a number of the nonTVS new hires to leave Washington for the first week of their employment with CNN either for personal reasons or to complete work on their prior job, Tr. 15,636–15,641, 15,775.

[22] Cases in which the Board has found that alleged successor was not engaged in normal operations are easily distinguishable. For example, in *Elmhurst Care Center,* 345 NLRB 1176 (2005), the employer, a nursing home, had not started receiving patients. CNN, by way of contrast, was broadcasting normally the day after the Team contracts ended. I would also note that the cause for the Board's policy concern in *Elmhurst Care,* i.e., that a small unrepresentative group of employees

58                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Alleged Discriminatory hiring practices
Discriminatory Motive

To establish a violation of Section 8(a)(3) and (1) in cases where a refusal to hire is alleged in a successorship context, the General Counsel has the burden to prove that the employer failed to hire employees of its predecessor and was motivated by antiunion animus. In assessing Respondent's motive, this case is no different than any other 8(a)(3) case. The Board requires the General Counsel to make an initial showing sufficient to support an inference that the alleged discriminatees' protected conduct was a "motivating factor" in the employer's decision. Then the burden shifts to the employer to demonstrate that the same action would have taken place even in the absence of protected conduct, *Wright Line,* 251 NLRB 1083 (1980), enfd. 662 F.2d 889 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 399–403 (1983) ; *American Gardens Management Co.,* 338 NLRB 644 ( 2002). Unlawful motivation is most often established by indirect or circumstantial evidence, such as suspicious timing and pretextual or shifting reasons given for the employer's actions.

Discriminatory motivation may reasonably be inferred from a variety of factors, such as the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for the discharge or refusal to hire and other actions of the employer; disparate treatment of certain employees with similar work records or offenses; a company's deviation from past practices in implementing the discharge; and proximity in time between the employees' union activities and their discharge. *W. F. Bolin Co. v. NLRB,* 70 F.3d 863, 871 (6th Cir. 1995).

The General Counsel made out its prima facie case. That CNN was aware that the Team Video employees were organized is uncontroverted. It also knew which of the job applicants were members of the Team bargaining units.[23] That the decision to embark upon the Bureau Staffing Project was part of an overall plan motivated by antiunion animus is established by the following direct evidence.

---

make a representation decision that binds a much larger "full compliment," is not present in this case.

  *Hilton Inn Albany* (a/k/a *Ten Eyck Hotel*), 270 NLRB 1364 (1984), a case in which the Board held that the employer recognized a union prematurely, is another case relied upon by CNN. In that case, the hotel was not open to the public for business when the employer recognized the union and only 76 of the over 200 unit employees who were working by the time the hotel opened had been hired.

  Similarly, in *A.M.A. Leasing,* 283 NLRB 1017, 1024 (1987), the Board's found a meat processing plant was not engaged in "normal operations" prior to the date it began to process meat.

[23] With regard to freelancers or daily hires, there may have been a grey area. However, CNN certainly knew which applicants were full-time employees of Team.

The 8(a)(1) Violations and Direct Evidence of
Discriminatory Motive Regarding the Termination
of the Team Video Contracts and the Implementation
of the Bureau Staffing Project

I find that the following statements by CNN agents violated Section 8(a)(1) and establish CNN's animus towards the union membership and activities of bargaining unit members. These statements clearly from an objective standpoint restrained, interfered with and or coerced employees in the exercise of their Section 7 right to organize.

Karen Curry's Explanation of CNN's Motivation
on September 29, 2003 (Complaint Paragraph 9(a))

On September 29, 2003, after CNN employees in the New York bureau received an e-mail from CNN Vice President Cynthia Patrick concerning the end of the Team Video contract, Bureau Chief Karen Curry sent out an e-mail to CNN employees, but not to TVS employees, inviting them to a series of meetings that afternoon in a small conference room on the 21st floor of the bureau. In her e-mail, Curry stated that TVS had "done an excellent job of running their business and meeting the needs of CNN." These meetings were scheduled at 1, 3, 4, and 5 p.m. (GC Exh. 515).

A CNN employee shared this e-mail with TVS studio technician Barbara Morrisey.[24] Although she was not invited, Morrisey attended the 4 p.m. meeting and took notes of what Karen Curry said (GC Exh. 515).[25]

Morrisey testified first as to what she recalled about the meeting without reference to her notes (Tr. 10872–10873):

Q. Tell us what you recall from the meeting.

A. Basically, I went to the meeting because I wanted to find out information on what was going on basically and no one knew what was going on.

And sitting in the meeting, basically, I was getting information from the people who were sitting there which I was not asking questions because I don't think I was supposed to be at the meeting. They were asking basically what was going on and what was going to be happening.

So the first thing they would start off with, if I go through my notes I can explain to you—because it's shorthand, I can tell you why I wrote them.

JUDGE AMCHAN: If you have any recollection independent of the notes I would like you to give me that. If you can't remember anything specific, she will ask you to go through your notes.

A. I know for a fact that in the meeting they said that when basically the Team Video was going to be out and when the CNN was going to take over everybody so that they can—what I remember from the meeting was that so they can work much easier with both the crews and the technical people.

And that in order to make it smoother, that they needed to get rid of Team Video and with Team Video came

---

[24] Morrisey married in the fall of 2003 and now goes by the last name of Morrisey-Marquez.
[25] Morrisey did not know that the speaker at the meeting was Curry, but that is clear from the record, such as Curry's testimony.

CNN AMERICA, INC.        59

along rules and regulations. And that in order—by getting rid of them, then they can have more control of their technical people, which would be me.

Then, Morrisey explained the notes she took during the meeting (Tr. 10877–10878):

> Q. What does it say directly under DVD cameras?
> A. "Manage us rather can't with third party."
> Q. Do you know why you wrote that?
> A. Basely she was explaining to the conference room why they were doing this, while they were getting rid of Team Video, and they went into saying that they were doing this because they can't—they felt like they couldn't manage the technical side of the people. And they wanted to be able to control the technical end of it.
> Q. What does it say under that?
> A. I wrote no union.
> Q. Why did you write that?
> A. I wrote that because as she was talking about manage us rather can't with third party, the person went into talking about basically the union has rules in which they find it harder to follow with managing the technical crews, technical end.
> Q. Who is this that said that?
> A. The person that was standing up, which was the woman.

Morrisey admitted that she is not sure that Curry explicitly stated there would be "no union" at CNN or that Curry used the term "union rules" as opposed to "rules." However, I credit Morrisey's testimony that Curry implicitly, if not explicitly, informed employees at this meeting that CNN would be operating without a union beginning in January 2004.

If Curry discussed rules which inhibited CNN's freedom in managing employees who worked at the Bureau, she necessarily had to be referring to the restrictions in the collective-bargaining agreement. There is no other type of rule that to which she could have been referring in this context. In January 2004, the collective-bargaining agreement between Team and NABET Local 11 had 2 years to run before its expiration.

CNN was planning to increase the use of "one-man bands" for field camera and audio work. CNN's freedom of action with regard to the use of "one-man bands" would have been inhibited by article 19 of the collective-bargaining agreement with Local 11, unless it got rid of the Union or at least the restrictions of the union contract.

I find Morrisey credible in part because she testified from contemporaneous notes. By way of contrast, the CNN witnesses testifying about the September 29 meetings were relying totally on their memory of events that occurred 4-1/2 years earlier.[26] Indeed, while the CNN witnesses generally could remember what Curry did not say, most did not testify at all about what she did say.

Moreover, Curry's testimony and what in fact occurred during the Bureau Staffing Project, is completely consistent with

Morrisey's recollection and her notes. Curry testified about her September 29 meetings (Tr. 8419–8420):

> We discussed that we were going to be no longer working with Team Video Services after a certain point.
> That we were excited about the move into Time Warner Center and the opportunity that the technology provided us and we really felt that it was an opportunity for us to redefine the way we did things, and that we felt that we were at a point where we could directly manage all of the employees who worked for CNN in this newly reconfigured environment.

Later, in response to a question from CNN counsel, Curry stated (Tr. 8461):

> Q. The complaint in this case alleges that at one of those meetings, the attendees were told that there would be no union after the Team contract was terminated. Did you say that there would be no union after the Team contract was terminated?
> A. No.
> Q. Were there other managers at the meeting?
> A. Yes.
> Q. Did other managers speak?
> A. Yes.
> Q. Did any of them say that there would be no union after the team contact was terminated?
> A. I don't think so, no.[27]

First of all, there is no reason to believe that Curry actually remembers what she said at every meeting on September 29. In a similar vein, Deputy Bureau Chief Edith Chapin, testified that she recalls very little of what transpired (Tr. 9210–9211):

> A. Yes, is that the date that—she wrote the E-mail—on September 29th—
> I see the times of the meeting. I'm confused whether that is the day of the meeting or not.
> Q. Are you familiar with the meetings being referred to regardless of the date?
> A. I have a vague recollection there were those meetings. And I'm confident I attended one or more of them. But they are not memorable to me in any other way.
> Q. Did Ms. Curry speak at those meetings?
> A. I'm sure she did, yes.
> Q. At the meeting, did she or any other manager say that there would be no union after the Team contract was terminated?
> A. I have no recollection of that. That is something I would remember if it had been said.

Curry's remarks must be viewed in the context of the record in this case as a whole. What Curry admits to saying only makes sense if she was communicating at least implicitly an intention to get rid of NABET. Curry did not claim to say that the reason for the Bureau Staffing project was the inability of the TVS employees to work with new technology or TVS

---

[26] The number of notations recorded by Morrisey is consistent with Jeff Gershgorn's testimony that the meeting he attended "was not brief." Tr. 7951.

[27] Curry testified that she believed that Ken Jautz, the head of CNNfn also spoke. Jautz did not testify in this proceeding.

shortcomings in managing its employees. In this context, Curry's message about "directly managing employees at the Bureau," necessarily conveyed an intention to do so without the Union. It also imparted a coercive message to CNN employees, who attended these meetings, that CNN in general will not tolerate a union and thus violated Section 8(a)(1) as alleged in complaint paragraph 9(a).

This conclusion is supported by the following testimony of Edith Chapin, the deputy bureau chief (Tr. 9083–9084):

> Q. When did you become aware that CNN wanted to hire people directly to do the camera work, the audio work that had previously been done by Team?
>
> A. I first learned of that in either late August, early September of 2003.
>
> Q. When did you first become aware or how, in what situation did that come up?
>
> A. The first I heard of it was from Karen Curry.
>
> Q. What did she tell you?
>
> A. Precisely, I don't recall. But the message was that the company had decided to ends its relationship with the contractor and that as we were looking to move towards the Time Warner Center in 2004 and with the technological changes that the company decided it was an opportunity to make the New York bureau and as I understood the Washington bureau as well similar to all other CNN bureaus around the world, and have a common work force and a comparable work force that was interchangeable and that that would be something that we would be working on in the months ahead, and that this would take place sometime early in the new year.

A "comparable work force that is interchangeable" with CNN's work force at other bureaus suggests a desire to have a work force that is nonunion, just like CNN's other bureaus and its Atlanta headquarters.

Danielle Whelton's Statement to Tim Garraty (Complaint Paragraph 9(k) as Amended at Trial)

On September 29, 2003, shortly after TVS cameraman Tim Garraty had learned that CNN was cancelling the Team contract, CNN White House Executive Producer Danielle Whelton called him into her office. During a discussion of this news, Garraty asked Whelton where the Union fit into CNN's plans. Whelton told Garraty there would be no union when CNN took over the technical work force (Tr. 13750).[28] Whelton's statement to Garraty violated Section 8(a)(1) as alleged in complaint paragraph 9(k).

Kathryn Kross' Statements to Local 31 President Mark Peach

Paragraph 9(b) alleges that CNN violated Section 8(a)(1), by D.C. Bureau Chief Kathryn Kross, on or about October 3, 2003, by telling CNN employees and Local 31 that after December 5, 2003, the Union would no longer represent employees. There is no evidence of remarks to CNN employees similar to those made by New York Bureau Chief Karen Curry. However, Mark Peach, then president of Local 31, testified about a meeting he had with Kross on October 3. Ordinarily, Peach's testimony is of the type at which I cast a jaundiced view due to its self-serving nature and lack of corroboration. However, CNN neither called Kross to contradict him, nor explained why she was unavailable to testify.[29] Therefore, I credit the following uncontradicted account by Peach:

> A. I asked her what NABET's role at CNN—what was NABET's role at CNN going to be after the 5th.
>
> Q. And did she respond?
>
> A. She did.
>
> Q. What did Ms. Kross say?
>
> A. She said that NABET would not be a part of CNN after the 5th, there would be no need for NABET because these employees would be so happy that they wouldn't need a union.
>
> Q. How did you react?
>
> A. I was shocked by her point-blank matter-of-factness. I was slack-jawed sitting there. I couldn't believe what she was saying.
>
> Q. And what happened next?
>
> A. She appeared to sense my shock and proceeded to tell me that it's okay, they won't--they won't need a union if they're happy. I perceived her to be trying to placate me based on my shock.
>
> She said that NABET people wouldn't be discriminated against. It's okay.
>
> Q. And what did you say, if anything?
>
> A. I looked at her and I said, You mean to tell me that the only reason for a union is when management sucks?
>
> She just sat there.
>
> Q. How did the meeting end?
>
> A. With that, I just--I closed my book, I shook her hand, I thanked her for her time and excused myself. [Tr. 1223–1224.]

Kross' remarks, in conjunction with other evidence, such as Garraty's uncontradicted account of his conversation with Danielle Whelton and Barbara Morrisey's testimony, persuade me that many CNN employees were aware by September 29, that CNN was planning to operate the Washington and New York bureaus without a union.

Jeff Kinney's Conversations and E-mail about Freelance Work (Complaint Paragraphs 9(h) and (i))

Additional direct evidence of CNN's discriminatory motive is an e-mail from Jeff Kinney, the manager for photojournalists in New York to Jim Peithman, a cameraman who had worked at the New York bureau from 1980 to 2003, but was not hired by CNN during the Bureau Staffing Project (GC Exh. 496).

[28] CNN did not call Whelton to contradict this testimony nor does it claim that Whelton was unavailable to testify, CNN Br. at 232..

[29] CNN at p. 222 of its initial brief states that Kross no longer works for CNN and was available. CNN faults the General Counsel for failing to call Kross. However, in the absence of any other evidence, Peach's account is credible.

CNN emphasizes Kross' assurance to Peach that there would be no discrimination against unit members. However, there was plenty of discrimination and it is possible that Kross was not privy to CNN's intentions in this regard on October 3.

CNN AMERICA, INC.                                                              61

Kinney testified that he did not send this e-mail and CNN thus suggests that it is a forgery. However, I find that to be extremely unlikely and I credit Peithman.[30] Kinney conceded that he had exchanged e-mails with Peithman, "probably soon after the transition, early 2004" (Tr. 11513). However, CNN introduced no evidence as to what these e-mails concerned.[31] The document contains both Kinney's e-mail address and Peithman's e-mail address (Tr. 11513). Moreover, if Peithman were to have forged an email from Kinney, I believe he would have drafted it in a fashion that would have been much more incriminating.

Peithman inquired of Kinney whether there was any possibility of his doing freelance camera work for CNN after the end of the CNN's contract with Team Video.[32] Kinney responded:

Hi Jim,

How are things going with you? I've heard through the grapevine that you have been sighted working around town a couple of times. It's good to hear that you're getting work. I'm sure that as the Presidential race heats up, that more work will present itself.

Things are going fine with the transition here. Things haven't gone entirely painlessly, but we're keeping our heads above water. The network seems to be trying to re-invent itself again, and with that there are many changes that aren't easy to understand.

As far as freelance work goes, we haven't really had much of a need to bring in anyone. While the reasons haven't been clearly articulated to me, there are issues regarding freelancers, and specifically former Team Video employees. I don't understand the liabilities and legalities involved, but suffice it to say that we're part of a huge company that makes decisions by committee, at the executive level, in rooms full of attorneys. I think that all of us yearn for aspects of the old, idealistic CNN.

I have to believe that the policy regarding freelance hiring will change someday, but until then, we'll have to make it work with what we have. Please feel free to call me at any time, Jim. I sincerely hope that you and your family are doing well. Take care and keep in touch.

Sincerely,

Jeff Kinney
212–714–5805[33]

Sent from my BlackBerry Wireless Handheld [GC Exh. 496; Tr. 10118].

The e-mail on its face strongly suggests its authenticity. Kinney testified that CNN did not hire any freelancers to do camera or audio work in New York between January 16, 2004, and sometime in March 2004 (Tr. 11497–11498). Moreover, it is likely that no freelancers were hired to do such work until sometime after May 18, 2004 (Tr. 11497–11502).

It is clear from Kinney's e-mail that CNN was discriminating against former Team Video employees in regard to hiring them for freelance work. The motive for this policy is clearly a concern that hiring such employees might adversely affect CNN's intention to remain nonunion.[34] Kinney's statement is a violation of Section 8(a)(1) as alleged in complaint paragraph 9(h).

CNN's discriminatory motive is also evident from the credible testimony of freelance cameraman Jonathan Smith about his conversations with Jeff Kinney. Whatever doubts I may have entertained about Smith's testimony on March 28, 2008, were eliminated by James Peithman's testimony on April 7, and particularly the e-mail Peithman produced from Kinney. Smith performed substantial freelance camera work for TVS at the New York bureau in 2003. He applied for a position at CNN and was not hired. In January, just prior to end of the Team Video contract, Smith approached Kinney and told him he wanted to be sure he could obtain freelance camera work after CNN took control of the technical work force on January 17. Kinney responded that it "would probably be possible."

Several weeks after January 17, Smith called Kinney again about freelance camera work. Kinney told Smith that CNN was hiring cameramen who owned their own gear (equipment). Smith responded that he had his own gear. Then, Smith asked Kinney if his membership in the Union was a problem. Kinney responded, "[T]hat's good to know." He told Smith he would have to check with "higher-ups."

Smith asked Kinney if he meant CNN's lawyers. Smith testified that "he said basically, yes." Kinney told Smith that he had a good reputation at CNN and that he would be good to have around because of his maturity. Smith called Kinney approximately 3 weeks later. Kinney informed Smith that because of his prior relationship with Team Video and the Union, CNN was not going to be able to offer him freelance work. Smith responded by observing that he thought it was ironic that he had to join the Union because he had worked 30 days for CNN and that now that membership was keeping him from his livelihood. Kinney agreed (Tr. 9844). Kinney's statements to Smith violate Section 8(a)(1) as alleged in complaint paragraph 9(i).

Finally, that Kinney, an agent of CNN, bore animus towards unions is established by his interview rating sheet for Jamie Wiener. Although, Kinney's overall rating of Wiener is fairly good, he noted as a concern, Wiener's "union mentality?" (GC Exh. 522 B, vol. 4, Wiener, B# 6151.) Wiener was one of only two Team field audio technicians hired by CNN in New York. However, Wiener was initially not included in the group of individuals to be offered a photojournalist position.

---

[30] Due to what I regard as Kinney's untruthful testimony, I regard him to be a generally incredible witness, when testifying in support of CNN's case on any issue.

[31] Kinney testified that he searched his computer for the e-mail that is GC 496 in 2005; Tr. 11512–11513. He does not contend that he looked for it again after Peithman produced the e-mail and testified on April 7, 2008. It is unclear why Kinney would have looked for this email in 2005.

[32] See p. 104 herein for a discussion of the status of freelance or daily hire employees when Team was the contractor at the New York and Washington bureaus.

[33] Kinney did not contend that this was not his telephone number.

[34] CNN's payroll records, which it claims it does not have, might show whether CNN was hiring freelancers during the first months of 2004, or whether it was avoiding doing so by bring in technicians from other CNN bureaus.

62        DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Paragraph 9(g) of the Complaint: Alleged
Statement by Lou Strauss

Jon Ford, a former TVS employee, testified that when Lou Strauss interviewed him for a job at CNN during the Bureau Staffing Project, the following exchange took place at the end of the interview:

> A. I remember telling Lou that I felt bad that the employees were under a lot of stress because I was a single guy, and I didn't feel as much stress as they were feeling. So a lot of my friends who had families and mortgages to pay for I was watching them suffer quite a bit. I mentioned that to him and he said that they had nothing to worry about. "Everything is okay, there is nothing to worry about." And at some point I asked him, I said is it a safe assumption to say the union won't be back at CNN and he said yes, that's a safe assumption to make. And he kind of got up at that point and kind of whisked me to the door. [Tr. 10984–10985.]

When Strauss testified a few days before Ford, CNN counsel asked the following question (Tr. 10275–10276):

> Q. Let me go to another allegation in the complaint. Paragraph 9G of the complaint alleges that on or about November 25, 2003, during a job interview in your office you told employees "that the union will not be back at CNN."
>
> Did you ever make such a statement?
>
> A. No.
>
> Q. How are you sure that you didn't make such a statement?
>
> A. Because it's not up to CNN to determine whether there is a union.
>
> Again, it's up to the employees to decide if they are going to seek representation . . . .

I credit Ford for several reasons; first, Strauss' testimony does not directly contradict Ford. Secondly, I asked Strauss to go through the list of 76 TVS Studio technicians to tell me which ones CNN hired and which ones it did not (Tr. 10276–10283). When Strauss got to Ford's name, he volunteered that he didn't even recall him, something he did not do for any of the other 76. I infer that Strauss stumbled on Ford's name because he recalled that he said something that he should not have when interviewing him.[35] Finally, I view all of Strauss' testimony with a jaundiced eye given his failure to mention the fact that he interviewed Neal Rivera after the studio operator debriefing/selection meeting.

When a successor employer tells applicants that the company will be nonunion before it hires its employees, the employer indicates to the applicants that it intends to discriminate against the predecessor's employees to ensure its nonunion status. Thus, Strauss' statement to Ford violated Section 8(a)(1), *Eldorado, Inc.,* 335 NLRB 952, 952 (2001). The coercive nature of

---

[35] Strauss was not the only CNN manager to be so candid during an interview. Jeff Gershgorn testified that some engineering candidates asked him if they were interviewing for a union job. He replied, "[I]t is not." Tr. 7985.

Strauss' statement is not mitigated by his assurances that there was nothing to worry about. Fifty of bargaining unit members in New York, including Ford, soon found out, if they did not already realize, that there was plenty to worry about regarding their continued employment at the CNN bureau and that their status as bargaining unit members would cost them their jobs.

Other Direct Evidence of Antiunion Animus

Although not alleged as 8(a)(1) violations, there is other direct evidence of antiunion animus in this record. One example, discussed below, is the effort to draft position questionnaires for photojournalist with a view to avoiding the Unions. Another example is that Scott Garber and Ken Stanford, CNN's satellite truckdrivers in New York and Washington, respectively, were assigned to the National desk in Atlanta prior to the Bureau Staffing Project "so they would be non-union" (GC Exh. 558).

*Circumstantial evidence establishing that the reasons given by CNN for not hiring former Team employees, including implementation of the BSP, are pretextual and that the real reasons were discriminatory.*

As noted by the court of appeals for the Ninth Circuit in *Shattuck Denn Mining Corp. v. NLRB,* 366 F.2d 466, 470 (9th Cir. 1966):

> Actual motive, a state of mind, being the question, it is seldom that direct evidence will be available that is not also self-serving. In such cases, the self-serving declaration is not conclusive; the trier of fact may infer motive from the total circumstances proved. Otherwise no person accused of unlawful motive who took the stand and testified to lawful motive could be brought to book. Nor is the trier of fact-here a trial examiner-required to be any more naïf than is a judge. If he finds that the stated motive for a discharge is false, he certainly can infer that there is another motive. More than that, he can infer that the motive is one that the employer desires to conceal-an unlawful motive-at least where, as in this case, the surrounding facts tend to reinforce that inference.

Accord: *Fast Food Merchandisers,* 291 NLRB 897, 898 (1988), *Fluor Daniel, Inc.,* 304 NLRB 970, 971 (1991).

I conclude that the General Counsel has met its burden of proving that CNN's overall plan, referred to in complaint paragraph 22(b), including the BSP, was discriminatorily motivated.

I have reached this conclusion on the basis of direct evidence of discriminatory motive, discussed above, and the following circumstantial evidence:

1) The degree to which CNN's desire to have a workforce able to cope with new technology could have been, and in fact was, addressed by training;

2) Overwhelming evidence that the Bureau Staffing Project was a sham as established by the following factors:

    a) The absence of any clear evidence as to who actually decided which job applicants would be hired and the basis on which these decisions were made.

    b) The manner in which CNN set up its hiring process so as to minimize the importance of the prior experience and work history of the Team Video job applicants;

CNN AMERICA, INC.                                                                63

c) The uneven playing field on which TVS applicants were competing for their jobs with non-TVS applicants;

d) The importance CNN placed on certain qualifications, such as non-linear editing (NLE), which CNN knew TVS applicants lacked, but which were marginally important to the performance of the jobs for which they were applying, or which Team applicants could have acquired with minimal training;

e) The disparate treatment in favor of non-TVS applicants with little experience, including the so-called "growth candidates;"

f) The hiring of non former TVS employees in jobs subject to the Bureau Staffing Project who had not applied and/or had not been interviewed prior to the selection/debriefing meetings at which hiring decisions were purportedly made.

g) CNN's departure from an employer's normal inclination to hire "known quantities."

These considerations lead me to the conclusion that the reasons advanced by CNN for terminating its contracts with Team Video, implementing the Bureau Staffing Project and its hiring decisions during the BSP are pretextual. Thus, CNN did not meet its burden of proof set forth in *Wright Line* and other Board cases.

Finally, I would note that while CNN hired many Team employees, this does not preclude a finding of discrimination. It is well established that an employer's failure to take adverse action against all union supporters does not disprove discriminatory motive, otherwise established, for its adverse action against a particular union supporter, *Master Security Services,* 270 NLRB 543, 552 (1984); *Volair Contractors, Inc.,* 341 NLRB 673, 676 fn. 17 (2004). The fact that CNN hired many unit members and even some union activists is outweighed by the overwhelming evidence that it discriminated against other unit members. Moreover, it is quite apparent that had CNN refused to hire all bargaining unit members, it would not have been able to operate its business, e.g. (GC Exh. 595).

### Training

Contrary to CNN's contentions, e.g. (CNN Br. 53), it was unnecessary for CNN to hire a new work force in order to take advantage of nonlinear editing or any other new technological developments. Whatever concerns CNN had about implementing new technology could have addressed by training the employees who already worked at the New York and Washington Bureaus. This training could have been performed either through Team Video or by CNN if it chose to terminate the TVS contracts.[36]

In fact, CNN trained all the employees it hired in the Bureau Staffing Project as it implemented new technology, regardless of whether or not they previously worked for Team Video. Secondly, it hired a majority of the technicians employed by Team Video. There is no evidence that any of the former Team employees that were hired were incapable of adapting to new technology. Moreover, there is no evidence that the Team employees CNN did not hire could not have adapted to the new technology.

The hiring of audio designers in New York provides a perfect example of why CNN's stated motive for the BSP is pretextual. At some point in the BSP process a list of audio designer candidates was prepared in order of desirability (GC Exh. 513). Only three of the top six applicants on the list were former TVS employees. However, all three of the top nonTVS candidates declined CNN's offer of employment. Thus, five of the six applicants hired had been bargaining unit employees.

All five, Mark Hubbard, Jason Greenspan, James Pertz, Gerard Kaufold, and Lawrence Greenberg, successfully adapted to the new technology, such as the Euphonix audio board, and were still CNN employees as of February 2008 (CNN Exh. 543).[37] The only nonTVS applicant offered a position as part of the BSP was John Wesley Hamilton. He was terminated for poor performance on April 3, 2004, and was replaced by Paul Bernius, a former TVS bargaining unit member, who was next of the list referred to above (CNN Exh. 543, 545). Bernius was still employed by CNN as an audio designer in February 2008.

### The Training CNN Conducted After the Termination of the TVS Contracts Establishes Pretext

At the New York bureau, all the engineering employees by CNN were required to complete an extensive training program as a condition of their employment (CNN Exh. 213). This training was completed over a 6–8-month period as new equipment came on line (Tr. 8180, 8184, 8196–8197, 8225). In fact, the engineers who had worked for TVS in some instances needed less training than new engineers who had never worked at the New York bureau previously (Tr. 8196–8197).[38]

The photojournalists hired in the New York bureau received extensive in-depth training on Final Cut Pro (software for editing video on a computer) and other subjects in the first 2 weeks of their employment with CNN. Jeff Kinney, CNN's photojournalist manager in New York, testified that after 2 days of training on Final Cut Pro, a photojournalist would be able to use this program to edit video in their work. As discussed later on, every single photojournalist hired in New York was able to edit with Final Cut Pro 2 weeks after they were hired.

### Training at the D.C. Bureau

The General Counsel asked Steve Redisch, CNN's D.C. deputy bureau chief in 2003, "Why was it necessary to cancel

---

[36] The Electronic Newsgathering Agreement (ENGA) between CNN and Team provided that Team "shall ensure that technicians are properly trained on any new equipment supplied by CNNA," GC Exh. 40, p. 20. There is no evidence that Team failed to comply with this contractual requirement.

When bidding on a renewal of the ENGA in June 2001, TVS listed among its key goals, "continue to develop the skills of our technicians through training and supervision," and "help CNNA make technological changes with minimal impact to their operations (e.g., the transition to the SX cameras)," GC Exh. 589, pp. 3–4.

---

[37] Kaufold transferred to the CNN London bureau in December 2007.

[38] Similarly, CNN media co-coordinators who had worked for TVS not only needed less training than those who had not worked for TVS, but at least one was responsible for training new CNN media co-coordinators who had not worked for TVS, Tr. 10487.

64                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

the contract with Team in order to address technology issues?" Redisch answered, "I don't know" (Tr. 5528). He doesn't know because CNN could have had Team train its employees on new technology, including nonlinear editing, as Team had trained its employees on new technology in the past (Tr. 380–382, 884, 1021, 3550–3556; GC Exh. 180, p. 4), or provided the necessary training directly to Team's work force.

Larry D'Anna, president of Team Video, testified in this regard (Tr. 3555):

> As a new piece of equipment was introduced into the CNN Washington plant, we provided training for our technicians to be able to operate that equipment. And it was specifically related to the equipment we were expecting them to operate.
>
> We provided training on specific type of digital equipment, yes.

An example of training Team gave its employees to perform their work for CNN occurred in 2002 or 2003. Mike Peters, one of the principals of Team Video, conducted an intensive week-long training session on the erection and operation of the jib camera (Tr. 6006–6008). The jib camera is used for sweeping motion shots. To accommodate this training, which was conducted for a group of eight employees, operators were relieved from their regular duties.[39]

CNN could also have trained Team employees, or the same work force without Team, in the same manner that it trained the work force it hired during the Bureau Staffing Project. CNN conducted a 2-week training program for all 39 Washington photojournalists in the weeks starting December 8 and 15 (GC Exh. 323). Included in that training was introductory and in depth training in Final Cut Pro. CNN also offered or required 5 days of NLE training in February and March 2004 (CNN Exhs. 145, 146). NLE training was offered or required again for several days in 2005 or 2006.

The Final Cut Pro training that CNN provided to photojournalists in February and March 2004 was provided by Inez Perez,[40] who also provided such training for the Union. TVS camera operator Elizabeth Zosso, who was hired by CNN, received 2 days of training on Final Cut Pro from Perez at a union facility in Silver Spring, Maryland, prior to being interviewed by CNN in the fall of 2003. She mentioned that she had some experience with NLE in her interview and this may account in part for the fact that CNN hired her. Thus, CNN could have had Perez train the TVS field technicians in nonlinear editing and could have avoided putting 18 of them out on the street.

Ex-TVS photojournalists were not the only D.C. photojournalists who received training from CNN in the months immediately following the termination of the TVS contract. Ben Coyte, the photojournalist manager, provided training on Final Cut Pro, the BGAN transmission device and/or its predecessor, and File Transfer Protocol to every photojournalist in D.C. (Tr.

15,501). The training on Final Cut Pro appears to have varied depending on the prior experience of the photojournalist. CNN provided Doug Schantz, who already had experience with Final Cut Pro with CNN in Atlanta, one-on-one sessions to learn more advanced techniques than those taught to beginners.

Khalil Abdalah, Ken Tillis, Ron Helm, and John Bena, who also were hired by CNN essentially to replace members of the TVS work force, were trained in File Transfer Protocol (FTP) techniques in March 2004 (CNN Exh. 146). Derek Davis also had to be trained how to use FTP (Tr. 15,482–15,483). FTP is the process whereby the material is transmitted via the Internet (Tr. 6394). Without this training, these photojournalists would not have been able to transmit material via the Internet (Tr. 15, 626).

Finally, it is not as if CNN did not have sufficient time to train the D.C. photojournalists in Final Cut Pro, FTP, etc. CNN's basic Final Cut Pro course is a 2-day course and its advanced FCP course is another two day course (Tr. 15,633–15,634). For at least the first 8 months and possibly longer, following the end of the TVS contract in D.C., many of the photojournalists were never called upon to edit with FCP or transmit via DNG techniques. Those that did edit and/or use DNG did so rarely.

### An Unprecedented Purge/Disparate Treatment vis-à-vis Nonunion Employees at CNN's Atlanta Headquarters

Another basis for my conclusion regarding pretext is that there is no evidence that CNN has ever taken such draconian measures at any of its nonunionized bureaus or its Atlanta headquarters. For instance, there is no evidence that whenever the photojournalist title was introduced at CNN headquarters or other bureaus, that CNN replaced its incumbent photographers.

Matthew Holcombe, engineering manager for CNN International, testified that CNN updates its equipment very often. When it does so, it trains its employees, as opposed to discharging current employees and hiring new ones. Most typically, CNN arranges to have this training conducted by the vendor of the new equipment. Indeed, almost immediately after the completion of the Bureau Staffing Project in New York, CNN conducted extensive training on its new technology for all the employees it hired, regardless of whether or not they had worked at the bureau before January 17, 2004 (Tr. 7719–7720, 8029–8031, 8180–8181, 8184–8185, 8225, 9259, 10439–10440, 10825–10832; CNNA Exhs. 213, 214).

When CNN implemented server or computer-based production in Atlanta, it did not conduct a whole-sale purge of its existing work force (Tr. 2129–2133, 7718–7720; GC Exh. 101, pp. 8, 10).[41] Instead, it has trained employees in new technology. For instance, in 2000, CNN witness Rick Denius had an apparently seamless transition from a tape-based feeds operator to a server-based "media coordinator" (Tr. 13099–13101).

---

[39] Other groups of TVS employees may also have received such training at sessions other than the one attended by witness Elizabeth Zosso, Tr. 6008.

[40] Perez is also referred to by the last name of her husband, TVS and CNN photojournalist Jerry Thompson.

---

[41] CNN apparently laid off about some "feeds" employees in Atlanta when the Pinnacle server was installed in 2005. Some "playback" employees were apparently laid off in about 2000 when Atlanta was transformed from an essentially tape-based environment to a server-based environment. There is no evidence that any of these Atlanta employees were replaced by employees from outside CNN or transfers from other bureaus, Tr. 12510–12511, 12521, 12904.

CNN AMERICA, INC.                                                                                         65

Similarly, when CNN introduced nonlinear editing in New York in 2002, it did not replace the editor/producer employees who worked directly for CNN. Instead, CNN contracted with Pinnacle, the manufacturer of its new nonlinear editing machines, to train these employees in how to edit on the new equipment (Tr. 12424–12425).

Anne Woodward, CNN vice president for technical operations, testified that the Atlanta headquarters, New York and Washington bureaus were all using the Wheatstone audio boards in 2003. These devices were replaced at all three bureaus (Tr. 13824–13825). There is no evidence that CNN solicited applicants for the audio technician positions and replaced any of the incumbents when it replaced the Wheatstone audio board at its Atlanta headquarters, as it did in New York and Washington.

Compelling Evidence that the Bureau Staffing
Project was a Sham

Manipulations by High-Level Executives

CNN contends that the hiring process in the Bureau Staffing Project was nondiscriminatory. CNN submits that the BSP hiring decisions were made in debriefing/selection meetings by the managers who interviewed the candidates. However, there is a plethora of evidence that the process was a sham. The record shows, for example, that CNN executives interfered with the process to prevent the hiring of Team Video bargaining unit employees.[42] In several cases, high-level CNN officials directed the hiring of inexperienced applicants over much more experienced, qualified Team unit employees.

At a debriefing/selection meeting held on or about November 3, 2003, a list was drawn up of the candidates for technical director (TD) at the Washington bureau in order of their desirability.[43] As of November 21, 2003, Barbara Cranmer/McCloskey,[44] a Team Video bargaining unit member was above Christian Keller, a nonTVS employee, on the list. On that date, Bob Hesskamp, CNN senior vice president for technical operations in Atlanta, e-mailed Cindy Patrick inquiring as to who was next on the TD list. Patrick informed him that Cranmer/McClosky was next. Hesskamp's response was "AAHHHH" (GC Exh. 534, vol. 3, (Keller) B# 5464.

On November 24, Patrick directed Sue Diviney to "switch Christian Keller and Barb Cranmer in TD, as Christian has accepted. Barb and Jimmy Suissa are unlikely to get offers," Id., B#19107. Sometime prior to December 4, Keller's rank in terms of the most desirable candidate was changed from eighth to seventh and Cranmer's position was changed from seventh to eighth (GC Exhs. 268, 269). CNN has not offered any nondiscriminatory explanation for this switch.

In an interview conducted on October 27, Mike Maltas found Keller to be "not fully competent-developable" in regard to his technical skills (GC 534, supra at B# 19930). Steve Alperin, a hiring manager from Atlanta, rated Keller higher but expressed concern that he was "a bit inexperienced (but eager to learn)" (Id., B# 14751). Keller worked for CNN for only 4 months (CNN Exh. 544).[45]

CNN hired Cranmer McCloskey on December 15, 2003. She resigned after working for CNN for about 6 weeks. In her exit interview, Cranmer McCloskey commented, "[T]he company did not hire back many people that were very qualified when they worked here under Team Video. There were people not brought back that were top notch and I wished I had them during some difficult times in the past month" (GC Exh. 534, vol. 3, B# 70818).

In another instance, Cindy Patrick directed that Craig Jackson, who was not a TVS bargaining unit member, be hired instead of Peter Mohen, a Team Video employee (GC Exh. 534, vol. 3, B# 64005). It also appears that Jackson was moved ahead of Mohen and Paul Skaife, another TVS employee, in the ranking of desirable candidates. A butcher block indicates Jackson was once tied for seventh place. On General Counsel's Exhibit 270, a CNN BSP spreadsheet dated December 5, 2003, Jackson has moved up to fifth place in front of Mohen and Skaife. Mohen was offered a job at the last minute on December 5. CNN did not offer a position to Skaife.

Hiring of Individuals who did not Apply, and/or were
Interviewed after the Meetings at which BSP Hiring
Decisions Purportedly took Place and/or were not
Evaluated at such Meetings

Washington Bureau

On December 29, 2003, Jose Nunez, an employee of CNN Espanol in Atlanta, transferred to the D.C. bureau as a technical director. Steve Alperin apparently interviewed Nunez for the TD/director positions in New York and Washington on October 30, 2003 (CNN Exh. 694, B# 1166).[46] Witness Kelli Clarke prepared a list of candidates for the TD/director position in Washington for use at the debriefing/selection meeting for technical directors (GC Exh. 549). This meeting was held on November 3, 2003 (CNN Exh. 583). Nunez' name is not on this list.

Nunez' name also does not appear on a BSP position tracking spreadsheet dated November 18, 2003 (GC Exh. 268).

---

[42] The record also shows that applicants' interview scores were sometimes changed for unexplained reasons. For example, GC Exh. 573 establishes that CNN's director of engineering, Tu Vu, filled out two rating sheets for Oscar Romay, a NABET member, with different scores, B#s 21588, 37720. Romay had been working full time at the CNN D.C. Bureau as a freelancer, filling in for an engineer who was on disability leave. Vu's rating sheets for unit member Nick Kiraly are also different, see fn. 126 herein.

[43] CNN Exhs. 529, 583 gives a schedule for the debriefing/selection meetings in Washington. Although CNN witnesses could not remember the dates of these meetings, I infer that they occurred on or about the dates listed in the exhibit: Monday, November 3, for director/technical director (TD), TD/director, audio designers; November 3 and 4 for studio operators; November 5 and 6, for photojournalists; November 5 and 6 for the broadcast engineers (BIT). Jim Hebb confirmed that the BIT selection/debriefing occurred on November 5, but couldn't recall if it lasted more than 1 day, Tr. 13231–13232

[44] Cranmer apparently married or remarried in the late fall of 2003.

---

[45] A number of employees hired during for BSP stayed in their jobs for a very short time. Manuel Samaniego, a nonTVS applicant, worked at the D.C. bureau as a technical director for less than 3 months before resigning. He was rehired in 2006.

[46] Alperin did not testify.

66         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

However, Nunez' name does appear on a spreadsheet dated December 4, 2003 (GC Exh. 269). On a December 5, spreadsheet, Nunez is listed as the ninth most desirable applicant for TD (GC Exh. 270). From this I infer that Nunez was not discussed and considered at the selection/debriefing meeting at which hiring decisions were supposedly made. I also infer that CNN transferred Nunez to Washington to avoid hiring a TVS applicant for discriminatory reasons.

### New York Bureau

### Engineers

Nowhere is it so evident that the Bureau Staffing Project was a charade than in the selection process for the engineering and studio operations departments in the New York bureau. The debriefing/selection for the engineering department in New York was held on December 4 and 5, 2003 (Tr. 13228). Jim Hebb, a CNN human resources manager, who attended this meeting, testified that CNN Exhibit 531, a list of composite interview scores used at the meeting in the discussion of applicants (Tr. 13238).

Hebb testified that "the purpose of the debrief meetings was to assure that there was a consistent process and a fair process for evaluating candidates for each position and determining who would be made offers" (Tr. 13227). He also testified that "butcher blocks" were used to document discussion of the engineering candidates in New York. These "butcher blocks," which CNN cannot find, were, according to Hebb, used "to determine who is the best candidate for each position" (Tr. 13242). It is quite surprising that these documents would be lost since CNN was concerned enough about the legal ramifications of the debrief meetings to assign Scott Porter, a Turner attorney, to attend the meeting (Tr. 13230).

In actuality, the hiring process at the New York bureau for engineers establishes that the BSP process was a sham. CNN conducted a secret hiring process apart from the BSP that none of its witnesses mentioned when testifying (GC Exhs. 396, 397).[47] CNN hired several engineers: Scott Garber, Chris

Stewart (or Stuart), Juan Lopez, Arkady Labovsky, and Conroy Dave Reynolds, in January 2004, who did not participate in the BSP process. It also hired several other engineers soon afterwards.[48] None of their names appears on CNN Exhibit 531.[49]

On December 8, Conroy Reynolds applied to Time Warner, for a position as an audiovisual services manager (GC Exh. 392B, B# 14144). On December 15, 2003, 1-1/2 weeks after the selection meeting, recruiter Suzanne Mackiewicz forwarded Conroy Reynolds' resume to Jeff Gershorn, CNN's engineering director for the New York bureau (GC Exh. 392B, B# 26044). Gershgorn purportedly interviewed Reynolds the same day (B# 26034). Matthew Holcombe purportedly interviewed Reynolds on December 18 (B# 2380). Reynolds was hired as a BIT support engineer on January 9, 2004, effective January 17, 2004, the day after Team Video ceased to be the contractor in New York. Thus, CNN hired Reynolds as a BIT support engi-

---

[47] The silence of many CNN witness regarding the hiring of individuals who were interviewed after the debriefing meetings leads me to discredit their testimony generally. I infer that virtually every CNN witness involved in the BSP was aware of this fact. They are thus not credible because they were more interested in supporting a litigation theory than in testifying candidly, see, e.g., In re: *Lexus of Concord, Inc.*, 330 NLRB 1409, 1412 fn. 9 (2000); *Carruthers Ready Mix, Inc.*, 262 NLRB 739 (1982).

For example, Matt Holcombe discussed the selection meeting at Tr. 7740–7754 and gave no indication that engineering candidates were interviewed and selected afterwards. Indeed, Holcombe testified that he, "wasn't part of the process," after the selection meeting, Tr. 7754. However, the record shows Holcombe interviewed Conroy Reynolds on December 18, two weeks after the debriefing meeting for New York engineers.

Michelle Lackey testified that there was only one meeting at which hiring decisions were made, Tr. 7892–7894, as did Jeff Gershgorn, Tr. 7970–7971. Gershgorn also interviewed Reynolds on December 18, and Arkady Labovsky on December 17.

Lew Strauss also interviewed individuals after the debriefing meeting for studio operators who were hired by CNN. I infer that this practice was common knowledge amongst the hiring managers and others

keeping track of the BSP, including, but not limited to: Cindy Patrick, Marty Garrison, Loren Kile, Jim Hebb, Jeff Polikoff, John Courtney, Strauss, Holcombe, Gershgorn, Rob Fox, Gina LaRussa and Tu Vu.

CNN's Br. at 241 states, "a debriefing session was held for each of the jobs." CNN's brief does not suggest that there was more than one debriefing or selection meeting for any job classification or that people who applied for positions after the debriefing meetings were hired for positions subject to the BSP.

Jeff Polikoff's testimony that he discussed his experiences with Chris Stewart at the selection meeting, Tr. 12703, is false. There is no evidence that Stewart was considered at the December 4 and 5 debrief/selection meeting. In fact, Suzanne Mackiewicz' December 15, inquiry to Polikoff, as to whether he knew Stewart, GC Exh. 392B (tab for Conroy Reynolds), B# 20094, establishes that Stewart was not considered as a candidate at the selection meeting. I would note that I inquired as to where hiring documents were regarding Stewart immediately after Polikoff testified about him, Tr. 12704–12705.

[48] These include:

Joseph Cocozza was hired on March 1, 2004, as a BIT support engineer. Suzanne Mackiewicz, a contract recruiter, forwarded Coccoza's résumé to Jeff Polikoff, CNN's vice president for technical operations, on February 10, 2004, CNN Exh. 551, tab 11.

Stanley Alexander (Alex) MacGregor was hired as a BIT support engineer on February 16, 2004, CNN Exh. 543. MacGregor, an employee of CNNfn in Atlanta, sent a cover letter to Suzanne Mackiewicz on December 5, 2003. CNN Exh. 551, tab 12, B# 10155. Mackiewicz forwarded this letter to Rick Cole, a CNN IT manager in Atlanta on January 21, 2004, Id. Cole apparently interviewed MacGregor on that date. VP Jeff Polikoff's testimony at Tr. 12711–12712 that MacGregor was hired as part of the Bureau Staffing Project is false. His testimony that MacGregor attended the orientation on the "first weekend" is also false, unless MacGregor attended before being hired. MacGregor's name does not appear on CNN Exh. 270, a new hire orientation schedule for January 17 and 18.

I advised the parties on the record that I was unaware of any BSP hiring documents relating to MacGregor and Coccoza, Tr. 12719.

[49] On October 28, 2003, Jeff Polikoff emailed recruiter Suzanne Mackiewicz regarding Juan Lopez, stating, "I know I thought he didn't have the experience. But lets interview him," GC Exh. 391, B# 20079. Lopez was apparently interviewed during the BSP for the position of BIT resource manager. Rick Cole and Michelle Lackey deemed Lopez "not fit" for that position, GC Exh. 398, B# 24774. There is no evidence that Lopez was discussed in the selection/debriefing meeting for the position into which he was hired, Senior BIT support engineer.

neer, after the selections for these positions had supposedly been made.[50]

Arkady Labovsky submitted a résumé to CNN in early October 2003. However, Jeff Gershgorn interviewed Labovsky on December 17, 2003, almost 2 weeks after the debriefing/selection meeting (GC Exh. 392-B, Labovsky, B#1161). CNN checked his references on January 8, 2004, and offered him a position as a BIT support engineer the next day.

### Hiring of Nonapplicants and Late Applicants as Media Coordinators and Studio Operators

In New York, CNN hired four studio operators: Stephanie Santasier, Phil Johnson, Neal Rivera, and Amy Graham, in January 2004, who also did not go through the TVS bargaining unit. None of these individuals were members of the TVS bargaining unit.

The selection meeting for studio operators took place on December 2, 2003, and possibly continued on December 3 (GC Exh. 401).[51] Santasier, Graham, Rivera, and Johnson do not appear on any lists of the applicants considered (GC Exhs. 498–501). However, Lew Strauss interviewed Rivera on December 12. CNN offered Rivera a position as a studio operator on January 8, 2004 (GC Exh. 529; Studio vol. IV, book 3 of 4: Lindenfeld-Rivera). There is no evidence that Rivera was subject to any other part of the BSP process.

Rick Denius forwarded Graham's resume to Lew Strauss and Andy Parsons on December 17, 2 weeks after the selection/debriefing meeting (GC 528, vol 2. B# 2620). Graham was interviewed by Parsons and Strauss on December 18. Strauss noted that Graham was "not technical, but a self starter for sure" (B#2611). He concluded, "I'd take a risk on her" (B# 2619). There is no evidence that Graham was evaluated in the same way that applicants were supposedly evaluated in the selection/debriefing meeting.

On December 17, Denius e-mailed Cindy Patrick about Philip Johnson, stating:

> Troy [McIntyre] interviewed Phil for D.C., and he was an average candidate. I do not believe we need to proceed with an additional interview for NY.

---

[50] CNN notes at p. 75 of its brief that Reynolds mentioned that he was a NABET member on his CV, GC Exh. 392B, B# 26048. Reynolds' NABET membership has no bearing on this case because what CNN was primarily concerned with was limiting the number of TVS bargaining unit members it hired, something Reynolds was not.

Respondent also states that other nonTeam employees hired, such as Neal Rivera and Terrence Thomas, indicated present or past union membership on their employment applications. That is irrelevant for the same reasons. Moreover, as discussed earlier, the fact that CNN hired many Team unit members does not preclude a finding of discrimination.

[51] Lew Strauss, the only witness who testified about the selection meeting could not recall the exact date, Tr. 10210. However, I infer from the notations on GC Exhs. 500, 501, that there was a meeting on December 2, 2003, as scheduled in GC Exh. 401. At this meeting applicants for studio operator were discussed and ranked. There is no evidence that there was any other selection/debriefing meeting for studio operator. Gina LaRussa, CNN human relations director in New York, testified about a single debriefing meeting for studio operators after which CNN had its final ranking list, Tr. 13333, 13337.

Are we comfortable with using his scores from the D.C. interview when we debrief and candidate select for NY? [GC Exh. 528, vol. 2, B# 21189.]

This e-mail suggests that there was another debrief/selection meeting after the one in early December. If so, this is something that CNN has not addressed either on the record or in its briefs. In any event, Lew Strauss and Andy Parsons interviewed Johnson on December 18. Strauss' observations (with unexplained crossouts) are that Johnson had a minimal technical background for a studio operator. He wrote and crossed out that Johnson's "tech skills are not a fit for requirement (do not consider him a growth candidate)" (B# 1845).[52]

Stephanie Santasier apparently applied online for the studio operator position on October 15, 2003 (GC Exh. 530, vol. 4, B#5312). However, it was not until December 16, that recruiter Shari Saye referred Santasier to New York for an interview. Saye described Santasier as "definitely a growth candidate." Strauss and Parson apparently interviewed Santasier on December 18, Id. *(B#s 5314, 5329)*. She was offered a job on January 6, 2004, Id. *(B# 10899)*.

These candidates were hired instead of such TVS applicants as Aspry Jones, who did go through the BSP process. Jones was rated a "not strong" candidate in the selection/debriefing meeting. However, it is unclear how this was determined and CNN has offered no explanation for this rating. Lew Strauss opined that Jones was "a quiet achiever-someone who will be an asset to CNN—Question is where" (GC 528, vol. 2, B# 8776). John Silva, a CNN witness, who supervised Jones for Team testified that he chose Jones as a bargaining unit "supervisor" because "he was quick. He had technical ability. He could manage very well. He demanded the job to be done right, and he was willing to learn" (Tr. 11797).[53]

### Transfers and Part-Time Employees in Positions Covered by the BSP

CNN also transferred some of its employees into positions subject to the BSP, without subjecting them to the BSP interview and evaluation process. Kim Moscaritolo, who worked for Rob Fox in CNNfn, was transferred into media operations on January 17, 2004. CNN hiring managers did not interview Moscaritolo for a media coordinator position. Her name does not appear on CNN Exhibits 539 and 540, which are the final rankings of applicants purportedly recorded at the December 9, 2003 debriefing session for this position (Tr. 13,332).

Since Rob Fox supervised Moscaritolo in CNNfn, and then supervised media operations, I infer that he was aware that she

---

[52] CNN Exh. 559, tab 34 contains a butcher block for Johnson in which he was rated a "not strong" candidate. Listed as developmental areas were "light on relevant experience" and "motivational fit." I infer this is a "butcher block" from a debrief/selection meeting in Washington, D.C., held in November 2003. There is no evidence that such a meeting took place in New York after December 2.

[53] As discussed later, Jones was not a statutory supervisor. He assigned employees to particular positions in the control room after TVS management had assigned a crew to the control room. Jones did not discipline employees or make hiring decisions. Jones, rather than TVS Manager John Silva, performed the hands on technical work when there was a problem in the control room, Tr. 11798.

68                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

was hired or transferred into media operations without being compared to BSP applicants at the debriefing meeting for media coordinator candidates. CNN also employed Timothy Rubino and Diane Zisa as part-time media coordinators from January 17 until June 7, 2004, Id.; neither participated in the BSP.[54]

### Disparate Treatment vis-à-vis Nonunion Employees at the Washington and New York Bureaus

Some employees who already worked directly for CNN in Washington and New York had to reapply for their jobs in the Bureau Staffing Project and some did not. With regard to both groups, Respondent did not replace its nonunionized employees to accommodate its new technology; it trained the employees it already had. For example, none of the 20 editor-producers who worked directly for CNN prior to January 17, 2004, in New York lost their jobs. Instead, CNN trained these employees to edit differently using the computer-based equipment that was being installed at the new Time-Warner Center (Tr. 12254–12255). Similarly, none of CNN's eight electronics graphics operators lost their jobs due to the fact that they were going to be working with new technology (Tr. 10412–10413).

Although a number of CNN employees in New York and Washington had to apply for their jobs pursuant to the Bureau Staffing Project, with only a few exceptions, no CNN employee lost their job.[55] By way of contrast, about 55 of 120 TVS bargaining unit employees in New York and about 38 of 86 TVS bargaining unit employees in Washington lost their jobs.

If the Bureau Staffing Project was motivated, as CNN contends, by a good-faith belief that the personnel in the D.C. and New York bureaus could not acclimate to new technology, the number of CNN employees who lost their jobs would be similar to the number of unionized TVS employees who lost theirs. The fact that is not the case strongly suggests discriminatory motive.

### Absence of Evidence as to how and why Hiring Decisions were made

There is very little specific evidence in this record as to how and why CNN selected some applicants who applied during the BSP over other applicants. It is very unclear how the various steps in the BSP related to one another. For example, there appears to be no correlation between an applicant's interview scores and their ranking at the debriefing sessions.[56]

More importantly, the most critical step in the hiring process, appears to be the placing of applicants into categories, such as "very strong possible," "strong possible," "possible," "possible minus." Unless a candidate was put into one of the higher categories, he or she was effectively eliminated from consideration for hire. This record does not establish when applicants were placed into these categories or by whom.

In some cases, even if you take CNN's testimony and documents at face value, it is impossible to discern the basis for some of its hiring decisions. One example concerns Ron Couvillion and Khalil Abdallah, neither of whom were TVS unit members. Couvillion rejected CNN's offer of a photojournalist position in Washington (CNN Exh. 693, tab 8; Tr. 4026). Abdallah accepted an offer.

The general tenor of CNN's testimony, at least with respect to the Washington photojournalists, is that its hiring managers met in a selection or debriefing meeting to discuss the candidates that had been interviewed. Each hiring manager then made a list in the order of the applicants they wished to hire and then the hiring decisions were made by averaging these lists.

The documentary evidence indicates that Couvillion was not ranked by hiring Manager Dan Young. Khalil Abdallah was not ranked by hiring manager John Courtney (GC Exhs. 250, 241). There is no explanation as to why these two applicants were offered jobs despite the fact that they were not ranked by every hiring manager. There were no TVS unit members hired as a photojournalist in Washington who were not ranked by every single hiring manager.

### The Absence of Credible Evidence Regarding the Hiring Decisions made for Photojournalists

TVS employees learned that CNN was terminating its contract with Team Video on or about September 29, 2003. Many Team Video employees, including camera operators, immediately became concerned about their jobs. Rick Morse, a TVS cameraman assigned to the White House, asked Danielle Whelton, CNN's executive producer for the White House, what was going to happen. Whelton told Morse that "all you guys on the White House unit will be okay" (Tr. 6201–6202). In fact, CNN hired all TVS employees regularly assigned to the White House.

TVS employees were told to visit the Turner jobs website and apply for whatever positions at the D.C. bureau that they were interested in. After applying, a human resources recruiter conducted an initial telephone interview with each applicant. Then applicants who were not screened out as unqualified for the photojournalist position were interviewed by one or more CNN "hiring managers" in late October and early November 2003.

However, so far as this record shows, one and only one hiring manager, CNN's chief photographer, Dan Young, had the authority to overrule the recruiters and have an applicant interviewed who the recruiter had screened out. With the exception of freelancer Beth Lasch in New York, none of these applicants

---

[54] The names of Zisa and Rubino appear on CNN's schedule for the week starting January 19, 2004, CNN Exh. 356. There are also the names of other "floaters/freelancers" on the schedule.
There are some errors in CNN Exhs. 543 and 544 some of which have to do with the employees' job titles. CNN has not given me a comprehensive list of the errors in this exhibit.

[55] Only some CNN employees had to reapply for their jobs during the Bureau Staffing Project. In the informational technology department in New York, 5 of the 14 CNN employees had to reapply. Four of the five were hired; the fifth, Wendy Deloughy, is the only CNN employee so far as I can tell, who was not rehired during the Bureau Staffing Project.

[56] There is no need for me to devote a lot time to discussing the very suspicious aspects of the interviews and interview rating process. The

lack of evidence that Respondent relied on the interview scores alone demonstrates that the BSP process was a sham.

CNN AMERICA, INC.                                                      69

were TVS bargaining unit members. Several of these nonunion applicants were hired; Lasch was not.[57]

Loren Kile, a Turner Broadcast Systems recruitment manager, testified that she designed the hiring process so as to require interviews by multiple interviewers (Tr. 12957). This process was not followed in all cases. TVS camera operators Sarah Pacheco and Tyrone Riggs[58] were only interviewed by one hiring manager, Matt Speiser. CNN did not hire either Pacheco or Riggs.

The record also establishes that a number of nonTVS applicants for photojournalist positions were only interviewed by one hiring manager. These applicants who were hired by CNN were: Derek Davis (by Dan Young on the telephone) (GC Exh. 543, vol. I, B# 125794); John Bena (by Dan Young); Jeremy Harlan (by Dan Young); Jose Santos (by Steve Redisch); and Ken Tillis (by Dan Young) (GC Exhs. 228, vol. II, and GC Exh. 266).

For the D.C. bureau, the photojournalist hiring managers were Matthew Speiser, then the director of newsgathering for the D.C. bureau, his supervisor, Stewart (Steve) Redisch, the deputy bureau chief in D.C.; R. J. Fletcher, operations supervisor; CNN newscore, John Courtney, vice president of the CNN Media Group in Atlanta; and Daniel Young, field producer and chief photographer for CNN in Atlanta. A very few applicants were interviewed by Michael Maltas, a director in D.C. Some applicants were interviewed by several hiring managers, others were interviewed by only one. In some interviews, one or more of the hiring managers, particularly Dan Young, participated by telephone.

Of the hiring mangers, only Redisch and Speiser worked at the Washington bureau. Neither Redisch nor Speiser had any responsibility for the cameramen/photojournalists and their familiarity with the work of many, if not all, the TVS field technicians was very limited.

It is also very unclear what actually transpired during the BSP, how the various steps in the hiring process related to each other and on what basis the final decisions were made. For one thing, the deliberations during the BSP are poorly documented. CNN's witnesses generally recall very little of what occurred, and their testimony is often inconsistent.

For example, John Courtney testified that at the meeting at which hiring decisions were made for New York photojournalists, he had no information as to how applicants were rated in their interviews. (Tr. 12485–12487.) He also testified that he had no such information at the selection meeting in Washington (Tr. 12502).[59] If his testimony is accurate, it indicates that the interview process was a complete sham. However, Gina LaRussa, CNN's HR director in New York, testified that the

hiring managers brought their interview ratings to each debriefing/selection meeting (Tr. 13320). Moreover, the testimony of CNN witnesses as to what transpired during the BSP is in some cases clearly inaccurate.[60]

As shown below, CNN constantly kept track of how many TVS bargaining unit employees it was hiring. Thus, throughout the Bureau Staffing Project, CNN was determined to limit the number of bargaining unit employees hired in order to avoid having to recognize and bargain with the Union.

An indication of this determination is contained in General Counsel's Exhibits 260 and 268. On the second to the last page of General Counsel's Exhibit 260, a list in which Steve Redisch ranked the candidates for photojournalist, he wrote "46–27." CNN counsel asked Redisch:

Q. There was some implication that 46 minus 27 in some way referred to union membership or Team Video employment?

A. That is the—that was the implication by the General Counsel.

Q. What is your response to that?

A. My response is that I would have to do the math. I don't know, I don't know why I did that. I don't recall why I did that. [Tr. 5693.]

In fact, by looking at page 2 of CNN's Exhibit 70, it is quite obvious that "46–27" refers to the ratio of TVS employees that would have been offered employment according to a list complied on or prior to November 17.[61] At a meeting on November 18, 2003, this list was revised, placing three TVS employees; Mike Greene, Chris Hamilton, and Mark Marchione, lower than they had been ranked previously (GC Exh. 268, B#s 42473 and 42474; Tr. 4189).

The Critical Classification of Applicants into Categories

After the interviews, the five Washington hiring managers for photojournalists met in a 2-day debriefing session on November 5 and 6, 2003, in a room that had been a health club at the bureau (CNN Exh. 529). A similar meeting regarding applicants for photojournalist in New York was held December 9–11 (GC Exh. 401). At some point, not necessarily at these meetings, applicants were placed in categories, such as very strong possible, possible, possible minus. Unless an applicant was placed in one of the higher categories, he or she was effectively eliminated from consideration for hire.

I infer that applicants were not placed in these categories by the hiring managers but that this critical step was performed by higher-level management. I draw this inference on the basis of the record as a whole, with particular emphasis, on the inability of CNN's witnesses to testify credibly as to when this categori-

---

[57] Initially, CNN recruiters did not recommend that TVS photographer Mark Marchione, who had worked at the D.C. bureau since 1996, be given an interview. This recommendation was changed between October 27 and 28, 2003, for reasons that are not contained in this record, GC Exh. 228, tab E. Marchione was not hired during the BSP, but CNN did hire him as a photojournalist in January 2004.

[58] GC Exh. 543, vol. 3.

[59] On redirect, CNN counsel led Courtney to change his testimony about the availability of applicants' ratings, Tr. 12513–12518. This only demonstrates the unreliability of his testimony.

[60] For example, John Courtney testified that in New York all photojournalist candidates were ranked, Tr. 12495–12496. A quick perusal of GC Exh. 429 indicates that this is not so, inasmuch as TVS applicant Jim Peithman was not ranked by any hiring manager.

[61] Although, I decline to credit any testimony of any CNN management witnesses unless corroborated by other credible evidence, I specifically discredit Cynthia Patrick's testimony at Tr. 12894, that the subject of how many Team Video employees would be hired, "never came up."

70                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

zation took place and who participated. I also rely on the
uncontradicted testimony of Brian Kiederling that he was told
by Edith Chapin, CNN's deputy bureau chief, that the hiring
decisions for New York CNN photojournalists were not made in New
York (Tr. 10010).

CNN's witnesses testified that at the debriefing meetings,
each applicant was evaluated on a large sheet of butcher block
paper that was affixed to the walls. At some point, these sheets
were arranged in order of the candidates' desirability. Howev-
er, it is quite possible that this order had been determined, to
some extent, beforehand. I draw this inference from the fol-
lowing exchange between the General Counsel and former New
York Bureau Chief Karen Curry:

> Q. I'd like to ask you during this ranking meeting,
> would you tell me how it progressed? You started with
> the materials you had in front of you, correct?
> A. Yes.
> Q. And then individual candidates' names I'm assum-
> ing were raised. Take me through it from there, what hap-
> pened? [Tr. 8393–8394.]
> . . . .
> A. It's been a long time.
> From my recollection, we set up sort of buckets for
> different categories, and I'm seeing from my notes here
> that the very, strong, possible, VSP—and then strong, pos-
> sible and possible plus.
> So my sense of things is that we went candidate by
> candidate and thought in terms of where we would put
> them in this initial go-round.
> Q. When you say buckets, are you referring to butcher
> block sheets of paper?
> A. Yes, I think that's what it was.
> Q. How did you use those, were those fastened to the
> wall or on easels?
> A. My recollection is they were on the wall. [Tr.
> 8394.]
> . . . .
> Q. Very strong possibilities, how did those names get
> there?
> A. When the candidate was being discussed, and it was
> determined which one of these categories he or she be-
> longed in, that's when that person's name was put into
> that category.
> Q. Let me ask you again, Ms. Curry, when were the
> categories established?
> A. I can tell you what I assume.
> I can't tell you—
> Q. You can tell me "I don't recall, I just don't remem-
> ber"?
> A. I don't recall. [Tr. 8397–8398.]

Matt Speiser, CNN's director of newsgathering in Washing-
ton, was similarly unable to recall when this critical categoriza-
tion took place during the selection process for photojournalists
in Washington.

> I'm very hazy on this point about how it was done, but people
> were ranked with one of those designations. [Tr. 4182.]

I infer from this that Speiser played no role in this categori-
zation. I find that Speiser used the passive voice when testify-
ing, because he not involved in this part of the selection pro-
cess. The same is true for Edith Chapin, then deputy bureau
chief in New York, who was also unable to testify when this
classification took place [Tr. 9239.]

Virtually none of the CNN witnesses could recall who did
the writing on the butcher blocks, or the order in which job
applicants were discussed. The fact that two butcher blocks
exist for some applicants, makes me very skeptical as to when
and how these large sheets of paper were created.[62]

For example, on what appears to be a butcher block relating
to the Washington selection, TVS applicant Martin Jimenez is
classified as a "possible +" (GC Exh. 262; Tr. 4105–4106,
5633, 5859). On another, he is classified as a "possible –" (GC
Exh. 543, vol 2, B# 16374). CNN did not hire Jimenez and he
was not ranked as one of the top 55 applicants, as discussed
below. CNN's inability to explain what General Counsel's
Exhibit 262 represents indicates to me that some or all of the
butcher blocks were not created, and some or all of the catego-
rization of applicants may not have been accomplished at the
debriefing/selection meetings.

Each of the Washington sheets indicated the applicant's cur-
rent employer, e.g., Team Video or CNN Atlanta, so that if the
hiring managers were inclined to keep track of which applicants
were members of the NABET bargaining units, it was easy to
do so.

On one side of each butcher block was listed the applicant's
strengths, on the other "development areas," which I would
assume to be weaknesses. At the bottom of the sheet was an
assessment of the applicant's chances of being hired, i.e., "pos-
sible +," strong possible, "not strong," "possible –". At least
some of these assessments changed during the course of the
debriefing session, or at some other time, for unexplained rea-
sons.

At some point each of the five Washington hiring managers
ranked applicants from 1–55; this also may have been done

---

[62] Jim Hebb, a Turner human resources representative, did the writ-
ing on the butcher blocks used at the debriefings for engineers, which
CNN can apparently no longer locate.

However, with regard to the other debriefing/selection meetings,
CNN's witnesses were often unable or failed to credibly identify any
individual who wrote on the butcher blocks, or were inconsistent: e.g.,
Speiser, Tr. 3977–3978; Redisch, Tr. 5609; Fletcher Tr. 5787–5788,
5829; Holcombe, Tr. 7745, 7775; Gershgorn, Tr. 7982–7983; Curry,
Tr. 8394–8398, Chapin, Tr. 9156; Kinney, Tr. 9302–9312; Strauss, Tr.
10242; Fox, Tr. 12289–12290; Courtney, Tr. 12486; Denius, Tr. 13173;
McIntyre Tr. 14586; and Kile, Tr. 14806.

Fletcher testified that at the photojournalist debriefing in Washing-
ton, only recruiters Kile and Denius wrote on the butcher blocks, Tr.
5787–5788. Kile testified that "a number of different people" did so,
Tr. 14806.

My inference that applicants had been categorized prior to the de-
briefing meetings is also based on the inability of many of CNN's
witnesses to testify as to the order in which job applicants were dis-
cussed: Speiser, Tr. 4175; Redisch Tr. 5686, Fletcher Tr. 5792, 5875;
Curry Tr. 8473; Chapin Tr. 9158; Kinney Tr. 9295; Strauss Tr. 10215;
Fox Tr. 10308; Courtney Tr. 12487–12488, 12498; Hebb Tr. 13239;
and Kile, Tr. 14811.

CNN AMERICA, INC.    71

more than once. Some candidates were not ranked by any one of the five; some were ranked by some and not others.[63] A composite list or final composite list of the rankings was compiled and the number where each applicant fell on that list was written on the back of the butcher block sheet. There is no reliable evidence as to how these rankings relate to the other steps in the hiring process.

An examination of the record evidence regarding some of the TVS applicants who were not hired and some of nonTVS applicants who were hired demonstrates how difficult it is to discern any rational nondiscriminatory basis for this hiring process.

### The Absence of any Credible Nondiscriminatory Evidence as to why nonTVS Applicants were Hired Instead of Team Video Bargaining Unit Members

#### The D.C. Cameramen/Photojournalists

As the lists below show, in the Bureau Staffing Project, CNN essentially replaced 18 camera operators from the TVS bargaining unit, some of whom had worked at the D.C. bureau for as much as 18 years. These photojournalists (or cameramen) were replaced by 17 employees, 16 of whom had never worked at the bureau previously.[64] Of these 17, 7 transferred from CNN in Atlanta and one transferred from CNN in London. Three of the newly hired photojournalists worked for a related company, CNN Newsource. Six new hires had no relationship with CNN immediately prior to December 6, 2003.

Table 1: The 28 TVS field technicians hired by CNN as photojournalists, senior photojournalists, and lighting specialists on December 6, 2003:

*Senior Photojournalist:*

Jerry Thompson
Rick Morse
Anthony Urmani
Barry Schlegel
Reginald Selma

*Photojournalist:*

Burke Buckhorn
Mike Bannigan
Tim Garraty
Kim Uhl
Mark Walz
John Bodner
Brian Yakyvich
Skip Nocciola
Peter Morris
Martin Dougherty
Maurice George
Ken Tuohey

Eddie Gross
Dave Catrett
Bill Alberter
James (Giacco) Riggs
Worth Kinlaw
Elizabeth Zosso
Dave Scherer
Mike Greene

*Lighting Specialists*

Dave Berman
Greg Robertson
Geoff Parker

All of the Team Video technicians assigned to a White House crew (Morse, Waltz, Buckhorn, Greene, Schlegel, Garraty, Robertson, Parker, and Berman) were hired by CNN (Tr. 6191; GC Exh. 270).

Table 2: 18 TVS camera operators not hired by CNN and their seniority date with Team Video and prior contractors at the CNN Washington D.C. bureau:

Charles Anderson—August 2002
Rodney Atkinson—February 1996
Tim Bintrim—May 1988
James Cook—November 1995
Daniel Farkas—November 1998
Chris Hamilton—July 1994 [offered a job by CNN on December 22, 2003; rejected offer]
David Jenkins—November 1995 [hired by CNN July 5, 2004]
Martin Jimenez—February 1996
Larry Langley—August 1996 [hired by CNN for work as a freelancer within 6 months of 12/5/03, Tr. 5519]
Myron Leake—October 1997 [hired by CNN for work as a freelancer within 6 months of 12/5/03]
Mark Marchione—February 1996 [hired by CNN on January 5, 2004]
Luis Munoz—June 1997
James Norris—September 2000
Sarah Pacheco—July 1990
John Quinnette—May 1985 [hired by CNN for work as a freelancer within 6 months of 12/5/03]
Tyrone Riggs—July 1991
James Suddeth—March 2003
John Urman—November 1989

Table 3: 16 nonTVS bargaining unit employees hired by CNN by December 6, 2003, and former employer (from GC Exhs. 270, 272):

Jose Santos, Belo—Senior Photojournalist
Derek Davis, KHOU—Senior Photojournalist
Jay McMichael (self-employed)—Senior photojournalist (had worked for CNN prior to 2003)
Daniel King (Lopez), KNTV-San Francisco—(ceased working for CNN in August 2004)[65]

---

[63] There were more than 55 applicants. Some nonTVS applicants were weeded out in the telephone interview. The exact number interviewed by the hiring managers appears to approximately 70.

[64] In the BSP, CNN hired Jerry Appleman as a photojournalist in Washington at a salary of $60,000. Appleman had been working for CNN in Atlanta. He came to Washington on December 6, and then returned to Atlanta almost immediately.

[65] Lopez was already trying to leave Washington by February 2, 2004, GC Exh. 543, vol. 2, B# 18161.

72                           DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Doug Schantz, CNN Atlanta
Brian Pearson, CNN Atlanta
John Bena—Capital News 9, Albany, New York,
Jeremy Moorhead, WBFF, Baltimore
Ken Tillis, CNN Newsource, Seattle
Floyd Yarmuth, CNN Atlanta
Jeremy Harlan, KOAT, Albuquerque
Ray Britch, CNN London
Bethany Chamberland Swain, CNN Newsource, D.C.
Ron Helm, CNN Atlanta
Khalil Abdalllah, CNN Newsource, D.C.
James (Mike) Haan, CNN Atlanta
Jerry Appleman, CNN Atlanta

Bena, Moorhead, Appleman, and Harlan were hired at an annual salary that was $20,000 lower than that of the senior photojournalists and $15,000 below that of many of the more experienced photojournalists. Chamberland/Swain, Helm, and Abdallah were hired at an annual salary $15,000 lower than that of the senior photojournalists. Thus, it is not clear, as CNN contends, that saving money was not a consideration in implementing the BSP and in the hiring decisions made during the Bureau Staffing Project.

These hiring decisions are at a minimum counterintuitive. As the Board has recognized in a number of cases, "it is human nature to want to hire "known quantities," *Smoke House Restaurant*, 347 NLRB 192, 196 fn. 13 (2006), and cases cited therein. In fact, Team Video Vice President Larry D'Anna, testified in this proceeding at Transcript 3676–3677, that his company prefers "known quantities." In responding to his counsel's question, as to the process he used in hiring freelancers as regular Team employees, D'Anna stated:

. . . Elizabeth Zosso . . . was a freelancer with us for a period of time. Our people had an opportunity to observe her work, and when positions became available, we first looked at the people that we had used on a regular basis as a freelancers because they were a known quantity and we knew what the quality of their work was. And that gave us a basis for hiring those individuals.

The quality of bargaining unit employees' work for CNN while Team was its contractor was acceptable, according to then Deputy Bureau Chief Steve Redisch, (Tr. 5515.) Matt Speiser, the director of newsgathering, testified that he was satisfied with the services provided by the TVS cameramen and audio technicians (Tr. 3762). However, contrary to "human nature," CNN's former deputy bureau chief, Steve Redisch, testified that an applicant's experience in working at the CNN D.C. bureau with Team Video was "wasn't a factor at all" in CNN's hiring decisions with regard to photojournalist applicants (Tr. 5693).

The hiring process was designed to minimize the importance of the TVS applicants' prior experience at the D.C. bureau their and work history. It was also devised so as to allow for a maximum amount of flexibility and/or manipulation. In order to minimize the impact of the TVS applicants' experience, no hiring manager discussed the strengths and weaknesses of TVS cameramen with Brad Simons, their TVS supervisor, nor did they look at TVS personnel files. Brad Simons, in fact, offered

to share his insights on the applicants with CNN hiring manager Matt Speiser, who rejected the offer.

Speiser testified that he did not take Simons up on his offer for the following reason:

There were a lot of people who wanted to give input. He wasn't the only one. And I was—in doing these behavioral interviews, I was trying to keep the process as clean as possible, as I mentioned earlier. . . .
Other than Brad, who was driving to give you input?
Editors, correspondents, assignment editors.
These are all people who had worked with these applicants?
Yes. [Tr. 3934.]

Speiser's testimony about keeping the process as clean as possible indicates an intention of maintaining as level as playing field as possible for all applicants. However, the field was decidedly not level. For example, Bethany Chamberland Swain and Khalil Abdallah, two of the relatively inexperienced nonTVS candidates, were interviewed by their boss at CNN Newsource, R. J. Fletcher.[66] Fletcher testified that he lobbied other hiring managers on behalf of Abdallah.[67] CNN hired both Swain and Abdallah.

In an October 10, 2003 e-mail that went to hiring Managers Speiser, Young, and Courtney, among others, Fletcher advised that Abdallah's shooting is good and solid and that he is very dependable (GC Exh. 228, tab J, B# 14783). Fletcher also spoke up for Abdallah in the debriefing session at which preliminary hiring decisions may have been made (Tr. 5835). On October 10, Fletcher also passed along to Speiser and Young, favorable comments about applicant Tony Butler, a freelance photographer who worked for him at D.C. Newsource (GC Exh. 330).

Similarly, on October 13, Dan Young passed along a favorable assessment of CNN Atlanta employee Doug Schantz, to Speiser, Courtney, and Young, among others (GC Exh. 228, tab T, B# 22455). Schantz was an advanced video tape editor. He was interviewed in Atlanta on October 21, 2003, by John Courtney, who was his immediate supervisor's supervisor and Dan Young. Schantz had worked intimately with Young, who taught him Final Cut Pro, as well as with Courtney (Tr. 15750).

Not surprisingly, both Courtney and Young gave Schantz high marks on the basis of his interview. In the debriefing/selection meeting, Schantz was rated the 15th most desirable candidate. Young ranked him 7; Courtney 12. Speiser,

---

[66] Fletcher initially testified that he did not recall interviewing Chamberland/Swain. Then his memory was refreshed by his interview guide. However, Fletcher testified that he interviewed Chamberland/Swain in person. She testified that her interview was over the phone.

[67] By way of contrast, when TVS employee Jimmy Suissa asked CNN's Mike Maltas for a recommendation, Maltas said he could not give him one because he was a hiring manager, Tr. 5237.

[68] Abdallah testified that Fletcher was one of the people who interviewed him for the photojournalist position, Tr. 15,774. Fletcher testified that he did not believe he interviewed Abdallah, Tr. 5835. Unlike the situation with Chamberland/Swain, there is no written documentation that Fletcher interviewed Abdallah.

CNN AMERICA, INC.                                                                73

Fletcher, and Redisch rated Schantz 20th, 29th, and 19th, respectively. Since there is no evidence that anyone other than Courtney or Young knew Schantz, knew anything about his work or had interviewed him, one must assume that the rankings of the other three hiring managers was based on what Young and Courtney told them about Schantz.

When Matt Speiser expressed concern about the camera experience of Floyd Yarmuth, an applicant who worked as an editor for CNN in Atlanta, hiring Manager Dan Young responded, on October 10:

> I know Floyd, he's a go getter, has learned the art of photography on his own and by volunteering for assignments other would not venture. I just viewed his resume tape, he's got talent, no doubt, could be a good candidate, worthy of second interview given his shooting and FCP experience, he could grow immensely into this job. [GC Exh. 228, tab V, B#s 21625, 22465.]

With one exception, there is no evidence of a hiring manager lobbying other hiring managers on behalf of any of the TVS candidates. That effort, by Matt Speiser, on behalf of David Jenkins, was completely ignored by his colleagues.

For instance, Matt Speiser, did not share with any other hiring managers his belief that TVS cameraman Chris Hamilton had great artistic talent and that "his work as a cameraman is beyond reproach."(GC Exh. 228, tab B, B# 16360; Tr. 5828.) Thus, it is not surprising that when the five hiring managers ranked applicants in order of preference, Speiser ranked Hamilton 23, while the other hiring managers ranked Hamilton 52, 47, 37, and 43, respectively (GC Exh. 261).

There is also little evidence that any of the hiring managers consulted with CNN producers, editors and reporters who were familiar with the work of the TVS cameramen. Indeed, when they did so, as in the case of Matt Speiser's inquiry regarding Luis Munoz, the hiring managers ignored favorable assessments, see e.g. (GC Exhs. 387, 389).

Similar uneven treatment was accorded TVS applicants for the audio designer and studio operator positions in Washington. Anne Woodward, a CNN manager in Atlanta, was the only person who interviewed candidates for audio designer in Washington. She made inquiries to managers of CNN applicants who worked in Atlanta regarding the applicants' job performance. Woodward made no such inquires regarding Team Video applicants.

Troy McIntyre is the CNN manager who interviewed applicants for studio operator positions in Washington. Like Woodward, McIntyre talked to the supervisors of CNN and Turner Broadcasting applicants about the candidate's performance. He did not talk to the supervisors of Team Video applicants (Tr. 14578–14580).[69] No one from CNN made any inquiry regarding

---

[69] On October 27, 2003, McIntyre e-mailed Andy Parsons, a CNN manager in Atlanta. He asked Parsons to identify "some of the solid DC folks you know of for the studio operator position." While Parsons regularly visited the D.C. bureau, there is no evidence that he ever was stationed in D.C. or was familiar with performance of all the TVS applicants.

---

the work performance of Team employees to Mike Marcus, the TVS director of studio operations 9Tr. 15,3840.

### Nonlinear Editing (NLE)

One factor that CNN did emphasize in the hiring process, particularly in justifying its decision not to hire many TVS cameramen who had worked at the bureau for many years, was nonlinear editing (NLE).[70] Nonlinear editing is editing video on a computer, rather than editing on tape. Sometime after 2003, CNN distributed Apple G4 laptop computers to most of its photojournalist teams in Washington and New York. On this computer, a photojournalist can edit video they shot using Final Cut Pro (FCP) an Apple software program.

Nonlinear editing was one of the principal devices seized upon early in the life of the Bureau Staffing Project to allow CNN to limit the number of TVS bargaining unit employees it would hire. I infer that this was not an after-the-fact happy circumstance. The individuals running the Bureau Staffing Project were aware that Final Cut Pro was used widely by other CNN bureaus and CNN Newsource, but not in Washington or New York (Tr. 12438–12439).[71] Job descriptions for the photojournalists were changed in 2003 in conjunction with the BSP to increase the importance of experience with FCP and File Transfer Protocol (Tr. 12470–12472). This provided the perfect cover for discriminatory hiring to get rid of the Unions in those two bureaus.

There is direct evidence that the requirements for photojournalist were drafted with the intent of discriminating against NABET members. On May 23, 2003, Matt Speiser suggested to Cindy Patrick that "the Photojournalist PQ . . . should emphasize the use of DV cameras (since this isn't within NABET jurisdiction now)" (GC Exh. 553).

CNN also did not fully apprise the TVS applicants as to how critical their lack of experience or training in nonlinear editing, and more specifically, in Final Cut Pro, would be in keeping their jobs. The May 20, 2003 position questionnaire for photojournalists (GC Exh. 227), which stated that 20 percent of a photojournalist's job duties would involve editing/producing: cutting video in the field or in the bureau, was not what applicants saw posted on Turnerjobs.com (Tr. 8353, 4867).[72] This

---

[70] The testimony of CNN witnesses as to how critical it was for an applicant to have experience performing nonlinear editing in the field is not entirely consistent.

Additionally, lack of nonlinear editing experience was not held against TVS cameramen in New York to the same extent that it has held against TVS cameramen in D.C. The reason is that CNN was able to limit the number of bargaining unit members hired in New York simply by not hiring the audio technicians. Since the New York selections were done after those in D.C., CNN may also have run out of suitable Atlanta employees who could replace the Team camera operators.

[71] However, Team Video introduced at least some of its employees to the Avid nonlinear editing system, which is similar to Final Cut Pro, Tr. 1021.

[72] CNN Exh. 93, a position questionnaire, for "lighting specialist/photojournalist" has similar language about NLE. The three TVS employees hired as lighting specialists in Washington, Dave Berman, Geoff Parker, and Greg Robertson have performed virtually no nonlinear editing since they were hired by CNN.

74                      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

document also stated the NLE field editing would be needed for most events and assignments. As David Jenkins, a union executive board member who lost his job in the Bureau Staffing Project, explained:

> If I had seen . . . these weighted percents [indicating that 20% of their job would involve editing/producing], I could have judged myself how to . . . properly prepare myself. We had vacation time and whatnot. We had time to address any issue that was in here. . . . if I had read anything about the non-linear editing, I think we would have talked among ourselves. Again, I could have . . . with the Union, they have non-linear editing training. I could have called Jim Harvey and the other members and said, look, I want to bring a trainer on X day. I want to bring in as many trainers as we need to train all of us to do this to meet this qualification.
>
> This only thing I ever saw was that coversheet on the turnerjobs.com which was just a little NLE editing. . . . If I had seen it [GC Exh. 227] I think I would have been more proactive for myself and everybody else that I worked with. [Tr. 4867–4868].

That Jenkins meant what he testified to is established by the fact that after he lost his job in December 2003, he paid for Final Cut Pro training out of his own pocket as a vehicle for getting hired by CNN in the summer of 2004.[73]

The position description for photojournalist was developed as early as May 2003. In describing the primary functions of the photojournalist job, CNN stated that one of these primary functions was, "NLE field editing for most events and assignments for CNN."

In so far for work in the D.C. bureau is concerned, that description is inaccurate. Steve Redisch, deputy bureau chief in D.C. at the time of the Bureau Staffing Project, testified as follows in answer to CNN counsel's question as to the significance of nonlinear editing in Washington, D.C.:

> It's significance is marginal, as far as how CNN is set up . . . because . . . much of what—the video we bring in, comes in on fiber lines that were already established, whether it's a hearing coming in on line, whether it's a photo opportunity at the White House that gets fed out, it gets fed out on lines, and that's already coming into the house. So the need for editing material out in the field—the need is low. There are times where, yes, it could help. . . . But for the most part, since the bureau is wired in a way that much of its material comes in on lines . . . the need for nonlinear editing in the field is marginal. [Tr. 5695–5696.]

Redisch went on to testify that D.C. photojournalists can be assigned anywhere in the world and that knowledge of nonlinear editing can be very helpful in those situations where you cannot feed back your raw material or it's not being fed back easily. However, it is clear from this record that the D.C. photojournalists have used nonlinear editing in 5 percent or less of the Washington work they perform. Moreover, in the first 6

months after CNN terminated the TVS contract, D.C. photojournalists utilized non linear editing less often than they did later on.

As discussed again later, some of CNN's photojournalists have performed a lot of editing with Final Cut Pro in the field since the end of the TVS contracts. This work has been done primarily outside of Washington and New York and a lot of it has been done overseas. However, lack of nonlinear editing experience is not a nondiscriminatory basis for the BSP. CNN had, as discussed elsewhere, plenty of time to train the existing work force in Final Cut Pro.

One example of this is Peter Morris, a former Team unit member who had "lacked NLE experience" when he was hired (Tr. 15,569; (GC Exh. 543. vol 2, B# 23053). Morris achieved proficiency in Final Cut Pro during 2005 and is now held out by CNN as a poster boy for the utility of nonlinear editing in the field (Tr. 6400, 7303, 11402–11403, 15,439, 15,569).

### The "Growth" Candidates

Matt Speiser testified that CNN, "set out to hire the best, most capable photojournalists available" (Tr. 3829). Steve Redisch testified that CNN was "trying to find and hire the best candidates available" (Tr. 5542). However, even according to its own witnesses, CNN did not do that. Instead, it hired a number of "growth candidates," none of whom were full-time TVS employees.[74] These were relatively inexperienced appli-

---

[73] Former Team cameraman John Quinette, who also did freelance work for CNN, took the same FCP training.

[74] I do not credit Cynthia Patrick's testimony that several full-time TVS employees who were hired by CNN were "growth candidates." Unlike nonTVS candidates such as Khalil Abdallah and Bethany Chamberland Swain, there is no evidence that these applicants were accorded special treatment despite a lack of shooting experience.
GC Exh. 268 has the letters G1–G7 to the left of the names of seven photojournalist candidates. None of them were TVS bargaining unit members. None of them were experienced camera operators. All were offered jobs by CNN. I would surmise these were growth candidates although several inexperienced nonTVS applicants (Harlan, Bena, and Moorhead) who were hired have no such designation by their names.
Patrick named David Catrett (possibly), Elizabeth Zosso, Ken Tuohey, Kim Uhl (immediately retracted), employed by Team in Washington, and Desmond Garrison, employed by Team in New York, as "growth candidates" who were hired by CNN. There is no evidence for this assertion other than Patrick's testimony.
When Matt Speiser was asked about growth candidates employed by Team, he could only come up with the name of freelancer Adam Webster, who CNN did not hire, Tr. 4055.
Steve Redisch testified that CNN did not have a separate "growth candidate" list of applicants, Tr. 5592, 5647. Matt Speiser indicated that a "growth candidate" was "loosely defined by experience," Tr. 4026. Both Matt Speiser and R. J. Fletcher had trouble positively identifying "growth candidates" who were hired by CNN, Tr. 4025, 4210, 5843, 5855. Even Patrick could not recall whether the relatively inexperienced Richard Frederick, who hired by CNN as a photojournalist in New York, was a "growth candidate", Tr. 12897–12898.
David Catrett had worked at the D.C. bureau for Team for 6 years prior to the BSP. He was considered for both the photojournalist and senior photojournalist positions. Zosso and Tuohey had worked as full-time employees at the bureau for 3 years. The interview rating sheets for Tuohey indicate no concerns regarding a lack of experience. Zosso was also considered for the senior photojournalist position.

cants some of whom were hired at considerably lower salaries than more experienced applicants, such as the full-time Team Video unit members. CNN hired "growth candidates" rather than experienced Team Video applicants in almost all, if not all job classifications.[73]

What constituted a "growth candidate" in the BSP appears to have been a very fluid concept. Former D.C. Deputy Bureau Chief Steve Redisch testified about this concept as follows:

> Q. The Bureau staffing project was not designed to seek growth candidates, right?
> A. It was not designed to what?
> Q. Seek growth candidates.
> A. Growth candidates?
> Q. Growth candidates.
> A. Again, define growth candidates.
> Q. Maybe you could help me. To your knowledge, how was that term used during the bureau staffing project? Was it ever used?
> A. In the process, we looked at people who had experience, people who had potential, so the term growth candidates was used to define people who could grow into the position at various levels.
> Q. And when was that first discussed as part of the bureau staffing project?
> A. I don't recall when it was first discussed, but it was discussed at various points and used in various different discussions.
> Q. Was it discussed at the debriefing session?
> A. The term growth candidates did come up during the debriefing session.
> Q. Was it used prior to the debriefing session?

---

None of these individuals were hired at substantially lower salaries than other employees hired by CNN in their job classification, as were a number of nonTVS "growth candidates."

Had not three nonTVS applicants declined an offer of employment from CNN, Garrison would not have been hired during the BSP.

If CNN was looking for growth candidates on a nondiscriminatory basis, it would have given greater consideration to TVS employees such as Jim Suddeth. Suddeth was hired as an audio technician by Team in March 2003. He was interviewed on November 6, 2003, the second day of the photojournalist debriefing session by Matt Speiser and Dan Young. Matt Speiser noted that Suddeth had done a little shooting and was looking to learn non-linear editing and camera. GC Exh. 543, B# 16437. Rick Denius, after talking to Suddeth on the telephone on November 4, noted that Suddeth was "looking to grow with technology," B# 21053. On the butcher block, assumedly created at the debriefing session, one of Suddeth's strengths was considered to be a "willingness to learn," B#16430.

Cynthia Patrick's testimony at Tr. 14968–14969, and CNN's statement at p. 36 of its reply brief, that Raeshawn Smith and Tawana Smith were Team growth candidates is disingenuous in contending that the hiring of growth candidates was nondiscriminatory. CNN has never conceded that these two TVS freelancers were members of the TVS bargaining unit for successorship purposes, e.g., CNN Exh. 706; GC Exh. 587.

[73] Thus, audio designers Steve Tovarek and Cory Hall were hired in Washington at salaries of $55,000 and $45,000 respectively, while experienced former Team audio designers were hired at a salary of between $65–$68,000.

---

A. I do not know. I do not recall.
Q. How did you figure in the concept of growth candidates into your ranking of 1 to 55?
A. As far as what was demonstrated—well, demonstrated. As far as our discussion were concerned, how I saw these candidates potentially moving through and where—and you know, projecting how well they can do six months, a year, two years and on out.
Q. So you factored that into your 1 to 55 rankings?
A. I factored that in—into my 1 to 55 rankings.
. . . .
A. As far as I know, there was no growth candidate list, separate list. [Tr. 5591–5592; also see Tr. 5647.]

When the General Counsel asked hiring manager R. J. Fletcher about the "growth candidates," he testified that:

> The growth candidate may be a candidate that is near the bottom of the list, but has potential to fit in [Tr. 5806].

In response to my question as to why these candidates weren't ranked higher on the hiring manager's composite preference list, Fletcher responded:

> Maybe they just didn't have some qualifications that we were looking for, but we didn't want just to exclude someone because of that. . . .

In fact, some of the candidates hired by CNN were clearly inferior to many TVS bargaining unit members who were not hired in terms of their experience and other qualifications. For example, in the Bureau Staffing Project, CNN hired: Doug Schantz, employed by CNN as an editor in Atlanta, who "shot" once a week; Bethany Chamberland Swain, who was an editor, not a photographer at CNN Newsource (Tr. 5835, 15440); and Floyd Yarmuth, who was also an editor, not a full-time photographer with CNN in Atlanta. They hired these applicants instead of the many TVS candidates who were full-time photographers at the D.C. bureau for many years.

CNN recruiter Rick Denius testified in what I regard as doubletalk on this issue:

> If somebody only has three years of experience in a very small market, there might be some developmental room that they need to accomplish before they get to be a seriously competitive candidate on a network level. [Tr. 13120.]

Denius then went on to say that he wouldn't discount a candidate on this basis. Of course, CNN did not eliminate candidates who had only a few years of small market experience. It hired at least three of them, Jeremy Harlan, Jeremy Moorhead, and John Bena during the BSP to be photojournalists in D.C. (See e.g., GC Exh. 270.)

That the designation of "growth candidates" was a device by which to avoid hiring too many TVS bargaining unit members is indicated by the following e-mail exchange between Matt Speiser and Cindy Patrick, the CNN executive in charge of the entire Bureau Staffing Project, on December 1, 2003:

76                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

SPEISER: Ron Couvillion turned us down. If we move down the list, the next non-growth candidate is Mike Green.[76]

PATRICK: We have not even begun to correct our growth candidate issue so the next offer should go to Khalil Abdallah.

SPEISER: As for replacing Ron, Sue [Diviney] and I thought that we had all agreed that when growth candidates fell off the list (such as Randy Thieben) we would replace them with growth candidates, but non-growth candidates would be replaced by non-growth candidates. Is your recollection different? I'll obviously go with whatever you want, but our understanding was different.

PATRICK: I thought our understanding as we need to correct the lack of growth candidates on the list and once we had a reasonable balance we would start looking at equitable issues. So far, we have only added Ron Helm to the list to replace a growth candidate so we didn't gain any ground on a better balance. [GC Exh. 228, tab O, B# 5421.]

This e-mail chain establishes that in making hiring decisions Cindy Patrick, or someone above her, had the final say so. Moreover, the involvement of Patrick and Sue Diviney in the selection process belies CNN's assertion that hiring decisions were made by the hiring managers who interviewed applicants.

Secondly, it shows that CNN manipulated its hiring decisions to obtain a "reasonable balance." In the context of this case, I infer that a reasonable balance was a mix of TVS and non-TVS applicants that in conjunction with CNN's plan to pack the bargaining unit, would allow it to decline to recognize Local 31.

### The Demo Tapes do not Establish a Nondiscriminatory Basis for Hiring Growth Candidates Instead of Experienced Team Applicants

CNN's chief photographer, Dan Young, reviewed sample video tapes, or demo reels, submitted to him by many or most of the photojournalist applicants and he made notes about them. Young's assessment does not provide a basis for concluding that CNN's hiring decisions were nondiscriminatory. First of all, as discussed with regard to applicant Carlos Christen, at page 86 herein, Young's notes appear in some cases to have been doctored. Additionally, other CNN witnesses said they also reviewed applicants' tapes and there is little evidence regarding the assessment of other managers of applicants' tapes.[77]

Still other hiring managers, such as R. J. Fletcher, testified that they were unfamiliar with Young's written observation of tapes (Tr. 5895–5896).

Jeff Kinney's notes regarding the tapes submitted by Perry MacLean and Jim Peithman, two longtime TVS cameramen in New York were more positive than Young's assessment. Neither was hired by CNN. Kinney's notes regarding MacLean's tape state, "'Mississippi'-solidly shot" (GC Exh. 430, B# 35228). His notes regarding Peithman's tape state, "'subway re-route'-required good pre-planning" (Id. at B# 35231).

It is not clear what, if any, weight was given to Young's opinion of the tapes in making hiring decisions. For example, Young's assessment of TVS unit member Martin Jimenez, who was not ranked by any hiring manager in D.C., was positive. Young wrote that Jimenez, "seems to have the skills for the job, good interv and su lighter" (GC Exh. 228, tab O, B# 20560).

Moreover, reliance of one tape, as opposed to the TVS candidates' years of photographic experience at the D.C. bureau, is itself suspect in the context of this case. A good example of how unreliable Young's assessments were is his opinion of Chris Hamilton's tape, "ok photographer, needs work" when compared to Matt Speiser's conclusion that Hamilton's "work as a cameraman is beyond reproach." Another example is the tape submitted by TVS New York cameraman Richard Shine, who was hired by CNN. CNN Executive Producer Barclay Palmer testified as to why he knew that the tape submitted to CNN during the hiring process was not a fair representation of Shine's abilities (Tr. 9481–9483):

I spoke up for one or two of them with whom I had had experience, and—because I thought their value—I knew something about their talents that needed to be said that not everyone in the group knew.

Q. Do you recall exactly what you said?

A. I will give you an example, a guy named Rick Shine—Rick Shine, when you looked at his tape did not didn't show the artistry that some of the others had. I had just come back having the good fortune with working with CNN magazine shows with some of the most talented freelance crews in the country. They had fantastic equipment and made the most of it. One example is that they had monitors that they would watch so they could watch what they're shooting, and prevent situations in which something was being shot with a problem that wasn't being determined because it wasn't being watched outside the camera. When I came back from these magazine shows I advocated for additional and improved equipment to help protect the product. And some of that equipment is expensive and those kinds of monitors are expensive. And I just

---

[76] Greene was the last TVS bargaining unit photographer hired by CNN in the Bureau Staffing Project.

[77] Karen Curry testified that tapes were screened by herself, Edith Chapin, and Jeff Kinney. She testified that she saw virtually every tape. There is very little evidence as to her assessment of any tape, GC Exh. 426.

Edith Chapin also testified that she reviewed tapes and made notes, Tr. 9110–9114. The only evidence of such notes is CNN Exh. 261, which contains very brief comments regarding the tapes submitted by seven applicants, none of whom were TVS employees and only one of whom was hired by CNN. Chapin testified that she relied on her own evaluations of the tapes, not Dan Young's opinion, Tr. 9147–9149.

Jeff Kinney testified that he reviewed every tape that was submitted and made notes about them. He also testified that he had these notes with him at the selection/debriefing meeting, Tr. 9288–9289, 9284. There is rather sparse evidence as to what Kinney thought of any of the applicants' tapes, GC Exh. 430; Tr. 9399–9401.

John Courtney testified that he reviewed approximately 90 demo tapes, Tr. 12453–12454. He also testified that he took notes on the demo reels (not rails as transcribed at Tr. 12482–12483) and gave them to Dan Young. Courtney doesn't know what happened to his notes.

remember a discussion where Rick Shine had come into the news room with a little 5 by 7 LCD monitor that he got in B and H around the corner for 75 bucks or 50 bucks. He said look, I can watch my stuff. I said what a great solution, you should go talk to your managers about that, because we are looking for ways to help you and your guys and our people know what we're getting so we don't lose good tape, lose good shots, waste people's work, lose good new gathering. And Rick had the talent, the insight, the initiative to figure things out like that, to figure out equipment, when there is a technical problem in the field, somehow he knew enough to fix it and come up with solutions when they weren't fixable. The guy had talent that needed to be recognized, that people from Atlanta didn't necessarily know about.

A mediocre assessment by Young seems not to have mattered much in the case of some non TVS applicants. For example, Young's assessment of the tape submitted by Ken Tillis, from CNN Newsource in Seattle, was "ok stuff, not the best, want to see more" (GC Exh. 228, tab U, B# 20554). There is nothing in this record that supports the assessment on the butcher block for Tillis that he was a "good shooter" or the fact that his composite ranking by the hiring managers was 28th, well above TVS candidates who were clearly more qualified in terms of photography experience.

Similarly, Young's assessment of Mike Haan's demo tape was, "not enough to go on, not enough experience" (CNN Exh. 64). Despite this, CNN hired Haan in Washington instead of numerous experienced TVS camera operators.

Young's assessment of the tape submitted by Gilbert De La Rosa, a nonTVS unit member, who CNN hired in New York, was "not much to go on but there's some talent here" (GC Exh. 426, B# 19814). Jeff Kinney, on the other hand, was not sure that De La Rosa had shot the packages on his tape (GC Exh. 520, vol. 2, B#2291).

Finally, there is no evidence that Young reviewed a demo tape submitted by either Bethany Swain Chamberland or Jay McMichael, who were hired by CNN in Washington, or Pelin Sidki, who was hired in New York.

### Record Evidence Regarding some of the TVS Bargaining Unit Members that were not Hired by CNN in Washington, D.C.

#### Sarah Pacheco

Sarah Pacheco worked at the CNN bureau as a photographer/field technician from 1990 to December 5, 2003. Pacheco received no information regarding her application for employment with CNN until 9 p.m. on December 5, when CNN informed her that she no longer had a job.

Pacheco was a very active and aggressive union steward. Soon after CNN announced the forthcoming termination of its contract with TVS, unit employees were advised that if they wanted to keep their jobs, they must apply for them on line at turnerjobs.com. Pacheco did so.

CNN recruiter Rick Denius conducted a telephone interview with Pacheco in October 2003. Denius asked Pacheco if she had editing experience and whether she had any familiarity with nonlinear editing. Pacheco informed Denius that in the late 1980s, while working for WCBS, her primary responsibility was tape—tape (linear) editing (Tr. 6630). Pacheco testified that she told Denius that she owned an Apple G4 computer, that she had Final Cut Pro software on that computer and had taught herself how to use it (Tr. 6630). I infer from Denius' notes, Matt Speiser's interview notes and the butcher block sheets used by CNN at the debriefing session for hiring managers that Pacheco told Speiser about her ability to edit with Final Cut Pro.

In an e-mail dated October 13, 2003, Hiring Manager Dan Young made the following comment about Pacheco:

> I like her previous experience on the local front, strong editor with good editorial decision making. [GC Exh. 228, tab H, B# 021621.]

Pacheco was interviewed by only one of the hiring managers, Matt Speiser, on November 4, 2003. He noted that "Sarah edited when she worked at WCBS and has FCP (Final Cut Pro) at home" (GC Exh. 228, tab H B# 26521/20). Speiser rated her "4" in two categories and a "3" in three others. He did not note any strengths or concerns on his rating sheet (GC Exh. 228, vol. 1, tab. H, Bates # (B#) 026350).

Matt Speiser could not recall any discussion of Sarah Pacheco in the debriefing session (Tr. 4206). On the butcher block posted during the debriefing session, an agent of CNN listed Pacheco's strengths as nonlinear editing, job knowledge, editorial awareness, and technical ability. Under developmental areas, CNN agents listed: enthusiasm, people skills, teamwork, initiative, and creativity. There is also no evidence as to the basis for these alleged deficiencies.[78]

I infer Pacheco's "lack of people skills" is related to her aggressiveness as a union steward for Local 31. Pacheco was not rated among the top 55 applicants by any of the five hiring managers. There is absolutely no evidence as to why this is so. Although nonlinear editing was listed as one of Pacheco's strengths and a lack of nonlinear editing was often advanced as a reason by CNN for not hiring other TVS applicants, Pacheco was apparently given no credit for this "strength."[79]

#### Chris Hamilton

Chris Hamilton had worked at the CNN D.C. bureau since July 1994. The record contains a number of messages from CNN reporters and/or producers complimenting Hamilton on his work for CNN. Matt Speiser interviewed Hamilton on October 13. Hamilton's performance at the interview was apparently uninspiring, but Speiser was well aware of his talents and

---

[78] CNN at p. 255 of its brief cites to disputes that Pacheco had with Team managers in 1999 and disciplinary warnings she received at that time. There is no evidence that CNN considered these incidents in failing to hire Pacheco, see e.g., Speiser testimony cited above.

[79] CNN states at p. 255 of its brief that Pacheco had not submitted a sample tape as of the debriefing session. There is no credible evidence to support this statement. Pacheco's testimony that she submitted two tapes Tr. 6637–6639, is uncontradicted. The first was submitted to Dan Young after Pacheco was screened by Rick Denius on or about October 10, 2003, GC Exh. vol. 1, B#26532, 21621. Matt Speiser could not recall whenever he saw a Pacheco demo tape, Tr. 4006.

work for CNN. He gave Hamilton a "4" in all 5 rating categories.

R. J. Fletcher also interviewed Hamilton, but the record evidence is inconsistent as to whether he did so with Speiser or at a later date. Fletcher gave Hamilton relatively poor ratings; 3-3s, 2-2s, and deemed Hamilton "not fit" for the position. He wrote at the bottom of his rating sheet, "I do not recommend Chris." (GC Exh. 259.)

Despite Fletcher's very negative appraisal, at one point at the early November debriefing session of hiring managers, Hamilton was considered a "strong possible" candidate. He ended up in 41st place in the final composite ranking by the five hiring managers. This is a strong indication that CNN knew that the questions asked at the face-face interviews and the applicant's performance in the interviews had little or no relationship to their ability to perform the job for which they were applying.

At a meeting on November 18, seven applicants, none of whom were TVS bargaining unit members were placed above Hamilton on the list and he fell to 49th place. There is no satisfactory nondiscriminatory explanation for this reordering of the list.

That CNN knew that Hamilton was highly competent photographer is established by the fact that CNN offered him a job on December 22, 2003, at which time, it believed he would no longer count as a member of the CNN bargaining unit for purposes of determining successorship. Hamilton rejected CNN's job offer.

### David Jenkins

David Jenkins had worked at the D.C. bureau since 1995. He was a member of the Union's executive board and was very active in the Union's picketing and demonstrations against Team Video during initial contract negotiations in 1997 and 1998.

When CNN's recruiter, Rick Denius, interviewed Jenkins by telephone on October 15, 2003, Jenkins told Denius that he had edited video for his personal use using an Apple G4 laptop and Final Cut Pro software (GC Exh. 228, tab C, B#s 11594, 23475). Several CNN reporters and/or producers had e-mailed TVS on several occasions to express their appreciation for the work Jenkins and other TVS field technicians had performed for the bureau. These included Bob Kovach and Laura Bernardini.

Jenkins was interviewed by Matt Speiser and Mike Maltas, a CNN executive producer. Maltas was not a hiring manager for photojournalists. Jenkins told both Speiser and Maltas that he had some experience with nonlinear editing as a result of playing with Martin Jimenez' laptop. Maltas gave Jenkins 1–5 and 4-4s in his interview rating and noted no concerns about him (Vol. 228, tab C, B# 15018). Speiser gave Jenkins 2-5s and 3-4s and did not record any concerns about him.

At some point in the hiring process, CNN prepared a list of applicants in descending order of their average interview rating scores. Jenkins, with a 4.2, was tied for 11th place on this list (GC Exh. 266).

What is a complete mystery is what happened with regard to David Jenkins in the hiring manager's debriefing session, which took place on November 5 and 6, 2003. At one point,

Jenkins was characterized as a "possible +" applicant but ended up being rated 51st out of 55 applicants who were rated. In their final rankings, Dan Young and John Courtney listed Jenkins 48th; Steve Redisch ranked him 55th; and R. J. Fletcher did not rank Jenkins at all. What is most difficult to understand is Speiser's ranking of Jenkins in 41st place, behind such inexperienced candidates as Jeremy Moorhead, Jeremy Harlan, and John Bena.

There is evidence that this ranking is not a reflection of Speiser's true opinion but is the result of pressure from above, possibly related to Jenkins' union activism. Sometime between December 5, 2003, and July 5, 2004, one of the CNN hiring managers, Dan Young, gave his impressions of a number of candidates for photojournalist positions at CNN:

> The funniest thing that happened during the first selection process was when Matt argued vehemently that we need to keep Dave Jenkins. Rick Denius came up to me later and said why don't we just make some t-shirts that say "Save Dave Jenkins" Dave's interview was actually very good, he wasn't fooling us with coached answers like the other ex-Team guys. He's very honest, has a great reputation in DC as the can-do guy and he seems passionate about learning the DNG gear and techniques. [G . Exh. 328.][80]

The above document not only indicates that Speiser's ranking of Jenkins did not reflect his true assessment of Jenkins, but is a smoking gun with regard to the animus of CNN towards the TVS bargaining unit members.[81]    I also infer that Jenkins'

---

[80] CNN counsel objected vehemently to the admission of this exhibit on hearsay grounds. It came from the hardrive of Dan Young's computer. Young died in August 2006. That this was authored by an agent of CNN who participated in the hiring process is established by the author's statement that he interviewed John Quinette on the first go around. I infer that the author was Young from the fact that the document comes from his computer and the author's repeated reference to the review of tapes. Young reviewed a large number of tapes submitted by photojournalist applicants.

[81] Rick Denius confirmed at trial that Speiser lobbied for Jenkins in the selection meeting, Tr. 13157. He then testified that Dan Young and John Courtney responded to Speiser by saying that Jenkins' demo tape was flat and lacked creativity. I do not credit Denius' testimony on this point (or any other); for one thing is inconsistent with Young's written assessment of Jenkins' demo tape.

The only evidence regarding anybody's review of Jenkins' tape is Young's, e.g., GC Exh. 228, vol. II, tab Q, B# 20560. Even assuming that Young's assessment of tape was determinative, which was not established, his opinion of Jenkins' tape does not support CNN's contention that its failure to hire Jenkins was nondiscriminatory. It also does not establish that CNN was acting without discriminatory motive in hiring many inexperienced applicants on the basis on one demo tape, as opposed to an experienced photographer like Jenkins, whose tape was at least adequate.

Young's assessment of Jenkins' demo tape is as follows:

Flower Garden: ok to good story, lots of potential for creativity, would've stopped intv [interview] to set up for more aesthetic shots, composition and storytelling.

Smithsonian: good b-roll and intvs

WH work: good, could've used more creative shots and angles, but the story was good overall.

Summary: fair to good photography, want to see more.

"great reputation in DC" was the result of his work at the bureau since 1995, rather than something he acquired by freelancing for CNN for a few months in 2004.

Jenkins started to perform freelance photojournalist work for CNN starting in February 2004. During the spring of 2004 he had 2 days of private instruction on nonlinear editing using Final Cut Pro.[82] This instruction was given by Inez Perez, the same person giving similar training to the CNN photojournalists hired during the Bureau Staffing Project. In July 2004, CNN hired Jenkins as a full-time photojournalist.

### Larry Langley

Larry Langley had worked at CNN's D.C. bureau since August 1996. On November 4, Steve Redisch interviewed Langley in person; R. J. Fletcher participated in the interview by telephone. Redisch gave Langley 3-4s and 2-3s in his interview ranking. The only concern he listed was a lack of nonlinear editing experience. Despite this ranking when Redisch ranked his top 55 applicants, Langley was not among them. In fact, none of the five hiring managers included Langley in their list. Fletcher's interview scores are not in this record.

On the butcher block sheet in this record, Langley was characterized as a "not strong" candidate. His "developmental areas" or deficiencies were communication, apparently based on somebody's assessment of his performance in the interview, shooting and editing. The sheet also states that CNN needs a sample tape from Langley, leading one to wonder on what basis the five hiring managers concluded that Langley was not a good photographer.

That Langley was at least an adequate photographer is established by the fact that CNN hired him to do freelance work during the 6 months after December 5, 2003, and the following comments of Dan Young during the same period (GC Exh. 328):

> Larry was very nervous during the interview, didn't sleep the night before. Nevertheless, he had some good answers, his resume tape was average and was a last minute addition on both occasions. Ben [Coyte, CNN photojournalist manager after December 5, 2003] says he never nothing bad about his work but obviously these same people are not exactly screaming for his services. He would do ok in the job.[83]

### Mark Marchione

Mark Marchione had worked at CNN's D.C. bureau since February 1996. Matt Speiser interviewed Marchione in person on November 4. R. J. Fletcher participated in the interview by telephone. Speiser's interview ranking was 4-4s and 1-3. He noted no concerns regarding Marchione. Fletcher's ranking, if

he made one, is not in the record. A butcher block that is in the record characterized Marchione as a "possible +." It listed his strengths as: DV camera, initiative, job knowledge, people skills, editorial awareness, and technical ability. His alleged deficiencies, or "development areas" were creativity and communication (inability to articulate).

Marchione was rated 46th of the hiring mangers' top 55 candidates. Despite Speiser's favorable assessment in the interview, he put Marchione 50th on his final list. Fletcher put Marchione at 45th, he was ranked 48th by Redisch, 53d by John Courtney, and 51st by Dan Young. In his review of applicant's tapes, Young characterized Marchione as an "o.k. shooter." On January 4, 2004, 1 month after it terminated Team Video as its contractor, CNN hired Marchione as a full-time staff photojournalist. This not only establishes that CNN considered Marchione a competent photojournalist, but is it also suggests that it manipulated the number of employees hired by December 6, 2003, in order to avoid recognizing and bargaining with the Union.

### Luis Munoz

Luis Munoz began working at the CNN D.C. bureau in June 1997. He was assigned to the CNN Spanish Network, CNN en espanol. During the week, Munoz occasionally was assigned duties by the general assignment desk, but only when the Spanish network did not need his services. On weekends, Munoz regularly worked overtime for the general assignment desk. When working for CNN en espanol, Munoz had very limited contact with Team Video; usually only interacting with TVS by signing in in the morning and signing out at night. During weekdays, Munoz normally took assignments solely from the producer and reporter employed by CNN's Spanish Network.

Matt Speiser and R. J. Fletcher interviewed Munoz on October 21, 2003. During that interview Munoz told the interviewers that "Spanish had final cut pro loaned to it for about a month and he played with it." (GC Exh. 228, tab F, B# 15314.) Speiser gave Munoz 2-5s, 2-4s, and 1-3. As a strength, he noted that Munoz "serves as one-man band." As a concern, despite what Munoz told him, Speiser indicated that Munoz had "No NLE experience."

Fletcher' notes indicate, "Final Cut Pro. Some editing. Willing to learn." Id., B# 24061. Fletcher gave Munoz 1-4 and 4-3s. The average of these two ranking put Munoz at 29th place (with others) among the applicants, based on the interview scores (GC Exh. 266).

On November 5, 2003, which was the first day of the hiring managers debriefing session, Matt Speiser e-mailed Willie Lora, senior producer, CNN en Espanol, for a recommendation regarding Luis Munoz. Lora had worked with Munoz since 1997 and had been his direct supervisor for several years. Lora's response was as follows:

> Thanks for the opportunity, let me tell you that Luis for the past six years has been an invaluable part of our operation, because of the nature of our network, and the enormous task that we face everyday with such a small group of colleagues. Luis has become a key player of our operations, he helps out with coordinating live shots, he goes out as a one man band to cover events, his knowledge of the inside bureau operations

---

[82] This was essentially the same training that Elizabeth Zosso received through the Union prior to the Bureau Staffing Project.

[83] The only evidence regarding Langley's job performance is a positive assessment by CNN's Bob Kovach regarding a week's work in September 2002, GC 228, tab C, B# 15034.

A few CNN witnesses mentioned how diverse were the employees hired during the BSP. If diversity was a factor in the selection process, there is no indication how it figured in CNN's decision not to hire Langley and Dennis Norman, African-Americans; Pacheco, a Hispanic female; and Munoz and Jimenez, Hispanic males.

makes him not only our photojournalist, but an integral part of our production team. I believe that for CNNE, Luis has been a good investment for our network and we'll be pleased to keep him and helping go the through the process of implementing the new technology and division that the CNN News Group is going. Thanks again. [GC Exh. 387.]

Lora was not the only CNN employee who thought highly of Luis Munoz. On December 9, 2005, 4 days after the end of the TVS contract, CNN National Security Correspondent David Ensor wrote an e-mail to Chris Crommet, operations director of CNN en espanol, with a copy to Matt Speiser, D.C. Bureau Chief Kathryn Kross, Deputy Bureau Chief Steve Redisch, and Willie Lora. Crommet passed the e-mail along to Cindy Patrick, asking her for suggestions as to how to reply to Ensor. Ensor wrote:

> I'd just like to express my astonishment at the decision not to keep Luis Munoz, who I regarded as one of the best cameramen I have worked with at CNN, and to suggest that in the unlikely event he does not find another fulltime job soon, you put him high on the list for freelance work.
>
> If the advice of those who work with him—in particular the CNN Spanish unit–had counted for anything, this decision could not have gone the way it did.
>
> I understand the company has another cameraman—a good one, and a Spanish speaker that it wants to bring to the US. If true, that's fine, but that should not have been a reason to lose one of best here.
>
> Very frankly, now that some of us-correspondents and producers who work with the crews here-are hearing who has been kept, and who let go, there is surprise at some of the choices made, and concern that the views of people who work directly with crews in Washington, and therefore have the greatest knowledge about their work, may have been overlooked.
>
> From here, it does not seem as if CNN's interest in keeping it best shooters was always the first consideration in the selections. [GC Exhs. 389.]

During the debriefing session, Munoz was at one time characterized as a "strong possible" candidate. (GC Exh. 232.) This butcher block lists Munoz' strengths as, "well under pressure," initiative, lighting, work ethic, and problem solving. Creative is crossed out and then listed as Munoz' only deficiency.

In the ranking of applicants, Munoz was at one point 49th and another 51st (GC Exhs. 232, 261, and 268). Speiser ranked him 50th; Fletcher ranked him 35th. Redisch ranked him 40th; Courtney 55th, and Dan Young didn't rank Munoz at all. Young's assessment of Munoz' tape was "ok shooter, needs more seasoning, more creativity from shots and composition." (CNN Exh. 64.)

In essence, during the Bureau Staffing Project, CNN replaced Munoz as the CNN Espanol photographer in Washington with Ray Britch, who worked for CNN Espanol in London (Tr. 15489–15490). He is the person referred to by David Ensor in his December 9, e-mail. I infer that Dan Young was aware of CNN's intention of replacing Munoz with Ray Britch

and that this accounts for the fact that Young did not rate Munoz in the top 55 applicants.[84]

### James Norris

James Norris was hired by TVS to work as a cameraman at the D.C. bureau in September 2000. In recommending Norris for an interview with the hiring managers, CNN Recruitment Manager Loren Kile noted "although he is limited on his knowledge of NLE, he did take a class this past August on AVID." AVID is a nonlinear editing system for video, somewhat similar to Final Cut Pro. CNN DNG trainer Ben Coyte testified that familiarity with AVID makes learning Final Cut Pro easier (Tr. 15,572–15,573). While nonTVS applicants were given credit for knowledge of AVID, Norris was not.

Steve Redisch and Matt Speiser interviewed Jim Norris on October 29. Redisch gave Norris 1-4, 3-3s, and a 2 in "teamwork." Speiser noted that Norris had a consumer version of a nonlinear editing system at home and that he had taken an AVID seminar with Team Video. Speiser rated Norris highly, giving him 1-5 and 4-4s. He noted no strengths or concerns. At the debriefing session, at one point Norris was characterized as a "strong possible" and then as a "possible +." Among his strengths listed was editing experience and "had trained on NLE." However, NLE was also listed as one of his deficits. (GC Exh. 228, tab G, B# 16249.) During the session, he was at least at one point rated 52d of 55 candidates ranked.

Sometime between December 5, 2003, and July 5, 2004, Dan Young opined that Norris is "now dubbed, Jim 'Wrong Answer' Norris. His resume tape from the first selection process was weak. He's a weak candidate." The basis for these assessments appear nowhere in this record. CNN's Exhibit 64 does not contain an assessment of Norris' tape. I would also note that this opinion is inconsistent with Speiser's interview evaluation and the comments on the butcher block created during the debriefing session. Given Young's thinly veiled and otherwise unexplained animosity towards TVS' employees, one must wonder whether Norris' "wrong answers" have something to do with his union membership or support.

### John Urman

John Urman worked at the D.C. bureau since 1989. He participated in handbilling in front of the CNN bureau during the Union's contract negotiations with TVS in 1998 (Tr. 6745, 6575).

On the résumé that Urman submitted to CNN, he listed Apple Final Cut Pro editing skills. After his telephone interview with Urman on October 7, CNN Recruiter Rick Denius noted that Urban had "dabbled with Final Cut Pro on his own, but he

---

[84] Because CNN was closing its CNN en espanol office in London in December 2003, Britch was about to lose his job. Despite this Ben Coyte had "serious concerns" about Britch and opined that he would be "a high maintenance employee," CNN Exh. 693, B#s 18135, 20507. CNN was negotiating with Britch over the amount of relocation money he would receive as late as December 2, 2003. It considered hiring Carlos Christen if Britch did not accept the offer to come to Washington. Christen was ranked lower than Luis Munoz in the debriefing meeting, GC Exhs. 556, 270.

has no professional editing experience" (GC Exh. 228, tab I, B# 23214).

Based on his review of the tape Urman submitted, Dan Young considered Urman an "o.k. shooter." Matt Speiser and R. J. Fletcher interviewed Urman on October 24. Speiser noted that, Urman "took a final cut training course from Inez." This refers to Inez Perez, the same person who CNN brought in during February and March 2004 to train the photojournalists it hired in nonlinear editing with the Final Cut Pro software.

Speiser gave Urman straight 4s on his interview and noted neither strengths and concerns. R. J. Fletcher gave Urman 1-4 and 4-3s (GC Exh. 234). Fletcher noted as Urman's strengths:

> Computer savvy would work well with FCP [Final Cut Pro] Things[?] in the future
> Used DV during D.C. protest[85]

As concerns about Urman, Fletcher listed:

> Lack of day to day editing experience
> Lack of shooting daily packages

At the bottom of Fletcher's rating sheet appear the words "I do not recommend John." It looks like something was whited out and that "do not" was written instead. When testifying at the instant hearing, Fletcher stated that the name John Urman, "did not strike a bell" (Tr. 5780).

Based on the interview ratings, Urman was tied for 36th place among the applicants. However, at the debriefing Urman was not rated as one of the top 55 candidates by anyone, including Matt Speiser, who have him all 4s in his interview. He appears to have been given no credit for his training with Final Cut Pro. For example, a butcher block sheet prepared during the debriefing characterizes Urman as a "possible" candidate but lists NLE as a "developmental area" (GC Exh. 235).

### Charles Anderson

Charles Anderson had worked for TVS as a full-time staff member for little over a year when he was interviewed by CNN in the fall of 2003. R. J. Fletcher gave Anderson 2-4s and 3-3s in his interview. Another interviewer must have given Anderson higher scores as evidenced by his composite 3.8 on General Counsel's Exhibit 266. Fletcher noted that Anderson has edited nonlinear and has a nonlinear system at home. Fletcher also noted that Anderson knew his way around D.C., having worked in films in the area. As a concern, Fletcher noted that Anderson had no professional NLE experience (GC Exh. 229).

When examined by the General Counsel, Matt Speiser testified that although Anderson had started out doing principally audio work at the bureau, he had been shooting video "in the last couple of years" (Tr. 4147). However, when CNN counsel asked Speiser about Anderson, he described him as "mostly a soundman and had hardly any nonlinear editing experience" (Tr. 4199).

---

[85] DV refers to a small digital camera. CNN photojournalists use a model named the PD-150. Although Urman's experience with a DV camera didn't seem to help him much in the Bureau Staffing Project, when it came to nonTVS applicant Khalil Abdallah, Dan Young described it as "another plus," GC Exh. 228, tab J, B# 14783.

Anderson was not rated in the top 55 applicants by any of the five hiring managers. There is no credible explanation in this record as to why that is so.

### Danny Farkas

Danny Farkas was a photographer and also frequently operated the microwave truck for Team. Matt Speiser rated Farkas very highly in his face-face interview. R. J. Fletcher rated Farkas very poorly. At some point during the debriefing, Farkas was considered a strong possible candidate, but was downgraded to "possible" for unexplained reasons (GC Exh. 543, B#15289). Instead of Farkas, CNN hired TVS engineer Chris Leonard to operate the microwave truck. Leonard had never done this before and was dying of brain cancer when CNN hired him.

### Myron Leake

Myron Leake worked as a cameraman for Team beginning in 1997. He was recommended for face-face interviews by Rick Denius. Dan Young's assessment of Leake's tape was "ok shooter, good potential" (CNN Exh. 64). There is no evidence in this record as to who, if anybody interviewed Leake. (GC Exh. 543, vol. 2.) There is also no evidence that Leake was even considered or discussed at the photojournalist debriefing session. While hiring managers had résumés for most applicants, they did not have one for Leake (Tr. 5878). Beginning in April 2004, CNN hired Leake as a freelance photojournalist.

### Martin Jimenez

Martin Jimenez had worked at the D.C. bureau since 1996. On Dan Young's assessment of Jimenez' tape was "seems to have the skills for the job, good interv and su lighter" (CNN Exh. 64). Matt Speiser and Mike Maltas interviewed Jimenez on October 27, 2003 (GC Exh. 543, vol. 2).

Speiser noted that Jimenez played with Premiere, a nonlinear editing system, with home movies. (Id. B# 16388.) He rated Jimenez with straight 4s, the second highest score. Maltas, who was not a hiring manager for photojournalists, rated Jimenez much lower. Maltas gave Jimenez 2s in decisionmaking and ethics and integrity. The latter rating was a result of Jimenez telling his interviewers that on one occasion, he was with a producer who used airport personnel to stage a shot of travelers going through security screening. Jimenez told Speiser and Maltas that he expressed his concerns to the producer. Maltas held it against Jimenez that he followed the producer's direction and filmed the staged shot (Id., B# 16380, 16384, 16392).

Jimenez' résumé was not given to hiring managers at the debriefing session (Tr. 5878). There are two butcher blocks with Jimenez' name on it. One lists as strengths, that Jimenez was a good shooter, good lighter, editing, and editorial. As a developmental area only NLE is listed. Jimenez is categorized as a "possible minus" (B# 16374).

On what appears to be another butcher block, Jimenez is classified as a "possible +" (GC Exh. 262; Tr. 4105–4106, 5633, 5859). As mentioned previously, CNN's inability to explain what this document represents indicates to me that some or all of the butcher blocks, and some or all of the categorization of applicants was not done at the debriefing/selection meetings. No hiring manager ranked Jimenez among their top

82                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

55 candidates and there is no explanation in this record why that is so.

### Record Evidence Pertaining to Some of the NonTVS Applicants Hired by CNN in Washington, D.C.

With regard to the photojournalists hired by CNN to replace TVS bargaining unit members, one can assume that they were generally qualified to do their job. The network would certainly not hire a lot of incompetents to do its camera work. Indeed, it is clear that some, but not all, of them have done excellent work for CNN since 2003. However, several of the nonTVS unit members hired had 3 years electronic newsgathering (ENG) and field production experience. CNN mandated this as a minimum experience requirement for the photojournalist position (GC Exh. 227). In fact, some of the new hires may not have had fulfilled these minimum requirements.

Regardless of the qualifications of the nonTVS new hires, I conclude that CNN would not have replaced many longtime employees with these relatively inexperienced applicants in the absence of antiunion animus. Given the ease with which CNN could have trained the TVS employees in Final Cut Pro and other new technologies, I conclude that this wholesale replacement of incumbent cameramen was discriminatorily motivated. The nonTVS candidates it hired were not so clearly better qualified than the TVS bargaining unit members that CNN would have taken this course of action in the absence of its desire to get rid of the Union and a large number of its supporters.

### CNN's Concerted Efforts to Justify Its Hiring Decisions after the Fact

At some time in 2004, CNN began to document the use of Final Cut Pro and other Digital Newsgathering Techniques, such as File Transfer Protocol (FTP) in order to prepare to defend itself in an unfair labor practice proceeding. For example, CNN witness Ben Coyte testified that he copied CNN's in-house counsel, Lisa Reeves, on August 11 and November 30, 2004 e-mails for this purpose (Tr. 15,652–15,657; CNN Exhs. 199, 655). Likewise, Cindy Patrick, in acknowledging an e-mail from John Courtney on March 17, 2005, regarding the use of DNG techniques, noted that "this is the kind of example we need to illustrate our argument . . . ." (CNN Exh. 656, B# 151749.)

In April 2005, CNN issued performance evaluations, "Turner Performance Management Program (TPMPs)" to photojournalists in New York for calendar year 2004 and other employees for 2004 and the first 2 months in 2005. There is no evidence that this kind of evaluation with its heavy emphasis on such subjects as DNG, pitching stories and editorial involvement were used anywhere in the Turner system prior to April 2005, e.g. (Tr. 15,950). In late 2005 or early 2006, CNN began issuing TPMPs to its Washington photojournalists for periods beginning on April 11, 2005. I view these documents as part of CNN's effort to justify the Bureau Staffing Project after the fact as part of its litigation strategy.[86]

TPMPs in at least some cases bore little relationship to what employees actually did. In some cases, they are simply inaccurate. In Khalil Abdallah's 2007 TPMP (CNN's Exh. 676 at 10), his manager, Jeff Kinney, intimates that Abdallah covered the Virginia Tech shootings. Abdallah did not do so (Tr. 15841–15842). In completing the employee comments on the TPMPs, employees were responding to objectives set by CNN. As a number of them testified, their desire was to make themselves look good (Tr. 13596, 13604).

Tim Garraty, for example, commented repeatedly on use of DNG (digital news gathering) in his April 11, 2005–February 27, 2006 TPMP, despite the fact that he rarely employed DNG techniques, such as nonlinear editing with Final Cut Pro, File Transfer Protocol or transmission to a satellite with a BGAN (CNN Exh. 581; Tr. 13762, 13804, 13813). John Bodnar's testimony also indicates that TPMPs are not an accurate reflection of what CNN employees actually do on the job. His TPMP states he frequently pitched stories between April 2005 and February 2006. Bodnar could recall only one such occasion.

Richard Shine wrote in his April 1–December 31, 2005 TPMP that "I've made many story suggestions to Reporters and Producers, some of which have made it air" (CNN Exh. 302, B# 153070). At trial, Shine testified that he has "never pitched a story" because "I haven't had anything that has come to mind that we thought we should cover" (Tr. 9636–9637).

Much of the testimony of CNN's witness was also part of this strategy. For example, Ben Coyte, who was the photojournalist manager in D.C. from December 2003 until sometime in late 2006 or early 2007, testified about the relative success of various photojournalists in learning DNG technology. He named over a dozen Washington photojournalists who he testified had successfully adapted to DNG technology. With two exceptions, Peter Morris and Anthony Urmani, the photojournalists he named had not worked for Team Video. I infer that the point of this testimony was to justify hiring these individuals instead of the 18 Team Video field technicians CNN did not hire.

I regard Coyte's testimony, e.g. (Tr. 15,438–15,444), to be simply argument support of CNN's contentions in this case. His testimony is also in many cases based on second-hand information and unreliable. An example of this is Coyte's testimony at Transcript 15,443 where he testified that Khalil Abdallah at Shannon Airport in Ireland, while on a VIP pool trip in March 2004, "was able to get off the plane and found a wi-fi in a pub in the airport and *cut the sound bites* and fed them in . . ." 9emphasis added); (also see Tr. 15,629, 15,669). Abdallah, however, made it clear that he did not "cut" or edit anything. He only transmitted sound bytes and possibly video via the Internet (Tr. 15,786–15,790). Similarly, Abdallah did not testify that he used "editorial judgment" on this occasion as suggested by Coyte (Tr. 15,669).

Similarly, Coyte testified as to how Abdallah's ability to speak Arabic has helped CNN producers by virtue of Abdallah getting the nuance of a story and explaining it to them (Tr.

---

[86] I also note that CNN introduced TPMPs which in many, if not most, instances are unsigned by either the employee being reviewed or the reviewer. In some cases, such as the 2005 TPMPs for the New York photojournalists, it is not clear who did the review. Danny Meara, whose name appears on many of these 2005 reviews as the reviewer, did not become manager of the photojournalists in New York until 2007.

CNN AMERICA, INC.                                                    83

15,444). Abdallah did not give any first-hand corroboration for Coyte's assertion when CNN called him as a witness.

Another example as to the unreliability of Coyte's testimony is his response to my questions as to the frequency with which digital newsgathering techniques (DNG), Final Cut Pro and FTP were being used by D.C. photojournalists in March and June 2004. There is no evidentiary support for Coyte's assertion that by June 2004, 5–7 photojournalists or as many as 10–15 crews would have been out on an assignment using these techniques on a given day (Tr. 15,470–15,471). In fact, the record, including the testimony of CNN's witnesses Doug Schantz and Khalil Abdallah, indicates that use of such techniques by D.C. photojournalists during 2004 was extremely rare.

Moreover, on December 6, 2003, former TVS photojournalists were at a disadvantage vis-à-vis some or most of the nonTVS photojournalists only with regard to their experience with the Final Cut Pro editing program. Many of the nonTVS photojournalists had no greater familiarity with FTP transmission techniques or the easily acquired ability to use satellite transmission, e.g. (Tr. 15,482–15,486).

CNN's Exhibit 544, its Washington payroll records, belies any contention that the nonTVS employees hired in the Bureau Staffing Project are superior to those former Team employees hired. The photojournalists who were hired effective December 6, 2003, in the D.C. bureau and who were subsequently promoted to senior photojournalist are all former Team employees: Brian Yaklyvich, Mark Walz, Ernest (Skip) Nocciolo, Peter Morris, Maurice George, and Martin Dougherty.[87] Coyte mentioned George as a photojournalist he would not send on an assignment that required editing (Tr. 15,582). This indicates that FCP skills are not as critical to the work of a photojournalist as CNN suggests. It also suggests that the TPMPs are not necessarily an accurate reflection of CNN's assessment of its photojournalists. TPMPs do not directly affect the amount of an employee's annual raise (Tr. 15,643).

Moreover, the relatively inexperienced nonTVS photojournalists hired during the BSP are still paid substantially less than the former TVS photojournalists. As of February 2008, for example, the annual salaries of John Bena, Jeremy Harlan, Ron Helm, and Jeremy Moorhead were less than $77,000 compared to salaries ranging anywhere from approximately $80,000 to $88,121 for former TVS photojournalists, such as John Bodnar. Former TVS senior photojournalists such as Anthony Urmani had salaries of up to $95,036 in February 2008.[88]

---

[87] In New York, three of the six individuals hired as senior photojournalists were former TVS unit members. Two of the three nonTVS senior photojournalists (Burgess and Ramirez) left New York shortly after they were hired. Since 2004, three former TVS unit members in New York and nonTVS unit members have been promoted to senior photojournalist, Tr. 11487.

[88] As of February 2008, the only former TVS photojournalist making less than $80,000 was Ken Tuohey, who left CNN in May 2004 and was rehired in March 2006, at a lower salary. Those nonTVS photojournalists who worked for CNN before December 2003 or other Turner companies such as Newsource (Schantz, Yarmuth, Britch, Haan, Swain, and Abdallah) appear to have higher salaries than those who did not work in the Turner system prior to the BSP.

## Evidence Regarding NonTVS Applicants who were Hired by CNN

### Khalil Abdallah

Khalil Abdallah has obviously had a successful career with CNN. However, at the time of the Bureau Staffing Project, CNN did not have a nondiscriminatory basis for hiring him instead of a number of Team technicians it did not hire. Abdallah worked for a local CBS affiliate for 18 months to 2 years and then was hired by CNN Newsource in Washington, D.C., in about August 2000. He performed a number of tasks for Newsource including shooting and editing. Most, if not all, the editing Abdallah did for Newsource was tape to tape (Tr. 15771). Towards the end of his employment with Newsource, Abdallah was introduced to Final Cut Pro. However, he did not use FCP for work done for Newsource (Tr. 15,830).

Abdallah testified that it was easy to learn FCP because it was similar to the Media 100 nonlinear editing system he learned in school (Tr. 15772). However, Abdallah had not used Media 100 in connection with his work at Newsource, either, Id.

Abdallah had a face to face interview on October 27, 2003, with Matt Speiser, Steve Redisch, and R. J. Fletcher, who was his direct supervisor at Newsource (Tr. 15,774). Fletcher apparently did not fill out an interview rating guide. Neither Redisch nor Speiser's notes of the interview indicate Fletcher's presence. At hearing, Fletcher testified that he did not believe he was one of the people who interviewed Abdallah (Tr. 5835). Abdallah's testimony establishes Fletcher was present at the interview and I find that Fletcher's testimony is not the result of faulty memory. To the contrary, I find that Fletcher was aware that his participation in Abdallah's interview, and Bethany Chamberland Swain's interview, who he also supervised (Tr. 16053), gave these two applicants an unfair advantage vis-à-vis the Team applicants.[89]

Steve Redisch rated Abdallah's interview with 3-4s and 2-3s. Redisch cited as strengths: Lots of live experience; speaks Arabic, nonlinear editing experience; goal oriented, and Washington experience. As concerns he noted that Abdallah was "short on specific examples."

Matt Speiser's notes of his interview with Abdallah note that, "he shoots in the field and edits in house on FCP. All field editing is done in the truck tape to tape." Speiser also noted that Abdallah bought Final Cut Pro for personal use. Speiser gave Abdallah 2-4s and 3-3s. He did not note any strengths or weaknesses on his rating sheet (GC Exh. 228. tab J, B# 14778). Abdallah's average interview score, 3.4, was lower than a number of TVS unit cameramen who were not hired.

On a butcher block prepared at the debriefing Abdallah was rated "possible +." Although motivation/work ethic were listed as a strength, work ethic/follow through was listed as a developmental area. Other strengths listed were: creative, technical skills, NLE, initiative, shooter-good, and troubleshooting.

---

[89] Fletcher initially also claimed that he did not remember whether he interviewed Chamberland/Swain, Tr. 5837. Then, he testified that he and John Courtney interviewed Chamberland in person, rather than by telephone, which is inconsistent with her testimony, Tr. 5838, 16,053.

84          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Abdallah was rated the 48th most desirable candidate, lower than Chris Hamilton and Mark Marchione, TVS unit members who were not initially hired. John Courtney did not rate Abdallah in his top 55 candidates.

CNN decided to hire Abdallah on December 1, 2003, when another nonTVS candidate, Ron Couvillion took himself out of consideration for a photojournalist position. When that occurred, Matt Speiser informed Cindy Patrick that the next person on the list was Mike Greene, a TVS bargaining unit member. Greene had been a union negotiator in collective bargaining with TVS.[90]

### John Bena

John Bena had no more that 3 years of experience in the Broadcast Industry and only 2 years of "shooting experience" when he was hired by CNN. Indeed, when Rick Denius screened Bena on the telephone on October 6, 2003, his impression was that he had only 1 year of "shooting/Eng experience," less than the minimum qualifications for the photojournalist position (GC Exh. 228, tab K, B# 11354). Thus, Denius deemed that Bena did not even have enough experience to warrant an interview (CNN Exh. 511; GC Exh. 228, tab K, B# 9499). Three weeks later, at the urging of Dan Young, who had looked at a demo reel, Denius sent his interview notes and Bena's resume to Matt Speiser (Id., B# 9421).

Bena had been employed by Capital News 9 in Albany, New York, a Time Warner station, for little more than a year. His salary at Capital News 9 was $30,000 per annum. While he performed nonlinear editing on a Pinnacle Vortex system, his only experience with Final Cut Pro was at home—just like unsuccessful TVS applicant John Urman.

Dan Young interviewed Bena on November 3, 2003. Young appears to be the only CNN hiring manager who interviewed Bena. He graded Bena with 3-4s and 2-3s on his interview rating sheet. In his concerns, Young opined, "[N]ot sure if he's ready for prime time" (Id., B# 16973). Despite these concerns, Bena ended up as a "strong possible" candidate and was rated the 26th most desirable applicant. Young rated Bena 39th; Speiser 36th; Redisch 21st; Fletcher 18th; and Courtney 15th. There is no rational nondiscriminatory explanation in this record for such a favorable rating compared to many TVS candidates. When he started working for CNN, Bena did not know how to use an audio mixer, a piece of equipment regularly used in the field by CNN photojournalists. Elizabeth Zosso, a former TVS camera operator, showed Bena how to operate this piece of equipment (Tr. 6050–6052).

### Bethany Chamberland Swain[91]

Rick Denius conducted a telephone screen with Bethany Chamberland Swain, a director/editor at Newsource, on October 21, 2003 (CNN Exh. 689, tab 19, B# 122811, 11376). Denius' notes indicate that Chamberland/Swain shot video very little for Newsource. Swain was not scheduled for a followup interview until 3:20 p.m. on November 5, the first day of the debriefing/selection meeting. Chamberland/Swain was interviewed on the telephone by R. J. Fletcher, her supervisor at Newsource, and John Courtney at 5:30 p.m. on November 5, the first night of the debriefing session (Tr. 16,053; GC Exh. 228, tab C, B# 14921). Swain was at her home during the interview.

CNN's Exhibit 64 and General Counsel's Exhibit 228, tab C, B# 14895 establish that CNN did not have a demo tape from Chamberland/Swain when a butcher block was initially created for her. Swain could not recall when she submitted a tape or whether she submitted more than one (Tr. 16,053–16,054). Matt Speiser could not recall if a demo tape by Chamberland/Swain was shown at the debriefing session. He could also not recall whether Dan Young commented about her shooting at the debriefing.

R. J. Fletcher, on the other hand, testified that he told Chamberland/Swain that her tape had not been received by Dan Young, so she prepared another one or a copy and brought it to the debriefing session. Swain did not testify that she went to the debriefing session personally.

Fletcher testified that Chamberland/Swain's tape was discussed at the debriefing session and that the hiring managers thought it was good (Tr. 5908). I deem Fletcher to be a completely unreliable witness given his hesitancy to acknowledge that interviewed his own employees. Steve Redisch, moreover, gave no indication that he saw a Chamberland/Swain tape at the debriefing (Tr. 5699). Since there is no testimony as to when and how Swain submitted a second tape, I find that CNN has not established that its hiring managers reviewed a demo tape or reel put together by Bethany Chamberland/Swain before it ranked her, which assumedly was done no later than November 6.[92]

According to her boss at CNN Newsource, R. J. Fletcher, Bethany Chamberland/Swain was not principally a photographer (Tr. 5835). Indeed, she described herself as a director/editor on her November 6, 2003 application to CNN (CNN Exh. 689, tab 19, B# 12281).[93] That may explain why Fletcher ranked her 53d, lower than the other four hiring managers.[94] She was rated a possible plus and the 42d most desirable candidate despite concerns about her lack of network level shooting

---

[90] I specifically discredit Cindy Patrick's testimony at Tr. 14913. She testified that if one of the top 39 candidates for photojournalist declined CNN's offer of employment, the hiring managers "regrouped" and decided which applicant would get the next offer. There was a meeting on November 18, 2003, at which the rankings of photojournalist candidates were reordered to the detriment of TVS bargaining unit members Chris Hamilton and Mark Marchione. However, not a single hiring manager (Speiser, Redisch, Fletcher, or Courtney) gave any indication in their testimony that any other regrouping occurred, such as when Ron Couvillion declined CNN's offer on or about December 1, 2003. Moreover, nobody testified as to what transpired at the November 18 meeting.

[91] Chamberland Swain was married sometime after December 6, 2003. She is referred to by her married name, Bethany Swain, at some portions of the transcript.

[92] Assuming Fletcher's testimony is accurate it indicates disparate treatment vis-à-vis TVS cameraman Larry Langley. The hiring managers did not have a tape from Langley at the debriefing and nobody called him to bring one in so the hiring managers could review it, Tr. 5610.

[93] On other documents she described her position with Newsource as director/editor/photographer.

[94] On the other hand, Fletcher may not have wanted to lose her.

and field experience. At the November 18 meeting, Chamberland/Swain was moved ahead of TVS bargaining unit employees Mike Greene (# 40) and Chris Hamilton (#41) on the list of preferred candidates.

Mike Haan and Jerry Appleman

Cindy Patrick authorized job offers to TVS bargaining unit employee Mike Greene and two nonbargaining unit members, Mike Haan and Jerry Appleman at 5:16 p.m. on December 4, 2003, the day before the TVS contract ended. (GC Exh. 228 tab M, B# 22420). Haan worked for CNN Atlanta in media operations. He was not principally a photographer. CNN hiring managers had concerns about Haan's lack of field shooting experience. Dan Young's assessment of Haan's demo tape was, "not enough to go on, not enough experience" (CNN Exh. 64).

Appleman apparently reconsidered CNN's job offer within a few days of his arrival in Washington and returned to Atlanta. Both Haan and Appleman were ranked lower at the debriefing session than TVS employee Chris Hamilton who was not hired during the Bureau Staffing Project. Appleman was also ranked lower that TVS unit member Mark Marchione, who not hired until January.

Jeremy Harlan

Jeremy Harlan had 3 years of experience as a photographer when he was hired by CNN. He had no familiarity with Final Cut Pro, although he had experience with another Apple-based nonlinear system.[95] Harlan was interviewed by Dan Young on October 25. Young expressed concern about Harlan's background in nonlinear editing and questioned whether he was too arrogant. He gave Harlan a 4 in all 5 interview categories. At the debriefing session, Harlan was rated the 33d most desirable candidate.

CNN started checking Harlan's references on November 10. He received glowing recommendations from several individuals who had worked with him previously. However, Harlan's references were not uniformly positive. One individual at a former employer told CNN that they would not rehire him and declined to say why he left their employ after 1 year.

On November 21, 3 days before CNN sent Harlan a job offer, it called his then current supervisor at KOAT in Albuquerque and a reporter who had worked with Harlan at the other station that had given a negative reference. Both gave Harlan a glowing recommendation. What is significant in Harlan's case is the extent to which CNN made efforts to get feedback from individuals who actually were familiar with the quality of his work. It did not do this with the TVS applicants.

Ron Helm

Ron Helm was an editor, not a photographer with CNN in Atlanta. Rick Denius, after his phone interview with Helm, noted that he was "light on shooting experience, but he is a strong non-linear editor (Avid)." As noted before, Final Cut Pro, the nonlinear system that CNN planned to use in the field in a different system than AVID; Helm had little or no familiar-

ity with Final Cut Pro. Dan Young noted that Helm's "shooting is good, not exemplary but could grow into this role." (GC Exh. 228, tab O B# 21624).

In the debriefing, Helm was rated 43d in desirability. NLE was noted as a strength despite his lack of familiarity with Final Cut Pro.[96] His developmental areas were job knowledge and people skills. At the interview, Helm stated that he lacked hard news experience (Id. B# 14345). He accepted a job on November 21, 2 weeks before CNN offered a job to TVS unit member Mike Greene, who was ranked 40th.

Jay McMichael[97]

Jay McMichael "worked for CNN (through subcontractors) in Washington for 13 years" (GC Exh. 228, tab P, B# 12333). However, he left Team Video to go into business for himself in June 2002; thus, for successorship purposes McMichael did not count at a TVS bargaining unit member. McMichael applied for the photojournalist manager position that was awarded to Ben Coyte in the Bureau Staffing Project.

It is not clear from this record if anyone interviewed McMichael for a photojournalist position. His name does not appear on General Counsel's Exhibit 266, which is a composite of interview rating scores for the D.C. photojournalist candidates. McMichael was apparently evaluated in a debriefing session, although possibly not the one in which photojournalist candidates were evaluated.[98] The weaknesses noted include "limited NLE" and "inside knowledge maybe a concern."

Jeremy Moorhead

Jeremy Moorhead had been a photojournalist/microwave truck operator/editor for the local Fox station in Baltimore, WBFF, for little over a year when he was hired by CNN. Prior to that he had 1-1/2 years of similar experience for a local station in Youngstown, Ohio.

CNN recruiter Rick Denius conducted a telephone screen with Moorhead on October 9, 2003. After the interview he sent an email to the photojournalist hiring managers in which he did not recommend Moorhead for face-face interviews. (GC Exh. 228, tab Q, B# 9480). Dan Young apparently overruled this recommendation on the basis on the demo tape Moorhead submitted.

On October 27, when forwarding Moorhead's résumé to Matt Speiser, at Dan Young's request, Rick Denius expressed a concern that Moorhead had "2.5 years total Photog/ENG experience, no Washington experience" (GC Exh. 228, tab Q. B# 16903). This is less than the 3 years minimum experience that CNN stated was required for the photojournalist position in its position description of May 20, 2003 (GC Exh. 227). Spreadsheets tracking the candidates during the Bureau Staffing Project gave Moorhead credit for 5 years of experience, although he seems to be given credit only for 2 years of shooting experi-

---

[95] Thus, Harlan was in the same position with regard to nonlinear editing as James Norris, a TVS applicant who was not hired.

[96] This demonstrates disparate treatment of TVS applicants such as Jim Norris.
[97] His given name is Samuel Jay McMichael.
[98] The butcher block at B# 12345, GC Exh. 228, tab P, looks different that any others for a photojournalist candidate. "PJ" is not written in the top left-hand corner. Weaknesses, rather than developmental areas, is the title of the right hand column.

86                DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

ence and 2 years of editing experience. In summary, it is not clear that Moorhead met the minimum requirements stated in the position description.

Matt Speiser interviewed Moorhead in person on November 4; Dan Young, who had already pushed for Moorhead's consideration, participated on the telephone. Young gave Moorhead 2-5s and 3-4s. Speiser gave Moorhead 1-4 and 3-3s. In the debriefing session, Young was rated the 27th most desirable candidate; Dan Young rated him 15th. NLE was listed as one of Moorhead's strengths. However, his nonlinear experience appears to have been mainly or possibly exclusively with AVID, not Final Cut Pro. Matt Speiser noted that "he has used FCP," but nothing about Final Cut Pro appears on Moorhead's résumé.

CNN began checking Moorhead's references on November 13, and offered him a photojournalist position on November 24, at $60,000 a year. Only Moorhead, John Bena, Jeremy Harlan, and Jerry Appleman were offered $60,000; all other successful applicants were offered more. The 8 applicants hired as senior photojournalists were offered $80,000 per year; 11 photojournalists were offered $75,000 as a base salary.

### Bryan Pearson

Bryan Pearson was an editor/photographer with CNN in Atlanta. He had experience with Final Cut Pro while on assignment in the Middle East. CNN raised its initial salary offer to Pearson to $74,000 per year in order to get him to accept its offer of employment in Washington, D.C.

### Jose Santos

CNN hired Jose Santos as a senior photojournalist. Santos was an experienced photographer with field experience using the AVID nonlinear editing system. It is unclear whether he had any significant experience with Final Cut Pro and if he did, it appears he was not comfortable using it (GC Exh. 228, tab S, B# 16834, 16824).

### Doug Schantz

Doug Schantz was an advanced video tape editor with CNN in Atlanta. Rick Denius noted that Schantz "shoots once a week" for a field production unit. In 2003, prior to his interview for the BSP, Schantz went to Iraq for 6 weeks as a one-man band photographer/editor.

Prior to 2002, Schantz' nonlinear editing experience was with the AVID and Pinnacle Blue edit systems. In 2002, Schantz was introduced to Final Cut Pro by Dan Young and was essentially self-taught. He used FCP for the 6 weeks he was in Iraq.

After interviewing Schantz on October 21, John Courtney, his supervisor's boss, expressed a concern about his experience, but rated him very highly based on his teamwork, motivation and creativity (GC Exh. 228, tab T, B# 17250). Dan Young, with whom Schantz had also worked closely, rated him very highly as well. Schantz and other CNN employees were paid $8000 in relocation expenses to move to Washington, D.C.

### Ken Tillis

Ken Tillis was a photographer with CNN Newsource in Seattle. He was very skilled in Final Cut Pro. Dan Young's review of Tillis' demonstration tape was lukewarm. His notes read, "ok

stuff, not the best, want to see more" (GC Exh. U, B# 20554). By July 13, 2004, Tillis had applied for a transfer to Denver (CNN Exh. 506).

### Floyd Yarmuth

Floyd Yarmuth was principally an editor rather than a photographer for CNN in Atlanta. As noted at page 48, Rick Denius expressed concerns of about Yarmuth's lack of practical shooting experience, which caused Matt Speiser to e-mail Dan Young and others involved in the Bureau Staffing Project. Young then went to bat for Yarmuth, who was offered a photojournalist position.

Yarmuth did not accept CNN's initial salary offer for employment in Washington. It apparently raised the offer to $72,500 in order to convince him to accept the job (Id., B#s 21591, 21588). Yarmuth was also given relocation expenses of up to $8000 to move.

### New York Bureau Field Camera and Field Audio Technicians

During the Bureau Staffing Project, CNN hired 29 photojournalists for the New York bureau, at least in part based on a list generated at the CNN hiring managers' December 10–11, 2003 debriefing session (GC Exhs. 401, 429). Team Video employed 17 field camera technicians at CNN's New York bureau. CNN hired 13 of these 17. The four camera technicians it did not hire were James Peithman, who had worked for contractors at the bureau since 1980; Vincent Everett, hired at the bureau in 1982; Perry MacLean, who had worked at the bureau since 1984; and Brian Kiederling, who had worked at the bureau since December 1987. Kiederling was one of, if the not the most, active employee in union matters at the New York bureau.

TVS also employed 17 audio technicians at the New York bureau. During the Bureau Staffing Project, CNN hired only two of the TVS audio technicians as photojournalists: Jamie Wiener and Desmond Garrison. Had it not been for the fact that three individuals declined job offers from CNN, it would not have hired any of the audio technicians (GC Exh. 429).[99] Garrison, who was the least senior audio technician working for TVS, has developed into an "excellent photojournalist" accord-

---

[99] Thus, there is no evidence to corroborate Cynthia Patrick's assertion that Garrison was a "growth candidate" in the same sense than certain other nonTVS applicants were "growth candidates."

Five of the top 29 candidates on GC Exh. 429, a list generated at or after the debriefing meeting, did not begin work at the New York bureau as photojournalists. Three declined offers. There is some uncertainty as to what happened to the other two. CNN introduced evidence through witness Rick Denius that Stephen Jackson, a nonTVS candidate for photojournalist, was not offered a job. Jackson was ranked the 24th most desirable applicant at some point. I am uncertain as to whether Denius testified on the basis of first-hand knowledge. However, assuming Denius' testimony is accurate, there is no explanation as to why Jackson was not offered a position. Carlos Christen, ranked 28th on GC Exh. 429 was also not offered a job. As with Jackson, there is no explanation in this record for this decision, but see p. 86 for a further discussion of Christen's quest for a photojournalist position.

ing to Edith Chapin, CNN vice president and deputy bureau chief in Washington, D.C.[100]

John Duffy, TVS' director of field operations, made sure that the audio technicians were capable of performing camera work. He did so because when a camera operator was absent, he generally upgraded an audio technician to do camera work and hired a freelancer to take the audio technician's place.[101] In the spring of 2003, Duffy sent TVS audio technicians Tom Maney, Joe Cantali, and Juan Hortua to a camera operator's workshop in Oklahoma conducted by the National Press Photographers Association. None of these three audio technicians was hired by CNN (Tr. 11115, 11118, 11120, 11142, 11177).

Two of the TVS audio technicians who were not hired, Chris Roebling and Steve Burnett, maintained the equipment room for the cameramen and audio technicians. One worked in the morning; the other in the evening (Tr. 9240). After January 2004, their tasks were performed at times by Brian Gassen, who had not been a member of the TVS bargaining unit (Tr. 9264–9265, 9275; CNN Exh. 543).[102] CNN has not offered any explanation for the replacement of these bargaining unit employees. As discussed in the section of this decision regarding the engineering staff, Jeff Jaramello, although classified as an audio technician, drove the bureau's microwave truck. He was also replaced by individuals who did not apply for his positions as part of the Bureau Staffing Project.

CNN has over the course of time since January 17, 2004, moved increasingly towards the use of "one man bands," that is one technician who performs both video and audio work.[103] However, for some time after it employed its own technicians, CNN had substantial work that the TVS audio technicians could have performed, even without further training. Photojournalist Manager Jeff Kinney testified that initially after January 17, there were seven two-person crews doing general news and three two-person crews assigned to CNNfn.[104] Thus, including the two crew room managers and the microwave truck operator, CNN had work for at least 13 of the TVS audio technicians.[105]

Nowhere in this record is the pretextual nature of CNN's explanation for its conduct so clearly demonstrated by the training given by CNN on Final Cut Pro to all the photojournalists it

hired during the first 2 weeks of their employment. While a few of the photojournalists who had worked for CNN previously were familiar with Final Cut Pro, every other photojournalist was scheduled for several days of FCP training during the first 2 weeks of their employment. CNN's Exhibit 272 shows that the photojournalists were scheduled for the following amount of FCP training during their first 2 weeks:

Table 1: Former TVS employees:

| | |
|---|---|
| Frank Bivona | 3 days |
| Ken Borland | 4 days |
| Joe Capolarello | 4-1/2 days |
| Doug Carroll | zero days |
| Desmond Garrison | 3-1/2 days |
| Mike Gittleman | 3-1/2 days |
| Walter Imparato | 2-1/2 days |
| Tom Jurek | 3-1/2 days |
| Steve Machalek | 4-1/2 days |
| Daniel Meara | 3 days |
| Tom Miucco | 3 days |
| Saylor Phair | 2 days |
| Fred Schang | 2 days |
| Ricky Shine | 1 day—was off work the first week of his employment with CNN |
| Jamie Wiener | 2 days |

Table 2: CNN photojournalists who had not worked for TVS, name of former employer, and days of FCP training during the first 2 weeks of their employment at the New York Bureau:[106]

David Allbritton, CNN Frankfort, Germany, 1-1/2 days
Doug Burgess, WFAA Dallas, 3 days
Steve Coppin, KMGH Denver, 3 days
Richard Frederick, WNYT, Albany, NY, 3 days
Rod Griola, WCPO, Cincinnati, Ohio, 3-1/2 days
Rick Hall, CNN Chicago, 1/2 day
Neil Hallsworth, CNN London, 1-1/2 days
Bryan Kane, News 12, Long Island, 3 days
Effie Nadim, News 12, Westchester, 2-1/2 days
Gabe Ramirez, CNN Los Angeles, 2-1/2 days
Tawanda Scott, KVBC, Las Vegas, 1-1/2 days
Pelin Sidki, Freelancer, CNN London, not present during first 2 weeks—awaiting visa.[107]

---

[100] Chapin was managing editor and deputy bureau chief in New York at the time of the Bureau Staffing Project.

[101] However, Jonathan Smith credibly testified that about half his freelance work for TVS at the New York bureau was camerawork. He also testified that sometimes he was paired with a full-time TVS employee and sometimes with another freelancer.

[102] There is no evidence as to who was performing the crew room coordinator tasks between January 16 and April 2004, when Jeff Kinney hired Brian Gassen, Tr. 9381–9382; CNN Exh. 543.

[103] In March 2008, CNN had 21 cameras for its 27 photojournalists. Edith Chapin testified that there are situations where one man bands are completely inappropriate, Tr. 9246. The circumstances under which cameramen would work as one-man bands were an issue of contention between Local 11 on the one hand, and CNN, Potomac, and TVS on the other, GC Exhs. 467–469.

[104] CNNfn went off the air in December 2004.

[105] There is no evidence that the audio technicians not hired by CNN has less experience shooting than some of the CNN employees hired as photojournalists in D.C.

---

[106] Of the nonTVS photojournalists hired during the Bureau Staffing Project, a couple stayed at the New York bureau for a very short time. Gabriel Ramirez, who transferred to New York from Los Angeles, transferred back to Los Angeles 2 months later, on March 29, 2004. Doug Burgess, who previously worked at WFAA in Dallas, left the New York bureau on May 15, 2004. In the BSP they were considered the 2d and 3d most desirable candidates.

[107] When Karen Curry, Edith Chapin, and Dan Young interviewed Sidki by telephone on December 2, 2003, they had not received a demo tape from her, CNN Exh. 266; GC Exh. 522, vol. 4, B# 5281. There is no evidence in this record that any hiring manager reviewed and evaluated a tape from Sidki before CNN decided to hire her. Although Rick Denius sent an e-mail to the effect that Sidki would send a tape to Edith Chapin sometime after December 1, there is no evidence that such a tape was either sent, received or reviewed, B# 5292.

88                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Emmanuel Tambakakis, Freelancer, NY, 3 days
Gilbert De La Rosa, CNN NY, 3 days.

Jeff Kinney, the photojournalist manager in New York and one of the hiring managers in the Bureau Staffing Project, knew from personnel experience that virtually anyone with minimal computer skills could be trained to use Final Cut Pro adequately in 2 days. He testified that he was trained by Dan Young in Chicago in 2001 and then trained the rest of CNN's staff at the Chicago bureau; four photojournalists, three producers and one reporter Thus, Kinney knew that CNN didn't need a new work force to use Final Cut Pro and that it would be relatively easy to train the existing work force. At Transcript 9378–9379, Kinney discussed his experiences training the Chicago staff:

Q. So that was my question, how long did it take you to train members of the Chicago staff in final cut pro?

A. There is no hard answer on that because there are varying skill levels and kind of varying levels of computer skills.

There is one person who it probably took half a day. There were other people who after spending a couple of days with them, they got it. And we would kind of continually work on it.

Q. Take either example, the person who was computer literate, the half a day or the two-day person, at the end of that were they proficient enough to use final cut pro in work that they did?

A. Yes.

Q. Do you have a feel for on average how much training a photojournalist would require to become proficient enough to use that technology in the field?

A. It seems as if two days of training is—seems to be ample time.

Kinney's experiences in Chicago were replicated in New York, as he testified (Tr. 9444–9445):

JUDGE AMCHAN: During the first two weeks, the people that you hired, did everybody go through final cut pro training?

THE WITNESS: Yes.

JUDGE AMCHAN: At the end of that, did you give a test or make any assessment as to whether they were reasonably adept at doing it so they can do it in the field.

THE WITNESS: Again, it's a very subjective thing, and utilizing it in the field there are all kinds of extenuating circumstances that kind of determine how adept a person is.

For instance, sometimes you may have only 20 minutes to edit a piece and get it on the air. Other times you may have the better part of a day.

JUDGE AMCHAN: At the end of the two weeks, did you make any determination as to whether the people that took the training had been successfully trained or not.

THE WITNESS: At the end of the two weeks, every person who participated in the training had probably cut at least two or three news pieces in training scenario.

JUDGE AMCHAN: Did you make a determination as to whether any one of them just wasn't getting it.

THE WITNESS: I did not. No.

JUDGE AMCHAN: How much training of final cut pro did they actually have in those two weeks?

THE WITNESS: The majority of them had probably at least two full days.

JUDGE AMCHAN: Two full days?

THE WITNESS: Yes.

JUDGE AMCHAN: Anything else?

Q. Those two full days, are you saying about 16 hours then of final cut pro training?

A. Yes.

Q. And were they all adept at using the program after that training period?

A. In varying degrees.

Q. Ranging from what to what?

A. Ranging from being able to cut a very basic news piece to being able to use effects and graphics and create a very highly crafted production.[108]

### The Selection Process for New York Photojournalists

As with other parts of the selection process, exactly when, how and on what basis decisions were made with regard to the hiring of New York photojournalists remains a mystery. It is unclear who made the ultimate decisions, when they were made and on what basis they were made (see, e.g., Tr. 8476–8477, 9152–9155, 9239).

The testimony of the CNN's witnesses who attended the selection meetings is of questionable value given the fact that there is no documentation of what went on at these meetings and the fact that they testified 4-1/2 years after the fact. However, even to the extent they can be credited, it is apparent that CNN applied very nebulous standards to the applicants. Karen Curry testified that one consideration equal in weight to all others was, "what an individual would bring to the table" (Tr. 8381–8382). Whereas, Edith Chapin testified that an applicant's "story" was more important that the applicant's interview (Tr. 9141–9142).[109]

The debriefing or selection meeting at which hiring decisions were supposedly[110] made was attended by a number of individ-

---

[108] CNN witness Ben Coyte testified that some individuals had difficulty learning Final Cut Pro, Tr. 15,581–15,585. CNN witness Don Koehler, on the other hand, testified that, "from my experience, most editor/producers, or anybody who utilizes it [Final Cut Pro] finds it fairly easy to learn and use," Tr. 15956.

[109] Moreover, the testimony of the attendees is inconsistent on many issues. For example, Edith Chapin testified that she gave the other attendees her assessment of the work of the TVS applicants with whom she was familiar, Tr. 9150–9151. When the General Counsel examined him, Jeff Kinney testified that nobody spoke about their work experience with TVS applicants, Tr. 9344. Then when CNN counsel examined him, Kinney testified that Edith Chapin and Karen Curry gave favorable assessments of TVS applicants, Meara, Imparato, and Gittleman, at the debriefing session, Tr. 9406–9407. Karen Curry did not recall any discussion of Team Video applicants, Tr. 8399.

[110] I say supposedly because I am not convinced that hiring decisions were in fact made at the selection meetings. CNN Executive Producer Barclay Palmer interviewed about a dozen applicants for the photojournalist positions but was on vacation at the time of the debriefing/selection session. Palmer testified that prior to the selection meet-

uals, most notably Cindy Patrick, who had not interviewed any of the candidates. It was also attended by John Courtney, who reported directly to Patrick and had interviewed only several of the applicants. What role they played in the deliberations is unclear.

The most critical stage of the selection process occurred when applicants were placed in categories, such as "very strong possible," "strong possible," "possible +," "possible" and "possible minus." Candidates in the most desirable category, "very strong possible," were ranked above other candidates. The initial list of 29 applicants to be hired were either classified as "very strong possible" candidates or "strong possible" candidates. Only after five of these applicants either declined offers or were eliminated from consideration were offers of employment made to five applicants categorized as "possible +" (GC Exh. 429).

It is not clear as to when and on what basis these classifications were made. In fact, since no CNN witness was able to credibly describe precisely how this was done at the debriefing meeting or in what order applicants were discussed, I infer that this categorization may have been done prior to the debriefing meeting (Tr. 9473–9477). CNN's witness Jeff Kinney testified that Cindy Patrick and John Courtney were involved in this categorization (Tr. 9303). John Courtney confirmed that he participated in this classification, but denied that Patrick did so (Tr. 12,491–12,492).

There is no evidence as to how great or small a role Patrick and/or Courtney played in these deliberations, or the basis on which anyone rendered this critical assessment of each candidate (Tr. 9367–9368). Matt Speiser testified that in Washington, Courtney's role was to present, "more of a corporate view . . . what, overall the company needed as far as this workforce that was being hired in Washington and New York" (Tr. 4167). I infer that the corporate view was that CNN needed a work force without NABET.

It was at this stage, that some applicants, including many TVS unit members were effectively eliminated from consideration altogether (Tr. 9152). Among the applicants eliminated from consideration at this stage were Jim Peithman, a cameraman who had worked at the ureau for over 20 years and most of the TVS audio technicians (GC Exh. 429). Also effectively eliminated by this categorization process were longtime TVS cameramen Brian Kiederling, Vince Everett, and Perry Mac-Lean.

Courtney also ranked the candidates in numerical order, one of five persons who input was critical at the next stage of the hiring process (GC Exh. 429). Since he did not interview most of the candidates, there is no evidence as to what criteria he used in making his rankings.

The importance of the job interviews in CNN's hiring decisions is also very unclear. In fact they may not have mattered at all. Edith Chapin, the deputy bureau chief in New York,

indicated that the scores applicants received in the interviews were unimportant in making hiring decisions:

> To me this [G.C. Exh. 450, a sheet consisting of applicants' composite interview scores] wasn't a very helpful document. These are numbers. Every person comes with a story and the story is more important. [Tr. 9141–9142.]

Chapin also indicated that in hiring applicants, the individuals involved in the selection process were looking for "a balanced, composed work force." (Tr. 9171.) Although, she did not explain what balance CNN was seeking, I infer that it was a balance of TVS unit members and nonunit members that would allow CNN to avoid recognizing and bargaining with the Union.

### CNN's Failure to Hire Brian Kiederling

The basis for CNN's decision not to hire Brian Kiederling is particularly suspect.[111] He does not appear to have been placed in any category, such as "very strong possible," despite his 16 years of service at the New York bureau (GC Exh. 429). Certainly, the assessments of Karen Curry and Jeff Kinney, on the basis on their face to face interview, provide no clue as to why Kiederling was not hired or even rated in a category (GC Exh. 459).[112]

Curry and Kinney interviewed Kiederling on November 12, 2003. On her rating sheet, Curry assessed Kiederling to a "4," i.e., proficient, more than acceptable, in the categories of creativity, ethics, and integrity. She rated Kiederling 4/5, between proficient and excel (well developed expertise; highly skilled) in the categories of initiative, decision making and teamwork. As strengths, Curry noted that Kiederling had very varied skills as an engineer, editor, audio, and camera technician (Id., B# 153034). She deemed Kiederling to be a real problem solver, who shows initiative, had good New York knowledge and "was ready to embrace change." As a concern, Curry noted that she needed to see more of Kiederling's shooting. This comment may be due to CNN losing the first demo tape that Kiederling submitted.[113]

---

[111] Not only is CNN's failure to hire Kiederling as a photojournalist suspicious, it's failure to hire him as an engineer also suggests discriminatory motive. Jeff Gershgorn wanted to hire Kiederling and was overruled by an unnamed CNN official in Atlanta, Tr. 10,006-10,009.

On one hand, hiring Kiederling as an engineer would have been a departure from the BSP process, since Kiederling was not evaluated in the debriefing session for engineers. On the other hand, CNN hired several other individuals, none of whom were TVS employees, for engineering positions who had not fully participated in the Bureau Staffing Project interview/debriefing process.

[112] A number of photojournalist applicants offered jobs by CNN had lower composite interview scores than Kiederling, GC Exh. 450. These include: Adam Shumaker, Desmond Garrison, Effie Nidam, Gilbert De La Rosa, Jamie Wiener, Neil Hallsworth, Richard Frederick, Richard Shine, Tawanda Scott, and Thomas Jurek. His scores were also higher than those of Stephen Jackson and Carlos Christen, who were initially ranked high enough to receive a job offer. For some of the interview scores on GC Exh. 450, such as those for Rod Griola, who was hired, the interviewers' rating sheets are not in this record.

[113] There is no evidence in the record of any CNN hiring manager rendering an opinion about the quality of a demo tape submitted by Kiederling, see CNN Exhs. 261, 262; GC Exh. 430 . Barclay Palmer

---

ing he participated in at least five discussions with other hiring managers and with Cindy Patrick and John Courtney during which the merits of various applicants were discussed, Tr. 9473–9477. These discussions played a role in the decision as to which applicants were hired, Tr. 9479.

90                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Kinney rated Kiederling a "3," i.e., competent, with regard to the category of creativity; 4s in the categories of initiative, decisionmaking, and teamwork, and a 5 in ethics and integrity. In the category of "motivational fit," Kinney rated Kiederling Fit with a question mark.[114]  Kinney noted as Kiederling's strengths: linear editing, long history with CNN, strong shooter, team player, open to change.  As a concern he noted Kiederling's lack of experience with nonlinear editing (Id., B#153044).

By virtue of not being placed in any category at the start of the debriefing session, Kiederling was most likely eliminated from consideration for hiring.  In the numerical ranking of candidates, Curry rated Kiederling the 35th most desirable candidate, as did Kinney.  Dan Young rated Kiederling 31st.  John Courtney and Deputy Bureau Chief Edith Chapin did not include Kiederling in their list of the most desirable 50 applicants.  There is no explanation as to why this is so.  The record reflects that Kiederling was highly thought of by the CNN personnel who worked with him.  He was the only technical employee interviewed for CNN's memorial broadcast, "CNN 9/11 remembers."

More importantly, there is direct credible evidence that Chapin's failure to rate Kiederling was not her decision and was in fact mandated by officials in Atlanta.  Kiederling testified that within a few weeks of his last day at the bureau, Chapin had photographer Danny Meara hand him a personal note.  At hearing Kiederling produced the note (GC Exh. 488).  He testified that in response to the note he went to Chapin's office.  Kiederling asked Chapin why he was not being hired by CNN.  She responded, "[T]he decision wasn't made in New York" (Tr. 10,010).[115]

Kiederling had worked at the New York bureau since 1986 and had been a full-time cameraman since about 1998.  Vivian Foley, a senior CNN producer, sent an e-mail to Jeff Kinney in August 2004, recommending that Kiederling be rehired (CNN, Exh. 565, tab 15, B# 15203):

> I understand that there is a photojournalist position open.  I hear that one of our old star team playing cameramen, Brian Kiederling is applying . . . .
>
> I've worked long hours, on difficult shoots many times with Brian and I have nothing but great things to say about his work, attitude and professionalism . . . .

Kiederling had been a union shop steward for about 10 years at the time of the Bureau Staffing Project, primarily representing the camera operators and audio technicians, including free-

---

testified that he remembered seeing a tape submitted by Kiederling, but gave no opinion as to its merits, Tr. 9486.

[114] Given the record in this case, it is quite possible that the question mark was added sometime after Kinney filled out the rest of the rating sheet.

[115] CNN did not recall Chapin, who is currently a CNNA vice president and the deputy bureau chief in Washington.  Kiederling's testimony is therefore uncontradicted.  His account is consistent with Chapin's inability to testify as to when in the hiring process applicants were categorized as "very proven possible" candidates, and so forth, Tr. 9239.

Jesse Spilka, a CNN project engineer, said something very similar to Bob Cummings, Tr. 8687.

lance (daily hire) employees.  Kiederling was a member of the union negotiating team in collective-bargaining negotiations with Team Video.  In his interview for a photojournalist job with CNN in the fall of 2003, Kiederling discussed CNN's plans to increase the use of one-man bands with hiring managers Curry and Kinney (Id., B# 153037).

One-man bands had been a contentious issue between Local 11 and its contractors (Tr. 9940–9945, 10111).  Article 19 of the collective-bargaining agreement between Local 11 and TVS limited TVS' discretion in assigning it employees to one person field crews (GC Exh. 17, p. 20).  Section 19.7 of aticle 19 prohibited TVS from taking disciplinary action against an employee who refused to accept or complete a one-person assignment reasonably and in good faith.

Jeff Kinney's testimony at Transcript 9360–9364, when the General Counsel questioned him on his June 25, 2004 affidavit, contributes to my conclusion that CNN's decision not to hire Kiederling was discriminatorily motivated.  Kiederling's raising the one-man band issue at the interview doomed any prospect he had of being hired.  It demonstrated that he was not "as forward looking as other candidates:"

> Q. Does it say, I recall that Brian Kiederling was a strong candidate?
>
> A. Yes.
>
> Q. "However, I recall that he did not have the non-linear editing skills and he was not as forward thinking as other candidates, meaning he could not foresee the assignment and the potential needs of the assignment as well as other candidates."
>
> Is that correct, that that is what it says?
>
> A. That is what it says.
>
> Q. How did you make that determination?
>
> A. I think it was made based on my collective experience with all of the candidates.
>
> Q. You're saying he didn't have foresight.  How could you determine that?   I want to know what criteria you used to determine that he didn't have the foresight that other candidates had?
>
> MR. FASMAN: I'm going to object to this.  He's talking about in that paragraph, the final hiring panel where the final hiring decisions were made.
>
> She is now saying this was his determination.  That is not what it talks about.
>
> MS. FOLEY:  It says, "I interviewed Brian Kiederling and I sat in on the meeting where the interview panel made its final hiring decision.  I recall that he didn't have"—
>
> MR. FASMAN:  That is not him saying that.
>
> Q. Was that the collective decision or was that your decision?
>
> A. Which decision are you referring to?
>
> Q. The ones that were made in this paragraph 13?
>
> A. Can you clarify, please?
>
> Q. Sure.
>
> You said you recall that Kiederling was a strong candidate, is that correct?
>
> JUDGE AMCHAN: He said that.
>
> A. Yes.

Q. You recall that he didn't have non-linear editing skills, that's correct, correct?

A. Yes.

Q. And he was not as forward thinking as other candidates, how was that determined, that he wasn't as forward thinking as other candidates?

A. It was based on his answers and the interview.

Q. I understand that, Mr. Kinney. But what criteria do you use to determine whether someone is forward looking or not?

A. Sometimes maybe it had to do with how he saw the direction that the industry was taking, the role that various members of the news gathering team can and are capable of playing within the process of news gathering.

Q. Anything else?

A. I'm sure there are other things.

It's not one of those things where there are very strict, hard and fast parameters.

Q. So was this—there aren't any hard and fast parameters so therefore how do you make the decision when there aren't any hard and fast parameters?

A. Well, when I say there aren't any hard and fast parameters, there isn't a specific set of questions that we ask and then based on a person's response we determine whether this person is forward thinking or not.

I think when we say—when I say forward thinking, we're talking about creativity, something that is very subjective.

Q. So the criteria is very subjective, is that what you're saying?

A. I'm talking about Mr. Kiederling's answer when I talk about the creativity. And a person's answers could be—and the way they view the future, there are not hard and fast parameters regarding that. It's very—I think that's where the creative aspect comes into play.

Q. So there is no hard and fast criteria, would that be fair to say?

JUDGE AMCHAN: I'm confused by the questions and the answers.

Are you asking he didn't have any hard and fast criteria by which to judge Mr. Kiederling's answers?

MS. FOLEY: Exactly.

Q. Subjective, would that be fair to say?

A. I would say both the questions and the answers are subjective.

First of all, I would note that Kinney's statements about Kiederling in his affidavit and in this hearing are inconsistent with the assessment when he interviewed Kiederling, that Kiederling was "open to change" (GC Exh. 459, B# 153044). I infer that Jeff Kinney's rating of Kiederling as the 35th most desirable candidate at the selection meeting does not reflect Kinney's actual opinion of Kiederling as a potential employee. In the summer of 2004, Kinney contacted Kiederling and asked him to apply for a position as a Senior Photojournalist at CNN (Tr. 10,012–10,017). Although Kiederling was not hired, I infer that Kinney's call was motivated by his belief that Kiederling was a highly competent cameraman, who not only

was qualified to be a photojournalist, but also a senior photojournalist.[116]

### Other Peculiarities in the Recruitment and Hiring Process for Photojournalists

Among many factors that indicate that the Bureau Staffing Project was implemented with a discriminatory motive are the incompletely explained circumstances surrounding the recruitment and hiring of Gabe Ramirez, Doug Burgess, and Richard Frederick as photojournalists in the New York bureau. Ramirez transferred to New York from CNN's Los Angeles bureau. After 2 months in New York, he transferred back to Los Angeles. In the context of this case, I infer that Ramirez was recruited as a stop-gap measure to enable CNN to hire fewer former TVS employees. I suspect the same with regard to Doug Burgess, who returned to Dallas sometime in 2004.

### Richard Frederick

The circumstances surrounding the hiring of Richard Frederick is even more curious. Frederick applied online for a photojournalist position on October 5, 2003. Recruiter Rick Denius interviewed Frederick on October 10. Initially, Denius did not recommend Frederick for a face-to-face interview (GC Exh. 543, vol. 1, Derek Davis tab, B# 9465).

On October 27, 2003, Rick Denius sent an e-mail to BSP members recommending that Frederick be interviewed. It appears that Dan Young told Denius that Frederick should be interviewed, which itself is a departure from the process described by Denius.

Denius noted that Frederick was operating as a one-man bureau for WNYT in Albany. He noted that Young liked Frederick's tape and that he operated as a "one-man band." was editorially involved and journalistically involved.

Dan Young interviewed Frederick for a position in Washington and gave him an overall interview score of 3.2, lower than a number of TVS cameramen who were not hired (GC Exhs. 450, 266). However, at one point Frederick was ranked the 44th most desirable candidate in Washington, but was not hired in D.C. for unexplained reasons. Matt Speiser thought that there might have been a problem with Frederick's background check (Tr. 4193).

Nevertheless, in the middle of the selection/debriefing meeting for the New York photojournalists, some hiring managers took a break to interview Frederick over the phone. Edith Chapin gave Frederick very high interview scores, but noted that his nonlinear editing experience was minimal. (GC Exh. 520, B#154004). Karen Curry gave Frederick similar ratings, but noting that he had little network awareness or NLE experience (Id., B# 154014).

Frederick ended up being deemed the 26th most desirable candidate in New York and was hired. Whatever attributes Richard Frederick had, there is no indication that he was a better candidate than the TVS cameramen who were not hired

---

[116] To the extent CNN was motivated by Kiederling's discussion of one-man bands in his interview, it violated Sec. 8(a)(1) in that he was clearly engaged in concerted protected activity. Nevertheless, it is also clear that CNN did not hire Kiederling as part of its overall plan to avoid recognizing the Union.

92                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(Peithman, Kiederling, MacLean, and Everett), if judged on a nondiscriminatory basis.

### Bryan Kane

Recruiter Rick Denius initially did not recommend Bryan Kane for an interview for the photojournalist position. Three days later, he changed his mind.[117] Despite his lack of network level experience and nonlinear editing experience, Kane was rated the 29th most desirable candidate. He was given credit for his experience with tape to tape editing and "a little Avid years ago;" for which credit was not given to TVS applicants (GC Exh. 520, vol. 2, B# 1173,1206, 1216, GC Exh. 405).

### The Strange Case of Carlos Christen

In the fall of 2003, Carlos Christen worked for CNN en espanol in Atlanta as a full-time editor and part-time camera-man. He applied for photojournalist positions in Washington and New York. Christen was apparently interviewed by John Courtney and Dan Young, and possibly by Karen Curry and Edith Chapin, as well, in early November (CNN Exh. 693, B# 23904). However, there is no evidence of these interviews in this record. There is no evidence that he was interviewed more than once.

General Counsel's Exhibit 228, tab U, B# 20554–20561 contains what are apparently Dan Young's observations regarding the demo reels submitted for photojournalist applicants in Washington, D.C. On page B# 20555, there appears an evaluation of Carlos Christen's tape. There is a description of eight different scenes and then a summary, "on the bubble, no hard news, live stuff, needs work."

CNN's Exhibit 262 is purportedly Dan Young's observations regarding demo reels submitted by applicants for photojournalist positions in New York. On page B# 121184 there is an assessment of Carlos Christen's tape. The description of the eight scenes on Christen's tape is identical to that in the Washington observations. However, the summary is different. It reads, "fairly good shooter, wanted to see more news, live shots."

At the end of the ranking process in Washington, Christen was considered the 57th most desirable candidate, out of 60 applicants (GC Exh. 269, B# 39982). Nevertheless, CNN considered hiring him instead of more highly ranked candidates if Ray Britch was unable to accept its offer (GC Exh. 556).

After the debriefing session in New York, Christen was ranked the 28th most desirable candidate (GC Exh. 429). There is no explanation as to why Christen was ranked so highly in New York after being ranked so low in Washington. CNN decided not to offer Christen a photojournalist job in New York and to offer it to Gilbert De La Rosa, another nonTVS unit member instead (GC Exh. 520, vol. 2, B# 19050). There is no explanation for this in the record.

However, Dan Young's sent an e-mail on January 7, 2004, to Cindy Patrick and John Courtney. It states:

Met with Carlos this afternoon, he took the news like a trooper, fully understands the situation.

Given that we lost a lot of backup photographers to D.C., I will work with Bill to see if we can free Carlos up on occasion to help us out on assignments and strengthen his photography skills. [CNN 693, tab 7, B# 21580.]

The obvious revision or doctoring of Young's summary regarding Christen's tape calls into question the integrity of the entire photojournalist selection process.

### The Absence of any Credible Nondiscriminatory Evidence as to why NonTVS Applicants were Hired Instead of Team Video Bargaining Unit Members for Studio and Engineering Positions

#### Audio Designer, D.C.

A perfect example of the lack of specific evidence for the BSP hiring process concerns the audio designers in Washington. Anne Woodward was the only person who interviewed applicants for these positions. She was unable to give any specifics as to how the selection process operated.

#### Technical Director, New York[118]

In many cases it is unclear as to when hiring decisions were made. One example is the CNN's decision to hire Jorge Galvez as a technical director in New York and not to hire John Rappa. The only testimony regarding how and why this decision was made is Lew Strauss' testimony at Transcript 10,231–10,237. Strauss is CNN's senior director of operations in New York.

Strauss could not remember the date of the selection meeting or names of anyone present at the selection meeting for technical directors, expect for Steve Alperin. Strauss testified that he and Alperin discussed the strengths and weakness of the candidates being considered. However, Strauss gave no specifics regarding this discussion.

One of the applicants hired was Jorge Galvez, a director for CNN en Espanol in Atlanta. The record indicates that a number of CNN managers were of the opinion that Galvez was not qualified for the technical director position in New York.

On September 15, 2003, Lew Strauss advised Cindy Patrick and Robert Hesskamp that "I do not believe he [Galvez] comes close to having the experience to direct a primetime show on CNN domestic, Please advise . . . ." (GC 531, Studio, vol. V, technical director/director, B# 152139.) Bob Hesskamp responded that "he [Galvez] discovered that he wasn't the best TD. Couldn't create complex effects. He has the years to be qualified, but I don't think he has the real experience for a position like this . . . ." (Id., B# 152137.)

Cindy Patrick responded, "Someone should sit down with Jorge and tell him why he is not getting these positions, as he knows what to work on." Id. Strauss and Steve Alperin interviewed Galvaz on November 19, 2003, and gave him favorable interview scores. At some point he was deem to be the sixth most desirable candidate for the technical director/director posi-

---

[117] CNN notes that Beth Lasch, a TVS daily hire, also was given an interview after being initially not recommended. The difference is that Kane and Jeremy Moorhead and other nonTVS applicants were hired; Lasch was not.

[118] While technical directors for CNNA were generally Team employees prior to January 17, 2004, CNN employees performed the duties of director and technical director for CNNfn during normal working hours, Tr. 10,719–10,720.

CNN AMERICA, INC.                                              93

tion. John Rappa, a TVS bargaining unit member, was deemed the eighth most desirable candidate. Galvaz was hired during the BSP; Rappa was not. There is no evidence establishing a nondiscriminatory basis for this choice.

CNN hired Rappa was hired as a full-time technical director/director on December 31, 2004, almost a year after the BSP (CNN Exh. 549). That he was fully qualified for this job is established the following e-mail authored by Lew Strauss on December 7, 2004:

> With the resignation of Jeff Greenstein (effective date 1/14—but he's taking 1/13, 14 as PTOs) it is critical that there by [sic] no delay whatsoever extending an offer to John Rappa.
>
> Any delay will jeopardize the launch of HLN. John will most likely be assigned to American Morning. We need him here by the last week of December for him to be able to assume that assignment (John did the show at BSP Penn as a TVS employee. The only other TD who has done the show is being assigned to the HLN launch. [GC 531, Studio, vol. V, technical director/director, B# 20929.]

### Technical Director, D.C.

#### Who Decided Which Applicants to Hire for the Technical Director? When were these Decisions Made? Why did CNN not Hire Jimmy Suissa?

Another prime example of CNN's failure to present specific evidence as to how decisions were made during the Bureau Staffing Project involves the selection of technical directors in Washington, D.C. CNN, at page 258 of its brief, notes that, "the General Counsel elicited little or no evidence on the hiring of technical directors in Washington." However, once the General Counsel makes out its prima facie case of discrimination, which it accomplished, the burden shifts to CNN to demonstrate that it would not have hired individual bargaining unit members even in the absence of their protected conduct, and/or in the absence of their membership in the Team bargaining units, *American Gardens Management Co.,* 338 NLRB 644, 645 (2002). Thus, the absence of evidence as to why various bargaining unit members were not hired inures to CNN's detriment.

The hiring managers for technical director were Steve Alperin, a CNN manager from Atlanta, and Mike Maltas, a senior newsroom director, who worked for CNN in the Washington, D.C. bureau. Neither Alperin nor Maltas testified in this proceeding.

According to CNN's Exhibit 529, a selection and debriefing meeting for the technical director position took place at the D.C. bureau on Monday, November 3, 2003. There is absolutely no evidence as to who participated at this meeting and what transpired. An example, of the irregularity of the selection process is the comparative treatment of Jimmy Suissa, a very experienced Team applicant and Christian Keller, a very inexperienced nonTVS applicant.[119]

Jimmy Suissa worked at CNN's Washington, D.C. bureau for 18 years prior to the BSP. He applied for the technical director position during the BSP but never received any notification from CNN that he was not hired. On December 6, 2003, Suissa simply found himself unemployed.

Suissa was possibly the most active union member in the bureau. He was assistant to the president of Local 31 for 8 years until resigning that post in 2003. Suissa had been a shop steward for over 10 years. He was one of the Union's principal negotiators in collective-bargaining negotiations with Team Video. Of the union negotiators, Suissa was the one who most regularly aggravated Team's representatives (Tr. 6983, 15,375).

Alperin interviewed Suissa on October 27 and gave him a 5 in leadership (an excellent rating), 4-4s (more than acceptable), and a 3 (competent) in verbal and written skills (GC Exh. 534, vol. 5, B#14560). Alperin noted as strengths the fact that Suissa knew the D.C. facility very well and was a good troubleshooter. His only concern was "can we challenge him?"

Alperin and Maltas also interviewed Keller on October 27. Alperin gave Keller 4-4s and 2-3s. He opined that Keller was "very technical," but "a bit inexperienced." (Id., vol. 3, B# 14751). Mike Maltas was less impressed. He gave Keller 3-3s and 2-2s (not fully competent), including a 2 for technical skills (B# 19930).

The butcher block prepared by some unknown person at some unknown time for Suissa lists as developmental areas: leadership (in which Alperin gave Suissa a "5"), teamwork, lack of communication and teamplayer. In the absence of evidence to the contrary, I infer the concerns about Suissa's teamwork and not being a teamplayer are related to his vigorous efforts on behalf of Local 31. A similar butcher block for Keller lists as developmental areas: motivation and directing and TD experience. Strengths include initiative and technical knowledge.

At some point in the process, Suissa was rated the 10th most desirable candidate for technical director (B# 14544). Chris Keller was rated 9th and subsequently hired. There is no evidence as to who made this determination, when they made it or how they made it. It is also an indication of complete lack of correlation between the interview scores, rankings and the hiring decisions.

There is also no nondiscriminatory explanation for CNN's hiring of Jose Nunez as a technical director in Washington, instead of Suissa and other TVS applicants. Nunez, an employee of CNN Espanol in Atlanta, transferred to the D.C. bureau on December 29, 2003. As discussed earlier, there is no evidence that Nunez was evaluated in a BSP selection/debriefing meeting.

### Media Coordinators, New York

The selection meeting for media coordinators in New York was apparently held on December 9, 2003 (GC Exh. 508). There is no reliable evidence as to how selections were made or

---

[119] CNN's assertion at p. 75 fn. 54 and at p. 258 of its brief that Suissa was a statutory supervisor is incorrect. This is wrong even assuming that TVS' bargaining unit supervisors were "supervisors" pursuant to Sec. 2(11) of the Act and therefore not protected by the NLRA.

Suissa was a bargaining unit supervisor for a very short period of time and was relieved of these duties on February 12, 2003, long before the BSP, Tr. 5308; CNN Exh. 104. CNN's brief at p. 258 in fact mentions that fact that Team removed Suissa's shift supervisor's title.

94                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

by whom. However, the treatment with regard to Dan Scalley, a TVS applicant, strongly suggests discriminatory motive in the selection process.

Rob Fox interviewed Scalley on November 12, 2003, and found him to be "more than acceptable" in all rating categories. (GC Exh. 525, B# 4937). Ashley Blackmon interviewed Scalley on the same day. Her rating of Scalley differed only in the score for initiative; she rated Scalley a 3 rather than a 4.

At some point in the process, Scalley was rated a "possible" candidate. However, that was crossed out and he was rated to be a "not strong" candidate. There is no evidence as to how this determination was made. In the various rating sheets that are in the record, Scalley is not rated among the 34 most desirable applicants (CNN Exh. 540; GC Exh. 508). That Scalley was qualified for the media coordinator position is established by the fact that CNN hired him as a media coordinator on September 20, 2004 (CNN Exh. 543). He was named media operations employee of the month for March 2006 (GC Exh. 525, B# 123884).

The Engineering Department in the Washington,
D.C. Bureau

In the fall of 2003, Team Video (TVS) employed eight broadcast engineers at CNN's Washington, D.C. bureau. They were:

John Cunha the engineering manager, a TVS supervisor, who had worked at the CNN Bureau since 1992, including five years for TVS' predecessor.

Cunha was not a member of the TVS/NABET bargaining unit. Cunha is not a CNN supervisor and CNN therefore contends that he is a member of its bargaining unit;

Dennis Norman, who had worked at the Bureau as a broadcast engineer since 1987;

Jeffrey Adkinson, who had worked at the Bureau since 1996;

Bobby Clemons, who was hired by TVS in August 2001; Clemons worked at WMAR in Baltimore as a broadcast engineer from 1979 to 1999.

Ronald Kuczynski, who had worked for TVS in May 2002; Kuczynski had worked for ABC News as a broadcast engineer for 4 years, worked 10 years for Xerox and ten years for RCA Service Company.

Christopher Leonard, who worked for TVS since 1997 and had ten years of broadcast related experienced prior to 1997;

Nicholas Kiraly, who had worked for TVS since 1998, and had nine years of previous experience as an engineer in broadcast or broadcast related positions;

William Evans, who had worked for TVS since August 1998, and had similar prior experience to that of Kiraly.

All eight of these broadcast engineers applied for positions with CNN. They were interviewed in late October and early November 2003. There were two interviews, conducted one right after another by two teams of interviewers. One of the teams consisted of Tu Vu, the director of engineering at CNN's Washington, D.C. bureau, and Matthew Holcombe, a manager for CNN International in Atlanta. Vu had worked closely with

the TVS engineers throughout their employment at CNN's Washington bureau. Holcombe had no contact with any of these engineers other than during the 30-minute to 1-hour interview.

The second team consisted of Joseph Murphy, the information technology director at the CNN Washington bureau, and Rick Cole, who was an information technology manager in Atlanta. Murphy knew some of the broadcast engineers because he worked in the same building with him, but during TVS' tenure at the Washington bureau, there was little interaction between Murphy's IT department and the broadcast engineers. Thus, Vu was the only one of the four interviewers who had significant knowledge of how well these engineers performed their tasks.

CNN hired Cunha, Leonard,[120] Clemons, and Kuczynski as broadcast engineers in its newly designated broadcast information technology (BIT) department.[121] It also hired a CNN employee, Ken Stanford, as a senior BIT support engineer, without subjecting him to the interview and selection process (GC Exh. 534, vol. 4, tab for Gershon Peaks, B#64732). Shortly after September 30, 2003, Stanford's title and responsibilities were altered precisely to allow CNN to hire him without subjecting Stanford to the BSP process (GC Exh. 558). Before the BSP, Stanford and satellite truckdriver Scott Garber in New York were assigned to the CNN National Desk in Atlanta "so they would be nonunion," Id.

Since I have concluded that the Bureau Staffing Project was discriminatorily motivated with respect to the Washington photojournalists and the project was one integrated plan, I conclude that it was discriminatorily motivated with regard to all job classifications. However, there is independent evidence of discriminatory motive with regard to the D.C. engineers.

CNN did not hire Norman, Adkinson, Kiraly, and Evans. However, just 2 months after the end of the TVS contract, CNN hired Andre Parker as a BIT support engineer, and Jordan Placie, as a BIT field engineer (Tr. 2455; GC Exh. 256; CNN Exh. 544). During the BSP, Parker applied for a job as project manager, not as a support engineer (Tr. 2453). He was assessed to be a weak candidate for the position he applied for (GC Exh. 152; Tr. 2454).[122]

Matt Holcombe interviewed Placie on November 25, 2003, weeks after the November 5 and 6 debriefing/selection meeting for the BIT department in Washington (CNN Exhs. 529, 691, tab 19, B# 2198). Suzanne Mackiewicz, the CNN recruiter

---

[120] Leonard had terminal brain cancer when he was hired by CNN. After going to work for CNN, he operated the microwave truck, which he had never done before. While TVS had the contract at the D.C. bureau, the microwave truck was operated by cameramen, most frequently by Danny Farkas, who was not hired by CNN. CNN's Exh. 544 indicates that Leonard died in September 2004.

[121] BIT was later renamed BEST, broadcast engineering systems and technology.

[122] CNN recruiter Suzanne Mackiewicz contacted Parker on December 30, 2003. Parker applied for the BIT support engineer position on January 27, 2004. When Tu Vu interviewed Parker for the project manager position on October 28, 2003, he noted that Parker "does not have a broad background in both engineering and IT," CNN Exh. 691, tab 18, B# 21299.

CNN AMERICA, INC.                    95

notified Tu Vu and James Hebb on December 3. that CNN was looking to hire Placie (CNN Exh. 691, tab 19, B# 16082).

Vu responded the same day, "this candidate is more of an SNG candidate than an "engineer" in the true sense. He concedes that he lacks the component troubleshooting background and said that he would be willing to learn." Id. At this point, Team engineer Nick Kiraly, a competent engineer who had worked at the D.C. bureau for 5 years and who had gone through the BSP process, was still working at the D.C. bureau. Three days later, Kiraly was out of a job.

Marty Garrison, senior CNN vice president in Atlanta, approved the hiring of Placie on December 9 (Id. B# 51235). Thus, one way CNN avoided hiring too many unit members was by hiring employees who had not fully participated in the BSP process soon after it was completed.[123] This represents a blatant end-run around the supposedly nondiscriminatory BSP process. There is no evidence that CNN's hiring managers evaluated Placie in a debriefing meeting and compared him with the TVS applicants.

There is no nondiscriminatory explanation for the hiring of Parker and Placie, as opposed, for example, to Nick Kiraly (GC Exhs. 152, 134 tab N; CNN Exh. 689 tab 8). Indeed, Tu Vu, CNN's director of engineering, noted that Kiraly was, "versatile, able to tackle most field or studio maintenance or production projects" (GC Exh. 134, tab N, B# 21532).[124] Kiraly also had some IT experience, which CNN appears to have made

---

[123] CNN hired a number of nonTVS unit members in D.C., who had not participated in the BSP (see GC Exhs. 548, 550; CNN Exhs. 588, 633), soon after December 6, 2003, among them are the following individuals listed on GC Exh. 256:

Ivan Burketh, hired as an audio designer II on February 16, 2004. He worked for CNN for less than a year, CNN Exh. 544.

Francis Herbas, hired February 11, 2004, as a Studio Operator I.

Jean Renaud, hired February 2, 2004, as a Studio Operator II.
Jason Strachan, hired as a Studio Operator II, on February 16, 2004.

[124] When he testified at this hearing, Vu denied that Kiraly was capable of filling either the support or field engineer role, Tr. 1990. For this and other reasons, I deem Vu to be a generally unreliable witness. One of these reasons is Vu's lack of candor regarding the circumstances under which CNN decided to hire Jordan Placie and Andre Parker instead of Kiraly.

I would also note that Vu's written version of his interview guide for Kiraly rated him as a "4," i.e., proficient-more than acceptable, with regard to Kiraly's initiative, CNN Exh. 689, tab 8, B# 21577. A typed rating sheet, GC Exh. 134, tab N, B# 21532, purportedly prepared the same day, rates Kiraly a "3," "competent meets the criteria" in the category of initiative. Vu also noted as a concern that Kiraly was "not always a self-starter." On the same piece of paper, Vu gave Kiraly credit for taking initiative for studying for the MCSE networking certification.

The handwritten version of Vu's rating sheet for Kiraly gave him a "5" in interpersonal skills; the typewritten version gives Kiraly a "4." The handwritten score for client service appears to have been altered from a 5 or a 4 to a 3. In light of Vu's changes to his scores for unit member Oscar Romay, see fn. 38 herein, I infer these changes were not accidental and are the result of CNN's intention to discriminate against unit members such as Kiraly and Romay.

great pains to denigrate in its hiring process (Id., B#s 36610, 36618, 36628, 21532; CNN Exh. 689, tab 8, B# 21569).

As with the photojournalists, it is not exactly clear how the hiring decisions were made with respect to the D.C. engineers. Tu Vu testified that the ratings in the face-to-face interviews were one factor in the hiring decisions but "there are comments taken as well" (Tr. 1919). There is no evidence as to whose comments mattered in the hiring process and how they effected the hiring decisions. For example, Marty Garrison, a CNN senior vice president who was Tu Vu's direct supervisor, was, or may have been present at the meeting at which the hiring decisions were made. There is no credible evidence as to what role he had, if any, in these decisions. Jim Hebb, from CNN's human resources department, was also present. There is no credible evidence as to what role he played in the hiring process.

Secondly, there is no convincing nondiscriminatory explanation for these hiring decisions. The individuals hired by CNN instead of Norman, Adkinson, Kiraly, and Evans were not obviously better qualified. In fact, Tu Vu, at least, recognized this fact. On December 23, 2003, he sent out an e-mail which can only be characterized as motivated by panic. He reported that Clemons and Kuczynski were unhappy with their CNN salaries and were considering other employment. Vu reported that Clemons and Kuczynski told him that since the changeover they had "added work duties that only they are qualified to do." He apparently agreed with this assessment in that he advised that he "can not afford to loose either Ron or Bobby" (GC Exh. 595). In response to Vu's e-mail, CNN gave Clemons and Kuczynski a $3500 raise on January 2 and 16, 2004, respectively. The other former TVS rank and file engineer, Chris Leonard, also received a $3500 raise at the same time (CNN Exh. 544).

CNN hired Stephen Pless, whose broadcast engineering experience at the time consisted of a year and a half at CNN in Atlanta. After interviewing Pless, Tu Vu noted that he had, "very limited electronic maintenance experience; no experience in field production; no computer networking experience" (GC Exh. 134, tab G, B# 16181). Matt Holcombe expressed concern that Pless did not have "a lot of networking computers on IT; not a lot of broadcast experience" (Id., 16180).[125]

CNN also hired Craig Fingar, who in 2003 had 2 years commercial experience as a broadcast systems integration design engineer, plus 4 years of experience with television studios while a college student. Rick Cole opined that Fingar did not have as much experience as other applicants (GC Exh. 134, tab H, B# 16605). Matt Holcombe wrote that Fingar "has a good skill set that is different than most broadcast engineers, but lacking in some basic broadcast engineering stuff" (Id., B#

---

[125] The first page of GC Exh. 140 suggests on its face that at some point, CNN considered hiring Team unit member Nick Kiraly instead of Pless. All the names circled on this document are individuals who were hired during the BSP, except for Kiraly. It may also be that CNN decided to hire Jordan Placie instead of Kiraly for discriminatory reasons.

Additionally, GC Exh. 145 suggests that immediately after he learned that the Team contracts would be terminated, Tu Vu expected that CNN would hire Kiraly and Dennis Norman, Tr. 2424–2425.

96                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

16617). Tu Vu gave Fingar very high interview scores despite his "limited electronic component level troubleshooting experience" (B# 16603).

After he was hired by CNN as a BIT support engineer, Fingar did little, if any, work in the job for which he hired. He spent almost all of his time doing technical drawings Tr. 2739–2744, 2871–2872).[126]

The salaries at which CNN hired Pless ($50,000) and Fingar ($65,000) were far below what the TVS engineers were paid under the collective-bargaining agreement. Thus, by getting rid of the Union and some of its members, CNN appears to have saving itself a substantial sum in wage payments, as well as the amounts paid in penalties under the union contracts.[127]

CNN also hired Ron Fribush at $65,000.[128] Unlike other applicants, Fribush was interviewed over the telephone, not in person. Also unlike the other applicants, Fribush was not interviewed by all four hiring managers. He was interviewed by Matthew Holcombe and Tu Vu, but not by the IT hiring managers, Cole and Murphy.[129] Holcombe noted that Fribush did not have much IT experience, a factor that CNN relies on for not hiring TVS applicants.

_____

[126] Where it conflicts, I credit the testimony of Bobby Clemons and Ron Kuczynski over that of CNN managers, such as Tu Vu and Joe Murphy. Board law recognizes that the testimony of current employees that contradicts statements of their supervisors is likely to be particularly reliable. *Flexsteel Industries*, 316 NLRB 745 (1995), enfd. mem. 83 F.3d 419 (5th Cir. 1996). The testimony of current employees that is adverse to their employer is ". . . given at considerable risk of economic reprisal, including loss of employment . . . and for this reason not likely to be false." *Shop-Rite Supermarket*, 231 NLRB 500, 505 fn. 22 (1977).

I specifically credit Clemons' testimony at Tr. 2677–2679, 2682–2683 regarding his weekend work on computer-based equipment and use of computers while an employee of Team Video. Ron Kuczynski did not corroborate Clemons' testimony that Kuczynski was trained to fix the teleprompter on weekends, Tr. 2910. However, I find no reason to discredit Clemons' testimony that Clemons received this training and performed such work. Kuczynski worked Saturdays; Clemons worked Sundays. Moreover, Kuczynski testified that he did not recall being trained to fix the teleprompter; not that he was not so trained.

I note also that CNN could have called Craig Fingar, John Cunha, or other rank and file employees to testify as to who did what after December 6, 2003, but chose to rely on management employees instead. Fingar and Cunha were still working at the D.C. bureau as of February 2008, CNN Exh. 544. Cunha could also have testified regarding such matters prior to December 2003.

Finally, I am not inclined to accept Joe Murphy's testimony at face value. He testified that he and Rick Cole interviewed Ron Fribush over the telephone, Tr. 2089, 2097–2098. There is absolutely no evidence to corroborate this contention and no explanation as to why CNN does not have Murphy's and Cole's interview rating sheets for Fribush, GC Exhs. 134, tab J; CNN Exh. 689, tab 7. Moreover, CNN Exh. 30 also suggests that Murphy and Cole did not interview Fribush. I believe Murphy recognized that there is a consistency problem with CNN hiring Fribush without being interviewed by all four hiring managers, as were other applicants.

[127] Dennis Norman was paid more than the other TVS engineers.

[128] GC Exh. 270.

[129] CNN Exh. 30 contains only Vu's interview scores for Fribush. Holcombe's interview guide regarding Fribush is contained in GC Exh. 134, tab J. Vu's interview guide is found at CNN Exh. 689, tab 7.

Fribush was apparently self-employed, unemployed or semi-retired in the fall of 2003. Fribush had 12 years of experience in the broadcast industry. He worked for CNN for about one week, quitting his job on December 16, 2003.

One reason CNN has advanced for its hiring decisions was the merger of its information technology and engineering departments after the TVS contract ended. CNN hired four information technology employees into its newly designated broadcast information technology (BIT) department. Each of these employees, William McGraw, Nathan Payne, Thomas Benz, and Adam Eyasu, worked for CNN before the Bureau Staffing Project. They were essentially computer help desk technicians prior to December 2003. Their duties were primarily helping CNN employees deal with personal computer problems, such as logging on to the network. None of them had any significant experience in the type of work performed by the TVS broadcast engineers.[130]

One of the most glaring facts about the Bureau Staffing Project is that although some non-unit CNN employees supposedly had to compete for their jobs, as well as TVS employees, virtually none of them, either in Washington or New York, lost their jobs in this process, while about half of the TVS unit employees lost theirs. While the lack of IT experience was held against the unit engineers in the hiring process, the lack of engineering knowledge and experience was not held against the nonunit IT applicants. Indeed, even for the engineering positions, lack of knowledge and experience did not inure to the detriment of nonTVS applicants.

Moreover, it is clear that whatever knowledge and skills the TVS engineers lacked with regard to IT could have easily been cured by training. After the Bureau Staffing Project, the engineers were not required to be experts in information technology. Thus, it was not necessary to replace many of the engineers to rectify their lack of experience with IT issues or to deal with the new technology CNN has implemented at the D.C. bureau since 2003.

The TVS engineers that CNN did hire in the Bureau Staffing Project, Cunha, Clemons, and Kuczynski have had no problem adjusting to these changes (Tr. 2540). CNN has provided its engineering staff extensive training since 2003, such as digital newsgathering training and Macintosh server training (Tr. 2542–2547). Former TVS engineer Bobby Clemons was sent to an Apple training facility near Dulles airport to train him for his role in the installation of nonlinear editing equipment at the

_____

[130] McGraw began picking up some engineering skills at some point in time after the BSP.

After the end of the TVS contract, CNN claimed that the IT employees, who were not part of the TVS bargaining unit, were part of the CNN bargaining unit. This assertion that its bargaining unit is larger than the TVS unit, is an essential part of CNN's claim that it is not a successor employer to Team Video.

CNN AMERICA, INC.                                                97

D.C. bureau (Tr. 2681–2681).[131] Ron Kuczynski was sent to Minnesota for 3 days to train on the RTS intercom system.[132]

After the Bureau Staffing Project, engineers and IT staff also cross-trained each other to the extent it was necessary (Tr. 2117). There is no reason to believe that this could not have been done with the TVS engineering workforce, none of whom ever declined training opportunities from TVS or CNN (Tr. 2361).

When CNN Atlanta has made dramatic technological changes, such as installing server-based systems, it did not, as in its unionized bureaus, go out and get a new workforce. It trained the work force it already had (Tr. 2130).

There are many factors that lead me to conclude that the Bureau Staffing Project was discriminatory with regard to the TVS engineers. Tu Vu, CNN's director of engineering, testified that the TVS engineers could handle every maintenance issue that CNN had in 2003. He was the only interviewer who had any familiarity with the work of the TVS engineers. Vu gave no indication that he thought they were incompetent. Indeed, he testified that they were "working fairly smoothly" for him (Tr. 1774). Yet in ranking 14 engineering and IT applicants, Vu ranked the 4 most experienced TVS bargaining unit engineers at the bottom of his list.

Absent evidence that the job performance of Norman, Adkinson, Kiraly, and Evans was deficient, Vu's rankings are at best counter-intuitive. As Matthew Holcombe, another interviewer testified, an applicant's familiarity with the D.C. bureau, the equipment at the bureau, the documentation for projects, are, other things being equal, an asset. An applicant with this institutional knowledge, would ordinarily require less training (Tr. 2181–2183).

Assumedly to justify not hiring TVS engineers due to their lack of IT background, Tu Vu testified that CNN was looking for well-rounded job applicants in Bureau Staffing Project because:

. . . . Right now we operate a combined help desk, it doesn't matter whether it was a broadcasting call or an IT request, it all comes to one number. Our staff takes the requests equally. They don't wear an engineering label, they don't wear a broadcasting label, we need people to fill the duties and have the technical knowledge to work that. [Tr. 1913.]

Vu later contradicted himself:

Q. Now, isn't it true that even today, four years later, you still have engineers that mainly do traditional broadcast engineering work, and you also have employees that still do essentially the IT work that had been done before?
A. Not completely true.

I mean, in some instances we—I mean, we have cross-over, but as I mentioned earlier, in any given working arrangement, you have subject-matter experts.

So today, you know, when it comes to the switcher, who do we go to, we go to Bobby Clemons or Ron Kuczynski. They've been schooled in it, so yeah, that remains their work. It's not something you give the IT gentlemen. [Tr. 2345.]

Vu's later testimony was confirmed by the credible testimony of Bobby Clemons:

They [the IT employees] don't work on the tape decks, the camera, switchers, routers, any of the hardware and terminal gear. What we performed before we still perform. [Tr. 2697.]

Former TVS engineer Ron Kuczynski, credibly testified that he does not perform any traditional IT work. He will reboot computer based equipment, but if that doesn't work he will refer the problem to the traditional IT employees (Tr. 2863, 2867).

It is not true that the broadcast engineers and informational technology staff are fungible. Moreover, they were even less fungible in the period immediately following the Bureau Staffing Project than they are today. After the Bureau Staffing Project, the information technology staff was supervised by Joseph Murphy and the broadcast engineers were supervised by George Kinney.

Murphy testified that in the first few months of 2004, the information technology employees were not performing such traditionally broadcast engineering duties as fixing tape decks or cameras and generally pulled only IT cable (Tr. 2096–2097). Thus, I conclude that CNN's rationale for replacing its experienced unionized engineers due to their lack of IT background is pretextual.

The D.C. Studio and Control Room Employees

The Washington and New York bureaus differed somewhat with regard to which employees were bargaining unit members employed by Team Video. Technical directors who directed from various incoming lines onto the air were in the TVS bargaining unit. Also in the bargaining unit were stationary (pedestal) camera operators, robotic camera operators, tape technicians (who played tapes on air), audio technicians, and quality control technicians. Team lumped the studio employees together into a classification titled "master controller." Unlike New York, the employees who recorded incoming material from fiber optic (light) lines onto tapes in the "feeds" area in Washington worked for CNN, rather than TVS.

The hiring process for studio operators in D.C. provides numerous examples of how difficult it is to determine who made the hiring decisions during the BSP, when those decisions were made and on what basis applicants were selected.

With the exception of five individuals who were interviewed by Anne Woodward, all applicants for studio operator in Washington were interviewed by Troy McIntyre, then a CNN news production supervisor in Atlanta. Three of the five applicants interviewed by Woodward, who did not attend the debrief/selection meeting for D.C. studio operators, were hired.

---

[131] While Clemons had more of an IT background than the TVS engineers who were not hired, Kuczynski did not. However, Clemons required extensive training for the new technology implemented after 2003, so it is unclear how much his prior IT experience helped him.

[132] Kuczynski appears to have received less training than some other CNN engineers and has received no formal IT training. He did not have significant IT experience when CNN hired him in 2003.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

I regard McIntyre to be a generally incredible witness. Generally, I am not a believer in the proposition that one can determine whether a witness is telling the truth from their demeanor. However, I was struck by the fact that every time McIntyre was asked an important question, there was a very long pause before his answer. Also, there were changes made in the list of studio operator applicants to be hired that McIntyre did not wish to acknowledge.

McIntyre testified about a conference call that was held a few weeks after the debrief/selection meeting. McIntyre, Cindy Patrick, CNN's in-house counsel, Lisa Reeves, CNN Mmanagers Mike Maltas and Robert Jackson participated in this call. McIntyre testified "growth candidates" were discussed in this meeting and he identified several applicants ranked low on CNN's Exhibit 635, a list of applicants prepared by McIntyre, who were hired. CNN has offered no explanation for its reordering of this list.

I infer however, that the list was reordered so as to hire nonTVS applicants at salaries far below what the Team applicants were earning under the collective-bargaining agreement. The growth candidates were hired as studio operators level 1 at salaries of between $45,000 and $52,500. More experienced applicants, including a number of Team Video employees, were hired as studio operators level II, at salaries ranging from $65,000–$68,000 (GC Exh. 270).

On CNN's Exhibit 635 and on the butcher blocks, TVS unit members Adilson Kiyasu, Doug McKinley, and Dennis Faulkner are ranked 14th, 16th, and 22d, respectively. Nonunit member Chris Parks is 15th; Michael DeSilva is 18th; Darrell Jordan is 19th; Kevin Cawley is 20th; and Stanley Hailes is 21th. Freelancer Raeshawn Smith is 26th and freelancer Tawana Smith is 28th. In the Bureau Staffing Project all of the nonfull-time TVS employees mentioned above were offered jobs as studio operators. Of the three full-time TVS unit members, only McKinley was hired during the BSP and then only after a nonunit applicant declined a job offer. Kiyasu and Faulkner were hired later. It is thus obvious that the hiring lists were altered and CNN has offered no explanation for the alteration.

CNN appears to have hired about 20 studio operators in the BSP.[133] Eleven of them were relatively inexperienced applicants, none of whom were full-time employees of TVS. They were hired at a salary considerably below what the TVS applicants were being paid. TVS went to great lengths to hire some of these individuals as opposed to the TVS applicants. For example, on November 25, 2003, CNN offered a studio operator 1 position to Michael DeSilva at a salary of $45,000. Two obviously qualified applicants who were not hired in the initial BSP selections were bargaining unit members Adilson Kiyasu and Dennis Faulkner. That they were qualified is established by the fact that CNN hired both of them within 1-1/2 months of the end of the Team contract.

### Adilson Kiyasu

Troy McIntyre interviewed Kiyasu on October 28, 2003, he gave him mediocre interview scores, including a "2" in communication skills and determined Kiyasu not fit (GC Exh 534, vol. 3, B# 16342). However, in the debriefing/selection meeting, Kiyasu was deemed a strong possible candidate and ranked 14th out of 29 applicants (Id. B# 16326; CNN Exh. 635).

On November 17, 2003, CNN did two reference checks on Kiyasu: one from Chris Wiggins at NBC and another from Bob Armfield of Fox. Both were extremely positive (GC Exh. 534, at B# 16331 and 16332). On the staffing project salary worksheet dated November 18, Kiyasu is the 14th name on the list (GC Exh. 268). For reasons, totally unexplained, Kiyasu dropped in the list of desirable applicants. However, on December 4, CNN again decided to extend him an offer and checked another reference, Tina Lurie, a TVS manager. Then a decision was made to offer a job to another TVS unit member, Doug McKinley instead of Kiyasu (B# 21246, 21341, 16329).[134]

On December 12, 2003, Gershon Peaks, who was hired in the BSP, rescinded his acceptance without having worked for CNN except for 2 days of training on December 6 and 7. CNN Studio Manager Robert Jackson observed that "with the loss of Gershon we are down 4 studio operators. We are having major problems trying to staff the production week." (B# 19129). Despite reservations on the part of Cindy Patrick, CNN extended an offer to Kiyasu on December 15, at an annual salary of $65,000. Kiyasu resumed his work at the D.C. bureau on January 15. CNN also hired several studio operators who had not applied during the BSP; Jason Renaud on February 2, 2004, and Jason Strachan on February 16, 2004 (CNN Exh. 544).

### Dennis Faulkner

CNN hired Dennis Faulkner on December 22, 2003, at an annual salary of $68,000 to replace former TVS unit member John Davis, who had resigned after working for CNN for 2 days. Troy McIntyre interviewed Faulkner on October 27, and gave him mediocre interview scores. In the selection/debriefing meeting Faulkner was ranked 22d. On December 4, 2003, CNN did reference checks on Faulkner contacting: TVS Studio Operations Manager Tina Lurie, CNN Lighting Director Mike Poley, and CNN Assignment Editor Mike McManus. All gave Faulkner glowing reviews (GC Exh. 534, vol. 2, B# 15601–15603. However, CNN did not offer Faulkner a job at this point.

On December 8, 2003, Cindy Patrick e-mailed other CNN personnel as follows:

> John Davis has given us a two week notice resignation. We suspect something is going on. We need to check references

---

[133] As noted in fn. 119, soon after the BSP, CNN hired three studio operators in Washington, who had not applied and been interviewed during the BSP process. It also hired an additional audio designer in February 2004, who had not applied during the BSP.

[134] There was manipulation regarding the hiring process in McKinley's case as well. He was ranked the 16th most desirable applicant in the selection/debriefing meeting and his references were checked on November 17, 2003. An offer letter was prepared for McKinley on November 24, but was not sent. After working directly for CNN for 2 months, McKinley resigned and took a job with ABC at the end of January 2004.

on Dennis Faulkner, the next candidate on the list who knows QC.[135] [B# 19162.]

Robert Jackson, CNN's director of operations in D.C., offered Faulkner a job on December 8. However, Cindy Patrick informed other CNN managers that "no one is supposed to make offers until Lisa [Reeves, CNN in-house counsel] and I say go ahead" (B# 5375). Faulkner was hired on December 22, at a salary of $68,000 per year.

### Michael DeSilva

Michael DeSilva has had a successful career with CNN since December 2003 and now works at the New York bureau. However, there is nothing that would lead one to conclude that he was a superior candidate to many TVS applicants who were not hired during the BSP.

Troy McIntyre interviewed DeSilva on October 31, 2003. He noted that DeSilva was making $20,000 a year and was looking for a salary of between $30,000–$35,000. The interview scores McIntyre gave to DeSilva were mediocre; all 3s with a 2 for his technical skills. As a concern, McIntyre noted "not many specifics in answers." As strengths, he noted "looking to grow-advance." His interview scores were lower than those for Michael Kauffman, James Stubbs, and Keith Crennan, three TVS unit members who were not hired (CNN Exh. 633).[136]

At the debriefing/selection meeting, DeSilva was rated the 18th most desirable candidate (GC Exh 534, vol. 1, B# 16805; CNN Exh. 635). On November 22, before making any reference checks, Troy McIntyre verbally offered DeSilva a job (B# 22258).

On November 24, CNN did reference checks with three former employers, but not with WVIT, listed on his application as DeSilva's current employer (B# 133853). DeSilva asked CNN not to contact his current employer. (GC 534, vol. 4, tab for Raeshawn Smith, B# 22415). A human resource employee at WTVJ in Florida informed CNN that DeSilva was an intern, that it doesn't evaluate interns and would only rehire DeSilva as an intern (B# 16806).

CNN also called John Barron, listed by DeSilva as his supervisor at WLP TV in Springfield, Massachusetts. Barron told CNN he would not rehire DeSilva (B# 16807). CNN also called Alice Hashimoto who supervised DeSilva for 3 months as an intern at the CNN Accent and Health College Network. She gave DeSilva a very positive recommendation. On November 25, CNN sent DeSilva an offer letter and he accepted a position as a studio operator 1 at a salary of $45,000 per annum on November 28.

### Lack of any Correlation Between Interview Scores, Butcher Blocks, and Hiring decisions

It is virtually impossible in certain cases to discern any relationship between CNN's hiring decisions, the scores applicants received during their interviews and the entries on the butcher blocks. One example is a comparison of the record evidence

for an experienced TVS applicant, Jeff Noble, who was not hired, and an inexperienced nonTVS applicant, Chris Parks, who was hired.

Troy McIntyre interviewed Noble on November 4, 2003, either during or after the debriefing meeting. He rated Noble with 3-4s and 2-3s. McIntyre noted a number of strengths including quality control and camera experience and noted a concern only with regard to Noble's ability to operate the jib camera (GC Exh. 534, vol. 4, B# 15104).

McIntyre interviewed Parks on October 31, and rated him with 5-3s. He noted jib experience as a concern and as strengths: "can learn, great attitude, and potential for advancement." (Id., B# 16858).

On a butcher block, assumedly prepared at a debriefing session, CNN deemed Noble the 25th most desirable candidate for studio operator. CNN rated Noble as a "possible" candidate and listed his strengths as: "QC, shading, robo and studio camera, teamplayer, initiate and TD." Developmental areas listed on the butcher block were: jib and flexibility (Id., B# 15088).

Parks was considered a "strong possible" candidate on his butcher block. CNN listed as strengths: growth opportunity, great attitude, relevant experience in robotic and studio cameras, shading and lighting. However, as developmental areas, CNN noted that he was light on relevant experience and the depth of his experience (Id., B# 16844).

What makes it particularly difficult to discern any relationship between the interview, the deliberations afterwards and the hiring decisions is that Troy McIntyre was the only person who interviewed either Parks or Noble for the studio operator position.

### New York Bureau Broadcast Engineers

Team Video employed 15 broadcast engineers at CNN's New York Bureau. In the Bureau Staffing Project, CNN hired 6 of the 15; Ed Scholl, William Greene, and James Clarke were hired as senior BIT (broadcast information technology) support engineers. Juan Ortiz, Carmine Casella, and Brahms Lee were hired as support engineers. Ortiz and Scholl had worked at the bureau since the 1990s. Clarke was hired by Potomac Video at the CNN bureau in 2000. Casella, Greene, and Lee were hired by team video in the fall of 2002.

CNN did not hire the following TVS employees, who had worked at the New York bureau since the date indicated by the names:

| | |
|---|---|
| John Gallagher | 1995 |
| Hamid (David) Rokhsar | 1997 |
| Jeffrey Carlough | 1999 |
| Michael Diana March | 2002 |
| Robert Cummings May | 2002 |
| Brian Wood May | 2002 |
| John Diaconu | July 2002—hired by CNN after the Bureau Staffing Project. |
| Michael Sollenberger | August 2002 |
| Peter Hedeman August | 2002. |

CNN hired the following broadcast engineers were not employees of team video:

---

[135] It is not clear to what list Patrick is referring.

[136] Respondent's failure to hire Keith Crennan was directly related to his protected activities as a union steward. There is no question that Crennan was competent studio operator, Tr. 14,600–14,601; GC Exh. 534, vol. 1, B#s 2330, 37986; Tr. 15385.

100                           DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| Terrence Thomas | Associate BIT Support Engineer |
| Christopher Stewart (or Stuart) | BIT Field Engineer[137] |
| David Bingham | a CNN employee, BIT Resource Manager |
| Raymond Smith | BIT Support Engineer |
| Conroy Reynolds | BIT Support Engineer |
| Mike Voculescu | BIT Support Engineer |
| Arkady Labsovsky | BIT Support Engineer |
| Jose Lopez | Senior BIT Support Engineer. |
| Scott Garber | Senior BIT Field Engineer[138] |

Stuart and Garber were hired as senior BIT field engineer and BIT field engineer, respectively, even though they did not apply for or were interviewed for their positions during the Bureau Staffing Project.[139] After January 17, 2004, these CNN field engineers drove and operated two trucks, one a satellite truck; the other a microwave truck.

During the Bureau Staffing Project, CNN considered several candidates for senior BIT field engineer (GC Exh. 394, B#3894). It did not hire any of these applicants. One of these, team video employee Jeff Jaramello, drove and operated the New York bureau's microwave truck prior to January 17, 2004, although he was classified as an audio field technician. As of January 17, a CNN BIT field engineer operated the microwave truck. Later in 2004, this truck was upgraded to included satellite reception capability. CNN essentially replaced Jaramello with Garber and/or Stuart.[140]

Jeff Polikoff, CNN's vice president of technical operations in New York, offered what Respondent purports to be an explanation as to why Jaramello wasn't hired to operate the microwave truck. Polikoff testified that when he was hired by CNN in January 2003, he encountered Jaramello in the microwave truck and that Jaramello was very rude to him (Tr. 12701). Polikoff

---

[137] Referred to in the transcript as both Stuart and Stewart.

[138] The statement in the General Counsel's brief that CNN did not consider the senior BIT [field] engineer position to be part of the BSP is incorrect. CNN interviewed applicants for this position in New York, GC Exh. 394.

[139] That Stuart did not go through the BSP is established by the fact that his name does not appear on CNN Exh. 531, and Suzanne Mackiewicz' inquiry to Jeff Polikoff on December 15, 2003, as to whether he knew Stuart, GC Exh. 392B (tab for Conroy Reynolds), B# 20094. This inquiry was made a 1-1/2 weeks after the selection process for BIT engineers was purportedly completed.

Garber and Ken Stanford, CNN's satellite truckdrivers in New York and Washington, respectively, were assigned to the National desk in Atlanta prior to the Bureau Staffing Project "so they would be nonunion," GC Exh. 558. This exhibit, which consists of two e-mails, indicates that Stanford's title and responsibilities were altered precisely to allow CNN to hire him without subjecting Stanford to the BSP process. It also indicates that CNN intended to hire Scott Garber in New York without going through the BSP process as early as September 30, 2003.

On May 30, 2004, I asked the parties on the record whether there was any evidence that Scott Garber had applied and been interviewed during the BSP, Tr. 13408–13410.

[140] Vic Spinelli, mentioned by CNN Vice President Jeff Polikoff, as one of the truckdrivers in New York, was not hired by CNN until July 26, 2004, CNN Exh. 543. He did not apply for a job with CNN until March 18, 2004, CNN Exh. 551, tab 8.

---

also testified that later that year during the New York City blackout, Jaramello was not very helpful. Further, Polikoff testified that his opinion of Jaramello was based on these two incidents and he shared this opinion with his subordinate, Jeff Gershgorn, and mentioned them at the debriefing/selection meeting for the BIT department.

For one thing, assuming that Polikoff testified truthfully, his testimony establishes the malleable nature of the BSP selection process. Polikoff was not a hiring manager for the BIT department, but by his own testimony was able to influence the hiring decisions on the basis of factors not otherwise considered by the hiring managers.

Secondly, Polikoff's account is not credible. On November 3, 2003, 1-1/2 months after the August 2003 East Coast power blackout, Polikoff exchanged e-mails with TBS recruiter Suzanne Mackiewicz about Jaramello. The exchange is inconsistent with Polikoff's testimony. Mackiewicz characterized Jaramello as "a great candidate." Polikoff responded as follows:

> He is our present microwave truck operator from team. We agree. But we should also look to the outside. Jeff will need to be trained as a satellite uplink operator. Otherwise he's a good catch. [GC Exh. 394, B#14926.]

Jeff Gershgorn gave Jaramello a reasonably positive interview rating average, 3.5. There is nothing in Gershgorn's notes that corroborates Polikoff. Gershgorn rated Jaramello a 3 in "interpersonal skills." He listed as Jaramello's strengths: institutional knowledge, site knowledge, adapts to changes; thinks on his feet. (GC Exh. 394, B#s 25909; 25918.)

Michelle Lackey, the other hiring manager supervised by Polikoff, gave Jaramello an even more favorable rating: 4.17 as an average (Id., B# 1881). Lackey noted as his strengths: understands job well; communication with others; can handle stress. Lackey did not note any other deficiencies. Lackey rated Jaramello's interpersonal skills at 5; the best rating possible. So did her interviewing partner, Rick Cole (Id. B# 1891).

Matt Holcombe, the engineering hiring manager from Atlanta, gave Jaramello a 2 in interpersonal skills; however, this assessment is not based on Polikoff's experiences with Jaramello. Among Jaramello's strengths, Holcombe noted that he was "highly motivated."

There is no corroboration for Polikoff's claim that he discussed Jaramello's alleged rudeness with other hiring managers. I do not credit his testimony in this regard. There is no credible nondiscriminatory explanation for CNN's decision to replace Jaramello with Garber and/or Stuart.

The other nonTVS engineers hired by CNN were also not obviously more qualified than the TVS applicants. For example, at the time of the Bureau Staffing Project, Terrence Thomas worked for Matt Holcombe in Atlanta. Holcombe described Thomas at the time of his interview as "fairly green. . . . He didn't have a lot of experience in broadcast engineering" (Tr. 7786–7787).[141]

---

[141] When Thomas was interviewed for a position in Washington, Tu Vu rated Thomas, "not fit" for a BIT support engineer position, CNN Exh. 691, tab 28 B# 21689, and noted that he had little experience in

CNN AMERICA, INC.                                                          101

As with every other part of the Bureau Staffing Project, just how these choices were made remains a mystery. Matt Holcombe testified that in the selection meeting great weight was given to Jeff Gershgorn's personal experience with the TVS applicants (Tr. 7747). Gershgorn, on the other hand, testified that his personal prior work experience with these employees played no role in the selection process (Tr. 7984, 8067–8068).

Michelle Lackey, supervisor for CNN's information technology employees, testified that the interview rankings of the applicants were not dispositive (Tr. 7901).[142] However, she could not recall the process by which the applicants were ranked in terms of their desirability (Tr. 7893). Jeff Polikoff, Lackey and Gershgorn's boss, participated in the selection meeting despite the fact that he had not interviewed any of the applicants. What role he played in the meeting is unclear. Polikoff could not testify as to what weight was given to the applicants' interview scores (Tr. 8131–8132).

The Studio and Control Room Technicians in New York

At the beginning of January 2004, Team Video employed 76 studio technicians at the New York Bureau. Forty-nine of them were hired by CNN. As with the other areas of the bureau, there is little reliable or credible evidence as to precisely how these hiring decisions were made. There were separate debriefing or selection meetings for different types of studio employees. CNN created job titles for the Washington and New York bureaus that were different than those held by TVS employees, but may have matched titles in other CNN bureaus.

Media Operations

As part of the Bureau Staffing Project, CNN created a media operations department in New York. CNN already had such a department in Atlanta. One of the individuals awarded a media coordinator position soon after the BSP was Kim Moscaritolo, who previously worked for CNNfn. There no evidence that Moscaritolo applied for a job during the BSP or was interviewed during the BSP (CNN Exhs. 429, 513, 518, 540, 551, 553A; GC Exh. 507). She was not under consideration by the hiring managers at their December 9, 2003 debriefing/selection meeting (GC Exhs. 508, 509).[143]

As discussed in my section on witness credibility, it is unclear who attended the debriefing/selection meeting for media coordinators, what decisions were made and who made them. It is not entirely clear, for example, whether Ashley Blackmon, one of the two managers who interviewed most, if not all, the media coordinator applicants, was present when hiring decisions were made.

Appropriate Bargaining Unit(s)

The D.C. Bureau's Couriers

Team Video employed four couriers at CNN's D.C. bureau in the fall of 2003. These four TVS employees were members of the NABET Local 31's bargaining unit. The couriers were essentially drivers, transporting equipment and personnel, and making deliveries. In the fall of 2003, Ron (Chip) Davis was the first-shift courier, working from about 6 a.m. to about 3 p.m. The second-shift courier was John Tripp, who drove from about 8 a.m. to about 5 p.m. William Tipper drove the third shift from 2 or 3 until about 11 p.m. It is unclear what the schedule was for the fourth courier, Alvester Williams.

During the Bureau Staffing Project, William Tipper applied for a job on Turnerjobs.com that was exactly the job he was performing for TVS. Kim Linden, the facilities manager for Turner Properties, a separate corporation from CNN under the Turner umbrella, and John Dunaway, the security manager for the D.C bureau interviewed Tipper.

At 6 p.m. on December 4, 2003, the day before the TVS contract expired, Kim Linden called Tipper and offered him a job. Tipper told Linden that he had accepted other employment and would have to find a substitute for this other position. Linden took Tipper to see Tim Traylor, a CNN human resources manager, who offered Tipper a job titled transportation facilities specialist with Turner Properties, rather than CNN. In this position Tipper performed the same duties that he had performed with TVS. Tipper was required to attend CNN's orientation on December 6, 2003, but did not actually start performing his duties for another 2 weeks. Ron (Chip) Davis was hired for the same job. It is unclear whether Tripp and Williams applied for positions during the Bureau Staffing Project.

After Tipper started driving for CNN (or Turner Properties) there were only two couriers driving two shifts; Davis drove the

_____

broadcast maintenance and no field production experience. Joe Murphy appears to have changed his mind as to Thomas' fitness for the job, B#37842. Vu deemed Thomas to have good IT knowledge, but Rick Cole's notes indicate that Thomas was "weak on IT side of the house," B#37827.

[142] Jeff Gershgorn agreed and then contradicted himself, Tr. 7983–7984.

[143] Rob Fox's failure to mention Kim Moscaritolo, the media coordinator who was hired from CNNfn without going through the BSP process, leads me to discount his credibility generally, Tr. 12291–12293. His testimony is at best incomplete and at worst intentionally misleading as to material matters. Fox was the director of operations of CNNfn where Moscaritolo worked prior to being hired as a media coordinator and was the supervisor of the media coordinators immediately after the BSP. The General Counsel asked Fox how many media coordinators CNN was looking to hire in the BSP. He answered: 14, Tr. 10290–10291. I find that Fox was well aware that CNN was going to hire Moscaritolo as a 15th media coordinator without going through the BSP process, see CNN Exh. 427. Since Fox discussed Mocaritolo's 2004 TPMP at Tr. 12208–12210, I find that he had not simply forgotten

about her, since Tr. 12257–12259. Her name also appears on the CNN's training logs and schedules for the week of January 18–24, CNN Exhs. 355, 356.

CNN introduced an exhibit, CNN Exh. 551, styled "NY Resumes & Applications." Tab 50 is a resume for Kim Moscaritolo. It is obviously not a resume submitted during the Bureau Staffing Project because listed under her experience is: "2004-present Media Coordinator CNN-NY."

I also find Fox to be an incredible witness due to his unwillingness to admit that he changed the scores on numerous interview sheets, Tr. 10306–10307. My review of GC Exh. 525, vol. 3, indicates that Fox changed the scores on about 19 of his interview rating sheets.

The most suspicious of these changes are those to Fox's rating sheet for Keith Crennan, who was a union steward in the Washington Bureau, B#2213, New York TVS bargaining unit member Mickael Squier, B# 5023, TVS unit member Tracy Organ, B#3240, CNN 518, and Tr. 13169 and freelancer Kristi Harper, who asked Fox a lot of questions about the Union, B#s 2011, 2017.

102                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

early shift; Tipper the late shift. Tipper drove vehicles that he drove for TVS, performed the same duties and got all his assignments from the CNN assignment desk. Sometime in 2004, CNN (or Turner Properties) hired Denise McIntosh, or transferred her from Atlanta, to work the second shift.

Even in 2008, Tipper spends no more than 1 hour per week performing duties other than driving. At least some of these duties he does as a volunteer. Other facilities employees who ask for Tipper's assistance in performing nondriving duties, must get clearance from the CNN assignment desk. The CNN assignment editors must know where Tipper is at all times in case they need him to make a delivery of equipment or persons, or a pick up.

The CEO of CNN News Group, Jim Walton, reports directly to the CEO of Turner Broadcasting Systems, Inc. (GC Exh. 101, p. 1). Phil Kent, then president of Turner Broadcasting Systems, was either present when the termination of the TVS contracts and the Bureau Staffing Project were first discussed in 2003 or was subsequently briefed on CNN's plans in this regard (GC Exh. 101, p. 4). Given all the evidence that the Bureau Staffing Project was motivated by a desire to avoid recognizing the Union, I conclude that the transfer of the TVS couriers to Turner Properties was a joint effort by CNN and Turner Broadcasting Systems. I also conclude that it was motivated by the desire to reduce the number of TVS bargaining unit members in any post-BSP CNN bargaining unit.

### Who was a Member of the Team Bargaining Unit?

### Who was a Member of the CNN Bargaining unit on December 6, 2003, in D.C. and January 17, 2004, in New York?

### The Composition of CNN's Bargaining Unit Factoring in its Blatant Discriminatory Hiring Process

Before launching into an extended discussion of what was an appropriate bargaining unit, or the appropriate bargaining unit on the dates the parties contend CNN began normal operations, it is important to note that but for its discrimination against bargaining unit members, a majority of CNN employees would have been former Team bargaining unit members by any calculation. Taking the scenarios presented by CNN at pages 150–151 of its brief, I find that at least 86 members of CNN's 108 member bargaining unit would have been former TVS unit members but for CNN's blatant discrimination in Washington.[144] At least 125 out of 175 in New York would also have been former Team unit members.

CNN concedes that 40 of the 108 employees it considers members of its Washington bargaining unit were former TVS unit members. I find that the positions held by the following employees (and maybe others) listed on CNN's Exhibit 706 would also have been filled by former TVS unit members had not CNN discriminated against them: three engineers (positions filled by Craig Fingar, Stephen Pless, and Ronald Fribush); four TD/director positions (filled by Brooker, Samaniego, Keller, and Roberts). An additional employee hired by CNN, Carolyn Stone, was not a statutory supervisor for TVS. TVS unit members would also have filled the three audio designer positions filled by Richman, Hill, and Tovarek. TVS unit members would have filled the eight studio operator positions held by Banks, Connor, Carroll, Desilva, Hailes, Jordan, Kelly, and Parks. Kenneth White, Raeshawn Smith, and Tawana Smith were freelance members of the TVS unit.

TVS unit members would also have filled the 16 photojournalist positions held according to CNN's Exhibit 706 by Derek Davis, Jose Santos, John Bena, Jeremy Harlan, Daniel Lopez, Jeremy Moorhead, Khalil Abdallah, Ray Britch, Bethany Chamberland Swain, James (Mike) Haan, Ron Helm, Bryan Pearson, Doug Schantz, Ken Tillis, Floyd Yarmuth, and Jerry Appleman. Jay McMichael was a freelance member of the TVS unit. Thus, even by CNN's calculations and CNN's choice of relevant dates, but for its discrimination, former TVS unit members would have occupied at least 86 of the 108 positions.

In New York, CNN submits that only 62 of 175 bargaining unit members were former TVS unit members as of January 26, 2004 (CNN Exh. 554). However, were it not for CNN's discrimination, TVS unit members would have held a majority of these positions. Among the CNN employees holding positions that were discriminatorily denied TVS unit members were 8

---

[144] GC Exh. 110-B indicates that there were 86 TVS bargaining unit members in Washington as of December 5, 2003 (studio operator Howard Lutt had resigned his employment with TVS prior to December 5). CNN Exh. 706, albeit not a completely reliable document, indicates that as of December 15, 2003, CNN employed seven engineers performing what had previously been bargaining unit work. This matches the number of TVS engineers. It is not clear how frequently Chris Leonard worked either immediately before or immediately after December 5, thus, his position could possibly have continued to be filled by freelance engineer Oscar Romay.

CNN Exh. 706 does not include the four TVS bargaining unit couriers. CNN hired two of them. This exhibit lists a total of 44 senior photojournalist, photojournalists, and lighting specialists. It does not

include Jerry Appleman, who was hired but never worked in Washington and was eventually replaced by Mark Marchione. Thus, there is almost an exact match with the 46 field positions in the TVS bargaining unit. One of the TVS field techs operated the microwave truck, a position transferred to engineering after December 5.

CNN Exh. 706 lists a total of 33 studio personnel; the TVS unit had 30 studio employees as of December 5, which indicates that some additional freelance members of the unit would have been hired as well but for CNN's discriminatory conduct. The exhibit does not include Gershon Peaks, who was hired during the BSP, but never worked at the D.C. bureau, nor Adilson Kiyasu, who was hired to replace him.

In the engineering department four full-time unit members lost their jobs and three nonTVS applicants (Fingar, Pless and Fribush) replaced them unlawfully. However, very soon after December 6, 2003, CNN hired other nonunit members, Jordan Placie and Andre Parker, in the engineering department. Thus, I conclude there was a position for all four TVS discriminatees.

Some freelancers hired by CNN, such as Raeshawn Smith, Tawana Smith, and Kenneth White were members of the Team bargaining unit by virtue of the number of hours and regularity of their work for Team.

The figures for the New York bureau also appear to be almost an exact match between number of unit members on the WARN letter, GC Exh. 21 and CNN's Exh. 554. There were at least 125 Team unit members who could have filled 125 positions with CNN. This does not take into account the fact that one TVS unit member was hired as a lines coordinator and that there is no evidence as to who was doing the job of the two TVS unit members in the crew room prior to April 2004.

CNN AMERICA, INC.                                                                     103

engineers: Lopez, Labovsky, Reynolds, Smith, Voiculescu, Thomas, Garber, and Stewart; 1 lines coordinator, Chimenti; 18 studio operators; 1 audio designer; 3 TD/directors; 4 floor directors; 14 media coordinators; and 14 photojournalists (Hall, Ramirez, Burgess, Allbritton, DeLaRosa, Hallsworth, Coppin, Frederick, Griola, Kane, Nidam, Tawanda Scott, Pelin, and Tambakakis). Thus, considering all the evidence in the light most favorable to CNN at least 125 of the 175 bargaining unit employees would have been former TVS bargaining unit members.

### Freelancers or Daily Hires

Team Video hired employees on a daily or temporary basis to fill in for full-time staff who were sick or on vacation, or to augment its full-time staff when circumstances warranted it. An example of the later circumstance occurred when Team hired numerous individuals to track Monica Lewinsky's whereabouts in Washington. These employees are referred to as freelancers or daily hires. Some of them worked for Team on a regular basis for long periods of time, e.g. (Tr. 15,396, 15,400).

Team initially took the position that these individuals were independent contractors. Later, it agreed to treat them as employees.[145] Pursuant to the collective-bargaining agreements with NABET, TVS was limited in its ability to hire freelancers. Daily hires in Washington were required to become member of Local 31 after working for Team for 20 days in a calendar year, or 30 days in consecutive years. In New York, a daily hire was required to join Local 11 after 30 days of employment with Team.

Pursuant to these agreements, daily hires/freelancers were compensated at rates set forth in the contracts, were paid the same penalties as full-time employees if they missed a meal, had their schedule changed or were called into work without a sufficient interval after their prior shift. They were also paid certain types of premium pay. However, they did not receive any other benefits such as health insurance and the right to participate in Team's 401(k) plan. Team was required to obtain CNN's approval in advance before hiring freelancers, e.g. (Tr. 15364; GC Exh. 40).

The issue of which, if any, freelance or daily hire technicians were members of the Team bargaining is significant in two respects. First, any such employee may be entitled a remedy such as backpay. Second, those freelance unit members hired by CNN would be counted in determining whether CNN is a successor employer. For example, CNN hired several studio operators, such as Raeshawn Smith and Tawana Smith, who performed many hours of freelance work for TVS during 2003.

First of all, CNN contends the Team freelancers were independent contractors, rather than employees. CNN, as the party making this assertion, has the burden of proof on this issue, *BKN, Inc.,* 333 NLRB 143 (2001). It has not met that burden. CNN presented the testimony of Jay McMichael, who worked as a freelance camera operator in 2002–2003. There is nothing in the record to establish that McMichael, when working on a shoot, was subject to any different conditions in terms of direc-

tion and control by CNN personnel than full-time Team employees.

On the contrary, I find, based on the uncontradicted March 28, 2008 testimony of Jonathan Smith, who regularly worked as a freelance camera operator and audio technician for Team of New York in 2003, there was no difference in the direction and control of freelance field technicians by CNN and Team compared with full-time Team employees. Indeed, Smith sometimes worked in a two-man crew with a full-time Team field technician (Tr. 9821–9833).

There is no evidence that suggests that the many freelancers who worked in the studio or engineering departments were not under the constant direction of CNN and Team personnel. Indeed, the record indicates that they were subject to same direction and control as full-time Team employees. Some of the evidence supporting this inference concerns longtime freelance studio employee Joe Wade at Transcripts 5256–5257, 5438, and 5470–5471. In the absence of evidence that these employees were not under the constant direction and control of CNN and Team personnel, CNN has failed to meet its burden of proving that freelance or daily hire employees at its Washington and New York bureaus were independent contractors.

CNN also argues that *none* of the freelancers or daily hires should be considered to be members of the Team bargaining units, including those who worked for Team almost daily during 2003, because some others also worked for other employers and because some other freelancers worked at the CNN bureaus infrequently. However, there is no precedent which supports its view regarding those freelancers who worked at the bureaus on a regular basis. CNN in its brief at page 169 states that 8 freelancers in Washington worked between 500 and 1040 hours in 2003, and that 18 did so in New York. These are generally the same individuals that I deem to be members of the Team bargaining units.

In determining whether on-call, freelance or daily hire employees should be included in the bargaining unit, the Board considers whether the employees perform unit work, and those employees' regularity of employment, *Trump Taj Mahal Casino,* 306 NLRB 294 (1992). Here, it is undisputed that the freelance/daily hire employees perform unit work. The General Counsel contends that the appropriate eligibility formula for this case is that stated in *Dic Entertainment, L.P.,* 328 NLRB 660 (1999). In that case the Regional Director including in the bargaining unit any freelance or daily hire employees who worked at least 15 days within the prior year. I find that is an appropriate formula, although the more permissive Davis-Paxson formula (an average of 4 hours per week for the quarter preceding the changeover) might also be appropriate.

The General Counsel has introduced Team Video payroll records that demonstrate which freelance/daily hire employees worked 15 days (over 150 hours of regular time) within the year prior to the termination of the Team contracts.[146] I find that all these employees who worked regularly for Team

---

[145] Locals 11 and 31's certifications include "regular part-time employees."

[146] CNN asserts at p. 179 of its brief that only 2 of the 64 TVS freelancers in Washington worked 30 days in calendar year 2003. However, the most probative evidence, the TVS payroll records, GC Exhs. 545 and 546, show that this is not true.

104                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

throughout 2003 and whose names appear in amended appendices C and D of the complaint (GC Exhs. 578, 579) should be deemed to be members of the TVS bargaining units, with an exception noted below.[147]

Freelance Discriminatees in New York

CNN contends there is no competent evidence that the employees on the freelance payrolls for New York performed bargaining unit work for the pay periods contained in the General Counsel's exhibits. I find to the contrary. Team Video's WARN Act letter regarding its New York employees (GC Exh. 21), contains a code to the left of each employee's name. Larry D'Anna testified that these codes are "probably accounting references" relating to different departments (Tr. 11078–11080. My review of General Counsel's Exhibits. 21, 566, 567, 568, 569, and 571 show that the codes on the payroll registers are a perfect match with the codes of the WARN Act letter and the evidence of record as to what tasks various employees performed.

For example, all the payroll register documents relating to the following freelance employees hired for studio-related jobs by CNN, have the code 4000 or 4500, Team's code for studio operations: Shimon Baum, Brian Duffy, John Fanning, Anthony Ioannu, John Conroy, Kevin Lishawa, David Weber, Jeff Greenstein, and Jonathan O'Bierne. Similarly, the code on the payroll registers for Jonathan Smith and Beth Lasch, 1300, Team's code for field audio work, is consistent with the record evidence regarding the work they performed for Team at the New York bureau.

By any standard most of the freelancers listed as discriminatees on General Counsel's Exhibit 579, the amended complaint appendix D, were members of the Team Video bargaining unit in New York. I have reviewed the Team payroll registers in General Counsel's Exhibit 566 and conclude that the following employees worked far in excess of 150 hours (15 10-hour days) in the 6 months prior to January 17, 2004. They also worked at the New York bureau on a regular basis during

calendar year 2003. What follows is the extent of my rough calculations:

Melanie Baker, field tech, over 500 hours between pay periods 16 in 2003 and pay period 1 in 2004;

Christopher Collins, studio tech, approximately 400 hours during the same time period;

Christopher Cunningham, studio tech, over 700 hours between pay period 18 and one;

Jennifer de Stefano, studio tech, over 500 hours between pay period 21 and one;

Jay Eric, studio tech, 272 hours between pay period 22 and one;

Donald Fenster (aka Charlie Frick), studio tech, 240 hours between pay periods 21 and one;

Mitchell Gomila, field tech, 164 hours between pay period 21 and one;

Kristi Harper, studio tech, 248 hours between pay period 21 and one;

Kenneth Kaplan, field tech, 304 hours between pay period 16 and 25;

Beth Lasch, field tech, 254 hours between pay period 21 and one;

Sareal Martinez, field tech, 428 hours between pay period 21 and one;

Robert Matteo, field tech, 416 hours between pay periods 21 and one;

Kathleen McLaughlin, field tech, 240 hours between pay period 21 and one;

Rod Nino, field tech, 352 hours between pay period 21 and 26;

Ramon Olivo, field tech, 388 hours between pay period 21 and one;

Todd Pivawer, field tech, 300 hours between pay period 16 and one;

Mark Peters, field tech, 328 hours between pay period 21 and one;

Danielle St. John, studio tech, 408 hours between pay period 21 and one.

The only individual listed on General Counsel's Exhibit 579, that I exclude from the TVS bargaining unit is Patrick Howley. Howley worked 282 hours in the studio at the New York bureau between pay periods 3 and 7 in 2003; I see no evidence that he performed any bargaining unit work after April 1, 2003.[148]

---

[147] Counsel for CNN objected strenuously to my receipt of TVS payroll records from the New York bureau. Counsel asserted that the General Counsel was violating my order with respect to offering New York evidence during the Washington, D.C. portion of the hearing, Tr. 15067–15074.

To the contrary, the General Counsel was in compliance with my rulings and directives. On April 10, 2008, in New York, counsel for the General Counsel stated, "As far as Team payroll records are concerned, the New York and Washington records are located in Washington and we are presuming that we are in line with your request about records if we put those in in Washington." I responded, "I don't see a problem with that." CNN's counsel raised no objection to this procedure, Tr. 10597.

Counsel for CNN, in objecting to my receipt of Team's New York payroll records, also asserted that "there were a number of occasions when we were in New York where your honor prohibited us, prohibited CNN from putting on evidence that related to Washington, D.C.", Tr. 15072. This assertion is incorrect. In every instance in which the General Counsel objected to the receipt of evidence in New York on the grounds that it pertained to Washington, I overruled the objection, Tr. 12,736, 12,744, 12,747–753, 12,779–12,784, 12,795, 12,922, 15,426–15,428.

[148] Phillip Hadrovic, an employee listed in app. D, was a regular full-time TVS employee, not a freelancer despite the fact that he is not listed on TVS' WARN Act letter, GC Exh. 21. Payroll records and timesheets for Hadrovic, GC Exh. 571, show that Hadrovic worked 104 hours for Team between December 29 and January 16, 2004, in the CNNfn control room. That he was not a freelancer is established by Team's deduction for its 401(k) plan, which was not available to freelance employees. Hadrovic may have been omitted from the WARN Act notice because he was on leave due to a family emergency from mid-2003 to December 2003, GC Exh. 528.

CNN AMERICA, INC.                                                    105

Freelancers who were Members of the Team New York
Bargaining Unit and were Hired by CNN

My review of the Team payroll registers indicates a number of employees who were hired by CNN performed well in excess of 150 hours of bargaining unit work in the New York studio as freelancers for Team Video in the year prior to January 17, 2004. These employees also performed bargaining unit work on a regular basis and thus must be counted as Team bargaining unit members in determining successorship. These eight employees are: Shimon Baum, Anthony Ioannou, Jeffrey Greenstein, John Conroy, Kevin Lishawa, David Weber, Jonathan O'Bierne, and Jonathan Reiss.

Alleged D.C. Discriminatees who were Freelancers

General Counsel's Exhibit 578, the General Counsel's amended appendix C to the complaint, lists alleged discriminatees in the D.C. bureau. Virtually all of them worked full-time virtually every day at the D.C. bureau during 2003 and by any standard would be considered members of the Team bargaining unit.[149] These employees are, Emmanuel Agomuoh, Donna Lacey, Fred Schall, Paul Skaife, Joseph Wade, and Aaron Webster. Another alleged discriminate, Oscar Romay, was hired as a freelancer to fill in for a sick or injured employee towards the end of 2003.[150] He worked at least 392 hours between pay periods 21 and 25 in 2003, and must also be considered part of the TVS bargaining unit.

Freelancers Hired by CNN who were Part of the
Team Bargaining Unit

Several employees, Samuel Jay McMichael, Tawana Smith, Raeshawn Smith, and Kenneth White, who worked regularly and well in excess of 15 days for Team in 2003, were hired by CNN. They must be counted as members of the TVS bargaining unit in any determination of successorship.

Must CNN Contentions Regarding the Appropriate
CNN Bargaining Unit

CNN argues that the former Team bargaining units are no longer appropriate bargaining units because the employees performing what used to be bargaining unit work no longer have a community of interest distinct from that of other CNN production employees. This is so CNN contends because (1) it brought all production work in-house; (2) the positions of the historical unit were functionally integrated with numerous other positions; and (3) the positions from the historical unit share a community of interest with other employees engaged in the production process (CNN Reply Br. at 17).

However, I find that the decision to terminate the ENGAs was motivated in substantial part by CNN's determination to get rid of NABET and, therefore, CNN is precluded from relying on this fact in refusing to recognize the historic unit. I find further that much, but not all of the functional integration of

bargaining unit positions with other positions was also part of CNN's overall discriminatory plan mentioned in complaint paragraph 22(b). As I conclude that CNN cannot be allowed to profit from its illegal conduct aimed at dilution of the bargaining unit, I conclude that the historic unit is still appropriate.

Given the possibility that I may be reversed on this point, it hardly matters whether the historic unit is appropriate or not. As a successor who discriminated against unit employees, CNN is obligated to recognize and bargain with the Charging Parties and return to the status quo if requested by NABET.

Nevertheless, it is well recognized that "long-established bargaining relationships will not be disturbed where they are not repugnant to the Act's policies. The Board places a heavy evidentiary burden on a party attempting to show that historical units are no longer appropriate." Indeed, "compelling circumstances are required to overcome the significance of bargaining history," *Ready Mix USA,* 340 NLRB 946, 947 (2003); *Banknote Corp. of America,* 315 NLRB 1041 (1994); *Cadillac Asphalt Paving, Co.,* 349 NLRB 6 (2007).

In *Banknote, Corp,* supra at 1044, one factor the Board relied upon was that although the successor's employees had been assigned to fill in on a wider scope of new duties, they continued to serve as the primary, and in some areas, the only employees performing their traditional duties. This would also have been the case in the instant case had CNN not discriminatorily refused to hire many all the members of the TVS bargaining unit.

In many cases, a historical unit will be found appropriate if the predecessor employer recognized it even if the unit would not be appropriate under Board standards if it were being organized for the first time, *Trident Seafoods, Inc.,* 101 F. 3d 111, 118 (D.C. Cir. 1996).

In a sense, what CNN is attempting in this case is an accretion of employees who worked for it directly into the Team bargaining units. Regardless of whether or not this case strictly falls within the Board's framework for analyzing accretions, I find that the caselaw in that context is useful by analogy. In *Seven-UP/Canada Dry Bottling Co.,* 281 NLRB 943 (1986), the Board adopted the reasoning of the administrative law judge, which I find relevant to the analysis of the instant case:

> Though the above principles are useful, it is important to note that the instant controversy fails to present the accretion issue in a classic setting. Here the focus is on a curtailment of bargaining for a previously represented group, rather than the addition of employees who had never voiced a preference with respect to collective bargaining. In such circumstances, Board policy appears to shift its attention in the direction of the forceful policy encouraging stable bargaining relationships, with freedom of choice and the accretion doctrine relegated to lesser standing. Thus, the right of an employer to terminate a bargaining relationship, totally or in substantial part, and thereby to deny contractual benefits has been viewed restrictively.

On this basis I find it is inappropriate to accrete any group of employees who were not part of the Team bargaining unit into CNN's bargaining unit. Such accretion deprives former Team employees of their statutory rights and at the same time de-

---

[149] CNN Exh. 642, cited at p. 179 of its brief is not a record of all hours worked by individual freelancers at the D.C. bureau in 2003, Tr. 15044–15046.

[150] Romay was most likely filling in for Chris Leonard, a Team engineer, who was on sick leave in the fall of 2003. CNN hired Leonard, who died of brain cancer in 2004.

106                 DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

prives those who were not members of the Team bargaining unit of their rights to decide whether or not they wish to be represented by a Union. This is particularly true in light of my finding that if it were not for CNN's discrimination, Team unit members would have constituted a majority of any CNN bargaining unit.

Thus, I find the appropriate bargaining unit in Washington to consist of: photojournalists and senior photojournalists, studio operators, lighting specialists, TD/directors, audio designers, field and support broadcast engineers, and couriers (transportation facilities specialists). I also find that the unit includes media coordinators. Even though these employees were hired long after the termination of the Team contract, much of the work they perform was performed by bargaining unit employees prior to December 2003.

In New York, I find the appropriate bargaining unit to consist of: photojournalists, studio operators, audio designers, TD/directors, field and support engineers, floor directors, and media coordinators.

### The CNN Employees in Question

#### Information Technology Employees in Washington

CNN called Joseph Murphy, who supervised its information technology (IT) employees in Washington until November 2005, as a witness on July 21, 2008. I assume he was called to support CNN's contention that the IT employees and broadcast engineers must be considered part of the same bargaining unit. First of all, I would note that instead of calling an engineer who still works at the D.C. bureau and has since at least 2004 (John Cunha, Craig Fingar, Andre Parker, and Jordan Placie), CNN chose to rely on a management employee who was not the direct supervisor of the engineers. I conclude that Murphy certainly did not credibly contradict the testimony of Bobby Clemons and Ron Kuczynski. These two current employees, as mentioned earlier, testified that for the most part the tasks they performed after December 6, 2003, are essentially the same as they were prior to that date, and that the duties of the IT employees are essentially the same.

As Murphy testified, much more of the equipment at the D.C. bureau is computer based than it was prior to December 2003. He testified to a number of situations in which IT employees performed tasks and engineers were "involved," e.g. (Tr. 16225, 16236, 16243, 16248, 16254–16255). He was very unspecific as to the nature of the engineers' involvement, because he doesn't know what it was (Tr. 2030–2031, 16225–16,226). The reason for Murphy's lack of knowledge is that he did not supervise the broadcast engineers. Tu Vu indirectly supervised the engineers, as he had to some extent while Team operated at the D.C. bureau. After December 6, Vu supervised the engineers through George Kinney and Sam Stevens, rather than through Team Supervisor John Cunha.

To the extent Murphy was specific; his testimony is consistent with that of Clemons and Kuczynski. For example, he observed Kuczynski pulling cable when installing server-based workstations (Tr. 16,236). In his earlier testimony, Murphy conceded that in the first few months of 2004, the IT employees were not fixing tape decks, repairing cameras, or pulling any cable other than IT cable (Tr. 2096–2097). The testimony of

Clemons and Kuczynski establishes that they have not done so since then.

Moreover, I am also not inclined to take Murphy's testimony at face value. At some points it was not clear whether he had first-hand knowledge regarding his testimony and at others his testimony was either inaccurate or misleading.

On December 14, when called as a witness by the General Counsel, Murphy testified as follows about the interview of nonTVS applicant Ron Fribush, who was hired by CNN during the BSP and then quit after a week:

> I—Ron Fribush, I never personally interviewed. He's the only candidate—I remember this specifically—I did not have a face-to-face with. We did him over the phone because of a scheduling conflict. . . .
>
> I believe I did [take notes of the telephone interview with Fribush] . . . I believe this is what I looked at last night, and I did not see notes for Ron Fribush, but there were other candidates I interviewed, including a couple in Atlanta that I don't see here. [Tr. 2089–2090.]

I infer that Murphy and Rick Cole did not interview Fribush. There is no evidence that they did in this record and CNN has not suggested that their notes of this interview were lost. Jim Hebb testified that a composite list of interview ratings was compiled and used at the selection meeting for engineers in Washington (Tr. 15849). Assuming his testimony is accurate, this composite would indicate whether and how Murphy and Cole rated Fribush. CNN neither introduced this composite list nor claimed that it was lost.

I infer further that Murphy testified that he participated in a telephone interview with Fribush because he recognized that the fact that he did not is an indication as to how unfair the BSP selection process was to the Team applicants.

Murphy also testified that Fernando Vega did a software plug-in for graphics in late 2004 (Tr. 16258). Murphy testified that, "Vega, who performed broadcast engineering duties primarily, he was trained to do that and did it quite successfully."

Later, Murphy described Vega as "an associate broadcast engineer that we brought in" (Tr. 16283). According to CNN's Exhibit 544, Vega was an associate BIT production support specialist and then a production support specialist, both IT positions, until June 2005. He became a broadcast engineer in June 2005. His employment with CNN terminated 4 months later.

Murphy also mentioned that Ken Stanford, the satellite truckdriver, sat in the IT area. I assume he did so to suggest greater intercourse between engineering employees and IT employees after December 6, 2003. There is no evidence as to where Stanford sat before December 6. Prior to December 6, Stanford was not a TVS broadcast engineer. He was a CNN employee assigned to the National desk.

Murphy's testimony, however, confirms that Clemons and Kuczynski, that Craig Fingar, who was hired as a broadcast engineer, did not primarily do engineer's work (Tr. 16,225). He also tacitly confirmed their testimony that the IT involvement of engineers was limited to such basic tasks as rebooting a computer (Tr. 16,257–16,258).

### Information Technology Employees in New York

No rank and file CNN engineers or IT employees in New York testified in this hearing. The only CNN engineer in New York whose testimony is credible is Supervisor Ed Scholl. Nothing in Scholl's testimony indicates that the work of broadcast engineers and IT employees is fungible. Scholl testified that there are instances when people with different backgrounds will respond to a problem to determine its source (Tr. 13088). I assume he means that engineers and IT people will work together to determine whether the problem is one to be fixed by a broadcast engineer or one to be fixed by a computer specialist.

Scholl's testimony is consistent with that of IT manager Michelle Lackey which indicates that if an IT employee is confronted with an engineering problem of any complexity they will call an engineer, "the expert on the subject" (Tr. 7939), and vice-versa. Thus, there is no evidence that would lead me to conclude that IT employees in New York must be included, or should be included in a bargaining unit that includes broadcast engineers. In this regard, I would note that after January 17, 2004, IT employees continued to report to Lackey, while broadcast engineers reported to Jeff Gershgorn. Both Lackey and Gershgorn reported to Jeff Polikoff.

### Electronic Graphic Operators in New York and Washington; Media Coordinators, Production Assistants, and Technical Production Managers in Washington, D.C.

The electronic graphic operators (EGOs) manage the graphics for the lower part of the TV screen and full-screen graphics, such as maps. Prior to the Bureau Staffing Project in New York, these eight employees were directly employed by CNN. CNN has taken the position that they are members of any appropriate CNN bargaining unit. Despite the fact that the EGOs worked on entirely new digital equipment at the Time Warner Center, CNN did not replace any of them; it trained them the new equipment (Tr. 10,412–10,413). After January 17, 2004, EGOs reported to the same supervisor, Clayton Sizemore, as did former unit audio designers.

If a reviewing authority were to decide that the historical unit is no longer appropriate, I would include the EGOs in the bargaining unit in New York, where they became a more integral part of the production process soon after the termination of the Team contracts. However, in Washington, there was no such job classification for over 1-1/2 years after the Team contract ended (Tr. 14534).

I would not include any media coordinators or electronic graphics operators who were hired into those positions in Washington or technical production managers in determining whether CNN is a successor employer. However, I would include media coordinators in the unit beginning in July 2006, when this position was created at the D.C. bureau (Tr. 15916). I would also include the Washington EGOs beginning in 2005.

CNN's witness Donald Koehler testified that the production assistant title was changed to media coordinator at some point in time. In the Bureau Staffing Project, CNN hired three production assistants: Nunu Japardize, Branden Ray, and Sital Patel. All of these had worked for CNN previously either as full-time employees or freelancers. They were given credit for their employment with CNN prior to December 6, 2003, in terms of seniority (CNN Exhs. 544, 679). Not one of these three was still a production assistant in July 2006 and not one of them became a media coordinator.

Other production assistants, such as Todd Huyghe, Chris Kenny, Lindy Royce, and David Gracey, who were CNN production assistants prior to December 6, 2003, were not subjected to the BSP process. None of these individuals was a production assistant in July 2006 and none of them were ever media coordinators (CNN Exh. 544). Shortly after December 6, 2003, production assistants reported to Warren Arenstein, who did not supervise employees who were performing work previously done by Team bargaining unit employees. Therefore, I would not include production assistants in an expanded CNN bargaining unit.

Chris Kenney became a technical production manager in Washington in May 2005 (CNN Exh. 544). Steve Dolce apparently transferred from New York to Washington in July 2004 (CNN Exh. 543). According to CNN's Exhibit 543, his title in Washington was technical program manager effective September 30, 2004, and director, technical program management effective January 1, 2005. Thus, it appears that there were no nonmanagerial technical production managers in D.C. until May 2005. These employees are not directly supervised by anyone who supervises employees doing what was formerly bargaining unit work. Moreover, if their duties are the same as technical production managers in New York, they should be excluded because they exercise management functions.

### Lines Coordinator

Lines coordinator is another job performed by CNN employees prior to the Bureau Staffing Project. CNN employed two types of lines coordinators; bureau lines coordinators and lines coordinators who were assigned to shows. CNN claims that lines coordinators must also be part of any appropriate bargaining unit. I credit the testimony of Stacy Leitner, who was a show lines coordinator from April 2005 until August 2006. On the basis of her testimony, which was essentially corroborated by CNN's witness Paul Vitale, I find that the duties of a show lines coordinator involved primarily administrative duties, rather than the technical duties performed by TVS employees (Tr. 10,496–10,499).

The line (or lines) coordinator reserved studios for guests, including those located outside New York City or Washington, reserved satellite trucks and transmission lines for incoming tapes. After January 17, 2004, lines coordinators reported directly to Lois Cioffi, who did not supervise any employees doing what was formally bargaining unit work. Cioffi reported to Lew Strauss, as did Clayton Sizemore, who did supervise former unit employees. I would exclude lines coordinators from the bargaining unit even if the historical unit is no longer appropriate.

I would also note that there is strong evidence of discriminatory motive in the hiring of lines coordinators in New York. Operations Director Lew Strauss was the only hiring manager who interviewed candidates for lines coordinator. He gave the top three interview scores to Julie Cretella, a TVS nonbargaining unit manager, Rick Jacobson, who apparently already worked for CNN and Mary Theodore, a TVS bargain-

108                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

ing unit supervisor. Jacobson and Cretella were hired; Theo-
dore was not. There is no credible explanation in this record
for why Theodore was not hired (Tr. 13,172–13,181; CNN
Exhs. 520, 521). Equally suspicious is the fact that soon after
the Bureau Staffing Project, CNN moved one of its employees,
George Chimenti, who had not applied or been interviewed in
the Bureau Staffing Project, into a lines coordinator position.[151]

### Operations Managers/Technical Production Managers in New York

In about 2006, CNN changed the title of its operations man-
agers in New York to technical production managers. It did not
change the job duties of these employees (Tr. 11,947, 11,963).
CNN contends they are part of its bargaining unit. Lois Cioffi
supervised the operations managers as of January 17, 2004.

CNN elicited testimony from its witness Paul Vitale that
technical production managers hire the crews at remote sites for
reporters and producers (Tr. 11,948, 11,958–11,959, 11,964–
11,965. I then asked Vitale about the extent of his authority to
hire these freelance crews. He testified that he must get per-
mission from an executive producer to spend CNN's money,
but he selects the crews on his own and commits CNN to pay
them. The executive producers do not care who the technical
production managers hire (Tr. 11,950).

This authority does not make operations managers/technical
production managers statutory supervisors because the record
does not show that the individuals they hired were employees
of CNN, as opposed to independent contractors, or employees
of independent contractors, *Crenulated Co.,* 308 NLRB 1216
(1992). However, the record demonstrates that they exercised
management functions for which I deem they should be exclud-
ed from any appropriate bargaining unit that includes the type
of technical employees who worked for Team Video, *Eugene
Register Guard,* 237 NLRB 205 (1978).

### Editor Producers

Editor producers were members of the Local 11 bargaining
unit when Potomac Television was the contractor at the New
York bureau. When the Potomac contract ended, CNN hired
the editor producers and they were not members of the TVS
bargaining unit. CNN now argues they must be included in
any bargaining unit that includes TVS employees at its
Bureaus. The editor producers' job differed and differs from
the jobs performed by TVS employees in that they actually
exercise substantial judgment in editing news footage as a sig-
nificant part of their job.

The editor producers determine, to far greater extent than
former unit employees, what segment of the news material
gathered makes it to the airwaves. Moreover, they are physi-
cally separated from other studio employees in that their work
is performed in edit rooms (Tr. 12,060–12,062, 15908; CNN
Exh. 414).

[151] Chimenti was a lines coordinator for CNN prior to the BSP. He
was retained in that position without going through the BSP process.
Chimenti's name does not appear on CNN Exh. 520, which is a compo-
site of the interview scores for lines coordinator candidates, which was
used at the selection meeting, Tr. 13174; also see CNN Exh. 516.

On January 17, 2004, the editor producers in New York re-
ported indirectly to Rob Fox through James Lambriolla and
then Gary Reynolds. Media coordinators, on the other hand,
reported directly to Fox. In Washington, editor producers re-
ported to Warren Arenstein in 2004. Arenstein did not super-
vise any employees who performed work previously performed
by Team bargaining unit members. I would exclude editor
producers from the bargaining unit even if the historical unit is
inappropriate.

### Application of the Successorship Criteria

#### Continuity of the Employing Enterprise

#### Changes to Employees' Job Duties as it Affects CNN's Status as a Successor Employer to Team Video Services

I have found that CNN is a successor employer to Team
Video. CNN hired a majority of Team bargaining unit mem-
bers who worked in the historic units of studio operators,
broadcast engineers, field camera and field audio technicians,
and in D.C., couriers. Moreover, a majority of the employees
CNN hired to do work formerly performed by unit members
were former unit members. This fact strongly suggests, and I
conclude, that former unit members were hired to do essentially
the same jobs they had performed for Team. Were that not the
case, CNN's hiring would resemble Dr. Baker's conclusions for
what the results of a random selection would look like. These
former unit employees also produced the same product for
CNN that they did when they worked for Team.

The nonTVS employees hired during the BSP, were mere
replacements for TVS employees who were not hired. As Cin-
dy Patrick stated on September 29, 2003, the objective of the
BSP was "to fill nearly as many new positions at CNN as cur-
rently filled by Team" (GC Exh. 338). Indeed, excluding the
CNN employees who generally were not in fact competing with
other applicants for their jobs, there is almost a perfect match
between the number of employees hired during the BSP and the
number of Team bargaining unit members.

In Washington, these employees continued and still continue
to work at the same location. In New York, they did so for
several months until they moved to the Time Warner Center.
While many of the Team supervisors were not hired by CNN,
former Team unit members took direction from the CNN em-
ployees who had previously managed them through the TVS
supervisors. Indeed, in many cases, these CNN supervisors had
given instruction to Team employees without using Team man-
agement as an intermediary.

CNN contends that it is not a successor employer on the
grounds that the jobs its employees perform were not the same
jobs that TVS employees performed. This argument is predi-
cated both on technical changes that occurred after the end of
the Team contracts and CNN's decision to require studio em-
ployees, at least in some cases, to perform only one job func-
tion to a far greater extent than did Team Video.

While CNN employees performing what was bargaining unit
work may use some newer equipment and may have been given
some additional duties, the work they performed was essential-
ly the same as the work they performed for Team Video. Most
employees continued to spend most of the day performing the

CNN AMERICA, INC.                                                    109

same tasks and using the same skills they had used in their work for Team. The fact that employees may have performed tasks in addition to those performed for Team does not necessarily establish that CNN was not a successor. This is particularly so when the record shows sufficient similarities in the job skills required by the two companies, *Capitol Steel & Iron Co.,* 299 NLRB 484, 487–488 (1990).

In some cases, CNN employees doing bargaining work are performing fewer tasks than they performed working for Team Video. However, this does not negate the continuity of the enterprise. CNN was aware that many of the Team employees had specialties or particular expertise. For example, CNN knew that John Davis in Washington worked as a QC operator for TVS the majority of the time (GC Exh. 534, vol. 1, Davis, B# 12502). CNN was aware that Dennis Faulkner, who it hired to replace Davis when he resigned, knew QC and that other studio operators did not (Id., at 19019, 11, vol. 2, Faulkner, B#s 12460, 15599). CNN was aware that TVS' technician, Paul Miller, also specialized or had expertise in audio design (Id., vol. 4, Miller, B#s 15216, 21439). CNN also knew that several of the studio employees in New York were audio specialists.

After terminating the ENGA, CNN assigned Davis to work exclusively as a QC operator, instead of also performing other studio functions. Similarly, the former TVS studio operators who were hired as audio designers, apparently work exclusively as audio designers—although CNN introduced a great deal of evidence regarding the cross-training of its employees. In any event, the fact that CNN has chosen to require employees like Davis and Dennis Faulkner to work exclusively as QC operators does not negate the substantial continuity of its operations, when compared to TVS's operations.

Indeed, a CNN operations supervisor at the New York bureau, John Silva, recognized that there was no fundamental change in the tasks performed by former TVS employees immediately after the end of the TVS contract. Silva testified that on Monday, January 19, 2004, he was training new employees who had not worked previously for Team Video in the control room at 5 Penn Plaza. I asked what were the former TVS employees, who had been hired by CNN, doing. Silva responded:

Their job. Whatever they were assigned. . . . [Tr. 11824.]

When employees continue doing substantially the same work they did for a predecessor, the addition or subtraction of some new job duties is unlikely to change their attitude towards their job to such an extent as to defeat a finding of continuity of the enterprise, *Phoenix Pipe & Tube Co.,* 302 NLRB 122 (1991); *USG Acoustical Products,* 286 NLRB 1, 9–11 (1987).

CNN relies largely on anecdotal evidence to establish that the jobs CNN employees hired during the BSP performed were materially different than the jobs TVS employees performed. However, with the exception of photojournalists working in relatively remote locations, CNN has offered no evidence that credibly establishes that CNN employees hired during the BSP were performing substantially different or additional tasks than they did for TVS for any significant portion of their workday. Even with regard to the photojournalists, the evidence shows that for at least 6 months after the end of the Team contract, all photojournalists were performing the same work as TVS field

technicians for the vast majority of the workday, e.g. (Tr. 3938). The same is true for most photojournalists even after the first 6 months.

For studio personnel, CNN also relies heavily on changes in New York after employees moved to the Time Warner Center. It also relies in large part on changes in job duties that occurred a year or more after Team Video's contract was terminated. However, whether CNN was a successor employer to TVS must be determined by what the employees were doing on December 6, 2003, in Washington and January 17, 2004, in New York. On those dates, CNN operated as it did the on the days just previous, using both unit employees and Atlanta employees on temporary assignment. CNN continued to broadcast without interruption and some of the work done to keep it on the air was done by the bargaining unit employees.[152] It is totally irrelevant to the attachment of the bargaining obligation that these employees also received training and that they were assisted by CNN employees from other bureaus.[153]

On the days immediately following the end of TVS contracts, unit employees did their jobs in precisely the same manner they did it on the last day of the TVS contract with essentially the same equipment, e.g. (Tr. 10,486–10,487). However, by May 2004, all the New York studio employees had moved to the Time Warner Center and were using mostly new equipment. Nevertheless, I credit the employees who actually performed this work that the nature of their jobs changed very little, and opposed to the contrary testimony of CNN managers, who did not perform the work. Moreover, almost all, if not all, of the CNN managers who testified demonstrated the unreliability of their testimony when discussing the Bureau Staffing Project.

Finally, many of the changes CNN relies upon in arguing that it is not a successor were violations of Section 8(a)(5) of the Act. Respondent was not entitled to unilaterally set the initial terms and conditions of employment due to its illegal refusal to recognize and bargain with the Union and its discriminatory hiring practices. It cannot rely on illegal unilateral

---

[152] The number of temporary duty employees needed was increased by the fact that some nonTVS employees hired during the BSP did not work for the D.C. or New York bureaus in the first week of their employment, and sometimes longer. For example, Ray Britch and Neal Hallsworth had to await the granting of their visas. Khalil Abdallah in Washington was "loaned" back to his former employer, Newsource, during the first week. Jeremy Harlan, Ken Tillis, and Daniel King Lopez were also not present at the D.C. bureau during their first week as CNN employees.

[153] I am not aware of any case on facts similar to this one in which the Board or a court of appeals has found an employer not to be a successor employer. In all the cases that I am aware of, in which successorship was not found, there was a hiatus between the operations of the predecessor and the alleged successor, e.g., *Georgetown Stainless Mfg. Corp.,* 198 NLRB 234 (1972); *Cagle's Inc.,* 218 NLRB 603 (1975); *Spencer Foods,* 268 NLRB 1483, 1485 (1984), revd. in relevant part 768 F.2d 1463, 1474 (D.C. Cir. 1985); *Woodrich Industries,* 246 NLRB 43 (1979).

*Woodrich Industries,* cited by Respondent at p. 203 of its brief is also distinguishable, in that Woodrich produced a different product than did its alleged predecessor and sold that product to a different type of customer.

110                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

changes to prove it is not a successor, *Precision Industries,* 320 NLRB 661, 711 (1996).

### Media Coordinators in New York

I specifically credit the testimony of Stacy Leitner and Dennis Finnegan, who worked for both Team and CNN in New York.[154] There is no testimony from anyone who actually performed the media coordinator job at the Time Warner Center that contradicts their testimony. For reasons discussed in my general treatment of witness credibility, particularly his lack of candor when testifying about the BSP and uncertainty as to what parts of his testimony were based on first-hand knowledge, I decline to take any of Rob Fox's testimony at face value, see pages 38, 140 fn. 139, herein.[155]

Immediately after January 17, 2004, media coordinators did exactly the same tasks that a studio technician performed for TVS, i.e., quality control of the incoming signals, tape playback, and feeds at the same location, 5 Penn Plaza.[156] After moving to the Time Warner Center in March or April 2004, media coordinators also performed essentially the same functions that were performed by Team bargaining unit members. They ingested most incoming footage onto a computer server, rather than onto tape, and inputted very similar data into the computer that they previously had written on the tape label (Tr. 10486–10,496, 10,658, 10,693–10,694).[157]

Whether inputting data into the server, or writing on a tape label, the employee was describing incoming material sufficiently for it to be identified by those who might want to use it.[158] The media coordinators' file management function was functionally the same as the recycling of tapes performed by Team. While the media coordinator position may have "edito-

rial elements" to it (Tr. 13101), these are an insignificant part of the job.

At the Time Warner Center, the media coordinators sit in two rows in the newsroom. In the first row, there are seven positions where media coordinators ingest incoming signals into a computer server. However, if there is not enough space on the server, the incoming signals are recorded on tape, just as they were in 2003. Incoming signals were also recorded on tape to back up the server.

In the second row, the media coordinators perform the quality control function of checking whether the quality of the material going to air during live shows (e.g., brightness) is adequate. This is same job that TVS employees performed except that at 5 Penn Plaza the incoming signals were recorded onto tape rather than directly into a computer.

Media coordinators also type into computer "metadata," the information that identifies the footage. This includes the slug (somewhat like naming a computer file), running time (trt), source of the footage, whose attention the footage was directed and sometimes an in and out cue for a sound byte. This is very similar information to that recorded on the label of tapes by TVS studio personnel in 2003.

CNN's job description of the media coordinator position includes many tasks that some, many or most of the media coordinators generally did not perform. This included editing, tape producing, and deciding what footage went on the air. Media coordinators also deleted stale material from the server. However, this was usually done pursuant to strict guidelines from CNN management personnel.

### Other Studio Operations

CNN Operations Manager Lou Strauss testified that under Team studio employees tended to rotate through various assignments except the job of technical director. However, Stacy Leitner, who worked as a TVS supervisor in master control[159] on the 22d floor, testified that was not the case in her area. She testified that, "if you were camera, you did camera. If you were an audio operator, you did audio." The only people who rotated were tape operators, who also recorded the incoming material onto tape (Tr. 10,524). I credit Leitner with respect to the master control room.

CNN's witness John Silva corroborated Leitner's testimony with regard to two or three studio employees who he regarded as audio specialists (Tr. 11,860–11,861).[160]  The interview

---

[154] Both Leitner and Finnegan had left CNN by the time they testified in this hearing. Therefore, they are not entitled to the deference given to current employees as stated in *Flexsteel Industries,* 316 NLRB 745 (1995), enfd. mem. 83 F.3d 419 (5th Cir. 1996). They might be entitled to backpay for the difference between what they were paid by CNN and the Union's contract. On the other hand, their stake in the outcome of this hearing is far less than that of CNN managers, such as Rob Fox.

[155] I also discount statements in performance reviews, or "TPMPs" which are contrary to the testimony of Leitner and Finnegan. These TPMPs were very likely were structured with the instant litigation in mind. For example, Stacy Leitner's dated April 15, 2004, confirms that she was the "main QC person for American Morning," CNN Exh. 358. However, Rob Fox discussed the "editorial aspects" of the media coordinator position and found Leitner somewhat wanting in this respect. I note that CNN did not put on a single-employee witness who testified about the "editorial aspects" of their job. As previously stated, I do not credit Fox's testimony generally and specifically about what employees actually did as media coordinators.

[156] CNN witness Rob Fox also testified that the QC function of the media coordinators is the same QC function they performed for Team Video, Tr. 10,344. It is clear that this was and remains a major part of the media coordinators' tasks.

[157] Dennis Finnegan testified that, as a media coordinator, the only change from his duties with Team was that he was entering metadata, i.e., identifying information about footage into a computer, as opposed to writing similar information on a label of a box of tape.

[158] Dennis Finnegan entered the slug that the producer gave him for footage. He did not determine the slug himself.

[159] Master control and quality control (QC) are apparently used to refer to the same job by some witnesses. Master control was also used to refer to studio work generally.

[160] CNN documents show that it considered many of the Team studio employees to be specialists or expert in certain areas; for example Troy McIntyre considered D.C. unit member Adilson Kiyasu's strength to be robo camera; Mike Maltas and other CNN personnel considered Reza Baktar, Howard Lutt, Chip Hertzl, and Carolyn Stone to be TD/director specialists, GC Exh. 534, vol. 3, Lutt B# 20465–20469; Cindy Patrick noted that Ralph Marcus was a director/TD on the evening shift, Id., Marcus B# 2255. Recruiter Anthony Williams deemed Paul Miller to have expertise in audio design, Id., vol. 4, Miller, B# 21439. Williams opined that TVS unit member Jeff Noble worked in numerous capacities at CNN, but was "especially sharp on the audio side of the house," Id., vol. 4, 15,089.

notes of TBS/CNN recruiter Anthony Williams also establishes that many TVS studio operators were considered to have specialties in certain areas, such as audio, e.g. (GC 523, vol. 1, Greenberg, B#s 17134-36.)

In this regard, I would note once more that while the General Counsel relied on witnesses who actually performed various jobs for CNN after January 17, 2004, CNN, with the exception of several photojournalists, relied exclusively on management witnesses to establish what various classes of employees actually did.[161]  As a general proposition, I find the testimony of those witnesses who performed the jobs credible.  For the reasons stated throughout this decision, I decline to credit the self-serving testimony of CNN's managers, unless corroborated by other reliable evidence.

Barbara Morrisey worked for TVS on the CNNfn floor (20) of the New York bureau.  She primarily operated the robotic cameras.  However, the TVS supervisors would assign Morrisey other tasks.  It is not clear whether they did so pursuant to specific instructions from TVS management, or whether the supervisor determined on his or her own that Morrisey was needed elsewhere.

The jobs which TVS employees performed were: technical director, an "A-1" who worked at an audio board; an "A-2" who placed microphones and IFBs[162] on guests and the "talent;" stationary (pedestal) camera operators, robotic camera operators, videotape operators, video shaders, who assured that output from every camera was identical; and quality control (QC) personnel, and floor director.

There is no credible evidence that the tasks of employees working as technical director or a floor director changed significantly after the Team contracts ended in New York or Washington.  Under Team, floor director and technical director were assignments given to employees classified as studio technicians.  CNN made them separate job classifications.

With regard to the studio operations, CNN reorganized and renamed many positions.  Nevertheless, the work performed by former TVS employees and those who replaced TVS employees is essentially the same work that was performed by the technicians in 2003.  Employees continued to ingest incoming video and audio material and insured its quality.  They continued to play an essentially unchanged role in transmitting these signals to air for broadcast.  CNN did not rely on these employees to any significant extent to come up with story ideas or make editorial suggestions.

#### Technical Directors

Technical director is the most skilled job in the studio.  Not every TVS studio technician performed this task; it was reserved for specialists.  Technical directors operated a switcher which transfers incoming signals to air.  Technical directors

hired by CNN performed essentially the same tasks as technical directors working for Team.

#### QC (Quality Control) and Tape Technicians

QC operators (aka master control) checked the quality of incoming video and audio signals.  Tape technicians checked the quality of tape and played the tape when told to do so.  Tape technicians also worked in an area designated as "feeds."  In "feeds" the tape technicians ingested incoming signals onto tape.[163]

After terminating Team Video, CNN generally assigned studio personnel to specific tasks on a permanent basis or semi-permanent, i.e., camera operator or QC operator.  Studio personnel for CNN performed tasks that were essentially the same as tasks performed for Team, although individual employees may not have performed all the tasks they performed for Team.  This has no bearing on CNN's status as a successor employer.

#### Floor Directors

The floor directors or floor managers under Team and CNN were basically stage hands, performing such tasks as giving the on-air talent their cues and telling guests where to sit.  They also moved chairs and props in the studio and kept cables out of the way so that the cameras would not get entangled with them.  The A-2 tasks may have been performed by the TVS floor managers.  CNN floor directors performed one of the same functions that Team employees had performed.

#### Audio Designers in New York

As CNN's own witness, John Silva, testified, the CNN position of audio designer is the same job as that of a Team Video audio technician or "A-1" (Tr. 11,854–11,855).  The jobs they perform serve the exact same function.  As of January 17, 2004, five of the six audio designers in New York were former TVS audio techs.  As the year progressed the nature of their job did not change; they merely performed it with much more sophisticated equipment.

As mentioned earlier, CNN hired six audio designers in the Bureau Staffing Project.  Five of these employees had been TVs bargaining unit members.  The one nonTVS audio designer hired by CNN, John Hamilton, was fired for poor performance in April 2004.  He was replaced by Paul Bernius, a former TVS employee (CNN Exhs. 543, 545).

Audio designers employees sit in a control room, monitor audio levels and play music from a computer server on cue from the director.  These are essentially the same tasks TVS employees performed.  However, they now use a digital audioboard rather than an analog board.  When the digital audioboard was installed, the manufacturer provided extensive training to CNN's employees.

#### Audio Designers and Studio Operators in Washington

CNN hired former TVS studio personnel to do the same jobs on the day following the end of the TVS contract in Washington that TVS unit members performed the previous day.  This is established in part by emails between Robert Jackson, CNN operations direction in D.C., and Bob Hesskamp, senior vice

---

[161] CNN introduced the performance reviews of numerous employees which contained statements made by these employees regarding their duties.  I accord such statements little weight and far less than the testimony of Leitner and Finnegan, since in many cases the declarants were not subject to cross-examination.

[162] IFB, intermittent feedback devices, allow the studio with communicate to a reporter in the field.

[163] In Washington, the employees in the "feeds" area worked directly for CNN and were not members of the bargaining unit.

112                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

president for technical operations in Atlanta, dated November 18, 2003 (GC Exh. 534, vol. 1, Bacheler, B# 17029).

Hesskamp asked Jackson to call him to discuss "the schedules for the shows we have to do on the transition weekend." Jackson responded:

> Attached you will find a copy of all the shows that we need to staff. Just added and not on the list is weekend Inside Politics. It starts Sunday Jan. 3, 2004 from 10am-11am. However, if Late Edition is in Atlanta that week we won't have to worry about it until the following week.
>
> If we could extend offers to the following people it would make the transition far more smoother because of their knowledge and understanding of the plant and the shows. . . . Let me know what you think.
>
> Audio John Otth
> Cam Mike David
> QC Brenda Elkins
> Video David Bacheler
> Dir. Reza [sic] Baktar
> Dir. Conrad Hirzel
> TD Dan Taylor
> TD Lori Jennings

The job of the audio designer in Washington during the year 2004 hardly changed at all from the audio tasks performed by studio technicians under Team, see, e.g., testimony of Peter Mohen at Transcript 14,044–14,045; 14,074–14,076; testimony of Paul Miller at Transcript 14381.[164]  Unlike New York, audio designers in D.C. continued to use the analog Wheatstone audio boards until sometime in 2005 (Tr. 14533).  The tasks performed by the studio operators also changed very little, if at all, particularly in the year immediately following the end of the Team contract, e.g., testimony of David Bacheler at Transcript 14,207.

CNN's also contends that the jobs of studio personnel has materially changed due to their "editorial involvement" in CNN's shows.  The record does not support this contention, and certainly does not support the contention that there was any material change during the first year after the Team contract ended.  For example, the testimony of CNN audio designer Paul Miller establishes that his "editorial involvement" was not materially different than that when he worked for Team.  He credibly testified that," even when I was working for Team Video, I've always pitched ideas or interviews or subjects that I thought would be good to cover" (Tr. 14,430).  The testimony of Peter Mohen establishes that Team personnel also selected music for CNN shows (Tr. 14,076).

### Alleged Changes in the Jobs of the Photojournalists

CNN contends that the job of its photojournalists is a different job than that of a camera operator or field technician who worked for Team.  The difference between the jobs according to CNN is that they are now "journalists," who are part of the editorial process.  This is so CNN argues, because they now "pitch" stories to be covered and edit video.

---

[164] There was apparently some use of the Enco server in 2004.

CNN photojournalists work alone, i.e., as a "one-man band" far more frequently than they did with Team.  However, in Washington, for Team, camera operators worked as a "one-man band" on about one-third of their assignments (Tr. 3763).  The circumstances under which a camera operator would work alone were an issue of contention between Local 11 and Team in New York.

### Laptop Editing in the Field

Immediately after the end of the Team contracts, the CNN photojournalists did the same work that the TVS camera and audio technicians performed with essentially the same equipment, e.g. (Tr. 5521–5523, 9654.  That is the point at which the issue of whether CNN is a successor employer must be determined.  Indeed, most of their work is still performed with the Sony SX camera as it was in December 2003.  After December 6, 2003, in Washington, and January 17, 2004, in New York, photojournalists were almost immediately given access to Apple G4 laptop computers and given training on how to edit on these computers with Final Cut Pro software.  However, many, if not most or all, the CNN photojournalists did little or no editing through mid-2004 and some still do little or no editing in the field.

There are, however, several photojournalists that since the fall of 2004 have spent much or most of their time covering assignments outside of New York and Washington for which they have done substantial laptop editing.  CNN has covered the Iraq War primarily with photojournalists from New York (Tr. 11,585, 11,656–11,558).[165]

This change may be the result of outsourcing by CNN of the work formerly done by bargaining unit employees.  I infer from the following testimony of Daniel Meara, who worked for Team and is now the photojournalist manger for CNN's New York bureau:

> What happened to the coverage in New York?  It sounds like everybody was out traveling.
>
> A. Well, not everybody.  We could still cover New York.  But the way CNN covers the news has changed through the years.  We don't really cover the local news in New York the way we used to.
>
> Back in the Team days, we covered it more because we had so many people here and available and we would cover a news conference at City Hall with a Team crew or a Team photojournalist as opposed to now where we might just take in a feed from a local affiliate.

---

[165] Indeed, it appears that what CNN has done to some extent is shift its staffing of international stories from its overseas bureaus to New York, and possibly Washington, as well.  Several New York photojournalists, such as Neil Hallsworth and David Allbritton, both of whom worked for CNN overseas prior to January 2004, appear to spend very little time in New York.

CNN has never contended that it failed to hire many TVS field technicians because they were unwilling or unable to travel.  Sarah Pacheco, who it failed to hire, and other Team camera operators spent considerable time covering the D.C. sniper trial in the Virginia Beach area.  TVS camera crews from New York also spent over a month covering the Skakel trial in Connecticut.

So we are not covering it the way we used to. [Tr. 11,581].

CNN also has reduced to amount of Washington, D.C. work covered by the photojournalists in the D.C. bureau. As a result they travel far more than they did with Team (Tr. 6293).[166]

#### "Editorial Involvement," i.e., Pitching or Suggesting Stories for CNN to Cover

As to pitching stories, CNN's witness Matt Speiser testified that prior to December 6, 2003, in Washington, there was nothing that prohibited Team camera operators from talking to CNN producers about a story or how things should be done differently (Tr. 3937–3938). Speiser also conceded that Team camera operators did offer their opinions on how things should be done.

An example of Team camera operators participating "editorially" was provided by witness Greg Robertson. In September 1998, Robertson and James Cook were assigned to cover the end of the game, the reporter and producer wanted to leave the stadium (Baltimore's Camden Yards) immediately. Robertson, who was more familiar with baseball, insisted that the reporter, producer, he and his partner go to the locker room for postgame interviews (Tr. 6989).

Assuming that CNN photojournalists may have greater latitude to express their opinion as to how their job is performed than did Team field technicians, their tasks are materially unchanged. If there is any difference of opinion as to how a scene should be photographed or recorded, they do as they are told by CNN reporters and producers. Although, they have been encouraged to suggest or "pitch" stories for CNN to cover, it was rare for most of them to do so even in 2008. There is no evidence that this was a material part of their duties in early 2004. CNN was certainly not relying on the photojournalists to initiate story ideas to any material extent. Even Respondent's rank and file witnesses: Hallsworth, Garrison, Schantz, and Abdallah, identified no more than a handful of stories they had "pitched" to CNN.

The testimony of some CNN photojournalists regarding the nature of their jobs under Team and CNN is as follows:

#### Washington

#### David Jenkins

Jenkins was hired as a full-time photojournalist in July 2004. Since then he has "pitched" two stories (Tr. 4589). He has never been told that there is a number of stories he is required to "pitch." Jenkins performs his job in essentially the same manner as he performed it for Team; he has edited with Final Cut Pro only a few times (Tr. 4628).

#### Tim Garraty

Tim Garraty did no nonlinear editing in 2004 outside of the classroom and has done little to none since. Since he has been employed by CNN, Garraty has "pitched" 2–3 stories. He also suggested stories to CNN personnel when he worked for TVS and Potomac (Tr. 13,802).

#### John Bodnar

Since he was hired by CNN, Bodnar has pitched several stories and has used Final Cut Pro the job three times. He has asked interview questions while working as a photojournalist for CNN, but he also did that when he worked for contractors at the D.C. bureau (Tr. 13,587, 13,673–13,573).

#### Doug Schantz

Doug Schantz was one of only two or three rank-and-file D.C. photojournalists called as a witness by CNN to testify about his job duties since December 6, 2003. His testimony lends support to the General Counsel's contention that in 2004, CNN photojournalists did little that was different from what Team camera operators had done the year before. Schantz edited from the field while covering John Edwards' vice presidential campaign in fall of 2004 (Tr. 15,691). While covering Edwards, Schantz edited two pieces (Tr. 15,699–17,701). The second piece was shot and edited in Chautauqua, New York, in October 2004.[167] He also performed some field editing in August or September 2004 while covering Hurricane Charlie. The piece was transmitted via a microwave truck, not with DNG techniques.

Schantz testified to only a few instances of field editing in 2005 until he went to CNN's New Orleans bureau from October–December of that year. CNN did not elicit from Schantz any specific testimony regarding his coming up with story ideas for the network (Tr. 15,710–15,711).[168] Schantz' definition of a "story pitch" appears to be no more than informally exchanging ideas with reporters and producers (Tr. 15,745). For all the high praise contained in Schantz' TPMPs, there is no indication that CNN is depending on him to come up with story ideas. Schantz has done substantially more field editing since 2006 than he did prior to October 2005.

Schantz also made it clear that when he works with a reporter, the reporter has the final say as to what goes into a package. He confers with the reporter before he begins editing and makes whatever changes to the package the reporter wants (Tr. 15,689–15,670). He also confers with reporters and producers before asking any questions in an interview (Tr. 15,742–15,743).[169] On a couple of occasions, Schantz has conducted

---

[166] CNN has also used its staff to do work for Newsource since ending the TVS contracts. For example, photojournalist Desmond Garrison was working for Newsource, not CNN America, when covering Hurricane Katrina in 2005, Tr. 11,729–11,7230. Doug Schantz was working for Newsource when he covered Mardi Gras in 2006, Tr. 15718.

[167] Schantz does not know if the Chautauqua piece aired.

[168] In his April 2005–February 27, 2006 TPMP, Schantz stated that in the past year, "I have pitched stories which were picked up by shows, interviewed subjects on my own." However, he gave no specifics and Ben Coyte, his reviewer, made no mention of this other than commenting that Schantz was "editorially aware," CNN Exh. 670.

[169] Team field technicians also asked questions of persons being interviewed by CNN prior to December 6, 2003. When he worked for Team at the D.C. bureau, CNN photojournalist Robert (Geoff) Parker would ask questions of a person being interviewed by CNN, "if something piqued his interest," Tr. 7148.

114                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

interviews without a producer or reporter present. The most notable incident was in 2006 when he was able to get to Point Barrow, Alaska, and the reporter and producer were not.[170]

### Bethany Chamberland Swain

Bethany Chamberland Swain, who has occupied a management or quasi-management position for the past 3 years, testified at length about the number of stories she has pitched (or suggested) since she was hired by CNN on December 6, 2003. She also testified about pieces that she has produced, written and edited.

Swain was a director/editor at Newsource before being hired at CNN; she was not primarily a photographer. After she was hired by CNN Swain continued to keep her hand in directing and editing, as well as in producing and writing, in addition to her duties as a photojournalist (Tr. 15,440). In October 2006, Swain went to Afghanistan as a producer (Tr. 16,023). While in Afghanistan, she shot half a of piece entitled "Soccer Fridays," which she also wrote, edited and produced.[171] Swain testified that in 2007, while covering the Anna Nicole Smith story in Florida, she was working primarily as a producer.

There is no evidence that a photojournalist was or is expected to write or edit scripts. Swain was the only photojournalist that Steve Redisch could recall editing her work at the bureau, rather than out in the field (Tr. 5597). Although he was the deputy bureau chief in 2004, Redisch appeared to be only vaguely familiar with the pieces Chamberland/Swain edited (Tr. 5699). John Bodnar testified that he often sees Swain editing at the bureau (Tr. 13,572).

Swain testified to pitching approximately 40 stories; 30 of which have been aired by CNN. For one thing, there is no evidence that this constitutes any more than a miniscule portion of her work for CNN in the last 4-1/2 years. David Jenkins testified that he does 20–30 shoots per month as a photojournalist

---

Team Video camera operator Sarah Pacheco told CNN hiring manager Matt Speiser during her BSP interview that while covering the Virginia Beach sniper trial, she was running and asking questions while staking out attorneys, GC Exh. 228, vol. 2, B# 26527; Tr. 6758–6759. There is no indication that Speiser did not take Pacheco's statement at face value.

[170] At his interview during the BSP on October 28, 2003, Team Video cameraman Brian Yaklyvich told CNN Hiring Manager Matt Speiser that he shot and conducted an interview on his own for CNN in the absence of a producer or correspondent, GC Exh. 543, vol. 4, B# 14989. Although I deem this statement to be hearsay, it has some probative value in that Speiser, an agent of CNN, apparently credited the statement and relied upon it in evaluating Yaklyvich. Speiser gave Yaklyvich all 5s (the highest rating) in all categories, Id., B# 14994. CNN hired Yaklyvich in the BSP.

Similarly, Team cameraman Jerry Thompson told interviewer Steve Redisch on October 20, 2003, that on one occasion he went to Virginia Beach to shoot a story about a cruise liner. When the CNN reporter got sick, Thompson and his partner did the interviews and then fed the information and tape to Atlanta. Redisch, like Speiser, apparently credited Thompson's account and gave him all 5s in the interview rating categories, GC Exh. 543, vol 3, B#s 16212, 16217. CNN hired Thompson.

[171] Abdallah's 2007 TPMP indicates that Swain was spending a significant amount of time working as an assignment editor, CNN Exh. 676, B# 156007.

(Tr. 4629). Assuming that CNN was actually using Swain as a photojournalist, I would expect that she did a similar number of shoots. There is no other evidence as to how many shoots per month other photojournalists perform. If Jenkins' work is even close to representative, 40 pitched stories amounts to approximately 4 percent of the work a photojournalist has performed in a period of 4-1/2 years.

A significant portion of Swain's pitching, writing, producing, and editing work appears to have been done for CNN's weekend editor Sharona (not Shwana) Schwartz. This also strongly suggests that her writing, producing, editing, and "pitching" was done in addition to her regularly assigned tasks. The other rank-and-file employees called as witnesses by CNN testified to only a few examples of pitching stories. Swain testified to only two occasions when she saw another photojournalist working on their own story for the weekend editor.

There is no credible evidence that when Swain performed the normal work of a photojournalist that she did anything substantially different than Team camera technicians did for at least 95 percent of her working hours. In fact, it is unclear how much of the time in the last couple of years Swain has worked as a photojournalist. Like Craig Fingar in the engineering department, Swain has done a lot of work that is not part of the job for which she was hired.

### Khalil Abdallah

Khalil Abdallah testified to a number of occasions on which he either edited video in the field or transmitted material via his computer using File Transfer Protocol (FTP) or via satellite with a BGAN. CNN presented Abdallah as a witness to prove how much the photojournalist's job differs from that of a TVS cameraman. However, his testimony shows how rare it was for photojournalists to use DNG techniques (laptop editing, FTP, satellite transmission with a BGAN) throughout 2004 and even later.

Abdallah edited one-seven and a half-minute piece early in 2004 while covering presidential debates in New Hampshire and transmitted the piece via satellite truck (Tr. 15,782–15,783). On two occasions in 2004, while travelling with then Secretary of State Colin Powell, Abdallah transmitted material via FTP, but did not employ laptop editing (Tr. 15,785–15,89). Abdallah transmitted material to Atlanta while covering the Bush campaign in 2004, but did not testify to doing any editing.

CNN counsel led Abdallah to testify that he edited a story for Andrea Koppel on a G4 laptop at the D.C. bureau, not in the field in 2004 (Tr. 15,792–15,793). However, Abdallah's testimony and CNN's Exhibit 674 indicate that this occurred after April 11, 2005 (Tr. 15,809).[172] Sometime in late 2004 or early 2005, he may or may not have edited a four minute piece in the field in South Carolina (Tr. 15,796–15,797; CNN Exh. 656). Abdallah's testimony thus indicates only a few occasions in 2004, 2005, and 2006, when he used any DNG techniques and

---

[172] Abdallah's partner on this occasion was Martin Dougherty, so the story could not have been shot early in 2004, as Abdallah testified at Tr. 15835. Abdallah did not start working with Dougherty until mid-2004 at the earliest, Tr. 15,777.

CNN AMERICA, INC.                                                    115

only a handful of occasions when he edited in the field using laptop editing, also see CNN's Exhibit 674, pages 1, 4 ,and 5.

In his TPMP for April 11, 2005, to February 27, 2006, Abdallah wrote, "I was able to edit a few PKG's [packages] this year and I take pride in that bec[ause] here in DC we don't get the chance that much. . . ." (CNN Exh. 674.)[173] This review gives no indication of any "editorial involvement" on the part of Abdallah. For example, there is no mentioning of his pitching stories and Abdallah did not testify about any stories he "pitched" to CNN.

### The White House Crews

Team assigned four two-man crews to the White House on a fairly permanent basis. CNN hired all these crewmembers. In fact, there is evidence that CNN decided to hire them before the BSP interviews got underway (Tr. 6203–6204). The work for the White House crews did not change at all when the Team Contract ended. These photojournalists did not do any laptop computer editing (Tr. 6256–6257), nor did they pitch many, if any, stories.

### New York
### Richard Shine

His job is "pretty much the same job. It's just that I'm able to edit and I have editorial say now. I can talk to reporters and producers and discuss the packages with them" (Tr. 9560). (Also see Tr. 9654–9655.) However, Shine sometimes offered suggestions as to how stories should be shot when he worked for Team (Tr. 9580–9581).

In 2004, Shine did not do any editing. Since then he has edited 24–36 packages, much of it in 2006 (Tr. 9558–9559; 9620, 9647). He has never pitched a story to CNN (Tr. 9636).

### Steve Machalek

Steve Machalek edited two stories in 2004; both of these were done for CNN en espanol apparently in the bureau rather than in the field. He had edited only once since then for air (Tr. 9700).

Machalek has suggested or "pitched" stories to reporters and producers. However, he could not remember the last time he did so. Moreover, Machalek was not aware of any obligation for a photojournalist to suggest stories (Tr. 9702). None of the stories he has pitched have been aired (Tr. 9743). When he worked for Team, Machalek made suggestions as to how a story should be shot (Tr. 9720).

### Thomas Miuccio

Miuccio did not do any editing for air in 2004 and 2005 (Tr. 9775).

In the 4 years he worked for CNN, Miuccio has "pitched" three stories; one of which was aired (Tr. 9777).

When working for Team, Miuccio did a video essay of the pictures he shot. He helped write the script and did the voiceover (Tr. 9785).

Miuccio made suggestions to producers and reporters as to how a scene should be shot when worked for Team and after CNN hired him (Tr. 9808–9809).

### Daniel Meara

Daniel Meara is now CNN's photojournalist manager at the New York bureau. His testimony also establishes that the job of CNN photojournalist is not materially different from that of a Team field technician:

> Did you pitch stories when you worked at Team?
> A. No.
> Q. As a Team cameraman, was it your understanding that you were expected to contribute editorially to a story?
> A. Was it expected, no.
> Q. Did you?
> A. Occasionally.
> Q. What did you do?
> A. Well, if I was out to shoot a story with a reporter or producer and I felt I had a little input, I would feel comfortable talking to them about what I thought the story was about and maybe ways that we could do a better job than they had planned.
> Q. In terms of shooting?
> A. Shooting for the interview, who to interview, who would be good to interview for a certain story.
> Q. Did you do that frequently?
> A. Yes. [Tr. 11,547–11,548. Also see Tr. 11,549.]

Meara's testimony is consistent with a July 15, 2002 memorandum from Team's general manager in New York, Rick Cohen, to Team field technicians. Cohen told his employees that "your input in the field is *important*. And your suggestions are *welcome*. The idea here is to help you share your creativity with your editorial counterparts and help make the output of this bureau even more distinctive" (GC Exh. 483).

There is no evidence that Meara did extensive editing in calendar year 2004 (Tr. 11,571–11,573).

### Neil Hallsworth

Neil Hallsworth was a cameraman and video tape editor for CNN International in London until he was hired as a photojournalist in New York during the Bureau Staffing Project. The start of his employment in New York was delayed until February while he obtained a visa.[174] Prior to coming to New York, Hallsworth had experience editing in the field with Final Cut Pro and transmitting his video packages via satellite. He began learning FCP in 2001 by watching others edit; he had little formal training. Transmitting by satellite with a BGAN device is, according to Hallsworth, "fairly simple." (Tr. 11,634, 11,642).[175]

---

[173] Abdallah cut and pasted the same paragraph into his January–December 2006 TPMP, CNN Exh. 675.

[174] Pelin Sidki, a freelance photojournalist from London, did not start work in New York until April 26, 2004, according to CNN Exh. 544. Ray Britch, a photojournalist in D.C., also had to wait several weeks to work in the U.S. while his visa application was processed. Britch and Hallsworth attended the initial two day orientation and but did not start work until they obtained visas.

[175] CNN DNG trainer Ben Coyte also testified that the BGAN is "a very simple tool to use," Tr. 15,504.

116                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

In the September 2004, CNN Hallsworth covered Hurricane Ivan in Jamaica and then went to cover the Iraq War in November 2004. Since late 2004, Hallsworth has done relatively little work in New York. For example, in 2005, 75 percent of Hallsworth's duties were performed outside of Metropolitan New York (Tr. 11,675). In 2006, Hallsworth only worked in Metropolitan New York for a few weeks (Tr. 11,678–11,679). In 2007, Hallsworth spent at least 10 months of the year working outside of New York. While it's not clear which of the New York photojournalists' work is typical; it's clearly not Hallsworth.

### Desmond Garrison

Desmond Garrison was the last full-time field audio technician hired by Team. He was also the last person on the list of photojournalists to whom CNN offered a position. When working for Team, Garrison did very little camera work; other audio technicians did more. That Garrison has become an "excellent photojournalist" according to Deputy Bureau Chief Edith Chapin, is another indication that CNN did not have to hire new people to perform the tasks of a photojournalist. Garrison has travelled a lot but there is little evidence that he did much, if any, editing in the field until 2005 or 2006. He could only cite one example of "pitching" a story, which occurred in 2005; it did not air on CNN.

### The Media Coordinator Position in Washington

The media coordinator position in Washington was not created until sometime after 2004 (Tr. 12,505). Thus, these two employees cannot be considered part of the CNN bargaining unit in D.C. when CNN became a successor employer to Team Video in December 2003.

### Engineers

The engineers also do essentially the same work that TVS engineers performed. In New York, with the move to the Time Warner Center, much of the equipment they work on is different. However, this equipment serves the same purposes that it did in 2003, ingesting video and audio, transmitting video and audio so that it can used on the air. The fact that this equipment is now digital, i.e., computer based, does not alter the fact that the essential tasks of the engineers are the same.

### The Changes in Employees' Job Situations after the Team Contracts Ended were not Sufficient to Negate CNN's Status as a Successor Employer to Team Video

While the Board considers the totality of the circumstances when determining if an employer is a successor, hiring a majority of the predecessor's employees is central. *Pennsylvania Transformer Technology, Inc. v. NLRB*, 254 F.3d 217 (D.C. Cir. 2001), enfg. 331 NLRB 1147 (2000). In assessing these factors, the Board has traditionally held that changes in the employing entity will not terminate the successor's obligation to bargain unless "the employee's job situation is so changed that they would change their attitude about being represented." In assessing whether Respondent is a successor, the analysis must focus "not on the continuity of the business structure in general but on the parties' operations of the business as they affect the members of the relevant bargaining unit." *Food & Commercial Workers Local 152 v. NLRB*, 768 F.2d 1463, 1470

(D.C. Cir. 1985), enfg. in part, denying in part, remanding in part 268 NLRB 1483 (1984).

The Board has repeatedly held that minor alterations in employees' job duties do not change their working conditions sufficiently to alter their attitude towards union representation. In this case after the termination of the Team Video contracts, the former TVS employees continued to gather the news, operate the studio equipment and maintained and repaired that equipment. The photojournalists went out of the same type of assignments they covered for Team Video; i.e., stakeouts, press conferences, and interviews. The fact that they did so with equipment that was constantly being upgraded with an intention to create an entirely digitalized operation has no relevance to whether or not they would still be interested in being represented by NABET.

The changes in these employees' duties and responsibilities, particularly in the 6 months following the end of the TVS contracts were relatively minor and also insufficient to defeat successorship. *Marine Spill Response Corp.*, 348 NLRB 1282, 1287–1288 (2006).

### The Supervisory Issue

Under Team Video a number of bargaining unit employees were designated as "supervisors." In Washington, these employees received a 7.5-percent increase in salary when they were acting as supervisors. In New York, these "supervisors" received a 15-percent increase when working as a supervisor. In Washington, the "bargaining unit supervisors" in December 2003 were studio employees, Reza Baktar, Chip Hirzel, Ralph Marcus, Brenda Elkins, and Carolyn Stone.

In New York, there were two "supervisors" in the TVS engineering department, William Greene, who was hired by CNN, and Robert Cummings, who was not hired.[176] In the studio operations department, TVS had a number of bargaining unit employees who were permanent supervisors: Don Walden, Stacy Leitner, Robert Strano, Lawrence Van Patten, and Samuel Sawyer, who were hired by CNN and Aspry Jones, Ed McShea, and Mary Theodore, who were not. In addition, some employees worked and were paid as supervisors when the per-

---

[176] Although, Cummings did not receive notice that he had not been hired before he accepted another job, I conclude that he was constructively discharged or was a victim of a constructive refusal to hire, and thus due a make-whole remedy.

 First, the burdens imposed upon the employee must cause, and be intended to cause, a change in his working conditions so difficult or unpleasant as to force him to resign. Second, it must be shown that those burdens were imposed because of the employee's union activities. *Crystal Princeton Refining Co.*, 222 NLRB 1068, 1069 (1976).

 CNN would not let Cummings know whether or not he would have a job with CNN nine days before the TVS contract ended after he informed CNN that he had received a job offer. Cummings told CNN that he received an offer from the Disney Channel in Florida but preferred to stay at the CNN bureau in New York. I conclude that CNN did not tell Cummings his status either because it had no intention of offering him a job or wanted him to take the Disney job and thus reduce the number of TVS bargaining unit employees it would hire.

manent supervisors were on leave or at lunch, such as Dennis Finnegan.[177]

Finnegan described the status of TVS New York "supervisors" as follows (at Tr. 10,743–10,744):

> . . . really a supervisor was somebody who could do most or all the jobs, so they became a supervisor and they could keep an eye on everything. And if they needed to jump in or they needed to point something out, they would be right there involved . . . [the supervisor's] particular spot was supervisor.

The bargaining unit supervisors were thus to some extent hands-on utility employees. With regard to a supervisor's scheduling responsibilities, Finnegan testified (at Tr. 10,835–10,886):

> Well, as a supervisor you needed to have enough people on the production team to produce that show. So you needed a cameraman, you needed an audio operator, two floor directors, tape technician, QC and video engineer.
>
> So you would look at the schedule, and because I worked with them so often, I knew who had what skills and who could do what. And I also have to give them a lunch break. So if somebody did video engineering for the whole day, I would give him lunch and replace them for that hour with someone who could do it during lunch break.
>
> Q. How did you know who was working on the day you were making the schedule?
>
> A. The Team Video manager provided me with a schedule a week in advance and then updated it if somebody was not in that day.

TVS set forth the duties of bargaining unit shift supervisors for the studio in Washington in a memo dated January 7, 2003 (CNN Exh. 103; also see CNN Exh. 649). According to this memo, a bargaining unit supervisor was to notify TVS manager Mike Marcus when somebody called in sick, make a note of employee mistakes and call the engineering department if equipment needed repair. However, in practice, the duties of bargaining unit supervisor were much more limited (Tr. 5303–5307, 15,367, 15,393–15,394). Employees were scheduled daily by TVS managers. TVS Studio Manager Mike Marcus corroborated Jimmy Suissa's testimony that generally the bargaining unit supervisors called Marcus if an employee was sick. Marcus would either call in a replacement, tell the supervisor how to rearrange the schedule, or have the supervisor rearrange assignments on their own (Tr. 15,367).

CNN claims all these employees were statutory supervisors within the meaning of Section 2(11) of the Act and therefore they cannot be considered TVS bargaining unit members for

determining successorship. Moreover, none of these employees would be entitled to either back pay or reinstatement if they are supervisors. This would be so even though I conclude that CNN did not hire several of these individuals primarily, if not solely, because it was concerned that they would be considered part of the TVS and CNN bargaining unit.

Team had more management level personnel than did its predecessor, Potomac Video. Thus, even if the bargaining unit "supervisors" were statutory supervisors while working for Potomac, they were not necessarily statutory supervisors while working for Team. Team management played a much greater hands on role in directing the technical work force than did Potomac. For example, in New York, Team hired a manager, Ed DeLauter, who was an intermediary between the bargaining unit supervisors on the one hand, and CNN and Team's general manager on the other.

TVS' studio management prepared a weekly schedule which informed the bargaining unit supervisors as to which employees would be available to work in their areas. The TVS supervisor then decided which employees would work at which tasks, i.e., who would operate the pedestal camera, who would operate the robotic camera.[178] Moreover, at least in some areas of the bureau, TVS employees were generally assigned to tasks on a permanent or semipermanent, such as camera and audio, e.g. (Tr. 10524).

In the engineering department in New York, TVS' manager, Ed Delauter, prepared the work schedule for bargaining unit employees and assigned them long-term projects. The bargaining unit supervisors, Bill Greene and Bob Cummings, were responsible for the moment to moment assignment of personnel or short-term projects. They made these assignments on the basis of which employees were available and their assessments of various employees' skills (Tr. 13,069, 13,082, 13,085, 13,090; CNN Exh. 501).

Section 2(11) of the Act defines "supervisor" as any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

In a series of decisions issued on September 29, 2006, the Board expounded on what constitutes the responsibility to direct employees, to assign employees and when the exercise of such authority requires the use of independent judgment, *Oakwood Healthcare, Inc.*, 348 NLRB 686 (2006); *Croft Metals, Inc.*, 348 NLRB 373 (2006); *Golden Crest Healthcare Center*, 348 NLRB 403 (2006).

With regard to the TVS bargaining unit supervisors, the only real issue is whether they are statutory supervisors by virtue of

---

[177] Finnegan worked mostly as a supervisor with Potomac Television prior to 2002. With TVS he worked much less as a supervisor because he was normally assigned to the New York Stock Exchange. CNN did not establish that Finnegan spent a regular and substantial portion of his work time while working for TVS performing supervisory functions. Thus even if the regular bargaining unit supervisors were statutory supervisors, CNN has not established that Finnegan and other part-time supervisors met the 2(11) criteria, *Oakwood Healthcare, Inc.*, 348 NLRB 686, 694 (2006).

[178] Dennis Finnegan testified that supervisors made assignments "with the guidance of a manager." Tr. 10,739. Any substantial guidance in this regard would negate any finding of "independent judgment" on the part of the supervisor in making assignments.

118                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

their authority to assign other employees to tasks.[179] They clearly are not supervisors by virtue of their authority to direct other employees in that there is no evidence that there were held accountable by TVS management for the performance of other employees, *Oakwood Healthcare, Inc.*, 348 NLRB at 692.[180]

The Board stated in *Oakwood Healthcare*, 348 NLRB at 689, that, "we construe the term 'assign' to refer to the act of designating an employee to a place (such as a location, department, or wing), appointing an employee to a time (such as a shift or overtime period), or giving significant overall duties, i.e., tasks, to an employee. That is, the place, time, and work of an employee are part of his/her terms and conditions of employment."

There is no evidence that the bargaining unit supervisors in the engineering department of the New York bureaus (Cummings and Greene) had such authority. TVS' April 2, 2002 memo regarding bargaining unit (shop) supervisors states that they "will be responsible for the moment to moment assignment of personnel and other duties as needed" (CNN Exh. 501). Ed Delauter, the TVS engineering manager, prepared the work schedules (Tr. 13,085). Before Team demoted Ed Scholl from the position of bargaining unit supervisor in June 2002, DeLauter gave out long-term assignments and Scholl assigned "day-to-day, short-term, trouble calls" (Tr. 13,090).

Cummings and Greene also on occasion directed employees to stay late to finish a task, but only if CNN approved their recommendation for overtime work. Their recommendation that an employee stay late to complete a task that reasonably should be finished does not require the exercise of the sort of independent judgment that makes an employee a statutory supervisor.

In the studios, TVS management assigned employees to a shift and a particular studio. The bargaining unit supervisors then decided, for example, whether a particular employee would operate the robotic camera or the audio board. They made such assignments based on their judgment as to which of the assigned employees performed better at a specific task. Assigning employees according to their known skills is not evidence of independent judgment. *Shaw, Inc.*, 350 NLRB 354 (2007); *Volair Contractors, Inc.*, 341 NLRB 673, 675 fn. 10

---

[179] Bargaining unit supervisors did not have authority to discipline or hire, or effectively recommend that TVS hire employees, Tr. 11,286, 11,299.

[180] CNN has the burden of proving that the TVS bargaining unit "supervisors" are statutory supervisors. It has presented no evidence that these individuals had the authority to hire, fire, discharge, or discipline other employees or to effectively recommend such action. The Board defines the power to effectively recommend as meaning "that the recommended action is taken with *no* independent investigation by superiors," *ITT Corp.*, 265 NLRB 1480, 1481 (1982); and *Wesco Electrical Co.*, 232 NLRB 479 (1982).

At p. 21 of its reply brief, CNN notes that Team removed several individuals, Jimmy Suissa, Joe Mosley, and Ed Scholl, from the bargaining unit supervisor position. There is absolutely no evidence that these individuals were being held accountable for the performance of other employees. Suissa was relieved due to an altercation he had with freelancer Joe Wade. Mosley was relieved because of what Team and CNN regarded as his own misconduct. There is no evidence as to why Scholl was relieved from his "supervisor" position.

(2004); *S.D.I. Operating Partners, L.P.*, 321 NLRB 111(1996); *Brown & Root, Inc.*, 314 NLRB 19, 21–22 (1994).[181]

Keeping in mind the Congressional intent in drafting Section 2(11), I conclude that the TVS bargaining unit "supervisors" are not statutory supervisors.

The Board in *Oakwood Healthcare* noted at 688, that:

> Both the drafters of the original amendment and Senator Ralph E. Flanders, who proposed adding the term "responsibly to direct" to the definition of supervisor, agreed that the definition sought to distinguish two classes of workers: true supervisors vested with "genuine management prerogatives," and employees such as "straw bosses, lead men, and set-up men" who are protected by the Act even though they perform "minor supervisory duties." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 280–281 (1974) (quoting S. Rep. No. 105, 80th Cong., 1st Sess., 4 (1947)). Thus, the dividing line between these two classes of workers, for purposes of Section 2(11), is whether the putative supervisor exercises "genuine management prerogatives."

I conclude that the degree of discretion exercised by the TVS bargaining unit "supervisors" in assigning work is insufficient to deem these individuals to be supervisors within the meaning of Section 2(11). By no stretch of the imagination did these employees exercise "genuine management prerogatives" (Tr. 11,240–11,241).

**Dennis Norman was not a Statutory Supervisor**

CNN also argues that Dennis Norman, the TVS engineer who was the "engineer in charge" on CNN's production truck at George Washington University, was a statutory supervisor, and thus not protected by the Act from CNN's discriminatory refusal to hire him. Norman's testimony at Transcript 3124–3125 makes it clear that the kind of direction that Norman gave to other TVS employees did not involve the type of independent judgment to make him a supervisor under Section 2(11) of the Act:

> Q. You said eight to 12 people worked for you?
> A. Yes, um-hmm.
> Q. I mean, these were camera people, audio people, the field techs, correct?
> A. Yes, um-hmm.
> Q. They worked for you?
> A. Well, it's not a matter of they worked for me, when they—when they stepped on the George Washington University site, then all their direction came from me.
> Q. What do you mean all their direction?
> A. As far as—as far as what time they would be on camera, as far as when to be on set before the show, as far as, you know, anything that involved actual production, that, you know, I was—I was their on-site—basically I was their on-site supervisor.

---

[181] The *Shaw* decision makes it clear that the Board in *Oakwood Healthcare*, *Croft*, and *Golden Crest*, supras, was not overruling earlier decisions regarding this type of an employee's authority to assign work.

Q. I see. And you told them where to go and what to cover?

A. Well, we covered the George Washington—the Crossfire show. So, if it came down to, you know, is the camera going to be over here that we need to put over there. Those directions also came from the directors and producer and they would come to me and say, well, get the guys on the crew, I think we should do this shot from over here. I mean, they wouldn't go to the guys directly, they would come to me to tell them what to do.

### Rick Morse, Greg Robertson, and Geoff Parker were not Statutory Supervisors Under Team

At page 152–53 of its brief, CNN argues that several experienced Team employees assigned to the White House rotation were statutory supervisors. It contends that Rick Morse was a statutory supervisor because he was the "lead guy" at the White House (see Tr. 15,389–15,393). There is no precedent for concluding that Morse was a statutory supervisor on this basis.

CNN contends that Greg Robertson and Geoff Parker, TVS lighting specialists at the White House, were statutory supervisors because they hired freelancer lighting specialists for TVS. When Robertson and Parker they knew they would need extra help, they would call one of two freelance lighting specialists who was familiar with the White House and who thus did not need training. They would make these calls to determine whether the person was available. If so, Robertson and Parker would call the Team assignment desk and ask if they could bring one of these individuals into work.

The final determination as to whether to hire these freelancers was made by Team management. Team did not always hire the individuals suggested by Robertson or Parker. Team or CNN on at least some occasions decided that additional help was not needed or that other employees were available (Tr. 6900–6901, 7220). CNN has thus not met its burden of proving that Robertson and/or Parker were statutory supervisors. It has presented no evidence that these individuals had the authority to hire, fire, discharge, or discipline other employees or to effectively recommend such action. The Board defines the power to effectively recommend as meaning "that the recommended action is taken with *no independent investigation by superiors,*" *ITT Corp.,* 265 NLRB 1480, 1481 (1982); *Wesco Electrical Co.,* 232 NLRB 479 (1982). Team or CNN clearly independently determined whether additional lighting specialists were needed at the White House.

### Witness Credibility

### Credibility of Witnesses Testifying about the Bureau Staffing Project

The origins of the decision to terminate the TVS contracts and implement the Bureau Staffing Project and why this decision was made are shrouded in mystery. Cynthia Patrick, a CNN executive vice president, stated in a sworn affidavit that she recommended this course of action at a meeting in mid- to late July 2003 (GC Exh. 101, p. 4; also see Tr. 733). However,

the development of the BSP began before that meeting.[182] CNN's Exhibit 62 refers to a meeting on April 3, 2003, concerns planning for the BSP. Matt Speiser, a CNN hiring manager in Washington, D.C., attended this meeting (Tr. 3806–3822), as did Patrick, Marty Garrison, head of CNN's engineering department, Karen Curry, the New York bureau chief,[183] and others. Lisa Reeves and other CNN or Turner attorneys also attended. At this meeting, the termination of the Team contracts was discussed and Speiser was charged with the task of drafting position descriptions for photojournalists by May (Tr. 3811, 3822).

Patrick's subordinate, John Courtney, also testified that he attended a different meeting than the one in July regarding the Bureau Staffing Project, early in 2003 (Tr. 12,450). Since his name does not appear on CNN's Exhibit 62, I infer this was a different meeting than the one conducted on April 3. CNN Human Resources Manager Jim Hebb testified that he was working on the BSP "around the spring of 2003" (Tr. 13,210). CNN introduced through Hebb a document regarding the BSP which is dated May 16, 2003 (CNN Exh. 527). On page 2 of that exhibit, Hebb noted that plans to upgrade the microwave trucks to satellite capacity were approved "per Cindy P."

This indicates that the decisions to terminate the TVS contracts and embark on the BSP may have been made prior to date indicated by Patrick in her affidavit and that there were other meetings and discussions about this initiative about which she did not testify and about which there is little or no evidence in this record.[184] In her affidavit General Counsel's Exhibit 101, page 6, Patrick also stated:

> I found out my recommendation to terminate the TVS contract and redefine our operation had been approved through a privileged attorney-client communication. This communication occurred within two weeks of the July meetings referred to above. I am not sure who made ultimate decision to act on my recommendation. I do not know if any discussion took place.

Thus, even assuming that this statement is accurate, there is no evidence as to the basis on which the final decision was made, or by whom.

One of the striking things about this case is how little specific evidence Respondent presented on issues that really matter, such as why various individuals were hired in the Bureau Staff-

---

[182] Two notable events which occurred proximate in time to the BSP were beginning of the Iraq War on March 19, 2003, and Jim Walton becoming president of CNN.

[183] Curry testified that the meeting occurred, "sometime probably within the first quarter, maybe, of the year, maybe a bit later in '03," Tr. 8345.

[184] CNN's efforts to reduce the number of bargaining unit positions began as early as March 2002. It made a concerted effort to restructure the editor/producer positions so that the Union could not successfully claim that these jobs remained in the unit, GC Exh. 559. The satellite truck operators in Washington and New York were assigned to the national desk in Atlanta in order to keep them out of the bargaining unit, GC Exh. 558. In drafting position descriptions for the photojournalists in early 2003, CNN was looking for a way to deprive these employees of union representation, GC Exh. 553.

120                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

ing Project and why other individuals were not hired. Although, these events occurred four years before this hearing started, CNN was on notice as early as March 2004, when the first charges were filed, that these might be issues in litigation. Moreover, CNN expected litigation at the outset of the BSP, since it had in-house counsel involved in every step of the process and involved outside counsel at meetings before the BSP was launched (GC Exh. 101, p. 4). CNN or Turner Broadcasting attorneys were also present at every meeting at which hiring decisions were purportedly made.

Despite this, there is little credible documentation of what occurred and Respondent's witnesses generally had trouble remembering what transpired. Even when CNN's witnesses testified about the BSP, their testimony was riddled with inconsistencies, such as when they testified as to who attended various meetings. CNN did little to preserve a record of how decisions were made, by whom and when they were made. For example, CNN cannot find important documents, such as the butcher blocks used to evaluate job applicants at the selection meetings for engineers in both New York and Washington. Respondent cannot locate these documents despite the fact that a Turner Broadcasting attorney, Scott Porter, was present at both meetings (Tr. 13,230, 13,242–13,243, 15,878, 15,892).

A perfect example of CNN's lack of specificity with regard to the BSP concerns the decisions made regarding the hiring of audio designers in Washington. Anne Woodward, called by the General Counsel, was the only hiring manager for audio designers in Washington (GC Exh. 588). She was also the only witness who testified as to what went on at the meeting at which applicants were purportedly selected for hire. Woodward could not recall how CNN came up with a list of applicants to hire (Tr. 13,845), and there is no other evidence as to how decisions were made. Moreover, Woodward could not testify as to who made the final decision as to who was to be hired (Tr. 13,854). This, as well as other evidence, establishes that CNN's contention that hiring decisions were made by hiring managers who interviewed job applicants at these selection/debriefing meetings is not true.[185]

Thus, for example, there is no explanation as to why CNN hired Steve Tovarek and Cory Hall, nonTVS applicants, as opposed to Darrin White, a TVS bargaining unit member. TBS recruiter Anthony Williams informed Anne Woodward and others that White had worked for Team Video since 2000 and that he worked at a small network for 16 years as the senior audio technician. Williams reported further than White indicated that he knows several audio boards in and out and that he worked on several shows for the CNN D.C. bureau. Williams concluded that White was a "good candidate for Audio Designer," (GC Exh. 534, vol. 5, B# 21455).

Woodward interviewed Darrin White on October 27, 2003. She gave White higher scores than she gave Tovarek and Hall, when she interviewed them (CNN Exh. 588). On a scale of 1 (the worst) to 5 (the best), Woodward rated White a 4 out of a possible 5 on his technical skills, his interpersonal skills and a 4+ on teamwork. She rated him a 3 on ethics & integrity and

initiative. Woodward did not note any concerns regarding White.

The "butcher block" purportedly prepared in the debriefing meeting (GC Exh. 543, B# 14510), also provides no indication as to why CNN did not hire Darrin White. While Tovarek has had a successful career at CNN, Hall had difficulty in performing his job adequately and was terminated for cause in May 2005 (GC Exh. 534, vol. 2, B# 128927–128930, CNN Exhs. 544, 545).

<center>The Inability of Respondent's Witnesses to give a<br>Consistent Account as to who was Present at the<br>Meetings at which Hiring Decisions were<br>Purportedly Made</center>

Additionally, I would expect that it would be clear who attended the various critical meetings and what was discussed. Yet, hardly any of Respondent's witnesses had a clear recollection of such matters. For instance, Respondent's witnesses even had trouble remembering whether Marty Garrison, the CNN senior ice president who oversaw the BSP as it applied to the engineers, was present at the two meetings at which candidates were selected, or what role he played at the meeting. A summary of their testimony on this point is as follows with regard to the New York debrief/selection meeting:

MATT HOLCOMBE: Garrison was present [Tr. 7741].

MICHELLE LACKEY: thinks Garrison was present [Tr. 7892], but can't recall if he said anything about any applicant [Tr. 7896].

JEFF GERSHGORN: Garrison was present [Tr. 7969].

JEFF POLIKOFF: can't recall if Garrison was present [Tr. 8116].

JIM HEBB: doesn't believe Garrison was at the New York selection meeting [Tr. 13,220].[186]

CNN also had difficulty establishing the presence of critical personnel at other debriefing/selection meetings. For example, most, if not all, the candidates for the media coordinator position in New York were interviewed by Rob Fox, then the Director of Operations for CNNfn (Respondent's financial network) in New York and Ashley Blackmon, Director of Media Operations for CNN in Atlanta. It is not clear from this record whether or not Blackmon participated in the ranking of candidates for media coordinator (Tr. 10,305, 10,306, 12,291, 12,300, 12,498).

Ashley Blackmon did not testify in this proceeding. Since she was one of the two people who interviewed candidates for the media coordinator position, it would be inconsistent CNN's contentions that the selection process was fair and unbiased, if Blackmon was not involved in selecting successful applicants. If the BSP process was nondiscriminatory, there should be no ambiguity as to who attended the debriefing meetings and what role they played.

---

[185] E.g., testimony at Tr. 1895 by Tu Vu; Tr. 14880 by Cindy Patrick, CNN brief at 71.

[186] The evidence is similar for the Washington debriefing meeting for hiring engineers. Joe Murphy and Matt Holcombe testified that Garrison was present, Tr. 2045, 2151. Jim Hebb couldn't recall whether Garrison was present, Tr. 15,848. Tu Vu recalled that only the four hiring managers were present and possibly Jim Hebb or another human resources representative, Tr. 1997–1998, 2324.

Testimony of CNN Witness which is either Inaccurate
or Less than the Whole Truth

Several management witnesses, such as John Courtney,[187] Troy McIntyre, Jeff Polikoff (that CNN did not hire Team unit member Jeff Jaramello because Jaramello was rude and unhelpful) and Jeff Kinney (denying he sent an e-mail (GC Exh. 496), to former Team cameraman Jim Peithman) testified on certain issues in a manner that is clearly inaccurate.

Many CNN witnesses, including, but not limited to, Cindy Patrick, John Courtney,[188] Jeff Gershgorn, Tu Vu, Matthew Holcombe, Lew Strauss, Loren Kile, Jim Hebb, Gina LaRussa, and Rob Fox, were not forthcoming about matters they were aware of, such as the fact that CNN hired employees who had not gone through the Bureau Staffing Project application, interview and debriefing meeting process for positions subject to the BSP.[189] These witnesses are not credible because when testify-

---

[187] For example, Courtney testified that all photojournalists that CNN hired during the BSP were proficient in either Final Cut Pro or another nonlinear editing system, Tr. 12,472. Many of Team cameramen who were hired had little or no familiarity with nonlinear editing and that was also true of some nonTVS applicants who were hired, such as Richard Frederick.

Courtney also testified that all applicants for photojournalist in New York were ranked by the hiring mangers, Tr. 12,495. This is also not accurate.

Courtney testified that individuals were hired into the media coordinator position in Washington during the Bureau Staffing Project, Tr. 12,516; this is inaccurate as well.

[188] As one of Cynthia Patrick's principal deputies, who attended many meetings regarding the BSP, I infer that Courtney was well aware that one of its principal objectives was to get rid of NABET. Indeed, as Matt Speiser testified, Courtney was present at the selection meeting for photojournalists in Washington to present "more of a corporate view . . . what, overall the company needed as far as this workforce that was being hired in Washington and New York," Tr. 4167. I infer, for example, that Courtney was aware that CNN planned to bring Ray Britch from London to work for CNN en espanol in Washington and thus get rid of TVS unit member Luis Munoz.

Among the things Courtney was silent about are the conversations Barclay Palmer testified to with other CNN managers, including Courtney, concerning New York photojournalist applicants between the interviews and selection meeting.

Courtney also did not testify as to how applicants were categorized as "very strong possible," etc.

Finally, Courtney knew and did not testify about how CNN created an uneven playing field for many TVS applicants. For example, Courtney personally interviewed nonunit applicant Doug Schantz, who reported to him in Atlanta, and participated in the interview of nonunit applicant Bethany Chamberland with R. J. Fletcher, Chamberland's supervisor. He knew that TVS applicants had no such advocates.

[189] Loren Kile, a TBS recruitment manager, testified that if a qualified candidate applied after a debriefing session, they would "go through the same process," Tr. 13,047. There is absolutely no evidence that individuals who applied for positions subject to the BSP after the debriefings went through the same process as applicants who applied prior to the debriefing sessions. There is no evidence that such individuals were ranked against other applicants. For example, Jim Hebb's testimony at Tr. 13,228–13,229, indicates there was only one debrief/selection meeting for engineers in New York on December 4–5, 2003.

---

ing they appeared to be more interested in supporting a litigation theory than in testifying candidly, see, e.g., *In re: Lexus of Concord, Inc.,* 330 NLRB 1409, 1412 fn. 9 (2000); *Carruthers Ready Mix, Inc.,* 262 NLRB 739 (1982).

For these reasons, I view virtually all the testimony of Respondent's managers, hiring managers, recruiters and human resource personnel and other agents with a jaundiced eye and decline to credit their self-serving testimony unless corroborated by other credible evidence.[190]

One of Many Examples of a CNN Witness more
Interested in Supporting his Employer's
Litigation Strategy than in Testifying Candidly

Troy McIntyre, who interviewed most of the applicants for the studio operator position in Washington, is a particularly incredible witness. CNN introduced CNN's Exhibit 635, a list of applicants for the studio operator position in Washington through McIntyre. McIntyre testified that the names and numbers on the list are in his handwriting. However, McIntyre repeatedly asserted that the numbers he wrote to the left of the names on the list have no significance (Tr. 14,695–14,696, 14,741–14,743.

I find this testimony to be false. The numbers McIntyre wrote to the left of the applicants names correspond to a ranking of the applicants that appears in a position tracking spreadsheet dated November 18, 2003 (GC Exh. 268, B# 42473). The numbers are consistent with those circled on the "butcher blocks," used to rank candidates at some point in the process, e.g. (GC Exh. 534, vol. 1, B# 16805).[191] I infer that there were

---

Kile's testimony in this regard indicates to me that she is aware that individuals were hired for positions subject to the BSP who applied after the debriefings. Her lack of candor in this respect leads me to deem her an incredible witness. It is also likely that many, and possibly all of CNN's management and former management witnesses were aware that CNN hired individuals for positions covered by the BSP who applied after the debriefing sessions.

[190] I reject the testimony of Dr. Mary Baker, who testified that a statistical analysis of the BSP, establishes that it was nondiscriminatory, see CNN Br. pp. 76–77 of its brief. Dr. Baker comes to the startling conclusion that the BSP was actually biased in favor of TVS unit employees, e.g., Tr. 16,177–16,178. Dr. Baker did not take into account, for example, the fact that CNN hired a number of nonTVS applicants who were interviewed after the debriefing/selection meetings at which CNN hiring managers supposedly selected which candidates CNN would hire during the BSP. These candidates were obviously not compared to the TVS applicants in a nondiscriminatory manner.

Dr. Baker essentially conceded that her analysis also does not take into account the possibility that TVS applicants were better qualified than nonTVS applicants because they had been doing the jobs for which they were applying for years, Tr. 16,179. Dr. Baker also ignored the fact that almost 100 percent of the CNN incumbents who were subjected to the BSP kept their jobs.

[191] The numbers on the butcher block sheets in GC Exh. 534, vols. 1-5, correlate exactly to the numbers at the left of each name on CNN Exh. 635. The first seven applicants were deemed VSP (very strong possible) candidates; numbers 8–16 (including Kiyasu and McKinley) were deemed SP (strong possible); numbers 18–29 were deemed P (possible) candidates. There is no butcher block sheet for #17, Doug Kozloski or #27, Wenzell Taylor. James Stubbs' butcher block does not have a circled number on it.

122                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

changes made in the list of applicants to be hired that McIntyre did not wish to acknowledge.

This was not the only incredible testimony given by McIntyre with regard to the selection of studio operators in Washington. CNN generally elicited testimony from its witnesses to the effect that the selection of applicants during the BSP was made by the hiring managers, that is the individuals who actually conducted the interviews. However, Anne Woodward, the only person who interviewed five of the Washington applicants for studio operator, was not present at the meeting at which hiring decisions for that position were purportedly made (GC Exhs. 535–539; Tr. 14,582).

In this regard, McIntyre testified as follows:

Q. Did you take any steps to become familiar with the candidates that Ms. Woodward interviewed?
A. Yes, I did.
Q. What did you do?
A. I contacted them and did a—talked to them on the telephone.
Q. When did you do that?
A. It was after this interview—after these interviews but before the selection meeting.
Q. In the interviews, did you evaluate candidates' technical skills?
A. Yes, I did.
Q. How did you do that?
A. Through the questions, throughout the interview. I would ask specifically to their experience with robotics, jib cameras, camera shading, use the questions that were a part of the interview guide to elicit responses on the technical skills as well. [Tr. 14,674–14,675.]

There is no document or any testimony that corroborates McIntyre's contention that he interviewed applicants who had been previously interviewed by Anne Woodward for the studio operator position (see, e.g., GC Exh. 534, vol. 1, 3; CNN Exhs. 689, 694). Respondent's witnesses generally testified that they had their interview notes in front of them when considering applicants at the debriefing session. McIntyre did not claim to have notes of his interviews of these five individuals at the debriefing (Tr. 14,586). I believe that McIntyre's testimony is false and that these five applicants were considered for employment without the input of anyone who interviewed them during the BSP.

The absence of anyone who interviewed these five candidates at the debriefing session shows how unimportant and indeed irrelevant the interviews were to the BSP hiring process. McIntyre's testimony merely reflects Respondent's recognition of that fact and is an attempt to deal with this obvious inconsistency in its contentions with regard to how the BSP operated.

Offers were made to three of these five applicants; TVS bargaining unit members Michael David, Douglas McKinley, and Patricia Carroll, who was not a unit member. As noted later, Carroll was hired instead of unit members Dennis Faulkner and

Adilson Kiyasu, who were clearly qualified as evidenced by the fact that CNN hired both of them after the BSP.[192]

*Credibility of Management Witnesses Testifying as to how the Duties of CNN Employees Hired During the Bureau Staffing Project Differed from those of Team Employees*

When attempting to prove what duties CNN employees hired during the Bureau Staffing Project performed, and how these duties differed from the duties of Team employees, CNN relied almost exclusively on management witnesses. Other than four or five rank-and-file photojournalists, CNN did not call any rank and file employees to testify as to what the jobs subject to the BSP entailed.[193] In many cases, CNN failed to establish that its management witnesses had first-hand knowledge as to these matters or a proper foundation for their testimony. Moreover, many of these witnesses destroyed their credibility when testifying about the Bureau Staffing Project. I decline to accept any of this testimony at face value. Moreover, in all cases where the testimony of a rank-and-file employee, who per-

---

[192] McIntyre also testified that newly hired studio operators did no work other than training during their first week working for CNN, Tr. 14565. However, when examined by CNN counsel, he conceded that these employees had produced a program called *Capital Gang* on the evening on December 6, 2003. He testified this work was performed only after the D.C. employees had finished their training, Tr. 14,713–14,714.

CNN introduced a plan for D.C. studio coverage by Atlanta personnel for Saturday and Sunday, December 6–7, 2003. McIntyre testified that there was a similar schedule for the rest of the week; however, CNN never produced such a document at trial, Tr. 14,711–14,713. For this, among many reasons, I find McIntyre's testimony totally unreliable insofar as it supports CNN's theory of this case. I find that D.C. personnel did a substantial amount of production work during their first week as CNN employees, as indicated by employee witnesses, Mohen, Bacheler, and Miller. This is also indicated by e-mails between Robert Jackson and Bob Hesskamp dated November 18, 2003, GC Exh. 534, vol. 1, Bacheler, B# 17029.

[193] CNN did not call as a witness a single rank-and-file engineer, studio operator, media coordinator, audio designer, technical director, information technology employee, or floor director. CNN also did not call any rank-and-file editor-producers. Jill Davis Wrate, a senior electronics graphics operator, called by CNN, may be a rank-and-file employee, but was not subject to the BSP. The same is true for Paul Vitale, an operations manager, who may be a statutory supervisor.

The four CNN witnesses who are clearly rank-and-file photojournalists are Neal Hallsworth and Desmond Garrison from the New York bureau; and Washington photojournalists Doug Schantz and Khalil Abdallah. I find the testimony of these witnesses to be generally credible. I also find the relevant nonhearsay testimony of three CNN management witnesses, Danny Meara, Ed Scholl, and John Silva, to be generally credible.

CNN also called Bethany Chamberland Swain as a witness. Swain appears to be a manager or quasi-manager at present, Tr. 16,091–16,092. I credit her testimony as to what she has done in her career with CNN. As discussed previously, I find that much of the work Swain has performed for CNN is different from or in addition to the photojournalist's job for which she was hired.

Finally, CNN called photojournalist Jay McMichael to testify about his work as a freelancer in 2002 and 2003. CNN did not ask McMichael a single question about the work he has performed for CNN since 2003. The testimony McMichael gave is completely credible.

CNN AMERICA, INC.                                                123

formed a job, conflicts with that of a manager, with regard to the scope of the employee's duties, I credit the rank-and-file employee.

### The Case Against Team Video

Local 31 in its brief argues that I should hold Team Video liable for CNN's unfair labor practices. The Union contends that Team knew or should have known that the termination of the ENGA was motivated by a desire to get rid of NABET. There is no evidence that Team protested the termination of the ENGA or tried to negotiate with CNN about the termination.

As the Union points out, Ed Delauter, Team's engineering manager in New York, testified that he was told by Jesse Spilka, one of the CNN engineering supervisors, that CNN was not taking the Union with it to the Time Warner Center and that CNN would only hire 50 percent of the engineering bargaining unit in order to get rid of the Union (Tr. 8526–8527). Neither CNN nor Team called Spilka, who as of April 1, 2008, was one of CNN's supervisors, to contradict Delauter. Thus, I credit Delauter. The Union suggests then that Team was aware of CNN's discriminatory motivate through Delauter, who was a supervisor and agent of Team. However, there is no evidence that Delauter communicated this knowledge to anybody above him in the TVS hierarchy. Delauter was a friendly witness for the General Counsel in part because he lost his job by virtue of CNN's termination of the ENGA.

Secondly, CNN Manager Matt Speiser testified that TVS General Manager Brad Simons offered to share his assessment of Team applicants with him during the BSP and that he declined. The Union argues that a reasonable person in Simons' position would infer from Speiser's lack of interest in his offer that CNN was determined to ignore the experience and work performance of Team employees for discriminatory reasons.

Nevertheless, I dismiss the complaint against Team Video Services largely because CNN, rather the Team, is the party that has the resources and ability to remedy the unfair labor practices in this case and because the evidence of Team's culpability is rather weak. It is unclear what Team could have done even if it knew or suspected that CNN's motives for terminating the ENGA and implementing the BSP were discriminatory. Moreover, although its parent, Asgard Entertainment, is actively engaged in business, Team and Team of New York are not.

### CONCLUSIONS OF LAW

1. Respondents, CNN America, Inc. (CNNA) and Team Video were joint employers of Team Video's employees at CNN's New York bureau prior to January 17, 2004, and at CNN's Washington, D.C. bureau prior to December 6, 2003 .

2. As a joint employer, CNNA violated the Act by refusing and failing to comply with the collective-bargaining agreements between Team Video and NABET Local 11 after January 17, 2004, and between Team Video and Local 31 after December 6, 2003.

3. Respondent, CNN America, Inc. (CNNA) is also a successor employer to Team Video Services at CNNA's Washington, D.C. and New York, New York bureaus.

4. By virtue of its discriminatory failure to hire many Team Video bargaining unit members at its Washington and New York bureaus and its illegal refusal to recognize the Charging Parties as the bargaining representatives of employees it hired to perform work previously performed by bargaining unit members, CNN forfeited its right to set the initial terms and conditions of employment of these employees.

5. CNNA violated Section 8(a)(1), (3), and (5) in implementing the Bureau Staffing Project (BSP) and conducting the BSP in a discriminatory manner so as to achieve a nonunion technical work force at its Washington, D.C., and New York, New York bureaus.

6. CNNA violated Section 8(a)(1) and (3) of the Act in limiting the number of Team Video bargaining unit members it hired during the Bureau Staffing Project in order to avoid having to recognize and bargain with NABET Locals 11 an 31.

7. CNNA violated Section 8(a)(1) and (5) by refusing to recognize and bargain with Locals 11 and 31.

8. CNNA violated Section 8(a)(1) and (5) in making changes to the employment conditions of former Team Video bargaining unit members without offering the Unions the opportunity to bargain.

9. The Team Video bargaining unit "supervisors" are not "supervisors" within the meaning of Section 2(11) of the Act.

10. CNNA, by Karen Curry, violated Section 8(a)(1) by telling employees explicitly or implicitly that CNNA intended to operate with a nonunion technical work force, thereby leaving CNNA employees with an understanding that if they exercised their Section 7 rights, CNNA would not hesitate to interfere with, restrain or coerce them in the exercise of such rights.

11. CNNA by Jeff Kinney, violated Section 8(a)(1) by telling employees in essence that their relationship to the Team Video bargaining unit disqualified them from employment with CNNA.

12. CNNA, by Lou Strauss, violated Section 8(a)(1) by confirming an employee's suspicions that CNNA intended to operate its technical staff in New York without a union at the end of the Team Video contract.

13. CNNA, by Danielle Whelton, violated Section 8(a)(1) in telling an employee that there would be no union at the Washington Bureau after CNN hired its own technical work force.

14. There is insufficient evidence to establish that Team Video knew or should have known that CNNA was acting against employees for unlawful reasons and/or that Team Video acquiesced in the unlawful conduct by failing to protest it or to exercise any contractual right it might have to resist it. Therefore, Team Video is not liable for remedying CNNA's unfair labor practices.

### REMEDY

Having found that Respondent CNNA has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

The Respondent having discriminatorily discharged and/or refused to hire employees, it must offer them reinstatement and make them whole for any loss of earnings and other benefits, computed on a quarterly basis from date of discharge to date of proper offer of reinstatement, less any net interim earnings, as prescribed in *F. W. Woolworth Co.*, 90 NLRB 289 (1950), plus

124                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

interest as computed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987).

Moreover, if any of the discriminatees require training in order to successfully perform the jobs to which they must be reinstated, CNN is required to provide such training. CNN may not profit from its illegal discrimination by failing to provide training that it would have provided these employees had it complied with the Act, *Hacienda De Salud-Espanola,* 317 NLRB 962, 963, 969 (1995); *Trompler, Inc.,* 335 NLRB 478, 486 (2001).[194]

Having found that CNN was a joint employer with Team Video and, thus, bound by Team's collective-bargaining agreements, CNN must also remit to Locals 11 and 31 all dues it was required to withhold and transmit pursuant to the collective-bargaining agreements, with interest, see *Forest Hills Family Foods,* 353 NLRB 411, 413 (2008); *Merryweather Optical Co.,* 240 NLRB 1213, 1216 (1979).

Because of CNN's widespread and egregious misconduct, demonstrating a flagrant and general disregard for the employees' fundamental rights, I find it necessary to issue a broad Order requiring the Respondent to cease and desist from infringing in any other manner on rights guaranteed employees by Section 7 of the Act. *Hickmott Foods,* 242 NLRB 1357 (1979).

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[195]

ORDER

The Respondent, CNN America, Inc., Washington, D.C., and New York, New York bureaus, its officers, agents, including Turner Broadcasting Systems, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to hire former bargaining unit employees of Team Video Services because of their union-represented status in Team Video's operation at CNN's Washington, D.C., and New York, New York bureaus, or otherwise discriminating against employees to avoid having to recognize and bargain with.

(b) Refusing to recognize and bargain in good faith with the NABET Local 11 and NABET Local 31 as the exclusive collective-bargaining representatives of its employees in the bargaining units recognized by Team Video Services.

(c) Unilaterally changing the wages, hours, and other terms and conditions of employment of former Team Video bargaining unit employees, and CNN employees performing work that was previously performed by bargaining unit members, or functionally equivalent work, without bargaining first with NABET Locals 11 and 31.

(d) Contracting out or outsourcing bargaining unit work without providing NABET Locals 11 and 31 the opportunity to bargain over such work.

(e) Interfering with, restraining, and coercing employees in the rights guaranteed by Section 7 of the Act by informing them either implicitly or explicitly that CNNA will not tolerate a unionized work force in any part of any of its bureaus.

(f) In any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Recognize and on request, bargain with NABET Local 11 and NABET Local 31 as the exclusive representative of the employees in the bargaining units recognized by Team Video Services concerning terms and conditions of employment of former bargaining unit employees and other CNN employees performing work that was previously performed by bargaining unit employees, or functionally equivalent work, and, if an understanding is reached, embody the understanding in a signed agreement.

(b) At the request of NABET Local 31, rescind any departures from the terms and conditions of employment that existed at CNN's Washington D.C. bureau prior to December 6, 2003.

(c) At the request of NABET Local 11 rescind any departures from the terms and conditions of employment that existed at CNN's New York, New York bureau prior to January 17, 2004.

(d) Nothing in this order shall authorize or require the withdrawal or elimination of any wage increase, or other improved benefits or terms and conditions of employment that may have been established at the Washington, D.C., or New York bureaus since the termination of CNN contracts with Team Video Services.

(e) Within 14 days from the date of the Board's Order, offer the employees whose names are listed in paragraphs 13 and 17 of the complaint, appendixes C–D (attached)[196] full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed. The seniority of these employees that was recognized by Team Video shall be recognized by CNN. Respondent CNN is to

---

[194] The solution for CNN's concern about having to reinstate untrained former Team employees, CNN brief at p. 263, is to provide those employees with the training they missed due to CNN's discriminatory failure to hire them in the first place. There is nothing in this record that indicates that the Team unit members that CNN did not hire could not be successfully trained in CNN's new technology, as were the Team unit members CNN did hire.

CNN's suggestion that remedying its unfair labor practices would require it to move back to 5 Penn Plaza in New York is a "straw man." Nobody is proposing such a remedy. The potential displacement of the innocent replacements for the discriminatees is almost always a possibility in remedying a discriminatory refusal to hire or discharge.

[195] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[196] Contrary to the notations on GC Exh. 578, the last amendment to appendix C, the following full-time Team bargaining unit members were never offered full-time employment by CNN: James Cook, Martin Jimenez, Myron Leake, and John Quinnette.

As discussed herein, Patrick A. Howley, listed by the General Counsel on appendix D, was not a member of the Local 11 bargaining unit and thus his name has been deleted.

As best as I can tell, John Fanning, listed on appendix D, was hired by CNN during the BSP. If that is accurate, his name should be deleted from that appendix.

CNN AMERICA, INC.                                                    125

provide whatever training it has provided since the termination of its contracts with Team Video Services, if such training is necessary to allow the discriminatees to perform their former jobs or substantially equivalent positions.

(f) Make all the employees whose names are listed in paragraphs 13 and 17, and appendixes A–D of the complaint (attached) whole for any loss of earnings and other benefits suffered as a result of the discrimination against them and/or unilateral changes in the terms and conditions of their employment, in the manner set forth in the remedy section of the decision.

(g) Restore any bargaining unit work which has been contracted out (outsourced) since the end of the Team Video contracts.

(h) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(i) Remit to Local 31 with interest, any dues it was required to withhold and transmit under the collective-bargaining agreement since December 6, 2003.

(j) Remit to Local 11 with interest, any dues it was required to withhold and transmit under the collective-bargaining agreement since January 17, 2004.

(k) Within 14 days after service by the Region, post at its Washington, D.C., and New York, New York bureaus copies of the attached notice marked "Appendix."[197] Copies of the notice, on forms provided by the Regional Director for Regions 2 and 5, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.

(l) Within 14 days after service by the Region, mail copies of the attached notice marked Appendix,[198] at its own expense, to all Team Video bargaining unit employees who worked at the CNNA Washington, D.C., and New York, New York bureaus at any time after September 29, 2003. The notice shall be mailed to the last known address of each of the employees after being signed by the Respondent's authorized representative.

(m) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C., November 19, 2008

---

[197] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[198] See fn. 197, supra.

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

      Form, join, or assist a union
      Choose representatives to bargain with us on your behalf
      Act together with other employees for your benefit and protection
      Choose not to engage in any of these protected activities.

WE WILL NOT refuse to hire former Team Video Services bargaining unit employees who worked at or for our Washington, D.C., and New York, New York bureaus because of their union-represented status, union or other protected activities, or otherwise discriminate against employees to avoid having to recognize and bargain with Locals 11 and 31 of the National Association of Broadcast Employees and Technicians (NABET), Communications Workers of America, AFL–CIO.

WE WILL NOT discharge or otherwise discriminate against any of you for supporting NABET Locals 11 and 31 or any other union.

WE WILL NOT refuse to recognize and bargain collectively in good faith with NABET Locals 11 and 31 as the exclusive bargaining representative in the bargaining units recognized by Team Video Services.

WE WILL NOT unilaterally change wages, hours, and other terms and conditions of employment of bargaining unit members without bargaining about these changes with Locals 11 and 31.

WE WILL NOT contract out or outsource any bargaining unit work without giving NABET Locals 31 and 11 the opportunity to bargain over such work.

WE WILL NOT in any other manner interfere with, restrain or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL, recognize NABET Local 31 as the exclusive bargaining representative of all our employees doing work that was performed by Team Video bargaining unit members at our Washington, D.C. bureau prior to December 6, 2003, or work that is functionally equivalent. We will on request, bargain with the Union and put in writing and sign any agreement reached on terms and conditions of employment for our employees who perform the work performed by members of the former Team Video Services bargaining units or functionally equivalent work.

WE WILL, recognize NABET Local 11 as the exclusive bargaining representative of all our employees doing work that was performed by Team Video bargaining unit members at our New York, New York bureau prior to January 17, 2004, or

126                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

functionally equivalent work. We will on request, bargain with
the Union and put in writing and sign any agreement reached
on terms and conditions of employment for our employees who
perform the work performed by members of the former Team
Video Services bargaining units, or functionally equivalent
work.

WE WILL at the request of Local 31 rescind any departures
from the terms and conditions of employment that existed prior
to December 6, 2003, at our Washington, D.C. bureau.

WE WILL at the request of Local 11 rescind any departures
from the terms and conditions of employment that existed prior
to January 17, 2004, at our New York, New York bureau.

WE WILL restore to the bargaining unit any work that we
have contracted out or outsourced since the termination of the
Team Video contracts.

WE WILL, within 14 days from the date of this Order, offer
the employees listed in paragraphs 13 and 17 of the complaint,
appendices C–D, full reinstatement to their former jobs or, if
those jobs no longer exist, to substantially equivalent positions,
without prejudice to their seniority or any other rights or privi-
leges previously enjoyed. The seniority date of employees who
accept reinstatement shall be the seniority date recognized by
Team Video.

WE WILL provide the same training to the employees men-
tioned above, that we have provided since the termination of
our contracts with Team Video Services, if such training is
necessary to allow the discriminatees to perform their former jobs
or a substantially equivalent position.

WE WILL make the employees listed in paragraphs 13 and 17
of the complaint, appendices A–D, whole for any loss of earn-
ings and other benefits resulting from their discharge, and/or
our discriminatory refusal to hire them, and/or any unilateral
changes we have made in the terms and conditions of their
employment, less any net interim earnings, plus interest.

    CNN AMERICA, INC.

    APPENDIX A      4 N N  TVS-DC Bargaining Unit
                              Paragraph 13(a)

                       **GC EXHIBIT 544**

| Last Name | First Name |
|---|---|
| Adkinson | Jeffrey |
| Agomuoh | Emmanuel |
| Alberter | Bill |
| Anderson | Charles |
| Atkinson | Rodney |
| Bacheler | David |
| Baktar | Reza |
| Bannigan | Mike |
| Bartlett | Cameron |
| Bartlett | Stephen |

| | |
|---|---|
| Berk | Jay |
| Berman | Dave |
| Bintrim | Tim |
| Bodnar | John |
| Buckhorn | Burke |
| Catrett | David |
| Clemons | Bobby |
| Cook | James |
| Cotton | Everett |
| Crennan | Keith |
| David | Michael |
| Davis | John |
| Davis | Ronald |
| Distance | Ken |
| Dougherty | Martin |
| Durham | Tim |
| Elkins | Brenda |
| Evans | Bill |
| Every | Thomas |
| Farkas | Danny |
| Faulkner | Dennis |
| Flores | Cesar |
| Galindo | Michael |
| Garraty | Tim |
| George | Maurice |
| Gomez | Augusto |
| Greene | Thomas Michael |
| Gross | Eddie |
| Hamilton | Christopher |
| Herald | Vernon |
| Hirzel | Conrad |
| Hollenback | Paul |
| Hugel | David |
| Jansen | Lesa |
| Jenkins | David |
| Jennings | Lori |
| Jimenez | Martin |
| Kauffman | Michael |
| Kinlaw | Warren |
| Kiraly | Nicholas |
| Kiyasu | Adilson |

CNN AMERICA, INC.                                                    127

| | | | | |
|---|---|---|---|---|
| Kopecky | Dave | | Robertson | Greg |
| Kos | Martin | | Romay | Oscar |
| Kortoski | Douglas | | Schall | Fred |
| Kuczynski | Ronald | | Scherer | David |
| Lacey | Donna | | Schlegel | Barry |
| Lafollette | Marianna | | Selma | Reggie |
| Langley | Larry | | Skaife | Paul |
| Leake | Myron | | Smith | Raeshawn |
| Leonard | Christopher | | Smith-Brown | Tawana |
| Liu | Tau | | Stone | Carolyn |
| Lutt | Howard | | Stubbs | James |
| Maciejewski | Michael | | Suddeth | James |
| Marchione | Mark | | Suissa | James |
| Marcus | Ralph | | Taylor | Daniel |
| McCall | Kevin | | Thomas | Arthur |
| McClam | Kevin | | Timchalk | Lisa |
| McCloskey | Barbara Stieritz | | Tipper | William |
| McKinley | Douglas | | Tripp | John |
| McMichael | Samuel Jay | | Tuohey | Ken |
| Miller | Paul | | Uhl | Kim |
| Mohen | Peter | | Umrani | Anthony |
| Moore | William | | Urman | John |
| Moran | James | | Wade | Joseph |
| Morris | Peter | | Walker | Joe |
| Morse | Rick | | Walz | Mark |
| Mosley | Joseph | | Webster | Aaron |
| Mueller | John (Nick) | | White | Darrin |
| Munoz | Luis | | White | Kenneth |
| Murphy | Tom | | Williams | Alvester |
| Noble | Jeffrey | | Williams | John |
| Noccioio | Ernest | | Yaklyvich | Brian |
| Norman | De:,nis | | Zosso | Elizabeth |
| Norris | Jim | | | |
| Otth | John | | | |
| Pacheco | Sarah | | | |
| Parker | Robert | | | |
| Perez-Thompson | Ines | | | |
| Pettus | William | | | |
| Quinnette | John | | | |
| Riggs | James | | | |
| Riggs | Tyrone | | | |

CNN AMERICA, INC. AND TEAM VIDEO SERVICES, LLC:
5–CA–31828, 5–CA–33125
Appendices to Complaint

128                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

COMPLAINT APPENDIX B
AMENDED, 5/30/08

(Complaint Paragraph 13(b))

# GOVERNMENT EXHIBIT 1 HH

| Last Name | First Name |
|-----------|------------|
| Abramson | Marc |
| Allen | John |
| Arnold | Andrew Gideon |
| Baker | Melanie |
| Bassett | Marcus |
| Baum | Shimon |
| Benedict | Gordon D. |
| Berkon | Shep |
| Bernius | Paul |
| Bertino | Dorian |
| Birch | Richard |
| Bivona | Frank |
| Borland | Robert |
| Braunwarth | Karl |
| Brennan | Robert |
| Brown | Chris |
| Bryne | Gregory |
| Burnett | Steve |
| Burns | Jeffrey |
| Cantali | Joseph |
| Capolarello | Joe |
| Carlough | Jeffrey |
| Carroll | Douglas |
| Casella | Carmine |
| Casey | Mark |
| Cassese | Timothy |
| Centa | Sergio |
| Clarke | James |
| Collins | Dwight |
| Collins | Christopher |
| Conner | Duff |
| Conroy | John R |
| Coombs | Stephen |
| Cummings | Robert |
| Cunningham | Christopher |
| Cutting | Paul |
| David | Viktor |
| Delli Paoli | Louis |
| DeStefano | Jennifer |
| Diaconu | John |
| Diana | Michael |
| D'Orio | Gary |
| Dottin | Michael |
| Dreyfuss | Stefan P. |
| Dubow | Ori M. |
| Dunkins | Bruce |
| Edelman | Jeffrey |
| Edgeworth | Larry |
| Eric | Jay |
| Everett | Vince |
| Fanning | John |
| Fayo | Nicholas J. |
| Fehl | Bradley |
| Fenster | Donald |
| Fermaintt | Felix |
| Ferrand | Todd |
| Ferry | John |
| Finnegan | Dennis |
| Ford | Jon C. |
| Forman | Stewart |
| French | John M. |
| Gallagher | John |
| Gamza | Arielle |
| Ganea | Nicolae |
| Garrison | Desmond |
| Geiger | Christopher |
| Gittelman | Michael |
| Glazier | Michael J. |
| Gomez | Ricardo |
| Gomila | Mitchell |
| Gorham | Glen R. |
| Gracia | Fernando |
| Greenberg | Larry |
| Greene | William |
| Greenspan | Jason |
| Greenstein | Jeffrey D. |
| Grima | Eric |
| Hacker | Daniel |
| Hadrovic | Phil |
| Harper | Kristi J. |
| Hedeman | Peter |
| Heneghan | John J. |
| Herman | Mark A. |
| Hollyday | Thomas P. |
| Holmes | Larry |
| Hortua | Juan |
| Hubbard | Mark |
| Imparato | Walter |
| Ioannou | Anthony K. |
| Jaramillo | Jeffrey |
| Jones | Asprey |
| Jurek | Thomas |
| Kane | William |
| Kaplan | Kenneth S. |
| Karas | Nicholas P. |
| Kaufold | Gerard |
| Khramtsov | Sergei |
| Kiederling | Brian |
| Kim | Paul T. |
| Knolle | Robert |
| Koslov | Keith H. |
| Kriegsman | Glen |
| Langan | Edward |
| Lasch | Beth |
| Latonero | P. Jeffrey |
| Laux | Brenda |
| Lazar | Jason |
| Lee | Brahms |

CNN AMERICA, INC.                                                                                   129

| Surname | First Name | Surname | First Name |
|---|---|---|---|
| LeGal | Laurent | Scalley | Daniel |
| Leitner | Stacy | Schang | Frederick |
| Leibman | Allan | Schlager | Shari |
| Lima | Steven | Scholl | Edward |
| Lindenfeld | Todd | Schumacher | David B. |
| Lishawa | Kevin M. | Seiden | William |
| Loccisano | Felice | Serra | Charles |
| Long | Connie | Shine | Richard |
| Machalek | Steven | Singleton | Charlene |
| MacLean | Perry | Smith | Jonathan |
| Madden | Christopher | Sollenberger | Michael |
| Maines | Douglas | Sparks | William M. |
| Maney | Tommy | Squier | Mickael |
| Manzo | Michael | St. John | Danielle |
| Marshall | Alexander | Stein | Michael |
| Martinez | Gilbert | Strano | Robert |
| Martinez | Sarael | Sullivan | Robert |
| Matteo | Robert | Theodore | Mary |
| McCarrie | David | Thomas | Roger |
| McClain | Roy | Thompson | Ronald L. |
| McGinn | Sean P. | Touhey | Shane |
| McLaughlin | Kathleen | Trier | Mike |
| McShea | Edward | Tsesmelis | Ioannis |
| Meara | Dan | Uhoda | Richard |
| Messina | Jennifer t. | Valentin | Pedro |
| Miuccio | Thomas | Van Patten | Lawrence |
| Montalbano | John | Walden | Donald |
| Morrisey | Barbara | Ward | Christopher |
| Mulvaney | Donald | Weber | David |
| Nino | Rod | Wenk | Robert |
| O'Beirne | Jonathan C. | Wiener | Jamie |
| Olivo | Ramon | Wood | Brian |
| Organ | Tracy | Zachar | Glenn W. |
| Ortiz | Juan | | |
| Pace | Dina V. | | |
| Parker | Diane | | |
| Peithman | James | | |
| Pernice | Philip | | |
| Perreira | Glenn W. | | |
| Persinko | Timothy A. | | |
| Pertz | James | | |
| Peters | Mark | | |
| Phair | Saylor | | |
| Pivawer | Todd | | |
| Price | Lauren | | |
| Rabel | Andrew | | |
| Rainone | Charles Jr. | | |
| Rappa | John | | |
| Reilly | John | | |
| Reiss | Jonathan D. | | |
| Riley | Scott | | |
| Rodriguez | Daniel | | |
| Roebling | Christian | | |
| Rokshar | Hamid "David" | | |
| Romano | Frank | | |
| Rotundo | Pietro A. | | |
| Santos | Joseph | | |
| Sawyer | Samuel III | | |

130                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

APPENDIX C
CNN TVS-DC Bureau Paragraph 17(a)

| Last Name | First Name |
|---|---|
| Adkinson | Jeffery |
| Agomuoh | Emmanuel |
| Anderson | Charles |
| Atkinson | Rodney |
| Bintrim | Tim |
| Cook | James |
| Crennan | Keith |
| Durham | Timothy |
| Evans | Bill |
| Farkas | Danny |
| Faulkner | Dennis |
| Hamilton | Christopher |
| Jenkins | David |
| Jimenez | Martin |
| Kauffman | Michael |
| Kiraly | Nicholas |
| Kiyasu | Adilson |
| Lacey | Donna |
| Langley | Larry |
| Leake | Myron |
| Marchione | Mark |
| Marcus | Ralph |
| Mosley | Joseph |
| Munoz | Luis |
| Noble | Jeffery |
| Norman | Dennis |
| Norris | James |
| Pacheco | Sarah |
| Quinnette | John |
| Riggs | Tyrone |
| Romay | Oscar |
| Schall | Fred |
| Skaife | Paul |

| Stubbs | James |
|---|---|
| Suddeth | James |
| Suissa | James |
| Urman | John |
| Wade | Joseph |
| Webster | Aaron |
| White | Darrin |

CNN AMERICA, INC. AND TEAM VIDEO SERVICES,
LLC: 5–CA–31828, 5–CA–33125
Appendices to Complaint     GC EXHIBIT 578

COMPLAINT APPENDIX D—AMENDED

| Last Name | First Name |
|---|---|
| Abramson | Marc |
| Baker | Melanie |
| Bassett | Marcus |
| Bernius | Paul |
| Bertino | Doriann |
| Birch | Richard |
| Burnett | Steve |
| Cantali | Joseph |
| Carlough | Jeffrey |
| Cassese | Timothy |
| Collins | Christopher |
| Conner | Duff |
| Cummings | Robert |
| Cunningham | Christopher |
| David | Viktor |
| DeStefano | Jennifer |
| Diaconu | John |
| Diana | Michael |
| Edelman | Jeffrey |
| Eric | Jay |
| Everett | Vince |
| Fanning* | John |
| Fenster | Donald |
| Frrmaintt | Felix |
| Ferrand | Todd |
| Ford | Jon C. |
| Gallagher | John |
| Gomila | Mitchell |
| Gracia | Fernando |
| Hacker | Daniel |
| Hadrovic | Phil |
| Harper | Kristi |
| Hedeman | Peter |
| Hortua | Juan |
| Jaramillo | Jeffrey |
| Jones | Asprey |
| Kaplan | Kenneth S. |

CNN AMERICA, INC.                                                131

| | | | |
|---|---|---|---|
| Kiederling | Brian | Pivawer | Todd |
| Knolle | Robert | Rainone | Charles Jr. |
| Kriegsman | Glen | Rappa | John |
| Lasch | Beth | Rodriguez | Daniel |
| Lima | Steven | Roebling | Christian |
| Long | Connie | Rokshar | Hamid "David" |
| MacLean | Perry | Scalley | Daniel |
| Maney | Tommy | Schlager | Shari |
| Martinez | Sarael | Seiden | William |
| Matteo | Robert | Serra | Charles |
| McClain | Roy | Sollenberger | Michael |
| McLaughlin | Kathleen | Squier | Mickael |
| McShea | Edward | St. John | Danielle |
| Morrisey | Barbara | Sullivan | Robert |
| Nino | Rod | Theodore | Mary |
| Olive | Ramon | Uhoda | Richard |
| Organ | Tracy | Valentin | Pedro |
| Peithman | James | | |
| Peters | Mark | | |

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

SEP 16 2014

RECEIVED

# UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT
**333 Constitution Avenue, NW**
**Washington, DC  20001-2866**
Phone: 202-216-7000    Facsimile: 202-219-8530

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED

SEP 16 2014

CLERK

CNN America, Inc.,

                Petitioner,

      v.

National Labor Relations Board,

                Respondent.

Case Number:  **14-1180**

**Rule 26.1 Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner CNN America, Inc., by its attorneys, Proskauer Rose LLP, hereby identifies the following parent corporations and publicly held corporations that own 10% or more of its stock:

> CNN America, Inc. is owned entirely by Cable News Network, Inc., a wholly owned subsidiary of Turner Broadcasting System, Inc.  CNN America, Inc. is ultimately and indirectly owned by Time Warner Inc., a publicly traded company. No publicly traded company has a 10 percent or greater stock ownership in Time Warner Inc.

CNN America, Inc. is a cable television network that provides 24-hour news coverage.

Dated:  September 16, 2014

                Attorney for Petitioner, CNN America, Inc.:

                /s/ Zachary D. Fasman
                PROSKAUER ROSE LLP
                Zachary D. Fasman, Esq.
                Eleven Times Square
                New York, NY 10036-8299
                (212) 969-3000
                D.C. Circuit No.:  930446

ORIGINAL

## CERTIFICATE OF SERVICE

I, Zachary D. Fasman, an attorney, hereby certify that on September 16, 2014,

pursuant to Rule 15(c) of the Federal Rules of Appellate Procedure, I caused a true and

complete copy of CNN America, Inc.'s Petition for Review to be served via First Class

Mail to counsel for parties admitted to participate in the proceedings before the National

Labor Relations Board, as follows:

Wayne Gold, Regional Director
National Labor Relations Board, Region 5
103 S. Gay Street, 8th Floor
Baltimore, MD  21202-4061

Allen Rose, Esq.
National Labor Relations Board
Region 2 – New York Resident Office
26 Federal Plaza – Room 3614
New York, NY 10278

Peter Chatilovicz, Esq.
Seyfarth Shaw
975 F Street, NW
Washington, D.C.  20004

Brian Powers, Esq.
O'Donoghue & O'Donoghue
4748 Wisconsin Avenue, N.W.
Washington, D.C.  20016

David Bigger, Esq.
Region 18, National Labor Relations Board
330 Second Avenue South, Suite 790
Minneapolis, MN  55401

Robert Marinovic, Esq.
Meyer, Suozzi, English & Klein, P.C.
1350 Broadway, Suite 501
New York, NY  10018

Steve Sturm, Esq.
Sturm and Pearl
9 Wittman Drive
Katonah, NY  10536

Tom Cappo
National Association of Broadcast Employees
and Technicians Local 11
145 West 30th Street, 12th Floor
New York, NY  10001

Jimmy Tarlau, Esq.
Communications Workers of America, District 2-13
9602-D Martin Luther King, Jr. Highway
Lanham, MD  20706

Richard McDermott
NABET-CWA Local 52031
4483-B Forbes Blvd.
Lanham, MD  20706

Gregory Beatty, Esq.
National Labor Relations Board
100 South Charles Street
Suite 600
Baltimore, MD 21202-4061

Judi Chartier, Esq.
Communications Workers of America,
AFL-CIO
501 3rd Street, N.W., Suite 800
Washington, DC 20001

Mr. Larry D'Anna
Team Video Services, LLC
4455 Connecticut Avenue, N.W., Suite 300
Washington, DC 20008

/s/ Zachary D. Fasman
Zachary D. Fasman, Esq.